# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ORLANDO CORDIA HALL, | ) | |
| | ) | CRIMINAL NO. 4:94-CR-121-Y |
| Petitioner, | ) | (Civil Case No. 4:00-CV-422-Y) |
| | ) | |
| v. | ) | **CAPITAL CASE** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**MOTION TO VACATE CONVICTION AND RESENTENCE UNDER 28 U.S.C. § 2255**

# TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................................1

PROCEDURAL BACKGROUND..............................................................................................3

      A.      Conviction and Sentencing. .........................................................................3

      B.      Direct Appeal and Collateral Review. ........................................................3

      C.      *Johnson v. United States* and *Welch v. United States*. ............................4

      D.      Initial Request to Pursue a Second or Successive § 2255 Motion. ...........4

      E.      *United States v. Davis*. ...............................................................................4

ARGUMENT................................................................................................................................5

I.      Mr. Hall's § 924(c) Conviction Is Void Because the Predicate Crime Cannot
Qualify as a "Crime of Violence.".........................................................................5

      A.      Section 924(c)'s Residual Clause Is Unconstitutionally Void for Vagueness.
.................................................................................................................5

      B.      Neither Kidnapping nor Conspiracy to Commit Kidnapping Qualifies
Categorically as a "Crime of Violence" Under The Force Clause in Section
924(c)(3)(A). ...........................................................................................6

II.      Mr. Hall Is Entitled To Relief Under 28 U.S.C. § 2255. ......................................8

      A.      Mr. Hall's Claim Is Cognizable Under § 2255(a)......................................8

      B.      Mr. Hall's Motion for Relief Is Timely. ...................................................9

      C.      Mr. Hall's Successive § 2255 Motion Satisfies the Requirements of 28
U.S.C. § 2255(h)(2). ..............................................................................10

III.      Because Mr. Hall's § 924(c) Conviction Is Unconstitutional, He Must Be
Resentenced On All Remaining Counts. .............................................................11

CONCLUSION AND PRAYER FOR RELIEF ........................................................................14

**Page(s)**

**Cases**

*Brecht v. Abrahamson*,
    507 U.S. 619 (1993)............................................................................................14

*Chapman v. California*,
    386 U.S. 18 (1967)..............................................................................................14

*Chatwin v. United States*,
    326 U.S. 455 (1946)..............................................................................................8

*Davis v. United States*,
    417 U.S. 333 (1974)..............................................................................................9

*Dean v. United States*,
    137 S. Ct. 1170 (2017).......................................................................................13

*Descamps v. United States*,
    133 S. Ct. 2276 (2013).........................................................................................6

*Jerkins v. United States*,
    530 F.2d 1203 (5th Cir. 1976) ...........................................................................13

*Johnson v. Mississippi*,
    486 U.S. 578 (1988)..................................................................................2, 11, 12

*Johnson v. United States*,
    135 S. Ct. 2551 (2015)................................................................................ *passim*

*Johnson v. United States*,
    559 U.S. 133 (2010)..............................................................................................7

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)..................................................................................................7

*Moncrieffe v. Holder*,
    133 S. Ct. 1678 (2013).........................................................................................6

*Pisciotta v. Harmon*,
    748 F. App'x. 634 (5th Cir. 2019) .....................................................................11

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018)................................................................................ *passim*

*United States v. Barboa*,
   777 F.2d 1420 (10th Cir. 1985) ...........................................................................9

*United States v. Brown*,
   752 F.3d 1344 (11th Cir. 2014) ...........................................................................9

*United States v. Davis*,
   903 F.3d 483 (5th Cir. 2018) ..................................................................... *passim*

*United States v. Dixon*,
   805 F.3d 1193 (9th Cir. 2015) .............................................................................7

*United States v. Easterling*,
   157 F.3d 1220 (10th Cir. 1998) .........................................................................13

*United States v. Gore*,
   636 F.3d 728 (5th Cir. 2011) ...............................................................................8

*United States v. Hall*,
   152 F.3d 381 (5th Cir. 1998) ...............................................................................3

*United States v. Hall*,
   455 F.3d 508 (5th Cir. 2006) ...............................................................................3

*United States v. Hopper*,
   723 F. App'x 645 (10th Cir. 2018) ......................................................................7

*United States v. Jenkins*,
   849 F.3d 390 (7th Cir. 2017) ...............................................................................7

*United States v. Miller*,
   594 F.3d 172 (3rd Cir. 2010) ............................................................................12

*United States v. Moreno-Florean*,
   542 F.3d 445 (5th Cir. 2008) ...............................................................................7

*United States v. Torres-Miguel*,
   701 F.3d 165 (4th Cir. 2012) ...............................................................................6

*United States v. Torres-Villalobos*,
   487 F.3d 607 (8th Cir. 2007) ...............................................................................6

*United States v. Wills*,
   234 F.3d 174 (4th Cir. 2000) ...............................................................................7

*Welch v. United States*,
   136 S. Ct. 1257 (2016)............................................................................. *passim*

**Statutes**

18 U.S.C. § 924(c) ............................................................................ *passim*

18 U.S.C. § 924(e) ...................................................................................4

18 U.S.C. § 1201............................................................................ *passim*

28 U.S.C. § 2244.....................................................................................10

28 U.S.C. § 2255 ............................................................................ *passim*

Orlando Cordia Hall moves the Court, pursuant to 28 U.S.C. § 2255, to set aside the judgment against him on Count 6 and order that he be resentenced on all remaining counts in case number 94-CR-121-Y ("Motion to Vacate" or "Motion"). In light of *Johnson v. United States*, 135 S. Ct. 2551 (2015), *Welch v. United States*, 136 S. Ct. 1257 (2016), *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and the Fifth Circuit's subsequent decision in *United States v. Davis,* 903 F.3d 483 (5th Cir. 2018) (per curiam), *cert. granted,* 139 S. Ct. 782 (2019), Mr. Hall's conviction for violating 18 U.S.C. § 924(c) cannot stand. Due to an approaching statute of limitations, Mr. Hall files this Motion to Vacate prior to receiving authorization from the Fifth Circuit Court of Appeals pursuant to 28 U.S.C. § 2255(f)(3). However, contemporaneously with the filing of this motion, Mr. Hall is moving the United States Court of Appeals for the Fifth Circuit for authorization to file a successive § 2255 motion. He is also filing in this Court a motion asking that this successive § 2255 motion be held in abeyance, or in the alternative transferred to the Fifth Circuit, pending the Fifth Circuit's ruling on his authorization motion and the Supreme Court's ruling in *Davis*. Mr. Hall takes these actions now because of the risk that time limits will expire before the Supreme Court issues its decision in *Davis*. But given the clear relevance of the outcome in *Davis* to Mr. Hall's claim, Mr. Hall believes it would be prudent to await that ruling before the court takes further action.

## INTRODUCTION

Mr. Hall was convicted by a jury on four counts: kidnapping in which a death occurred (Count 1), conspiracy to commit kidnapping (Count 2), traveling in interstate commerce to promote possession of marijuana with intent to distribute (Count 3), and using and carrying a firearm during and in relation to the crime of violence alleged in Count 1, in violation of 18 U.S.C. § 924(c) (Count 6). Mr. Hall's conviction for violating § 924(c) must rest either on that statute's "force clause" (also called the "elements clause") or its "residual clause." The force clause cannot

1

support his conviction because it is possible to commit the offenses underlying the § 924(c) charge, kidnapping under 18 U.S.C. § 1201(a)(1) and conspiracy to commit kidnapping under 18 U.S.C. § 1201(c), without the use of force. And, a series of recent decisions from the Supreme Court and the Fifth Circuit establish that the residual clause of § 924(c) is unconstitutionally vague and may not form the basis for Mr. Hall's conviction on Count 6.

The residual clause of § 924(c) is materially indistinguishable from the residual clause of the Armed Career Criminal Act ("ACCA"), which the Supreme Court invalidated as unconstitutionally vague in *Johnson*. That ruling was made retroactive in *Welch*. The Supreme Court subsequently invalidated a similarly-worded residual clause in 18 U.S.C. § 16(b) in *Dimaya*. Thereafter, the Fifth Circuit, applying *Dimaya*, invalidated the residual clause in 18 U.S.C. § 924(c). In light of *Johnson*, *Welch*, *Dimaya*, and *Davis*, Mr. Hall's conviction under § 924(c) is invalid.

A death sentence cannot stand when one of the counts of conviction that the jury took into consideration when imposing the death sentence is invalid. *See Johnson v. Mississippi*, 486 U.S. 578 (1988). That is precisely what happened to Mr. Hall. When the jury deliberated over whether to impose the death sentence on Mr. Hall, it believed Mr. Hall had violated § 924(c) by committing a crime of violence while using or carrying a firearm. In fact, Mr. Hall had not; indeed, he should never have been charged with that crime. The heightened need for reliability in the imposition of the death sentence requires that a jury resentence him, having in mind only those crimes for which Mr. Hall was validly convicted.

Accordingly, Mr. Hall asks this Court to grant his § 2255 motion, vacate his § 924(c) conviction, and order that he be resentenced on all remaining counts.

2

**PROCEDURAL BACKGROUND**

**A.      Conviction and Sentencing.**

On November 22, 1994, Mr. Hall was indicted on six counts: (1) kidnapping, (2) conspiracy to commit kidnapping, (3) possession of marijuana with intent to distribute, (4) extortion, (5) racketeering, and (6) using or carrying a firearm in relation to a crime of violence. The indictment specifically charged Count 6 as using and carrying "firearms, during and in relation to a crime of violence, namely kidnapping in violation of Title 18, United States Code, Section 1201(a)(1) and conspiracy to commit kidnapping, in violation [of] Title 18, United States Code, Section 1201(c)." *United States v. Hall*, 4:94-cr-00121, at Dkt. 15 (N.D. Texas).

On October 31, 1995, a jury convicted Mr. Hall on one count each of kidnapping in which a death occurred (Count 1), conspiracy to commit kidnapping (Count 2), traveling in interstate commerce to promote possession of marijuana with intent to distribute (Count 3), and using and carrying a firearm during and in relation to a crime of violence, namely kidnapping and conspiracy to commit kidnapping, in violation of 18 U.S.C. § 924(c) (Count 6).  *See* Dkt. 446.  He was sentenced to death on Count 1, life in prison on Count 2, and 60 months in prison for both Counts 3 and 6.  *See* Dkt. 593.

**B.      Direct Appeal and Collateral Review.**

Mr. Hall timely appealed.  The Fifth Circuit affirmed, and the Supreme Court denied review.  *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *cert. denied,* 526 U.S. 1117 (1999). Mr. Hall then timely pursued collateral review under 28 U.S.C. § 2255.  This Court denied relief and declined to issue a Certificate of Appealability; the Fifth Circuit denied a Certificate of Appealability.  *United States v. Hall*, 455 F.3d 508 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

**C.** *Johnson v. United States* **and** *Welch v. United States***.**

In June 2015, the Supreme Court held that the definition of "crime of violence" in the "residual clause" of the Armed Career Criminal Act, *see* 18 U.S.C. § 924(e)(2)(B), was too vague to provide adequate notice under the Fifth Amendment's Due Process Clause. *See Johnson*, 135 S. Ct. 2551.  A year later, the Court held that *Johnson* applied retroactively to cases on collateral review.  *See Welch,* 136 S. Ct. 1265.

**D.** **Initial Request to Pursue a Second or Successive § 2255 Motion.**

In light of *Johnson* and *Welch*, Mr. Hall moved for leave to file a successive motion under 28 U.S.C. § 2255, to test the validity of his § 924(c) conviction under *Johnson.*  The Fifth Circuit denied leave to proceed, reasoning that Mr. Hall's claim was not cognizable under 28 U.S.C. § 2255(h)(2) because *Johnson* did not directly address 18 U.S.C. § 924(c)(3), the specific statute under which Mr. Hall had been convicted.  *In re Hall,* No. 16-10670, Dkt, 20 at 2 (5th Cir. June 20, 2016).[1]

**E.** *United States v. Davis***.**

In *Dimaya*, 138 S. Ct. 1204, the Supreme Court considered whether 18 U.S.C. § 16(b) was unconstitutionally vague in defining "crime of violence" to include "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  The Court answered that question in the affirmative, concluding that the provision suffered from the constitutional flaw *Johnson* had identified in the Armed Career Criminal Act.  *See Dimaya*, 138 S. Ct. at 1211-13.

---

[1] Following the denial of Mr. Hall's application for leave to file a second petition under *Johnson* and *Welch*, Mr. Hall has been pursuing relief on his *Johnson* claim via a habeas corpus petition under 28 U.S.C. § 2241 in the Southern District of Indiana, where he is confined.  That case has been stayed pending resolution of *Davis.  See Hall v. Daniels*, No. 2:17-cv-00176-WTL-MJD, Dkt. 21 (S.D. Ind. March 20, 2019).

The Fifth Circuit subsequently held that, since the language invalidated in *Dimaya* was essentially indistinguishable from the language in § 924(c)(3)(B), the residual clause of § 924(c)(3) likewise could not stand. *United States v. Davis,* 903 F.3d 483 (5th Cir. 2018), *cert. granted,* No. 139 S. Ct. 782 (2019). The Supreme Court will hear oral argument in *Davis* on April 17, 2019.

## ARGUMENT

**I.      Mr. Hall's § 924(c) Conviction Is Void Because the Predicate Crime Cannot Qualify as a "Crime of Violence."**

After *Johnson*, *Welch*, *Dimaya*, and *Davis*, Mr. Hall's conviction for using or carrying a firearm during and in relation to a "crime of violence" is void because the predicate offenses of kidnapping and conspiracy to commit kidnapping cannot, as a matter of law, qualify as "crimes of violence" for purposes of § 924(c).  Section 924(c) defines "crime of violence" in two ways:

[T]he term "crime of violence" means an offense that is a felony and –

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).  The first clause, § 924(c)(3)(A), is the force clause.  The second, § 924(c)(3)(B), is the residual clause.

**A.      Section 924(c)'s Residual Clause Is Unconstitutionally Void for Vagueness.**

In *Dimaya*, the Supreme Court struck down as unconstitutionally vague the residual clause in 18 U.S.C. § 16(b).  Thereafter, applying *Dimaya*, the Fifth Circuit held that the identically worded residual clause of § 924(c)(3) was likewise invalid. *See Davis,* 903 F.3d 483. Therefore, under *Dimaya* and *Davis*, Mr. Hall's conviction for kidnapping is not a crime of violence under the invalidated residual clause of § 924(c)(3)(B) and can only stand if one of the predicate crimes

5

– kidnapping or conspiracy to commit kidnapping – constitutes a crime of violence under the force clause in § 924(c)(3)(A). Neither does.

**B.      Neither Kidnapping nor Conspiracy to Commit Kidnapping Qualifies Categorically as a "Crime of Violence" Under The Force Clause in Section 924(c)(3)(A).**

In determining whether an offense qualifies as a "crime of violence" under the force clause of § 924(c), courts employ the categorical approach. *See Descamps v. United States,* 133 S. Ct. 2276, 2283 (2013). The categorical approach requires that courts "'look only to the statutory definitions' – *i.e.*, the elements – of a defendant's [offense] and *not* 'to the particular facts underlying [the offense].'" *Id.* (citation omitted). Under this approach, the factfinder must "presume that the conviction 'rested upon [nothing] more than the least of th[e] acts' criminalized." *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684 (2013) (citing *Johnson v. United States*, 559 U.S. 133, 137 (2010)). In other words, under the categorical approach, an offense can only qualify as a "crime of violence" if all of the criminal conduct covered by a statute, including the least culpable conduct, constitutes a "crime of violence." *See, e.g., United States v. Torres-Villalobos,* 487 F.3d 607, 616 (8th Cir. 2007); *see also United States v. Torres-Miguel,* 701 F.3d 165, 167 (4th Cir. 2012). If the most innocuous conduct penalized by a statute is not a "crime of violence," then the statute categorically is not a "crime of violence."

Given this framework, an offense qualifies as a "crime of violence" under the force clause of § 924(c) only if it has, as an element, the use, attempted use, or threatened use of "*physical force*" against another person. 18 U.S.C. § 924(c)(3)(A) (emphasis added). "Physical force," in turn, has two requirements. First, "physical force" must involve *violent* force – that is, "strong physical force," which is "capable of causing physical pain or injury to another person." *Johnson v. United States,* 559 U.S. 133, 140 (2010). Second, the use of such force "must be intentional, not just reckless or negligent." *United States v. Dixon,* 805 F.3d 1193, 1197 (9th Cir. 2015); *see*

*also Leocal v. Ashcroft,* 543 U.S. 1, 12-13 (2004).  It is not enough that the statute includes some requirement of specific intent, such as the intent to deprive a person of property or even the intent to cause injury.  To qualify as a crime of violence under the "force" or "elements" clause, the statute must have as a required element the intent to use strong physical force.

Kidnapping under 18 U.S.C. § 1201(a) does not require the use or threatened use of violent force.  Section 1201(a) defines "kidnapping" to apply to anyone who "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . ."  18 U.S.C. § 1201(a).  Because kidnapping under § 1201(a) may be accomplished through non-physical means, such as by "inveigling" or "decoying," it does not categorically require violent force.  *See United States v. Jenkins*, 849 F.3d 390 (7th Cir. 2017) (holding kidnapping under § 1201(a) is not a crime of violence under 924(c)(3)'s force clause), *vacated and remanded on other grounds*, 138 S. Ct. 1980 (2018); *United States v. Hopper*, 723 F. App'x 645, 646 (10th Cir. 2018) (same).[2]  Likewise, the requirement that the kidnapper "hold" the victim for ransom or reward does not categorically require physical force.  As the Supreme Court has explained, "the act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical *or mental restraint* for an appreciable period against the person's will and with a willful intent so to confine the victim."  *Chatwin v. United States*, 326 U.S. 455, 460 (1946) (emphasis added).

---

[2] *See also United States v. Wills*, 234 F.3d 174, 177 (4th Cir. 2000) ("By its terms, § 1201(a) criminalizes kidnappings accomplished through physical, forcible means and also by nonphysical, nonforcible means."); *cf. United States v. Moreno-Florean*, 542 F.3d 445, 450-52 (5th Cir. 2008) (determining that California kidnapping statute did not include physical force as an element because the crime could be accomplished through non-physical means).

Because kidnapping under § 1201(a) may be accomplished without the use of any physical force, it does not categorically include "physical force" as an element of the crime, and categorically cannot qualify as a crime of violence under the "force" or "elements" clause in § 924(c)(3)(A). Nor is conspiracy to commit kidnapping under § 1201(c) a "crime of violence." When a conspiracy offense is at issue, the analysis includes "an examination of the elements of the target offense of the conspiracy conviction." *United States v. Gore*, 636 F.3d 728, 730-31 (5th Cir. 2011) (holding a conviction for conspiracy to commit aggravated robbery under Texas law does not have "as an element the use, attempted use, or threatened use of physical force against the person of another"). Because § 1201(a) fails to qualify as a "crime of violence" under § 924(c)(3)(A), so too does conspiracy to commit kidnapping under § 1201(c), as it similarly does not necessarily require proof that a defendant used, attempted to use, or threatened to use force.

## II. Mr. Hall Is Entitled To Relief Under 28 U.S.C. § 2255.

### A. Mr. Hall's Claim Is Cognizable Under § 2255(a).

A federal prisoner may obtain relief under 28 U.S.C. § 2255(a) if his conviction "was imposed in violation of the Constitution or laws of the United States," or is in excess of this Court's jurisdiction. Mr. Hall's conviction and sentence violate the Due Process Clause of the Fifth Amendment, violate the Eighth Amendment, violate federal law, and exceed this Court's jurisdiction. This Court therefore should grant him relief under § 2255(a).

First, as explained *supra*, neither kidnapping nor conspiracy to commit kidnapping under 18 U.S.C. § 1201 satisfies § 924(c)'s force clause. For that reason, the integrity of Mr. Hall's conviction on Count 6, the § 924(c) charge, depends on the residual clause. Because that clause has been invalidated as unconstitutionally vague, Mr. Hall's conviction for violating § 924(c) is void. Therefore, Mr. Hall's conviction violates the laws of the United States and results in a fundamental miscarriage of justice. This is precisely the type of error that is cognizable under 28

8

U.S.C. § 2255(a).  *See Davis v. United States,* 417 U.S. 333, 346-47 (1974) (holding that when an intervening decision establishes that a prisoner was convicted of "an act that the law [no longer] make[s] criminal . . . such a circumstance 'inherently results in a complete miscarriage of justice and present(s) exceptional circumstances' that justify . . . relief under § 2255" (citation omitted)).

Second, Mr. Hall's conviction exceeds this Court's jurisdiction because not only did the indictment fail to state a § 924(c) offense, it affirmatively alleged conduct that is outside that statute's reach.  That is, Count 6 of the indictment alleged that Mr. Hall used or carried a firearm during or in relation to a crime of violence – *i.e.*, kidnapping and conspiracy to commit kidnapping under 18 U.S.C. § 1201.  As explained above, neither offense qualifies as a "crime of violence" for purposes of § 924(c).  For that reason, a § 924(c) conviction can never be sustained based on the underlying offense of kidnapping pursuant to 18 U.S.C. § 1201, regardless of the facts of the case.  Because Count 6 is a legal nullity that was entered in excess of this Court's jurisdiction, Mr. Hall's conviction on that count must be vacated.  *See United States v. Brown,* 752 F.3d 1344, 1352 (11th Cir. 2014) (noting that a jurisdictional defect exists "when the indictment affirmatively alleges conduct that does not constitute a crime at all because that conduct falls outside the sweep of the charging statute"); *United States v. Barboa,* 777 F.2d 1420, 1423 n.3 (10th Cir. 1985).

**B.      Mr. Hall's Motion for Relief Is Timely.**

Section 2255(f) requires that § 2255 motions be filed within a one-year limitations period.  That period runs from the latest applicable triggering event.  28 U.S.C. § 2255(f).  Among these triggers is "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review."  *Id.,* § 2255(f)(3).  Mr. Hall sought relief within one year after the decisions in *Johnson* and *Welch*, but the Fifth Circuit did not agree that those decisions triggered Mr. Hall's right to relief.  In the wake of *Dimaya* the Fifth Circuit has since embraced the view

9

that the residual clause of § 924(c) is unconstitutionally vague.  *See Davis*, *supra*.  The Supreme

Court decided *Dimaya* on April 17, 2018.  Mr. Hall has filed this application within one year of

that date, and this Motion is timely filed.

**C.**     **Mr. Hall's Successive § 2255 Motion Satisfies the Requirements of 28 U.S.C. § 2255(h)(2).**

Section 2255(h)(2) imposes a gate-keeping restriction on second or successive motions.

Before filing such a motion, the petitioner must obtain permission to do so from the appropriate

circuit court of appeals.  *See* 28 U.S.C. § 2255(h)(2).  The court of appeals must certify that the

successive motion contains a claim based on "a new rule of constitutional law, made retroactive

to cases on collateral review by the Supreme Court, that was previously unavailable."  *Id.; see also*

28 U.S.C. § 2244(b)(3)(C).

Mr. Hall files this successive § 2255 motion contemporaneously with requesting

authorization to do so from the Fifth Circuit under § 2255(h)(2).  As he files this § 2255 motion,

Mr. Hall is also moving this Court to hold it in abeyance, or to transfer the case, pending the Fifth

Circuit's decision on his application for certification under § 2255(h)(2) and the Supreme Court's

decision in *Davis*.  Because Mr. Hall has made a *prima facie* showing that he has satisfied §

2255(h)(2), the Fifth Circuit's certification, once the Supreme Court has ruled in *Davis*, is

anticipated.[3]

---

[3] While the Supreme Court did not address retroactivity in *Dimaya*, it characterized the outcome in *Dimaya* as logically compelled by *Johnson*. *See Dimaya*, 138 S. Ct. at 1213 ("*Johnson* is a straightforward decision, with equally straightforward application here"). And *Johnson* itself is fully retroactive.  *See Welch, supra; see also Dimaya*, 138 S. Ct. at 1210 (*Johnson* controls the analysis of similarly worded provisions in other statutes besides 18 U.S.C. § 924(e)). That chain of reasoning is sufficient to make Mr. Hall's *Johnson* claim cognizable in a successive motion under § 2255. It would be unreasonable to deny retroactive effect to an outcome that results from a "straightforward" application of a decision that is itself retroactive, and no published decision of the Fifth Circuit has taken that view. *But see Pisciotta v. Harmon*, 748 F. App'x. 634 (5th Cir.

**III.    Because Mr. Hall's § 924(c) Conviction Is Unconstitutional, He Must Be Resentenced On All Remaining Counts.**

The jury returned a death sentence against Mr. Hall on Count 1, the kidnapping count of the indictment.  While *Johnson* does not affect Mr. Hall's conviction on Count 1, his death sentence on that count nevertheless must fall as a consequence of invalidating his conviction on Count 6, the § 924(c) violation.  Given the unparalleled need for reliability in capital sentencing, the Eighth Amendment cannot tolerate the risk that Mr. Hall's invalid § 924(c) conviction contributed to his death sentence.  Accordingly, that sentence must be vacated.  *See Johnson v. Mississippi*, 486 U.S. 578 (1988).

In *Johnson v. Mississippi*, the Court struck down a death sentence that rested in part on a conviction invalidated after the death sentence was imposed, and it did so even though other valid aggravating factors supported the death penalty.  *See id.*  As the Court explained, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case."  *Id.* at 584 (citations and internal quotations omitted).  Because the petitioner's prior conviction in *Johnson v. Mississippi* was invalid, and that conviction had formed a part of the basis for his death sentence, the Court concluded that the "death sentence imposed on petitioner" must be reversed.  *Id.* at 586.

In reaching its conclusion, the Court emphasized the risk "that the use of that [invalid] conviction in the sentencing hearing was prejudicial."  *Id.*  As the Court explained, "[e]ven without that express argument, there would be a possibility that the jury's belief that petitioner had been

---

2019) (per curiam) ("*Dimaya* did not address whether its holding might apply retroactively on collateral review of a criminal conviction . . . .").

convicted of a prior felony would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* (quoting *Gardner v. Florida*, 430 U.S. 349, 359 (1977)).

The same principles apply here. There is a constitutionally unacceptable risk in this case that the void § 924(c) conviction influenced one or more jurors to choose the death penalty over a life sentence. Similarly, it cannot be determined with the certitude required by the Eighth Amendment that the jury's consideration of the invalid conviction did not affect its conclusion that Mr. Hall would present a continuing threat of future violent criminal conduct, as the government alleged in support of the death sentence. There is also a constitutionally intolerable risk that the jury's deliberation in connection with the invalid conviction influenced its consideration of statutory aggravating factors or distorted its consideration of mitigating evidence that might otherwise have been found to warrant a sentence less than death.

The reason for vacating Mr. Hall's death sentence is particularly compelling. Mr. Hall's § 924(c) conviction was characterized as "in relation" to his kidnapping conviction. Courts have recognized that some counts of conviction are so interdependent that invalidating a conviction on one count requires resentencing on the other count(s). That is because "interdependent offenses result in an aggregate sentence, not sentences which may be treated discretely." *United States v. Miller*, 594 F.3d 172, 180 (3rd Cir. 2010) (describing how judges consider "sentencing packages") (citations omitted). Courts have also concluded that § 924(c) convictions and the related crime are "interdependent" even if "technically separate." *United States v. Easterling*, 157 F.3d 1220, 1223 (10th Cir. 1998). For example, in *United States v. White*, the Seventh Circuit explained that when one count in a multi-count sentence is vacated, the package is unbundled, and the district judge should adjust the entire package to achieve an appropriate sentence in light of the remaining convictions. *See* 406 F.3d 827, 832 (7th Cir. 2005) (citing *United States v. Martenson*, 178 F.3d

457, 465 (7th Cir. 1999)); *see also Dean v. United States*, 137 S. Ct. 1170, 1176 (2017) (describing the sentencing package doctrine and explaining that in cases "including ones where § 924(c) convictions are invalidated – the Government routinely argues that an appellate court should vacate the entire sentence . . . . As we understand it, the Government's theory in those cases is that the district court may have relied on the now-vacated conviction when imposing sentences for the other counts").

Here, this Court instructed jurors at the culpability phase that they should convict Mr. Hall on the § 924(c) charge only if they were "convinced that the government ha[d] proven . . . [t]hat the defendant committed the crime of interstate kidnapping as alleged in Count 1 of the indictment." (Dkt. 44, Hall Guilt-Phase Jury Charge, at 16.) That is, the charge made the connection between the kidnapping conviction and the § 924(c) conviction explicit and essential. Without resentencing, there would be an unacceptable risk that the jury's consideration of Count 6 affected the sentence it imposed for Count 1. A court should vacate a sentence when "it can [not] be ascertained from the record, as it now stands" that a "sentence on a valid conviction was not affected by a subsequently invalidated conviction on another count of the indictment." *Jerkins v. United States*, 530 F.2d 1203, 1204 (5th Cir. 1976). That standard is easily met here, regardless of what harmless error standard might apply. Under either *Chapman v. California*, 386 U.S. 18 (1967) (constitutional error requires reversal unless the prosecution proves it harmless beyond a reasonable doubt) or *Brecht v. Abrahamson*, 507 U.S. 619 (1993) (error requires relief when the record makes plain that the error had a substantial and injurious effect on the verdict),[4] the death

---

[4] The implication of holding *Johnson* fully retroactive is that the relevant portions of 18 U.S.C. § 924(c) have always been void for vagueness. Thus, this constitutional flaw, though not yet recognized, in fact existed at the time of Mr. Hall's direct appeal. Because Mr. Hall had no opportunity to raise the claim at that time – when it would have been reviewed under the standard

sentence is sufficiently tainted that it cannot be left standing given the invalidity of Mr. Hall's § 924(c) conviction.

**CONCLUSION AND PRAYER FOR RELIEF**

For all the reasons set forth above, Mr. Hall respectfully asks that this Court

a) vacate his conviction and sentence on Count 6, the invalid charge under 18 U.S.C. § 924(c);

b) vacate his sentence on all remaining counts and order a new sentencing hearing as to those counts;

c) grant him leave to amend this motion after the Supreme Court issues its anticipated decision later this Term in *Davis*;

d) Any other relief that may be necessary to correct Mr. Hall's invalid conviction and sentence.

Date: March 27, 2019

Respectfully Submitted,

/s/ Kelley Conaty

Kelley Conaty
SIDLEY AUSTIN LLP
Texas Bar No. 24040716
2021 McKinney Ave #2000
Dallas, TX 75201
Tel.: (214) 981-3300
Fax: (214) 3400
kconaty@sidley.com

Robert N. Hochman *(Pro Hac Vice to be submitted)*
Illinois Bar No. 6244222

---

of *Chapman v. California*, 386 U.S. 18 (1967) (constitutional error requires reversal unless the prosecution proves it harmless beyond a reasonable doubt) – the error should be reviewed under *Chapman* here.

Benjamin Gillig *(Pro Hac Vice to be submitted)*
Illinois Bar No. 6326947
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Tel.: 312-853-7000
Fax: (312) 853-7036
rhochman@sidley.com
bgillig@sidley.com

Robert C. Owen
Texas Bar No. 15371950
Bluhm Legal Clinic
Northwestern Pritzker School of Law
375 East Chicago Ave.
Chicago, Illinois 60611
Tel.: (312) 503-0135
Fax: (312) 503-8977
robert.owen@law.northwestern.edu

Marcia A. Widder
Georgia Bar No. 643407
303 Elizabeth Street, NE
Atlanta, GA 30307
Tel.: 404-222-9202
marcy.widder@garesource.org

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 27th day of March, 2019, a copy of the foregoing Motion to Vacate Conviction and Resentence Under 28 U.S.C. § 2255 was served via the CM/ECF electronic filing system. I further certify that on the same date, the foregoing Motion was served on the following by electronic mail:

Wes Hendrix
Assistant United States Attorney
Chief, Appellate Division
Wes.Hendrix@usdoj.gov

/s/ Kelley Conaty
Kelley Conaty

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

**UNITED STATES OF AMERICA**,
        *Plaintiff,*

      v.                         **CIVIL ACTION NO. 4:00-CV-422-Y**
                                    **(Criminal No. 4:94-CR-121-Y)**

**ORLANDO CORDIA HALL**,
        *Defendant.*

**SECOND AMENDED MOTION OF ORLANDO CORDIA HALL**
**TO VACATE CONVICTION AND SENTENCE AND FOR NEW TRIAL**
**PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF**
**THE FEDERAL RULES OF CRIMINAL PROCEDURE**

**INTRODUCTION**

1.    Orlando Cordia Hall ("Mr. Hall") is a prisoner in the custody of the United States, under

sentence of death, being held at the United States Penitentiary, Terre Haute, Indiana. He was

convicted and sentenced to death in violation of the Constitution and laws of the United States,

and therefore respectfully moves the Court to vacate, set aside or correct his conviction and

sentence, pursuant to 28 U.S.C. § 2255. In support of his motion, Mr. Hall states as follows:

**JURISDICTION**

2.    This Court has jurisdiction to grant the requested relief under 28 U.S.C. § 2255.

**PROCEDURAL HISTORY**

3.    On October 26, 1994, a criminal complaint filed in the United States District Court for the

Northern District of Texas charged Bruce Webster, Mr. Hall, Steven Beckley and Demetrius Hall with kidnapping and aiding and abetting, in violation of 18 U.S.C. §§ 1201(a)(1) and 2. Docket No. 1; R. 1:1.[1] On or about November 22, 1994, the grand jury returned a six-count superseding indictment charging Mr. Webster, Mr. Hall, Demetrius Hall, Mr. Beckley, and Marvin Holloway with kidnapping in which a death occurred, in violation of 18 U.S.C. §§ 1201(a)(1) and 2 (Count 1), and various noncapital charges. Docket No. 15; R. 1:37-45. On February 23, 1995, the Government gave notice of its intention to seek the death penalty against Mr. Hall under the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 *et seq.* ("FDPA").[2] Docket No. 60; R. 1:82-87.

4. On March 9, 1995, the Court allowed Mr. Hall's attorneys, Mark Daniel and Michael Heiskell, to withdraw. Twelve days later, the Court appointed Michael Ware and Jeffrey Kearney as Mr. Hall's new counsel.

5. On April 6, 1995, this Court severed Mr. Hall's trial from that of his co-defendants and ordered Mr. Hall's trial to begin October 2, 1995. Docket Nos. 82-84; R. 1:108-20.

6. On June 2, 1995, the Court continued Mr. Webster's trial from July 17, 1995, to March 4, 1996. *See* Order dated June 2, 1995, N.D. Tex. No. 4:94-CR-121-Y. On August 2, 1995, Mr. Hall's attorneys filed his first motion for continuance, Docket No. 252; R. 2:487-93, which was

---

[1] Citations to the record will employ the Fifth Circuit's numbering of the record and will be set forth as follows: R. [volume number]:[page]. Items entered on the Docket will be cited as "Docket" followed by the item number.

[2] Webster was tried separately from March 3-27 and June 3-21, 1996. He was convicted and sentenced to death. The Government did not seek the death penalty against the remaining defendants.

denied eight days later. Docket No. 261; R. 3:508-09. Subsequent requests for a continuance made orally during the trial were also denied.

7.      Trial commenced on October 2, 1995; voir dire lasted from October 2-19. From October 24-31, Hall was tried by the jury before this Court. On October 31, 1995, the jury found Mr. Hall guilty on counts 1, 2, 3 and 6. *See* Verdict Form (Docket No. 446, R. 6:1332-33). From November 1-3, the same jury that had decided guilt/innocence heard testimony and argument in the penalty phase. On November 6, 1995, the jury returned a verdict of death on Count 1. *See* Special Findings Form (Docket No. 466; R. 6:1377-89).

8.      After denying Mr. Hall's motion for new trial, Docket No. 510; R. 6:1458, the Court entered judgment on February 12, 1996, sentencing Mr. Hall to death.[3]   Docket No. 593; R. 6:1469-72; R. 36:1-9.

9.      Mr. Hall timely appealed to the United States Court of Appeals for the Fifth Circuit, which affirmed. United States v. Hall, 152 F.3d 381 (5th Cir. 1998). Mr. Hall sought review in the Supreme Court, which denied *certiorari* on May 17, 1999.  Hall v. United States, 526 U.S. 1117 (1999).

10.     On May 18, 1999, Mr. Hall renewed his motion for the appointment of counsel under 21 U.S.C. § 848, to permit him to pursue post-conviction relief under 28 U.S.C. § 2255. The Court granted that motion on May 20, 1999, *nunc pro tunc* to May 17, 1999.

11.     Mr. Hall filed his original petition under 28 U.S.C. § 2255 on May 16, 2000. By subsequent

---

[3]  Mr. Hall additionally received a term of life imprisonment on count 2; a concurrent term of 60 months imprisonment on count 3; and a term of 60 months imprisonment on count 6 to run consecutively to the sentences imposed on counts 2 and 3.

order, this Court provided that Mr. Hall would be permitted to file a motion for discovery and that, upon the Court's ruling on that discovery motion, Mr. Hall would have 60 days to file an amended motion for relief under 28 U.S.C. § 2255. The Court denied Mr. Hall's motion for discovery on April 17, 2002.

## STATEMENT OF FACTS

### Pre-Trial Events

### The Kidnapping and Murder of Lisa Rene

12. The evidence presented at the guilt/innocence phase of the trial, largely through the testimony of Demetrius Hall, Beckley and Holloway,[4] indicated the following:

13. Mr. Hall and Holloway, together with Webster, sold marijuana in Pine Bluff, Arkansas, out of Holloway's home. With the assistance of Beckley, who lived in Irving, Texas, they bought marijuana in varying amounts in the Dallas/Fort Worth area. The marijuana was then transported, usually by Beckley, to Arkansas and kept at Holloway's home. R. 26:152, 27:100-27; 29:16-28.

14. On September 21, 1994, Holloway drove Hall from Pine Bluff to Little Rock, Arkansas, so that Hall could fly to the Dallas/Fort Worth area. There, Mr. Hall met his brother, Demetrius Hall, and Beckley. That same day, the three were swindled out of $5,000 by two drug dealers,

---

[4] The government did not seek the death penalty against the co-defendants who testified. Following Hall's trial, they received the following sentences: Demetrius Hall received a term of imprisonment of 300 months; Beckley received a term of imprisonment of 360 months; and Holloway received a term of imprisonment of 180 months. The superseding indictment was also dismissed against Holloway and he pleaded guilty to one count each of accessory after the fact with respect to the kidnapping, and aiding and abetting in the commission of the offense of interstate travel in aid of a racketeering enterprise.

Stanfield Vitalis and Neil Rene, who are brothers of the victim, Lisa Rene. R. 28:73, 75. The Halls and Beckley decided to locate Vitalis and Rene and force them to return the money. R. 27:130-53. Mr. Hall contacted Holloway in Arkansas and asked him to send Webster down to help because "he knew how to handle things like this." R. 26:153.

15. On September 24, 1994, Holloway drove Webster to the airport in Little Rock and Webster flew to the Dallas/Fort Worth area. That evening, the four went to the Polo Run Apartments in Arlington, Texas, where they had determined that Vitalis and Rene lived. Mr. Hall and Webster were armed with guns procured by Beckley, and Demetrius Hall carried a small (souvenir) baseball bat. When Lisa Rene, the only person home, refused to open the door, Demetrius Hall and Webster went around to the side. Demetrius Hall broke the patio glass door with the bat; Webster went into the apartment and dragged Lisa Rene out to the car. Mr. Hall and Beckley had already run to the car when they heard the sound of glass breaking. Webster forced Lisa Rene into the car and the five drove off. R. 26:160-72; 27:156-72.

16. That same evening, Webster, Demetrius Hall and Beckley drove Lisa Rene to Pine Bluff, where they obtained money from Holloway to get a hotel room. R. 26:181-89. Mr. Hall remained in Irving and flew to Little Rock the next day. Holloway picked him up and drove him to the hotel where Lisa Rene was being held by the others. The next day they moved to another hotel using money received from Holloway. R. 26:206. Throughout the abduction, each of the defendants sexually assaulted Lisa Rene. R. 27:166-67, 170-73, 175-79.

17. Early in the morning of October 26, 1994, Webster, Beckley and Mr. Hall took Lisa Rene to a

site in Byrd Lake Park where a grave had been dug.[5] All three struck her on the head and shoulders with a shovel (between five and fifteen times), most likely rendering her unconscious. R. 27:193-98; 29:139, 144. Webster put her in the grave, removed her clothes, gagged her and poured gasoline over her body. R. 27:199-202. She was buried in a four-foot-deep grave where she died.

### Hall's Arrest, Arraignment and Appointment of Counsel

18. On September 29, 1994, the State of Texas issued a warrant for the arrest of Mr. Hall and two co-defendants, Beckley and Demetrius Hall, for the aggravated kidnapping of Lisa Rene. R. 12:7. That same day, a federal criminal complaint and arrest warrant were issued charging Mr. Hall with flight to avoid prosecution on the Texas charges, in violation of 18 U.S.C. § 1073. R. 12:26-28 & Def. Pretrial Ex. No. 4.

19. The following day, after Demetrius Hall, Beckley and Webster were all arrested, Mr. Hall surrendered to law enforcement authorities in El Dorado, Arkansas, in the presence of his retained counsel, James Bennett. R. 12:107-109. That afternoon, Mr. Hall was taken before an Arkansas state judge and waived his right to contest extradition to Texas. R. 12:38-40. The Arkansas judge did not advise Mr. Hall of his Miranda rights. Id.

20. That same day, after Mr. Hall consented to extradition, Mr. Hall's attorney James Bennett agreed to allow F.B.I. Special Agent (SA) Garrett Floyd[6] and Arlington Police Detective Jim Ford to

---

[5] These same defendants had taken Ms. Rene to Byrd Lake Park the previous evening, but were unable to locate the grave. R. 27:182-86.

[6] SA Floyd had been part of the investigation since September 26, 1995. R. 12:80.

speak with Mr. Hall in Bennett's presence about Lisa Rene's whereabouts. R..12:53-61. Bennett advised the officers that he did not believe Mr. Hall wished to make a statement and instructed them to "take him to Texas as soon as possible . . . and let him talk to a Texas attorney." R. 12:111. The agents advised Mr. Hall of his rights and stated what they believed had transpired. Mr. Hall provided no information about the crime during the interview. R. 12:96. He told the agents that he would talk to them in Texas, though he did not indicate he would do so without counsel. R. 12:61.

21. On October 2, 1994, Lisa Rene's body was found. R. 27:25-33.

22. Mr. Hall was transported to Texas on October 4, 1994. R. 12:10. He did not make any statements during the trip. R. 12:11. On October 5, 1994, Mr. Hall was taken before a Texas municipal court judge who read him and a room full of jail inmates their rights. R. 12:43-50. The judge did not inform Mr. Hall that he was a suspect in either a state or federal capital murder case for which he could receive the death penalty. R. 12:51.

23. That same afternoon, SA Floyd and Detective Ford came to the Arlington jail to interview Mr. Hall. R. 12:63. Floyd and Ford read Mr. Hall his <u>Miranda</u> rights, secured a written waiver, and interviewed him without an attorney for approximately six hours, during which time Mr. Hall incriminated himself orally and in writing. R. 12:63-72.

24. On October 28, 1994, after the federal complaint in this matter was filed, Mr. Hall was formally arraigned for the first time by a federal magistrate and appointed an attorney, Mark Daniel. Docket No. 34. On January 6, 1995, Mr. Hall was appointed a second attorney, Michael Heiskell. Docket No. 40. R. 1:68.

25. Although the docket reflects that little motion practice was undertaken in the first few months following the initiation of federal charges, Mr. Hall's initial attorney, Mark Daniel, obtained the services of an investigator, Danny LaRue, and made an investigative trip to Arkansas in November, 1994. Daniel and Heiskell additionally traveled to Washington, D.C. to meet with representatives of the Department of Justice in an attempt to dissuade the Government from pursuing the death penalty against Mr. Hall.

### Alleged Escape and Hostage Plot/Withdrawal of First Attorneys

26. On February 28, 1995, Larry Donnel Nichols, a federal inmate housed in the same cell block as Mr. Hall in the Mansfield Detention Center, who was at that time cooperating with the Government as a witness against his co-defendants, approached SA Arthur Grovner while in court for a hearing in his own case. SA Grovner was the case agent in charge of the investigation of the case against Nichols. Nichols told SA Grovner that he had information "regarding a possible escape attempt from the Mansfield Detention Center by an inmate who was involved in the Lisa Rene kidnapping case." Exhibit 1 (FBI-302 re: Larry Nichols, dated 2/28/95). According to the report filed by SA Grovner, Nichols claimed Mr. Hall had confided "a plan to escape custody as he is being transported from the Mansfield facility to the Federal Courthouse in Fort Worth." *Id.* Nichols further claimed that Mr. Hall thought "the best time to escape [was] when the prison vehicle reaches a point in the trip where there is a wooded area and the guards are not paying much attention to the inmates." The report indicates that SA Grovner told Nichols he would be interviewed again later for more information. *Id.*

27. One week later, on March 7, 1995, Nichols was interviewed by SA Kenneth Bersano, SA Bobby

Oakley, and Assistant United States Attorneys (AUSAs) Richard Roper and Paul Macaluso, purportedly pursuant to an agreement between Nichols' attorney and AUSA Roper. The FBI 302 generated from that interview states that Nichols was moved out of the cellblock on March 5, 1995, and details what Nichols claimed to have learned from Orlando Hall about his involvement in the kidnapping and murder of Lisa Rene, his involvement in the drug business, and other matters. Nichols' disclosures were discoverable from newspaper reports and court documents, as well as from Demetrius Hall and/or Bruce Webster, with whom Nichols had previously been housed at Mansfield, and from court documents in Mr. Hall's possession to which Nichols could have surreptitiously gained access. The 302 also states, *inter alia*, that Nichols detailed a more elaborate and violent escape plan on March 7 than he had originally reported to SA Grovner a week earlier:

> ORLANDO HALL also talked of escaping from the Mansfield Correctional Facility. NICHOLS stated there was a six-inch shank and razor blade hidden above the door just inside B Cell door that HALL and other inmates could get to them. HALL and a Mexican inmate (not further identified) had planned to use the "shank" to take a female guard hostage and escape but they did not have a car on the outside. HALL also talked of taking his attorney hostage when the attorney came to visit him at the jail. HALL was going to put a pen or pencil to the attorney's throat and force his way outside, but again said he did not have a car on the outside. HALL said if there was anyway he could escape, he would.

Exhibit 2 (FBI 302 re: Larry Nichols, dated 3/7/95). Nichols failed to repeat his initial allegation that Mr. Hall intended to escape from a prison vehicle while being transported from Mansfield to court. Nor is the report consistent with Nichols' later testimony that Mr. Hall expressed his intention to take the judge hostage and to stab the judge if he were found guilty. R. 31:228.

28. On March 7 or 8, 1995, AUSA Richard Roper told defense counsel that a confidential informant had informed the Government that Mr. Hall planned to escape by taking his attorneys hostage using a ball point pen or shank. A search of the cell block apparently uncovered two "shanks" and a portion of a razor blade areas in common areas of the cell block to which all prisoners had access. R. 32:19-21.

29. Without taking any steps to ascertain the reliability of these allegations against their client, Mr. Daniel and Mr. Heiskell immediately filed, on March 8, 1995, a sealed motion to withdraw from the case. Docket No. 71. The following day, the Court conducted an *ex parte* hearing, at which no court reporter was present, to address defense counsel's motion to withdraw. *See* Docket No. 73. Upon information and belief, Mr. Hall was not present nor represented at this hearing, and no sworn testimony was presented from any witness. Following the hearing, the Court granted counsel's motion to withdraw. Docket No. 74.

### Failure to Prepare for Trial by Mr. Hall's Second Set of Attorneys

30. On March 21, 1995, this Court appointed Jeffrey Kearney and Michael Ware to represent Mr. Hall.

31. On April 6, after severing Mr. Hall's trial from that of his co-defendants, *see* Docket Nos. 82-83; R. 1:108-13, the Court set Mr. Hall's trial for October 2, 1995. Docket No. 84; R. 1:114-22.

32. As set forth more fully below, from the time Mr. Ware and Mr. Kearney were appointed through the eve of trial, virtually no investigation was performed in this matter by counsel or anyone acting on their behalf.

33. On July 14, 1995, the Court conducted an *ex parte* hearing on various defense motions for

funding. Docket No. 216; R. 12:1-17. During the course of the hearing, defense counsel made clear that they expected the matter to proceed to a penalty phase at which the jury would determine whether Mr. Hall would receive a death sentence or be sent to the penitentiary for life without the possibility of release. As Mr. Ware observed, "this is not really so much a 'who done it.' I mean, the facts such as they are and the evidence such as it is, I don't know that there is going to be — at least at this point -- I don't know that there is going to be a whole lot that can be done about that. I think to the extent that there is something we can do as this man's counsel, it is to pick a jury in which he at least has a fighting chance, so to speak, of getting a life sentence under the facts of this case." R. 12:7.

34. Despite counsel's anticipation that this case would proceed to a penalty phase, counsel failed to secure the resources necessary to prepare for the sentencing trial. At the July 14 *ex parte* hearing, defense counsel stressed the need to have a jury selection expert in this matter. R. 12:3-10. Counsel also requested the appointment of both Randy Price, a psychologist, and Dr. James Grigson, a psychiatrist, as well as Dr. Linda Norton, a forensic pathologist. R. 12:10-14.

35. Although counsel had filed on June 30 an *ex parte* sealed motion requesting the appointment of a mitigation specialist to investigate and develop potential mitigating evidence, *see* Exhibit 3 (sealed motion for appointment of mitigation specialist), they abandoned this motion at the July 14 hearing:

> The Court: Okay. On your request for mitigation specialist, do you want to put that forward?
>
> Mr. Ware: I have talked to at least one mitigation specialist. Jeff and I have talked about it. We are really more interested in getting a psychologist and a psychiatrist. The particular psychiatrist we have in mind probably could effectively subplant the

need for a, quote-unquote, "mitigation specialist." And that's really what we're more interested in right now, I think, the psychologist and psychiatrist, than the mitigation specialist. Evidently, they are all the rage now, and it may come at some point that we have to ask for one just because we feel like we need to.

R. 12:10.

36. On July 20, 1995, this Court authorized funds for Mr. Hall to obtain the services of a psychiatrist, a psychologist, and a forensic pathologist, but denied the motion for funds for a jury selection expert. The Court noted that the motion for appointment of a mitigation specialist was rendered moot, due to counsel's having withdrawn the request. *See* Exhibit 4 (Sealed Order, dated July 20, 1995). Even though the defense obtained funds for retaining a psychiatrist in mid-July, Mr. Hall was not seen by a psychiatric expert until more than sixty days later, on September 23, nine days prior to trial. R. 35:5.

37. On August 2, 1995, Mr. Hall's attorneys filed his first motion for continuance, authored and signed by lead counsel Mr. Kearney. Docket No. 252; R. 2:487-93. The motion described Mr. Kearney's trial schedule from May through September 1995, and argued that this trial schedule would prevent the defense from being prepared to proceed on October 2. The motion, in pertinent part, stated:

> 4) Because of Jeff Kearney's overwhelming trial schedule, counsel has not been able to devote the necessary time to the preparation of this death penalty case. In particular, counsel has not had sufficient time to interview the Defendant in detail regarding his background and the facts surrounding this case. Counsel met with the Defendant briefly at the federal courthouse at the time of his appointment to this case and met with Defendant again, on this date, for the purpose of having the Defendant execute a Waiver of Speedy Trial. It will be necessary for counsel to spend many more hours with the Defendant in order to prepare for trial. A complete investigation of Defendant **ORLANDO HALL'S** background needs to be made under the close supervision and direction of counsel to discover and develop any evidence that may mitigate against the death penalty. This has not been done, and said investigation is a

prerequisite to render effective assistance of counsel. Counsel's trial schedule does not allow for such preparation prior to October 2, 1995 trial date.

5) Additionally, discovery in this matter is voluminous, and because of his trial schedule, Defendant's attorney has not had nor will have the opportunity to review such discovery and adequately prepare for the present trial date.

R. 2:489-90. The motion for continuance made no mention of Mr. Ware's schedule for the six-month period following appointment and preceding trial.

38. On August 10, 1995, this Court denied the requested continuance. Docket No. 261; R. 3:508-09. The Court noted that Mr. Kearney and Mr. Ware had been "appointed [on] March 21, 1995, over four months ago. Additionally, as required by law, Defendant was appointed two attorneys, and his motion is silent regarding his second attorney's schedule for the next two months. In any event, the Court believes that by the October 2, 1995 trial date, Defendants' counsel will have had an adequate opportunity to prepare for the trial of this cause." R. 3:508.

39. On September 7, 1995, less than one month before trial was set to begin and only after additional prodding from Federal Death Penalty Resource Counsel Kevin McNally, defense counsel finally renewed their request for funds for a mitigation specialist, requesting that the Court appoint Tena Francis. Exhibit 5 (9/7/95 motion for appointment of mitigation specialist). On September 12, 1995, the Court granted the motion. Exhibit 6. Ms. Francis was notified of her appointment on September 14, 1995 and began work the next day. Exhibit 7 (Affidavit of Tena Francis), ¶¶ 7-8. As a result, the mitigation investigation in this case was undertaken just seventeen days before the October 2 trial date.

40. The case proceeded to trial on October 2, 1995. Counsel unsuccessfully renewed their motion for a continuance as jury selection began. R. 14:14-15. As an alternative to a continuance, the

Court allowed Mr. Hall to proceed with *voir dire* with only one attorney, Mr. Kearney, present, while Mr. Ware attempted to prepare the case for trial. R. 14:16. During most of the lengthy and crucial individual voir dire process, Mr. Hall was represented by just one attorney. R. 14:24.

41. In the middle of *voir dire*, on October 12, 1995, defense counsel filed an *Ex Parte* Motion for Additional Services Required of Mitigation Specialist. Exhibit 8. The motion recounted the work that remained to be done in preparing to defend the case:

> 2. As the defense may present evidence of the relative culpability of Orlando Hall's co-defendants ... there is an essential need for further investigation into their backgrounds. Motivation to testify falsely ... and other evidence to discredit the co-defendants may be uncovered during investigations of their reputations, criminal histories, histories of violent behavior, relationships to each other and other government witnesses, statements made in reference to the crime to persons other than the police, etc.

> 3. In reference to the fourth co-defendant, Bruce Webster, his culpability should be investigated also. It is obvious from the government documents that this co-defendant played perhaps the most important role in the kidnapping, sexual assault, murder, and destroying evidence. The investigation thus far has revealed that he has a history of violent behavior and psychiatric problems. To date, about fifteen (15) witnesses have been identified that will have information pertinent to these background investigations. These witnesses reside in both Texas and Arkansas. Some have been interviewed but there are others who need to be interviewed.

> 4. The two jailhouse informants (who provided information that Orlando Hall planned to take a hostage and escape from the Mansfield detention center) must be investigated thoroughly. This alleged plan will be a critical aspect of the government's punishment phase. Testimony about the planned escape, if believed by the jury, will assist the government in portraying Orlando Hall as a danger to society and will effective[ly] undercut any mitigation evidence presented by the defense. The government has not provided any discovery to the defense concerning this alleged escape plan. Therefore, the defense must further investigate the witnesses involved. Further, it has been learned that one of these

witnesses has a reputation as a "professional informant". This witness is suspected of providing information to authorities on cases other than Orlando Hall's in exchange for leniency regarding his own criminal charges and sentence.... Orlando Hall's defense must investigate this witness's criminal history, other cases for which he is a government witness, and his relationship to law enforcement personnel. The defense currently knows very little about a second government informant. A similar investigation needs to be conducted concerning his background and motivation. Since witnesses and records pertaining to these witnesses are located in Texas and Louisiana, a trip to Louisiana may be necessary in order to thoroughly investigate one of these informants.

5. The government has listed fifteen (15) "reputation" witnesses to date. Many have been interviewed but the rest of these witnesses must be interviewed in order to determine whether they have the knowledge of Orlando Hall and/or the contact with him necessary to form an opinion as to Orlando Hall's reputation. It is also possible some of these witnesses can provide helpful information (concerning Orlando Hall's family life, for example, which will assist experts developing the punishment phase information). Some of these witnesses have arrest/criminal records and some may have been offered immunity in exchange for their testimony against Orlando Hall. All possible impeachment material must be investigated.

6. Several prior adjudicated and uncharged offenses will be presented by the government during the punishment phase of the trial. Many of the witnesses who will testify as to these events have been involved in criminal activities themselves. It is necessary to investigate the backgrounds of each witness, as well as the possibility of immunity agreements with the authorities. The events in question must also be further researched. Even though Orlando Hall was accused of some offenses, he was not prosecuted. Understanding the reason for this lack of prosecution will enable the defense to deal with the testimony concerning the events, as well as to enable the defense to more effectively present evidence in mitigation.

7. The mitigation/social history investigation into the life of Orlando Hall is not complete. This type of investigation is particularly tedious and time consuming since it involves very private and sensitive issues. The complete social history will then be used by expert witnesses to complete their evaluation process.

8. The investigation has led to information that serious domestic violence existed in Orlando Hall's family. The violence between Orlando Hall's parents often extended to the children. The extent and effect of this trauma is not yet realized and more information needs to be developed. For the most part, the victims of, witnesses to, and perpetrators of this abuse have never discussed it outside their family and there has not been counseling for any persons involved. For these reasons, the process of gathering information about Orlando Hall's childhood is a slow one, as the investigator must first deal with a variety of emotions from the witnesses (anger, denial, hurt, fear of retribution from the abuser, etc.) in order to elicit the needed information. Orlando Hall has five siblings and five half-siblings. Two of these potential witnesses reside in states other than Texas or Arkansas. Two are in prisons in Texas and Arkansas. Each of Orlando's siblings must be interviewed.

9. Information has been obtained that Orlando Hall's mother was beaten with a two-by-four board during the second trimester of her pregnancy with Orlando. This [sic] significance of this information is clear and further investigation is mandatory in order to assist the expert witnesses. School records indicate Orlando had difficulty learning, even in remedial classes. Witnesses report Orlando has always had difficulty following instructions and with his memory. This information, coupled with available medical records, is vital to the mitigation investigation.

*Id.* at 2-5. The Court granted the motion for additional investigative funds on October 13, 1995. (Exhibit 9).

42. The guilt phase commenced on October 24, 1995, and concluded on October 31. The Government presented evidence tending to prove the facts set forth above. The defense presented no evidence, R. 29:162, and waived closing argument. R. 30:40. After hearing the Court's instructions and the Government's summation, the jury retired to deliberate and returned with verdicts of guilty on October 31, 1995.

**Government's Evidence Presented In Penalty Phase**

43. The penalty phase began the following morning. The Government presented additional evidence

and/or argument in support of the mental state elements required by 18 U.S.C. § 3591(a), as well as six aggravating factors for which it had given notice:

-- that the death occurred during the commission of the offense of kidnapping, 18 U.S.C. § 3592(c)(1)

-- that the defendant committed the offense in an especially heinous, cruel or depraved manner in that it involved torture or serious physical abuse to the victim (18 U.S.C. § 3592(c)(6));

-- that the defendant committed the killing after substantial planning and premeditation to cause the victim's death (18 U.S.C. § 3592(c)(9));

-- that the victim was particularly vulnerable due to her age (18 U.S.C. § 3592(c)(11));

-- that the defendant constitutes a future danger to the lives and safety of other persons (non-statutory factor);

-- "the effect of the instant offense on Lisa Rene's family" (non-statutory factor).

44. Several Government witnesses testified concerning, *inter alia*, Mr. Hall's involvement in drug trafficking, two prior felony convictions on drug charges and a juvenile adjudication resulting in probation for taking three dollars from a schoolmate while armed with a knife. *See* R. 31:11-18 (Joel Stevenson testifying about Mr. Hall's prior record and videotape made at grave site); R. 31:20-40 (SA Garrett Floyd testifying about unredacted written statement and oral statements by Mr. Hall after arrest); R. 31:40-51 (Mary Nelson testifying about juvenile adjudication); R. 31:51-59 (LaTonya Anders testifying about her relationship with Mr. Hall and his drug trafficking). The Government David Butler, Wendall Holden, Gerald Gardner, Carolyn Dykes, Nelson Post, Benny Brumley, and Jeff Hubanks as character witnesses to testify that he or she was familiar with Mr. Hall's reputation and knew it to be bad. The defense failed to cross-examine all but one of these character witnesses.

45. The Government also called Erma Willis and Garen Willis to describe an incident in which two men, Tony Jones and "Bone," attempted to obtain money from her home, while Mr. Hall sat in a car outside. R. 31:187-205. A .9 millimeter gun was allegedly visible on the dashboard. R. 31:187-205. David Baker, a former Arkansas parole officer, testified that he wrote up a report and forwarded it to Mr. Hall's parole officer after Erma Willis reported that incident. R. 31:205-08.

46. By far the most damaging evidence introduced in the penalty phase, and the only evidence suggesting that Mr. Hall would be a danger even if imprisoned, was Larry Nichols' testimony concerning, *inter alia*, Mr. Hall's alleged plans to escape from jail. R. 31:208-270.

47. Nichols claimed to have befriended Mr. Hall at Mansfield sometime in late February 1995. R. 31:215-219. According to Nichols, Mr. Hall bragged about having raped Lisa Rene, boasting that he "used 100 rubbers on her." R. 31: 219-222. Mr. Hall was "macho and proud about it." *Id.* Mr. Hall also expressed his intent to kill Steve Beckley, whom he called a "bitch." *Id.*

48. Nichols detailed Mr. Hall's alleged plans to escape from custody. R. 31:224-227. Mr. Hall said it would be easy to "escape from the attorney room" by "holding somebody hostage," namely, "his lawyer." *Id.* Mr. Hall supposedly told Nichols that he would accomplish this by arming himself with a "shank," or homemade knife. Nichols also claimed Mr. Hall talked of taking a female guard hostage. *Id.*

49. Nichols related that inside the "zone," *i.e.*, the common area to which all inmates in the same part of the Mansfield facility had access, there were two "shanks," one short and the other

long.  *Id.*  The short one, he claimed, was "real, real sharp at the edge of it."  *Id.*  Nichols claimed Mr. Hall had also declared that if he were "found guilty of the crimes," he would "hold [the] judge hostage, also," and "attempt to stab the judge."  R. 31:228-231.  Nichols said he'd seen Mr. Hall sharpening one of the shanks on the concrete ceiling.  R. 31:231-35.

50. Nichols was given an apparent boost in credibility by the testimony of Darryl Hensiek, a former corrections officer at Mansfield.  Hensiek testified that on March 7, 1995, he and other officers conducted a shakedown in the cellblock and that, following instructions from Nichols, they located two shanks and a razor blade in areas of Zone B.  R. 32:17-22.  Although Hensiek conceded on cross-examination that every prisoner in the cellblock had access to the areas where the shanks and razor blade were found, R. 32:27-28, his testimony that weapons were found in the cellblock in which Mr. Hall was housed clearly lent some support to Nichols' allegations.

51. The Government closed its penalty phase case with the testimony of Lisa Rene's mother, Agnes Rene, who spoke about her daughter and the effect of her death on her family, and identified the victim-impact statements authored by Mr. and Mrs. Rene and the Josephat family.  R. 32:28-43; Government Exhibits 110-A, 110-C.

52. At the close of the first day of evidence in the penalty phase, following Nichols' testimony, the defense renewed its "ongoing motion for continuance for all the reasons we've previously articulated and for the additional reason of getting or having sufficient [sic] amount of time to get the witnesses together in order to present them in Hall's portion of the punishment case."  R. 31:270.  The Court denied the motion.  *Id.*  The next day, the Government presented the testimony of Darryl Hensiek and Agnes Rene, and rested.

53. Before putting on their case, defense counsel orally moved the Court to allow Mr. Hall to make a statement in allocution to the sentencing jury. Following argument on the motion, the Court denied the request, but indicated that it would allow the defense to submit at a later date a written proffer of what the statement would have been. R. 32:45-51.

**Defense Evidence Presented in Penalty Phase**

54. The defense presented eight witnesses at the penalty phase. FBI SA Bobby Oakley and Arlington Police Detective Jim Ford recounted Steven Beckley's admissions to sexually assaulting the victim on two occasions. R. 32:52-55 (Oakley); R. 32:55-70 (Ford). Rick Pritzen, a Pine Bluff policeman, and Maxie Thomas, an Arkansas state police officer, described Bruce Webster's violent tendencies and criminal history. R. 32:79-89 (Pritzen); 32:92-97 (Thomas). Gary Cardinale, operations manager at Mansfield Law Enforcement Center, testified that the unoccupied cell in which the shanks were found was accessible to all of the inmates in the cellblock; that the last time there had been a thorough shakedown prior to March 7, 1995, was in December of the preceding year; that it was not unusual to find contraband during shakedowns; and that he had no record of any problems with Mr. Hall from the time Mr. Hall got to Mansfield through March 7. R. 32:98-105. Douglas Reagan was called to identify a one-page document from Kroger Company reflecting that Steven Beckley was discharged on December 18, 1990, for dishonesty, either proven or confessed. R. 32:108-09.

55. The only witnesses called by the defense to talk about Mr. Hall's background and character were his mother, Betty Hall, and his sister Cassandra Ross. This testimony occupies thirty-nine pages of the trial transcript; over half of this testimony was adduced on cross-examination. *See* R.

32:111-35 (Betty Hall); 32:1136-50 (Cassandra Ross). Both witnesses testified in fairly general terms about the physical violence that A.J. Hall inflicted on his wife, Betty, during their marriage. Defense counsel elicited conclusory testimony from Betty Hall that Orlando Hall loved and was a good father to his four children and that when her twin brother had been murdered years before, she had opposed the death penalty for his murderer because of her religious beliefs. R. 32:119-20. Cassandra Ross attempted to testify about her brother's remorse for the crime, but was cut off by the prosecutor's objection. R. 32:141 Again, defense counsel only elicited conclusory testimony from Mrs. Ross that her brother was a good person who loved his children and whose life should be spared. R. 32:141-42.

56. Defense counsel failed to prepare either witness for areas of cross-examination which the defense should have anticipated. Betty Hall was questioned by the Government about whether she and her husband had made sure that Orlando was raised going to school, being fed and clothed, and going to church, as well as concerning Mr. Hall's ability to work an honest job instead of dealing drugs. R. 32:122-28. Questions to Cassandra Ross emphasized that she turned out okay despite having grown up in the same violence-scarred household in which Mr. Hall was raised. R. 32:142-46

57. Following the testimony of these witnesses, the defense rested. R. 32:152. The Government presented no rebuttal. *Id.*

### The Jury's Penalty Phase Findings

58. On November 3, 1995, following closing arguments and instruction, the jury retired to deliberate at 4:55 p.m. Supp. R. (Trial Transcript Vol. 20-A), at 99. The jury was dismissed for the

weekend at 11:15 p.m. that evening without having reached a verdict, with instructions to return at 9:00 a.m. on Monday, November 6. Supp. R. at 111-13. The jury returned with a verdict of death shortly after 1:20 p.m. on November 6. R. 34:2-4. The jury thus spent more than ten hours deliberating Mr. Hall's fate.

59. With respect to the mental state elements, the jury did not find that Mr. Hall had intentionally killed Lisa Rene, nor did it find that he had intentionally inflicted serious bodily injury which resulted in her death. The jury did find that Mr. Hall had intentionally engaged in conduct intending that Lisa Rene would be killed or that lethal force be employed against her and her death resulted; and that Mr. Hall intentionally engaged in conduct which he knew would create a grave risk of death to Lisa Rene and that such conduct resulted in her death. *See* Special Findings Form, R. 6:1377-78.

60. The jury found two statutory and two non-statutory aggravating factors: (1) that Lisa Rene's death was caused during the commission of the offense of kidnapping; (2) that Mr. Hall committed the offense in an especially heinous, cruel or depraved manner in that it involved torture or serious physical abuse to Lisa Rene; (3) that Mr. Hall constitutes a future danger to the lives and safety of other persons; and (4) the effect of the offense on Lisa Rene's family. R. 6:1379-81. The jury rejected two other aggravating factors urged by the Government: that Mr. Hall "committed the killing of Lisa Rene after substantial planning and premeditation to cause the death of Lisa Rene," and that Lisa Rene "was particularly vulnerable due to her age." R. 6:1379-80.

61. The jurors' determination of mitigating factors were as follows: Nine jurors found that one or

more equally culpable defendants would not receive the death penalty; and at least one juror found the defendant's age, upbringing, and "any other aspect calling for a sentence less than death" to be mitigating. No juror found the mitigating factors of Mr. Hall's acceptance of responsibility for his role in the offense or Mr. Hall's remorse. R. 6:1382-83.

### Outside Influences Affecting the Jury's Penalty Phase Deliberations

62. The trial of this matter was accompanied by widespread publicity. Following the jury's death verdict, some jurors voluntarily participated in press interviews regarding the trial. According to the sworn account of Cassandra Ross, a woman juror was interviewed by one of the Dallas/Ft. Worth television news stations. The juror revealed that she had held a birthday party for her daughter during the weekend recess which interrupted the penalty phase deliberations. At the party, a candle was placed on the birthday cake in honor of Lisa Rene's memory, and the juror and guests had prayed for Lisa Rene. A similar report apparently was broadcast on a radio station.

63. After viewing the television news report, Mrs. Ross telephoned Michael Ware and left a message for him describing what she had seen. She never heard back from Mr. Ware concerning the report. Mr. Ware's file, however, reflects this call from Mrs. Ross. In addition, Mr. Ware's file includes a memo dated "11-15-95," reflecting that Mr. Hall told Mr. Ware that he had heard a radio broadcast of the same story; the memo includes notations reading, "see if we can get tape of program" and "file motion to interview jurors!" Exhibit 10. Attorney Kevin McNally recalls a conversation with Mr. Hall on November 16 in which Mr. Hall likewise mentioned the radio news story and reported that he had informed his attorney. Mr. Ware filed no motion to

interview the jurors and did not otherwise follow up on this report.

64.  On December 6, 1995, the defense filed a motion and brief for new trial, arguing, *inter alia*, that the Court erred in failing to sequester the jurors during punishment phase deliberations, given the risk that extensive media coverage of the case would impact their deliberations, and in denying a mistrial or failing to poll the jurors concerning whether any of them had seen a November 5, 1995 television news broadcast involving a discussion of the death penalty.  Docket No. 504; R. 6:1440-41.  The defense did not raise a claim that the juror's leading a group prayer for Lisa Rene during the weekend before deliberations were completed constituted misconduct, nor did counsel seek the Court's permission to interview jurors with respect to this incident or the media-exposure claims actually raised in the motion for new trial.  The next day, the Court denied the motion for new trial without a hearing.  Docket No. 510; R. 6:1456.

# CLAIMS FOR RELIEF[7]

## I.

## MR. HALL'S CONVICTION AND DEATH SENTENCE VIOLATE THE FIFTH AMENDMENT UNDER <u>RING V. ARIZONA</u>, ___ U.S.___, 122 S. CT. 2428 (2002).

**65.** Mr. Hall was charged by indictment with kidnapping resulting in death, in violation of 18 U.S.C. §1201(a)(1). R. 1:37. Count One of the indictment alleged only that Mr. Hall, alone or in concert with his co-defendants, committed the acts constituting the kidnapping offense itself (*i.e.,* that he "did willfully and unlawfully seize, confine, inveigle, kidnap, abduct, and carry away and hold for ransom, reward, and otherwise, Lisa Rene, and did willfully transport said Lisa Rene in interstate commerce from the Northern District of Texas to a location in or near Pine Bluff, Arkansas, and as a result the death of Lisa Rene occurred"). The remaining counts in the indictment charged Mr. Hall with non-capital offenses. R. 1:38-44. The grand jury did *not* allege anywhere in the indictment that it had found any of the aggravating circumstances which, under the Federal Death Penalty Act of 1994 ("FDPA"), must be found at trial in order to render the defendant eligible for the death penalty. Pursuant to the FDPA, those factors were separately

---

[7] Counsel have worked diligently, within the constraints imposed by lack of discovery and essential funding, to identify, raise, and support all the substantial grounds for relief that might be raised on Mr. Hall's behalf. However, due to factors we have identified for the Court in our several requests for discovery, access to witnesses and jurors, and funding, our development of our client's claims for relief remains incomplete. Mr. Hall does not waive any claims for relief which have not been identified or fully presented as a consequence of limitations on his appointed counsel's efforts on his behalf.

alleged in the Government's notice of intent to seek the death penalty against Mr. Hall, which enumerated the aggravating factors the Government would seek to prove.  R.1:82-87.

66.   Mr. Hall moved to dismiss Count 1 of the indictment, arguing, *inter alia*, that the indictment "purport[ed] to allege a death penalty eligible homicide by simply stating 'and as a result the death of Lisa Rene occurred,'" and that it "[did] not allege manner or means of death [nor] Defendant's culpable mental state [at] the time the death occurred."  R. 2:477.  As a result, Mr. Hall argued, his "fifth amendment right to be tried by grand jury indictment ha[d] been abridged."  *Id.*; *see also* R. 2:478-479 ("the Government is attempting to obtain a death sentence by relying on numerous allegations [that] apply to the particular case for which the Defendant is being tried but which are not alleged in the indictment itself and which were therefore, evidently, never passed on by the grand jury," in violation of the Fifth Amendment).  The Government plainly understood Mr. Hall to be arguing that the aggravating factors had to be included in the indictment, because it responded directly to that argument in its own pleadings.  *See* R. 2: 413-414.[8]  The Court denied Mr. Hall's motion on September 18, 1995.  R. 4:820-821.

---

[8] Specifically, the Government argued as follows:

> Apparently, Hall is suggesting that count one must be specific enough to actually allege a murder in the course of a kidnapping.  Congress, however, chose not to place murder as an element of a kidnapping offense even when the statute calls for a mandatory life imprisonment or the death penalty.  If Congress had chosen to require the government to prove a murder in the course of a kidnapping for life imprisonment or the death penalty, then Congress would have placed that requirement specifically in section 1201(a).  Congress did not include this language in section 1201(a).  Consequently, the government does not have to prove what Congress chose not to define as a part of the offense of kidnapping resulting in death.

> The government would note that Congress did require the government to, in effect,

67. On June 24, 2002, the Supreme Court decided <u>Ring v. Arizona</u>, 122 S.Ct. 2428 (2002). <u>Ring</u> overruled <u>Walton v. Arizona</u>, 497 U.S. 639 (1990), in light of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000). The key finding in <u>Ring</u>, for purposes of this Court's review of Mr. Hall's sentence, is that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of *an element of a greater offense'. . . .*" <u>Ring</u>, 122 S.Ct. at 2443, quoting <u>Apprendi</u>, 530 U.S. at 494 n.19 (2000) (emphasis added).

68. The Court had previously held in <u>Jones v. United States</u>, 526 U.S. 227, 251-52 (1999), that the Fifth Amendment requires that all elements of a federal offense be "charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." As the Court has made clear since <u>Jones</u>, an "element" for purposes of constitutional analysis is any "fact[] necessary to impose the maximum [punishment]." <u>Harris v. United States</u>, ___ U.S. ___, 122 S. Ct. 2406, 2419 (2002). <u>Ring</u> makes clear that aggravating factors in a capital case are elements because they are "legally essential" to increase the available sentence from life imprisonment to

---

prove a murder to get the death penalty when a kidnapping occurred. <u>See</u> 18 U.S.C. §3591(a)(2). *However, Congress required that notice to be provided <u>not</u> in the indictment as an element of the offense; but as predicate in the sentencing phase of the trial where notice is provided by way of the government's written notice to seek the death penalty. <u>See</u> 18 U.S.C. §3593(a). The government submits that it has fully complie[d] with these applicable sections.*

*What Hall is asking the Court to do is require the government to plead, in the indictment, factors relating to sentencing,* i.e., that Hall participated in a murder. This information relating to sentencing does not have to be alleged in the indictment. <u>See</u> <u>United States v. Deisch</u>, 20 F.3d 139, 146 (5th Cir. 1994) ["(A)n indictment need not allege mere sentencing factors."] . . . .

R. 2:413-414 (emphasis added).

death (as the Court put it in <u>Harris</u>, they are "necessary to impose the maximum [punishment]"). Taken together, these cases dictate the conclusion that in a *federal* capital prosecution, the Fifth Amendment requires that all aggravating factors and mental state elements be alleged by indictment. Thus, the indictment under which Mr. Hall was convicted and sentenced to death is fatally flawed because the grand jury failed to consider or find those elements of the capital offense.[9]

69. This absence of a fundamental procedural protection was not rendered harmless by the fact that the petit jury subsequently found at trial that the Government had proved, even "beyond a reasonable doubt," the aggravating factors alleged in its notice of intent to seek the death penalty. The Supreme Court has emphasized that the grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, *including the important decision to charge a capital crime*." <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998), citing <u>Vasquez v. Hillery</u>, 474 U.S. 254, 263 (1986) (emphasis added). <u>Ring</u> makes clear that the grand jury which indicted Mr. Hall never made that "important decision." Its failure to do so cannot be rendered harmless by subsequent findings of the petit jury after the Government appropriated the grand jury's constitutionally protected role.

70. This reading of <u>Ring</u> – that it requires the grand jury to allege in the indictment any fact-finding necessary to render the defendant death-eligible -- is reinforced by the Supreme Court's action four days after <u>Ring</u> in <u>Allen v. United States</u>, ___ U.S.___, 122 S. Ct. 2653 (2002). The Court

---

[9] On counsel's information and belief, since <u>Ring</u> the Department of Justice has apparently directed prosecutors with pending FDPA cases to seek superseding indictments including aggravating factors.

granted *certiorari*, vacated the decision below (United States v. Allen, 247 F.3d 741 (8th Cir. 2001)), and remanded for further consideration in light of Ring.  The first question presented in Allen's petition for *certiorari* was whether, in a capital case brought pursuant to the FDPA (*i.e.,* a capital case like Mr. Hall's), the Fifth Amendment required that aggravating factors be presented to, and found by, the grand jury, rather than simply being alleged by prosecutors as provided by 18 U.S.C. §3593.  *See* Allen, 247 F.3d at 761-764 (addressing and rejecting this claim, prior to Ring).  The Supreme Court's decision to vacate and remand Allen is strong evidence that the Fifth Amendment requires, in a federal capital case, that aggravating factors be presented to and found by the grand jury.[10]  Because Mr. Hall's indictment did not contain those elements of the offense, his conviction and death sentence violate his right to grand jury indictment under the Fifth Amendment and this Court should grant relief.[11]

---

[10] Ring does not discuss the grand jury issue since that case arose in the context of a state prosecution, where the Fifth Amendment's Indictment Clause does not apply.  Hurtado v. California, 110 U.S. 516 (1884).  Ring clearly establishes, however, that aggravating factors in a scheme such as the FDPA operate as elements of an offense that must, in the federal system, be alleged by way of indictment.  The only issue presented by Allen's petition for writ of *certiorari* to which Ring could apply was the applicability of the Indictment Clause to aggravating factors in a case brought pursuant to the FDPA.

[11] Ring -- which concerns the definition of what elements constitute a particular (greater or lesser) offense -- is a decision of substantive constitutional criminal law, and thus should be retroactively applicable in this case notwithstanding the fact that Mr. Hall's conviction became "final" on direct review prior to the decision in Ring.  *See, e.g*., United States v. McPhail, 112 F.3d 197, 199 (5th Cir. 1997) (Bailey v. United States, 516 U.S. 137 (1995), "applies retroactively to cases on collateral review" because it "articulate[d] the substantive elements that the government must prove to convict a person charged [under 18 U.S.C.] § 924(c)(1)," and thus was "a substantive, non-constitutional decision concerning the reach of a federal statute" and "not … a new rule of criminal procedure [implicating] the retroactivity analysis set forth in Teague v. Lane,") (citation omitted).  In a very recent decision in a *non-capital* case, United States v. Brown, ___ F.3d ___, 2002 WL 2027346 (5th Cir. Sept. 5, 2002), a panel of the Fifth Circuit held that the rule of Apprendi, upon which Ring is

71. Ring's declaration that the aggravating circumstances and mental state factors in the FDPA are elements of the offense, indeed, renders the FDPA itself facially unconstitutional and requires relief from Mr. Hall's death sentence on that basis, as well. The "greater offense" of which those findings are elements (which, for the sake of convenience, we will denote here as "federal capital murder") has not yet been created by Congress, which alone can establish and define federal criminal offenses and the penalties which attach to them. United States v. Hudson, 11 U.S. 32, 34 (1812); Bousley v. United States, 523 U.S. 614, 620-21 (1998) ("[O]nly Congress, and not the courts, [can] make conduct criminal"). While Congress no doubt intended to create such a death-eligible offense, the plain import of Ring is that it failed to do so.

72. The doctrine of separation of powers, combined with the non-delegation doctrine[12] and the long-established constitutional principle forbidding judge-made "common law" criminal offenses, compel the conclusion that the FDPA cannot, after Ring, be judicially "construed" to create an offense and associated procedures which comply with constitutional mandates.[13] Even

---

based, is not a substantive rule of law and thus is subject to the limitations of Teague v. Lane, and that Teague bars collateral relief on such a claim. Brown is distinguishable, however, since it is a non-capital case and so does not implicate the grand jury's pivotal role in deciding whether a defendant should face capital charges, nor the elements of death-eligible criminal homicide under federal law. We respectfully submit that the Supreme Court, which has yet to rule on the retroactivity of Apprendi or Ring, will ultimately hold that a death-sentenced federal prisoner like Mr. Hall is entitled to the benefit of Ring on collateral review.

[12] The non-delegation doctrine, see Mistretta v. United States, 488 U.S. 361, 371-372 (1989), would preclude either the Executive or the Judiciary, whether acting individually or in tandem, from substituting its judgment for that of Congress in relation to prescribing the elements and the procedures for application of a federal death penalty.

[13] The doctrine of "constitutional avoidance," see United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 408 (1909); see also Jones, 526 U.S. at 239–40, has no place in this

if this Court is confident it can divine how Congress would have defined the elements of "federal capital murder" had it been legislating against the post-Ring legal landscape, and even if this Court believes it could craft workable solutions to the numerous procedural questions about how to accommodate the provisions of the FDPA to Ring's declaration that aggravating factors are now elements of the offense,[14] the law forbids it from doing so. United States v. Jackson, 390 U.S. 570, 572-582 (1968) (rejecting efforts to save a comparably flawed federal death penalty statute). It is not that this Court is not competent to fix the FDPA, but that the Constitution places that power, for good or ill, exclusively in the hands of Congress.[15] Under Ring, this Court's duty is to declare the FDPA facially unconstitutional and vacate Mr. Hall's death sentence.

**II.**

---

analysis because the portions of the FDPA which are impossible to square with Ring are wholly unambiguous. This Court may not accomplish that which Congress never intended by "construing" the FDPA in a way Congress never contemplated. See United States v. Albertini, 472 U.S. 675, 679 (1985).

[14] These procedural problems include, but are not limited to, the following: whether non-enumerated aggravating circumstances as provided by 18 U.S.C. § 3592(c) ("any other aggravating factor for which notice has been given") must, like the enumerated aggravating circumstances in § 3592(c)(1) – (c)(16), be found by the grand jury and alleged in the indictment (and, if so, in what language and with what particularity); whether the accused must plead to the aggravating circumstances and/or mental state factors; and whether some elements of the "greater offense" of "federal capital murder" -- but not others – may be proved by evidence that does not satisfy the Federal Rules of Evidence. Cf. § 3593(c) (making "information" admissible at the special sentencing hearing "regardless of its admissibility under the rules of evidence governing admission of evidence at criminal trials").

[15] See Jackson, 390 U.S. at 573, 578; id. at 580 (a court may "fill a minor gap in a statute," but not "create from whole cloth a complex and completely novel procedure" solely to rescue a statute from being declared unconstitutional).

## MR. HALL WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT

### Introduction

73. The Sixth Amendment guarantees an accused "the guiding hand of counsel at every stage of the proceedings against him." Gideon v. Wainwright, 372 U.S. 335, 342 (1963) (quoting Powell v. Alabama, 287 U.S. 45, 68-69 (1932). Beginning with pre-trial preparation and continuing through the verdict at sentencing and the denial of their motion for new trial, Mr. Hall's appointed attorneys failed to provide the reasonably effective assistance guaranteed by the Sixth Amendment. Their errors and omissions fell objectively outside the wide range of professional representation and, but for counsel's deficient performance, it is reasonably likely that Mr. Hall would not have been sentenced to death.

### Counsel failed to conduct a timely investigation

74. The Court appointed Michael Ware and Jeffrey Kearney to represent Mr. Hall on March 21, 1995, after permitting Mr. Hall's prior counsel, Mark G. Daniel and Michael Heiskell, to withdraw. At the time Mr. Ware and Mr. Kearney were appointed, investigator Danny LaRue was already on the case. About two weeks after Mr. Ware and Mr. Kearney were appointed, the Court set Mr. Hall's trial to begin October 2. Docket Nos. 82-84; R. 1:108-20.

75. Mr. LaRue conducted almost no investigation between the date Mr. Ware and Mr. Kearney were appointed and the beginning of jury selection on October 2.[16] According to Mr. LaRue's

---

[16] Mr. LaRue was the investigator appointed to assist Mr. Hall's original attorneys, Mark Daniel and Michael Heiskell. From 11/15/94 to 3/21/95, while Messrs. Daniel and Heiskell were representing Mr. Hall, Mr. LaRue performed a total of 7.8 hours of work on the case. *See* Exhibit 11.

time records, during that six-month span Mr. LaRue performed less than 14 hours of investigative work, barely more than 2 hours per month. Exhibit 11 (Declaration of Danny LaRue, with billing records appended).[17]

76. Nor did Mr. Ware or Mr. Kearney personally conduct the necessary penalty-phase investigation during the same six-month period.[18] From March 21 to the start of trial on October 2 (a period of approximately 195 days, or about 6½ months), Mr. Kearney spent approximately 179.4 hours of out-of-court time working on Mr. Hall's case. However, substantial portions of that time were spent on reviewing motions and the Government's responses thereto (7.5 hrs.), reviewing transcripts (13.5 hrs.), preparing for the suppression hearing (26 hrs.), reviewing discovery materials (51.5 hrs.), reviewing jury questionnaires prior to *voir dire* (16.0 hrs.), and reviewing proposed jury instructions (3.0 hrs.) -- a total of 117.5 hours, leaving 61.9 hours of

[17] According to his billing statement, Mr. LaRue worked a total of 19.5 hours between March 21 and October 1. He spent 5.8 hours in court assisting counsel at the suppression hearing on September 1. The remaining time (13.7 hours) includes, *inter alia*, conferences with Mr. Hall's attorneys, attempting to obtain statistical information concerning the racial makeup of the Northern District of Texas, and review of the Government's exhibit list. The time which can conclusively be described as investigation during the interval from March 21 to October 1 is basically 5.5 hours of interviews with Mr. Hall (some part of which included an interview with Mr. Hall's brother Demetrius), one eighteen-minute phone call with one of Mr. Hall's sisters, and an interview of indeterminate length with LaTonya Anders. *See* Exhibit 11. The precise calculations are immaterial because the total is unreasonably low for sixth months of preparation even if every hour noted was spent on investigation.

[18] On August 3, 2000, the Court entered an order unsealing the vouchers submitted by Mr. Ware, Mr. Kearney, Mr. LaRue, Mr. Daniel, Mr. Heiskell, investigator Tena Francis, psychiatrist Lisa Clayton, M.D., and pathologist Linda Norton, M.D., as well as motions and orders related to funding for the defense at trial. Mr. Hall alleges that the number of hours of investigation performed by counsel and their representatives, individually and collectively, prior to Mr. Hall's trial fell below an objectively reasonable standard of performance for counsel in a death penalty case.

out-of-court time to spend on other tasks.  Thus, even if Mr. Kearney spent all his remaining 61.9 hours of out-of-court time on factual investigation and preparation for the punishment phase of trial, he spent less than 10 hours per month on those essential tasks between appointment and the beginning of trial.

77.     During the same time period (*i.e.*, from the date of appointment through October 1), Mr. Ware's vouchers reflect that he spent about 289.2 hours of out-of-court time working on Mr. Hall's case.  However, that figure likewise includes a total of 163 hours in the billing categories of "legal research and writing" and "obtaining and reviewing the court record," *i.e.,* not spent on investigation -- leaving 126.2 hours of out-of-court work.

78.     For the first *four months* counsel were on the case – April, May, June, and July of 1995 – the total out-of-court time spent on Mr. Hall's case by *all three members* of his defense team (Mr. Kearney, Mr. Ware, and Mr. LaRue) -- again, excepting the hours counsel attributed to "legal research and writing" -- was fewer than 60 hours.  Given the impending October 2 trial date, this four-month interval represented two-thirds of the total time available for pre-trial investigation and preparation. This failure to conduct a timely investigation was objectively unreasonable. Exhibit 12 (Declaration of Michael E. Tigar, Esq.), at ¶¶ 18-30.

79.     Counsel's obligation to ensure adequate investigation does not require that counsel personally perform investigative tasks.  21 U.S.C. § 848(q) gives defense counsel in capital cases *ex parte* access to resources for fact development.  Counsel performed deficiently in failing to take timely advantage of the statutory entitlement to resources for investigation and other reasonably necessary services.  *Id.* at ¶ 22 (Counsel's "[f]ailure to make timely and intelligent use

of [21 U.S.C. § 848(q)] is, in and of itself, a substantial departure from the standards that a federal capital defendant has the right to expect").

80.     Notwithstanding the ready availability of investigative assistance under 21 U.S.C. § 848(q), counsel waited until June 30, 1995, three months into their representation, to move the Court *ex parte* for appointment of a mitigation specialist to conduct investigation into potential mitigating evidence. When their motion was heard in mid-July, however, counsel affirmatively decided not to pursue the motion further at that time. Given the fact that no substantial investigation had been accomplished by that date, counsel acted unreasonably in abandoning this part of their *ex parte* motion for funds.[19]

81.     Trial counsel did not renew the request for a mitigation specialist until September 7. Even then, counsel had to be prodded into action by Federal Death Penalty Resource Counsel Kevin McNally, who had been consulting with them since their appointment in March:

> In the summer of 1995, I had contact with Mr. Hall's defense attorneys … [and] inquired about the status of their investigation, particularly their pursuit of evidence for what appeared to be an inevitable penalty phase given the circumstances of the Government's case against Mr. Hall. I was startled to

---

[19] Counsel's failure to appreciate the extent to which they were deficient in pursuing investigation into mitigating evidence, and their obligation to seek appropriate assistance in that regard, is reflected by Mr. Ware's comment to the Court during the *ex parte* hearing that counsel had only filed the motion requesting appointment of a mitigation specialist because "they are all the rage now, and it may come at some point that we have to ask for one just because we feel like we need to." R. 11:10. Contrary to Mr. Ware's characterization, "[t]he use of mitigation specialists . . . to accomplish [social history investigation] was well-established by the mid-80's." Exhibit 14 at ¶ 12. Significantly, counsel realized by the date of that hearing (July 14, 1995) that whether Mr. Hall should be sentenced to death would likely be the only issue at trial. As Mr. Ware put it, "I think to the extent that there is something we can do as this man's counsel, it is to pick a jury in which he at least has a fighting chance, so to speak, of getting a life sentence under the facts of this case." *Id*. at 7.

learn that they had done essentially nothing to investigate the case since being appointed. No one had undertaken the complex, time-consuming, and essential task of exploring Mr. Hall's background in order to develop evidence that could persuade jurors to spare his life. In 1995, the national standard of practice for defending capital cases required such an investigation, as a necessary prerequisite to making vital decisions about motion practice, defense strategy, jury selection, use of experts, and a wide range of other potentially pivotal choices in the course of the representation. It was understood that preparation for trial simply could not be approached meaningfully unless such an investigation was performed. … Hoping to jump-start counsel's effort, I urged Mr. Ware and Mr. Kearney to seek funds for the services of a mitigation specialist to conduct an appropriately broad and deep inquiry into Mr. Hall's social history and assist them in developing evidence for the penalty phase. … Counsel initially filed [such a motion on] June 30, 1995, along with requests for funds for other experts. They abandoned that part of their funding request, however, in the course of the July 14 *ex parte* hearing on their motions … . When I subsequently had contact with Mr. Hall's counsel, and learned that they still had not undertaken any meaningful investigation into Mr. Hall's background, I redoubled my efforts to persuade them to seek funding for a properly qualified mitigation specialist. I believe that I may have drafted the motion for that purpose which Mr. Hall's attorneys filed on or about September 7, less than a month before the scheduled trial date of October 2. This motion was granted and Tena Francis was appointed to assist counsel as their mitigation investigator.

Exhibit 13 (Declaration of Kevin McNally) at ¶¶ 5-9.

82. Thus, counsel lacked this indispensable assistance in performing a task essential to the penalty-phase defense until September 12, less than three weeks before jury selection began.[20]

*parte* motion for funds.[21]

---

[20] Although the Court's order was signed on September 11 and filed on September 12, Mr. Ware did not contact to confirm her appointment until two days later (September 14), and did not meet with Ms. Francis until September 15. Exhibit 7 at ¶¶ 7-8.

[21] Counsel's failure to appreciate the extent to which they were deficient in pursuing investigation into mitigating evidence, and their obligation to seek appropriate assistance in that regard, is reflected by Mr. Ware's comment to the Court during the *ex parte* hearing that counsel had only filed the motion requesting appointment of a mitigation specialist because "they are all the rage now, and it may come at some point that we have to ask for one just because we feel like we need to." R.

83.    As a result of counsel's unreasonable delay in undertaking necessary investigation, almost all the mitigation investigation performed on Mr. Hall's behalf was conducted during the trial itself, while the jury was being selected and while the Government was presenting its case.  This practice was objectively unreasonable and fell outside the wide range of reasonably effective professional assistance.  Exhibit 12, at ¶¶ 23-30; Exhibit 13, at ¶¶ 5, 12; *see also* <u>Williams v. Taylor</u>, 529 U.S. 362, 395 (2000) (counsel performed deficiently in that they "did not begin to prepare for that phase of the proceeding [*i.e*., the sentencing hearing] until a week before the trial").

84.    No one can dispute that counsel must conduct a reasonable investigation in order to provide effective assistance under the Sixth Amendment.  <u>Strickland v. Washington</u>, 466 U.S. 668, 690-691 (1984); *see also, e.g*., <u>Nealy v. Cabana</u>, 764 F.2d 1173, 1177 (5th Cir. 1985) ("[A]t a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case"); <u>Crisp v. Duckworth</u>, 743 F.2d 580, 583 (7th Cir. 1984)  (counsel "must investigate a case in order to provide minimally competent professional representation"); <u>United States v. Gray</u>, 878 F.2d 702, 711 (3rd Cir. 1989) ("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made").

---

11:10.   Contrary to Mr. Ware's characterization, "[t]he use of mitigation specialists . . . to accomplish [social history investigation] was well-established by the mid-80's." Exhibit 14 at ¶ 12. Significantly, counsel realized by the date of that hearing (July 14, 1995) that whether Mr. Hall should be sentenced to death would likely be the only issue at trial.  As Mr. Ware put it, "I think to the extent that there is something we can do as this man's counsel, it is to pick a jury in which he at least has a fighting chance, so to speak, of getting a life sentence under the facts of this case." *Id*. at 7.

85. In a capital case, this duty includes the responsibility to seek out mitigating evidence for use in the penalty phase, in the event the defendant is convicted of a death-eligible crime. Because of "the overwhelming importance of mitigation evidence to the just imposition of the death penalty," courts must "scrutinize carefully any decision by counsel that deprived [the defendant of such] evidence." Holloway v. Horn, 161 F.Supp.2d 452, 566 (E.D. Pa., 2001). "Generally, any lawyer who tries capital murder cases knows that he or she has a duty to investigate the client's life history and emotional and psychological make-up through an inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology, and present feelings." Valdez v. Johnson, 93 F.Supp.2d 769, 780-781 (S.D. Tex. 1999), *aff'd in part and vacated in part sub nom. Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) (internal quotation marks omitted; citation omitted).[22]

86. Similarly, because "the acquisition of mitigation evidence is so critical in any capital case," reasonably effective counsel appreciate that "preparation for the sentencing phase must begin when counsel is first appointed." *Id.* at 781; *see also* Exhibit 14 (Declaration of Jill Miller) at ¶ 17 ("[I]t is essential that the [social history] investigation be undertaken as early as possible in the history of

---

[22] A note about the status of the merits holding in Valdez is appropriate. On the State's appeal of the district court's order granting habeas relief, the Fifth Circuit concluded that the district court had erred in failing to review Valdez's claims under the "deferential framework" erected by 28 U.S.C. §2254(d) [as amended by the Antiterrorism and Effective Death Penalty Act of 1996]. Valdez, 274 F.3d at 956. So finding, the Court of Appeals "decline[d] to address the merits of Valdez's claims for habeas relief" and remanded for further consideration. Id. This Court's review of Mr. Hall's claim of ineffective assistance of counsel, however, is *de novo* -- not " deferential." Accordingly, the district court's conclusions in Valdez with respect to counsel's duty to seek out mitigating evidence in a capital case continue to constitute persuasive authority.

the case"); Exhibit 12 at ¶ 21 ("[W]aiting four full months to undertake any meaningful mitigation investigation in any capital case [is] objectively unreasonable.").  Whether or not Mr. Hall's attorneys were aware of the scope of this duty, the record demonstrates they failed to attend to it in a timely manner.

87.    The applicable standard of practice for capital defense at the time of Mr. Hall's trial demanded that counsel undertake a broad investigation into potential mitigation:

> [D]efense counsel in a capital case must undertake "the most extensive background investigation imaginable," in the words of one representative [training] publication, including "look[ing] at every aspect of [the] client's life from birth to the present," and "talk[ing] to everyone . . . who has ever had any contact with [him]."  By no later than 1985, the unanimous view of qualified capital defense attorneys across the nation was that the likely success of the penalty phase depended on conducting the most extensive  pretrial social history investigation possible. . . . [I]n 1994-1995, the standard of practice for defending death penalty cases obliged counsel to make sure that a complete and thorough social history investigation [was] completed in a timely manner.  In 1994-1995, the standard of practice also required counsel to obtain the assistance of such persons, appropriately qualified by training and experience, as might be necessary to accomplish this task.

   Exhibit 14 at ¶¶ 27-28.

88.    Investigating potential mitigation requires counsel or counsel's agent to find and interview witnesses, obtain and examine relevant documents and other tangible evidence, and visit locations associated with the events of the client's life.  Exhibit 14 at ¶¶ 26-39.

89.    Beyond the time necessary to identify potential witnesses, locate them, and spend time with them in the places where they live (tasks which can be challenging, especially with witnesses whose interactions with the client took place years in the past), developing mitigating evidence and preparing it for presentation to a jury creates unique time demands:

[A]cquiring a full understanding and appreciation of the events of the client's life requires counsel or their investigator to ask the client and important people in his life to talk about events and memories that are profoundly painful and difficult to recall. This takes time and cannot necessarily be compressed into a short period, even one in which counsel or the investigator spends substantial time with the client or witness. Developing the case for life requires counsel or her investigator to form relationships of trust with the most important individuals who will become penalty-phase witnesses for the defense. Such relationships may take repeated visits and long hours of conversation – or companionable silence – to develop. In addition, in order vividly and persuasively to convey the locations and events of the client's life for the jurors, counsel needs a genuine appreciation for those circumstances, and needs to consider thoughtfully how to communicate that information to the jury. These tasks all demand substantial, *unpressured* time. They cannot be effectively pursued mid-trial.

Exhibit 12 at ¶ 25 (emphasis in original).

90. Jill Miller, M.S.S.W., who has worked on more than ninety capital murder cases, describes the time demands of a properly conducted social history this way:

A properly conducted social history investigation . . . inevitably involves eliciting personal information from the client and others, particularly information of a private and sensitive nature. . . . [F]actors such as denial, repression, shame, and a sense of privacy all inhibit the ability to fully disclose critically important information. Where present, these factors increase the amount of time necessary to complete the investigation, since the mitigation specialist cannot obtain such sensitive information without building a relationship of genuine trust with the persons who are providing information. Building such a relationship takes time; for example, where a source is also a victim of trauma, it may be necessary to conduct repeated interviews of the source, or even involve a consulting or treating expert to assist the source, in order that information about traumatic experiences may be obtained without overwhelming or retraumatizing the subject. These time demands cannot be artificially compressed to meet an external schedule. Consequently, it is essential that the investigation be undertaken as early as possible in the history of the case.

Exhibit 14 at ¶ 17.[23]

---

[23] It is worth noting that defense investigator Tena Francis, as she attempted to investigate the case while trial was ongoing, developed information that Mr. Hall manifested symptoms of trauma (including withdrawal, depression, and suicidal thoughts), even as a young child. In addition, Betty Hall today shows classic symptoms of Post Traumatic Stress Disorder (PTSD), such as depression

91. Reasonably effective capital defense counsel in 1995 would have understood that it was necessary to undertake the investigation of Mr. Hall's background and other potentially relevant mitigating circumstances immediately upon their appointment to the case in March. It was objectively unreasonable for Mr. Hall's counsel to fail to undertake those essential tasks until mid-September, and impossible for counsel to complete them adequately given that trial began as scheduled on October 2. The investigation undertaken by Mr. Ware in October, and by mitigation specialist Tena Francis in the six weeks from mid-September to the end of trial, was inadequate to fully develop the available mitigating evidence which could have been presented on Mr. Hall's behalf, including evidence which would have undermined the Government's case for the death penalty. The defense team in fact failed to develop all such available evidence as required by the governing standard of practice for reasonably effective assistance in a death penalty case.

**Consequences of Trial Counsel's Failure to Investigate**

92. Trial counsel's failure to undertake any investigation in the case until the eve of trial precluded them from making informed decisions about how to conduct critical stages of the trial and had a disastrous impact on their ability to defend Mr. Hall and to persuade the jury to spare his life. As capital defense expert Kevin McNally points out, such an investigation was understood in 1995 to be "a necessary prerequisite to making vital decisions about motion practice, defense strategy, jury selection, use of experts, and a wide range of other potentially

---

and recurring distressing dreams, and could probably be diagnosed as suffering from that condition. *See* Exhibit 14 at ¶ 52; *see also* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 4th edition (DSM-IV), at 424-429. Reasonably effective counsel, having first undertaken the investigation in a timely fashion, would have pursued and fully developed

pivotal choices in the course of the representation." Exhibit 13, at ¶ 5; see also Exhibit 14, at ¶ 15. As a result of counsel's failure to conduct a timely investigation into available mitigating evidence, counsel were unable to exercise appropriate professional judgment in numerous vital areas of conducting the defense. For example, counsel were necessarily handicapped in selecting the jury, since counsel had little idea during jury selection what mitigating evidence would be presented or what witnesses would sponsor it. Counsel made all guilt-phase decisions without having a clear idea of what they would present at punishment, making it impossible for them to pursue the important goal of "bridging" the two phases of trial for the jurors. Exhibit 12, at ¶ 35. Counsel also made last-minute decisions about which witnesses to present in mitigation without having undertaken a reflective examination of the defense case as a whole, and without having spent enough time with the potential witnesses to assess meaningfully how they would perform on the stand and what the defense stood to gain or lose by calling them. Exhibit 7 at ¶¶ 23-26. These examples illustrate but do not exhaust the situations in which counsel's failure to conduct a timely investigation constrained their ability to defend Mr. Hall in a professionally reasonable manner at trial.

93.     Time constraints, moreover, necessarily resulted in counsel's inability to develop and present compelling mitigating evidence about Mr. Hall's background and character, because counsel lacked sufficient time either to incorporate recently discovered evidence into their understanding and presentation of the case, or to develop and prepare the witnesses necessary to present the evidence effectively to the jury. In other words, counsel's last-minute investigation precluded

---

these facts to support their presentation of evidence about Mr. Hall's violent upbringing.

them from making effective use of even the incomplete and inadequate evidence they unearthed as trial itself was proceeding.

**By Failing To Investigate The Facts Before Choosing A Focus For The Penalty Phase, Counsel Made An Unreasonable Decision To Emphasize The Mitigating Factor Of "Equally Culpable Co-Defendants" To The Virtual Exclusion Of Other, More Persuasive Mitigating Evidence**

94.     On September 15, 1995, the day after she was retained to conduct a mitigation investigation, Tena Francis met with Michael Ware for the first time. At the meeting, Mr. Ware advised her that he thought the statutory mitigating factor that equally culpable co-defendants would not be sentenced to death was the best avenue to pursue in the penalty phase.[24] Exhibit 7, ¶¶ 9-10. Ms. Francis devoted much of her time during the month of investigation that followed, as did Danny LaRue, to seeking evidence tending to show that Mr. Hall's co-defendants were as culpable, if not more culpable, than Mr. Hall. *See* Exhibit 7, Appendix A, at ¶¶ 3-6; *see also* Exhibit 11.

95.     As virtually no investigation had been done prior to September 15, 1995, trial counsel's decision at that time to focus on this particular mitigating factor as preferable to any other potentially available mitigation was made without *any* information to inform that choice. Notwithstanding the fact that some evidence to support this factor was contained in documents disclosed by the Government in discovery, deciding to focus on this factor to the exclusion of all others before conducting any investigation outside the scope of the Government's discovery was objectively unreasonable.

96.     While the relative culpability of Mr. Hall's co-defendants was a valid factor to investigate

---

[24] *See* 18 U.S.C. 3592(a)(4).

and present, counsel had an obligation to begin an investigation early in the case to explore the existence of *all* factors that might persuade a juror to vote for a sentence less than death. "While trial counsel is afforded tremendous deference over matters of trial strategy, the strategy that is selected must be supported by adequate investigation. . . . Before selecting a strategy, counsel must investigate the defendant's background for mitigation evidence to use at sentencing." Turpin v. Lipham, 510 S.E.2d 32, 40 (Ga. 1998)(citation omitted); s*ee also* Valdez v. Johnson, 93 F.Supp.2d 769, 780-781 (S.D. Tex. 1999), *aff'd in part and vacated in part sub nom. Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) ("any lawyer who tries capital murder cases knows that he or she 'has a duty to investigate the client's life history, and emotional and psychological make-up' through an 'inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings . . . . Since the acquisition of mitigating evidence is so critical in any capital case, preparation for the sentencing phase must begin when counsel is first appointed.'") (citation omitted); Carter v. Bell, 218 F.3d 581, 592-97 (6th Cir. 2000) (counsel's decision to focus on residual doubt without investigating mitigation objectively unreasonable).

97.     Moreover, the "equally culpable" factor is unusual as a mitigating circumstance because its mitigating value lies in its potential appeal to a juror's abstract notions of justice, rather than its connection to personal characteristics of the defendant and his background which may supply positive reasons to spare his life. As this Court observed during *voir dire*: "It doesn't seem unreasonable, looking at this totally in the abstract, that equally culpable defendants would strike some people as not a very strong mitigating factor." R. 19:59. That the equally culpable factor,

considered alone, lacks persuasive force as a mitigator is readily apparent from the comments of numerous prospective jurors, who expressed the view that whether other equally culpable co-defendants were not sentenced to death would have little or no bearing on their penalty decision. *See, e.g.*, R. 16:195-96, 198 (Joyce McGough); 19:52-53 (Vicky Lane); 19:213 (Randal Davis); 20:99-101 (T. Michael Mearse); 22:60 (David Cheatham); 23:59, 64-70 (Terri Jackman). Counsel's decision to focus their attention on this mitigating factor, to the virtual exclusion of other circumstances, was unreasonable in the absence of any information to inform counsel's choice.

98.     Counsel's apparent decision, prior to involving Ms. Francis in the case, to limit the case in mitigation to the "equally culpable" factor was further unreasonable in light of the federal death penalty statute's adoption of a "weighing" scheme by which the jury must determine the penalty. 18 U.S.C. § 3593(e) provides that "the jury, or if there is no jury, the court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death."  As a matter of basic common sense, this sentencing scheme requires that capital defense counsel investigate, develop and compellingly present as many possible statutory and non-statutory mitigating factors as they can find.

99.     Review of the trial record, moreover, reveals that trial counsel, in emphasizing the "equally culpable" factor, gave short shrift to other potentially more persuasive mitigating evidence relating to Mr. Hall's background and personal characteristics.  Five of the eight defense

witnesses presented in the penalty phase testified regarding Webster's and Beckley's bad qualities; only two unprepared witnesses addressed Mr. Hall's family background and good qualities. *See, e.g.* R. 32: 110-121 (direct examination of Betty Hall), 136-142 (direct examination of Cassandra Ross). Closing argument was almost exclusively devoted to the arguments that others were equally or more culpable than Mr. Hall and that the Government had dirty hands for cutting deals with criminals. *See* Supp. R. Vol. 20-A: 51-84 (defense closing argument). Counsel's failure to present evidence that would have supported a meaningful argument that Mr. Hall's deprived and abusive childhood and positive personal characteristics were persuasive reasons to spare his life was a direct consequence of counsel's failure to begin any investigation into their client's background until the eve of trial. The timetable adopted by counsel precluded the meaningful development of mitigating evidence of Mr. Hall's background and character.

### Counsel's Failure To Conduct An Adequate Investigation Resulted In The Presentation Of Ill-Prepared Witnesses

100. Trial counsel's failure to investigate Mr. Hall's family and social background resulted in a weak and unconvincing presentation in the penalty phase of critically important evidence that his childhood was marred by deprivation and family violence, as well as leaving the jury with the affirmatively misleading and false impression that Mr. Hall himself was not the target of physical abuse in the family home. Equally important, counsel's lackadaisical approach to such investigation -- waiting until the eleventh hour to begin -- resulted in their failing to discover evidence of Mr. Hall's numerous positive characteristics and even an act of heroism, when he saved his nephew Syroid from drowning in May 1994. Such evidence is of vital importance in

presenting a case for life. "Mitigating evidence concerning a particular defendant's character or background plays a constitutionally important role in producing an individualized sentencing determination that the death penalty is appropriate in any given case." Moore v. Johnson, 194 F.3d 586, 612 (5th Cir. 1999). As Justice O'Connor has explained, "evidence about the defendant's background is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319 (1989)(citation omitted). *See also* Eddings v. Oklahoma, 455 U.S. 104, 115 (1982) (evidence of a "turbulent family history [is] particularly relevant" to an individualized sentencing determination.).

101. Likewise, evidence of a defendant's good qualities, which reveal a human dimension of his character typically not discernable from the facts of the crime, are highly relevant to the jury's sentencing decision. *See, e.g.*, Parker v. Dugger, 498 U.S. 308, 314 (1991) (evidence of defendant's "positive adult relationship with his own children and with his neighbors" is mitigating); Payne v. Tennessee, 501 U.S. 808, 826 (1991) (noting that evidence that defendant was "a good son" and "extremely polite" was mitigating); Boyde v. California, 494 U.S. 370, 385 (1990) (evidence that defendant was good with children is mitigating); South Carolina v. Gathers, 490 U.S. 805, 817 (1989) (O'Connor, J., dissenting on other grounds) (evidence that defendant was affectionate and caring person is mitigating); Franklin v. Lynaugh, 487 U.S. 164, 186 (1988) (O'Connor, J., concurring) (acts of "voluntary service, kindness to others, [and] religious devotion" are mitigating); Hitchcock v. Dugger, 481 U.S. 393, 397 (1987) (evidence

that defendant "had been a fond and affectionate uncle to the children of one of his brothers" is mitigating); <u>Valdez v. Johnson</u>, 93 F.Supp.2d 769, 783 (S.D. Tex. 1999), *aff'd in part and vacated in part sub nom. <u>Valdez v. Cockrell</u>*, 274 F.3d 941 (5th Cir. 2001) (finding counsel ineffective for failing, *inter alia*, to discover and present evidence of the defendant's "many redeeming, humanizing qualities").

102. The testimony of Mr. Hall's mother Betty and his sister Cassandra Ross had rich potential to impart precisely this critical information about Mr. Hall. Yet, the testimony as developed and presented at trial was flat and unpersuasive, lacking the detail necessary to paint a compelling and persuasive picture of the harsh circumstances in which Mr. Hall was raised, or to convey the good qualities in his character that he exhibited despite having been subjected to such a turbulent upbringing. *Cf.* <u>United States v. Big Crow</u>, 898 F.2d 1326, 1331 (8th Cir. 1990) (where defendant's consistent efforts to lead a decent life were highly unusual in the extremely bleak environment of his reservation, district court had discretion to grant downward departure to defendant convicted of serious assault charges). Moreover, it falsely painted Mr. Hall as just a bystander to violence in the family home, when the truth was that Mr. Hall himself suffered serious physical abuse from fierce beatings arbitrarily inflicted by his parents. *See* Exhibit 14, at ¶¶ 34, 42. Trial counsel's failure to elicit compelling and accurate testimony from these two critical witnesses is the direct result of counsel's failure to conduct a timely investigation of Mr. Hall's background and their failure to exercise reasonable professional care in preparing these witnesses to testify.

103. Because counsel failed to undertake an adequate mitigation investigation well in advance of

trial, neither they nor their investigators had established relationships of trust with the witnesses sufficient to enable these (and other) family members to reveal intimate and painful details of their lives. Without investing the time necessary to develop such relationships, neither counsel nor their investigator could expect to unearth the rich detail necessary to convey to the capital jury the unique qualities of the man whose fate they were deciding. *See* Exhibit 12, ¶ 26 ("Preparing such witnesses to testify, particularly when their testimony will cover subjects and events which are extraordinarily personal or painful, takes extensive time and emotional energy on the part of counsel and the witness alike. Simply because the witness has been able to acknowledge painful facts to counsel or his investigator does not mean the witness will be able, without patient and time-consuming preparation, to talk openly and expressively about the same events to a roomful of strangers in a formal, artificial setting"); Exhibit 14, at ¶ 17 (neither counsel nor investigator can "obtain . . . sensitive information without building a relationship of genuine trust" with the witness); Exhibit 13, at ¶ 12 ("[w]orking with witnesses who have suffered from trauma is a demanding and time-consuming task …"); Exhibit 7, Appendix A at ¶¶ 7-9. Without having this information in hand, moreover, defense counsel could have little idea how to prepare the witness to testify or how to structure the direct examination.

104. Counsel, moreover, failed to exercise reasonable diligence in preparing either Betty Hall or Cassandra Ross to testify. These witnesses had met only briefly with counsel prior to taking the stand. The night before he called them to testify, Mr. Ware attempted -- without much success -- to speak with Mrs. Hall by telephone, then complained to Tena Francis that the effort had been unproductive:

Later that night, Mr. Ware telephoned me and told me that he had tried to question Mrs. Hall (Orlando's mother) over the phone, and that her answers lacked the kind of details I had noted in my reports. He seemed very discouraged, and said words to the effect that, "They're not saying anything you said they would say." For my part, I was frustrated that Mr. Ware was trying to conduct these sensitive conversations by telephone. I had explained to him more than once in the course of working on the case that it was next to impossible to elicit painful and embarrassing details from witnesses about the intimate facts of their lives without spending time with them in person, to get to know them and form some kind of relationship with them.

Exhibit 7, at ¶ 23.

105. Though Mr. Ware had suggested he might call them to testify, neither witness understood he intended to put them on the witness stand until a few minutes before he did so, when he told them in the hallway of the courthouse during a lunch break in the middle of the penalty phase. The setting Mr. Ware chose for that conversation, alone, made effective preparation nearly impossible, as Tena Francis recalls:

During the lunch break on November 2, Mr. Ware asked me to join him while he prepped Mrs. Hall and Cassandra Ross to testify after lunch. Our meeting with them took place in the hallway outside the courtroom. Tearful members of the victim's family were standing nearby in the same hallway while Mr. Ware was trying to go over his anticipated questions with Mrs. Hall and Mrs. Ross. In addition, FBI agents were continuously circulating in the same hallway. Because of these circumstances, Mr. Ware was forced to conduct his preparation of these witnesses by whispering to them so that no one else could hear what was being said.

Exhibit 7, at ¶ 25.[25]

106. Counsel's failure adequately to prepare these witnesses closely resembles the deficient performance condemned by the Eleventh Circuit in <u>Cunningham v. Zant</u>, 928 F.2d 1006 (11th Cir. 1991). Trial counsel in <u>Cunningham</u> presented two mitigation witnesses, one of whom he

---

[25] Indeed, Mr. Ware even had Ms. Francis draft much of the direct examination itself, on the day Betty Hall and Cassandra Ross would testify. *See* Exhibit 7, at ¶ 24.

did not interview until the day of trial and spoke to, even then, "only for a few moments." *Id*. at 1017. Counsel's "minimal questioning" of all his witnesses, as a "consequence of this minimal preparation," resulted in his failing to elicit "substantial mitigating evidence regarding Cunningham." *Id.* The same thing happened here.

107. Mr. Ware did not prepare them for cross-examination by exploring questions that the prosecutor would likely ask. Nor did he explain courtroom procedure, which neither Mrs. Hall nor Mrs. Ross had even witnessed as they were kept sequestered throughout the trial. *See* Exhibit 15, ¶¶ 9-10; Exhibit 16 (Declaration of Cassandra Ross), ¶¶ 7-8; Exhibit 7, Appendix A at ¶ 10. In all these ways, counsel's performance fell below the objectively reasonable standard expected of capital defense attorneys in 1995, and Mr. Hall suffered prejudice as a result. Exhibit 12, ¶ 26-27.

108. Betty Hall, whose direct examination occupies only eleven pages of the transcript, was called primarily to establish that Mr. Hall was raised in a violent home where she was severely and regularly beaten by her husband "A.J.," Orlando's father. Counsel's questioning of her on this subject drew terse, unilluminating responses regarding events that could have been riveting in their detail, had counsel appropriately prepared Mrs. Hall to testify. *See* R. 32:113-17. Answering Mr. Ware's question about what she recalled of her relationship with her ex-husband during her pregnancy with Orlando, she replied that "[i]t was bad, a lot of abusive, a lot of fight, a lot of beating, with Orlando and the other three kids below Orlando." R. 32:114. Asked to give an example of the kinds of physical abuse, she stated: "Well, I was beaten repeatedly,

repeatedly when I was pregnant with Orlando. After he was born — before I got pregnant with Orlando, I was beaten with all type of objects. I was beaten with the butt of a gun, I was beaten by two by fours, fists, my teeth was knocked out, everything happened to me during that time, but I stayed there because I had five little kids. I didn't have nowhere to go." *Id.* She implied that her ex-husband's violence was inflicted randomly; he could be set off by "[j]ust about anything, and nothing at all. You know, he would maybe be drinking, you know, or go out and stay out and come in, and we'd all be in bed, he'd come in, jump on me. I'd get home from work at the same time every day. I got a beating for that. Just anything. I could go to the grocery store and come back, and he didn't like if I didn't get back as soon as he thought I should, he jumps on me, just any little thing." R. 32:115. Nothing in this testimony, however, captured accurately the brutality and arbitrariness of A.J. Hall's attacks on Betty, or the terror that they inspired in her and in all her children.

109. The inadequacies of Betty Hall's trial testimony were not the consequence of her unwillingness or inability to speak to the jury. Rather, they were the product of defense counsel's failure to exercise reasonable professional judgment and care in developing her as a witness from the very beginning of the case. The inadequacy of Mrs. Hall's testimony simply demonstrates the utter failure of counsel's professionally unreasonable attempt to condense the difficult and time-consuming development of mitigation into a month and a half. The exchange between Mr. Ware and Betty Hall clearly shows that Mr. Ware had little idea of what information he could elicit from Mrs. Hall and that she was not prepared in advance of her testimony. The combination resulted in a direct examination that failed to provide jurors with

available, compelling, detailed evidence that Mr. Hall's childhood was shaped by the extreme violence between his parents. Defense counsel's inability and failure to elicit more than a mere recitation that Mrs. Hall was abused throughout her marriage, rather than anecdotes that would effectively and vividly convey the randomness and brutality of A.J. Hall's attacks on his wife, is directly attributable to trial counsel's unreasonable failure to embark on an adequate penalty phase investigation early in the case and consequent failure to develop the mitigating evidence embedded in this family's history.

110. Had counsel begun to develop the case in mitigation early in the case, as required by the then-existing standard of practice for reasonably effective assistance by capital defense counsel, Exhibit 12, ¶¶ 18-21; Exhibit 14, ¶¶ 16-17; Exhibit 13, ¶¶ 5 and 12, Betty Hall would have been prepared by the time of trial to describe in detail all the painful events from her marriage and to paint in colorful strokes a picture of Orlando's childhood. Her declaration (Exhibit 15) sets forth some of the detailed accounts that competent counsel, with adequate preparation, could have elicited at trial:

> I hate the day I met A.J. Hall. My marriage was full of misery because that man beat me routinely, even when I was pregnant. Although there were many times when I should have gone to the hospital, I think that I only went to the hospital twice because A.J. wouldn't let me go. Once I was taken to the hospital by ambulance and another time I was either taken or accompanied by my niece Robbie Charles. The time that I was taken to the hospital by ambulance, the police arrested A.J. and took him to jail. His brother T.J. bailed him out and he came right back to our house.

> A.J. would abuse me when he was drinking. I think he was jealous of my attractiveness and the age difference between us, because he was 16 years older. I also think he was jealous because I made more money than him at my job at Con Agra. A.J. always wanted to brutalize my face when he beat me. I think he was trying to disfigure me. If he thought I had done something, he was ready to knock me out. It wasn't anything I was doing — I was working all the time.

A.J. would get upset with me if I did anything different from the routine he imposed. He'd want me to get home at the same time every day and if I didn't get home on time, he'd accuse me of doing something and beat me up. I couldn't always get off work at the same time and would be in a panic, trying to get home on time for A.J. I'd run red lights and almost run over people, because I knew what would happen if I was five or ten minutes later than yesterday. There was no explaining to A.J. why I was late. It was his way or no way. I'd just get out of work like a bat out of hell because I couldn't waste any time. I remember times I drove up and he knocked me off the porch because I was ten minutes late. I went through that for years.

There were times the police came to our house. They came every time I called, I think about five or six times. It was never the same officers. The police would talk to me about what happened and tell me to go to the prosecutor and press charges. But I couldn't press charges and live there. Why would I do something that would jeopardize me even more? We'd all end up back there together and A.J. would be even madder than before. I may have pressed charges the one time he went to jail. Another time the police took him outside and threatened him. It seems like another time the police came, but I didn't talk to them because I was in the back and couldn't talk because I was hurting too bad. I probably should have; I had two black eyes.

I recall that A.J. hit me with a 2" X 4" when Cassandra was about two or three and I was pregnant with Orlando. A.J. hit me on the top of the back of my head and I had to go to the hospital. A.J. had been drinking at the time and was jealous about something.

Another time, A.J. threw me through a picture window in our house; he hit and shoved me through the window. He was drunk and full of it. He didn't have to be mad about anything I had done. He'd just get to drinking and go crazy; all he wanted to do was just fight.

On another occasion, I had gone to the grocery store with Demetrius. On the way home, a car pulled out in front of us and there was almost a wreck. When Demetrius and I got home, we lay on the floor watching TV. A.J. was sitting there drinking. I made some remark to Demetrius about my blood pressure going up from the scare of almost getting into an accident. A.J. heard the remark and must have thought that I said something else. He jumped on me and nearly beat me to death. One of the kids managed to get out of the house and called the police. I don't know if it was Cassandra, Orlando or Tracy. I know that Scotty was already in the service at this time. The police came and manhandled A.J. and threatened him, but they didn't take him to jail.

I have scar tissue on the side of my nose where A.J. beat me with a gun. I didn't go to the hospital for that. There are lumps on the back of my head from beatings. There were many times I feared for my life when A.J. was beating me. My daddy told me before he died that A.J. would be the death of me.

I went to the hospital several times because I had such bad headaches. I doubt I told the doctors about the abuse I got at home even though I think the beatings to my head caused my headaches. Back then people didn't talk about such things and it was safer not to. The police would have gotten involved but nothing really would have been done about it. I would have gone home and it would have just started up again.

My children would see a lot of the violence in the house. When they were little, there wasn't anything they could do. When Scotty, the oldest boy, got big enough, he told A.J. he would kill him if he hurt me. In response, A.J. would threaten to kill Scotty. I was relieved when Scotty decided to leave home right after high school and join the service, because I was sure that if he stayed, one of them was going to end up killing the other.

The neighbors knew about the abuse as well. Sometimes fights would spill out into the street. I recall there were times when I tried to get away from A.J. in the car. He would jump on the hood and try to stop me. I would try to throw him off. I wanted to break his head. There was one time I dragged him alongside the car. He had got in the door and grabbed the wheel. When I drove off anyway, he let go.

There were days I went to work when I was beat up so bad the supervisor sent me home.

After beatings, A.J. would act like he hadn't done nothing. He would want to go to bed and have sex and I had to act like I wanted it too. If I just lay there, he would beat me. I had to take a lot of this. That is the awfulest thing I had to do in my life, to have sex after I'd just been beaten like a dog and kicked in my privates. So many times I just wanted to die.

I stayed in the marriage because I had six young children and no place to go. I told myself that when Demetrius was old enough, I would get out. I remember that I was at work one day and all of these bad feelings about my marriage welled up in me. I asked for permission to leave work, and went home and packed up everything. The next day, I rented an apartment, borrowed a truck, and moved myself and my children to a house on El Dorado Avenue.

After I moved out of the house, I filed for divorce and found out that I had never even been married to that man. When A.J. married me, he still hadn't divorced his

previous wife, Geraldine Hall, so all my miserable years with him were nothing but a lie.

A.J. was the meanest man I ever saw in my life — he'd rather beat a woman than look at her. He was like that with any woman he had. I know from talking to other women he was with that he beat the daylights out of all of them. Vera Merchant, who was the mother of A.J.'s sons Keith and Paul, was all scarred up from him beating her. I remember that early on in my marriage to A.J., he hid out in Vera's apartment when she went out with another man and attacked her when she came home. He beat her and, when she threw up her hands to protect herself, nearly cut off her finger with a knife. She called me the next morning and told me that my husband had cut her. When I confronted A.J. about it, he beat me and then left the house.

Exhibit 15, ¶¶ 14-29.[26]

111. Cassandra Ross' testimony, whose direct and redirect examinations occupy nine pages of the transcript, was likewise needlessly unilluminating and unpersuasive. R. 32:136-42, 148-50. The transcript of her stilted direct examination reflects counsel's failure to prepare Mrs. Ross to testify. Counsel's deficient performance in this regard is particularly troubling because the range of topics touched on during counsel's cursory examination of this witness suggests that counsel must have intended Mrs. Ross to articulate and sum up the bulk of the mitigating evidence presented. Counsel asked her about her father's physical abuse of her mother; the impact of her parents' separation on the younger boys' lives; Mr. Hall's positive, loving relationship with his own four children and other good personal qualities; and how out of character this crime was for Mr. Hall. Counsel also asked Mrs. Ross for a "personal plea" to the jury to spare her brother's

---

[26] We do not suggest that had trial counsel properly prepared Mrs. Hall to testify as a witness, her testimony would have been limited to the matters described above. Due to the difficulties of eliciting information about traumatic events from witnesses who have kept such memories buried within themselves, see Exhibit 15, ¶ 30; Exhibit 14, ¶ 19; Exhibit 7, ¶¶ 17, 23, 27-28, as well as continuing time and funding restraints, Mrs. Hall's recollections of her painful past and children's lives have not been fully explored.

life.  Mrs. Ross also unsuccessfully sought to describe Mr. Hall's deep remorse over his role in the crime — a topic defense counsel had not thought to raise in his questioning.  As a result of counsel's failure to ask meaningful questions and his failure to prepare Mrs. Ross to testify, however, Mrs. Ross' answer took the form of a narrative.  The Government's objection to the form of the examination was sustained.  R. 32:141.

112.    Asked about what she recalled "about the physical abuse that your father perpetrated on your mother," Mrs. Ross responded in correspondingly vague, general terms: "It was — it was physical as well as verbal abuse.  He — he was abusive.  He would — it was a lot of abuse.  They fought a lot." R. 32:138.  Asked whether she remembered "your father beating your mother with — with certain objects," she testified: "Yes, yes.  He had — he was — he was abusive.  He was abusive.  He would beat her with boards, whatever he could get his hands on at the time that he was angry." *Id.* She testified that this treatment continued after Orlando was born and was still going on when she moved away from home, *id.*, and that the children would attempt to intervene on behalf of their mother, without success.  R. 32:139.

113.    Had Mrs. Ross been prepared as a witness, she could have described her father's brutal attacks on her mother with much greater detail and persuasive force:

> My parents' relationship was extremely violent for as long as I can remember and they fought a lot.  If it wasn't every weekend, it was every other weekend.  I think my mother was beaten at least three times a month for as long as she was with my father.  Even though he is my father and I respect him for that, A.J. is a total monster as far as I'm concerned.
>
> I recall my mother being beaten with a 2" X 4" and going to the hospital.  Once, A.J. threw her through a window.  Even though she was hurt and bleeding, she didn't go to the hospital for that.  I recall them going at each other with hammers.  When I was twelve, A.J. chased my mother through the streets trying to hurt her.  Everyone in our

neighborhood knew about the violence in my family. I remember as children we would sometimes be awakened by bumps in the night. When that happened, we knew that A.J. was beating our mother and we had to get up to protect her. To this day, if I hear a loud thump, I involuntarily start to panic.

As children, we were all aware of the abuse and saw a lot of it. When we were there, we would try to stop it, but there wasn't much that we could do as children. I recall A.J. would lock the doors and not let my mother or us get her medical care when she was beat up. We couldn't run out or do anything. I don't know why we didn't all break for the door, since there were so many of us, but we were kids and didn't think of doing that. I think because we saw A.J. beating our mother, we were scared to do anything for fear that he would turn on us.

I do remember picking up the phone once to call the police. A.J. jerked the phone out of the wall and I was left just holding the receiver. That was very scary because I thought A.J. would hit me, too, but he didn't.

Since there were so many of us, there were a lot of times when one of us did manage to escape and call the police. When they came, A.J. would be calmed down and act like nothing was going on. The police would sometimes take A.J. away, but my mother wouldn't press charges so he wouldn't get arrested.

When the boys got older, they would try to stand up to A.J. when he was beating our mother. My oldest brother Scotty left to go into the military right after high school because he and my father were on the verge of killing each other.

A.J. would beat my mother for any reason or no reason at all, mostly when he was drinking. A lot of times, we wouldn't know what the fights were about because they were already in progress when we woke up or came in the house. Other times, I know that A.J. was mad because he wanted my mother's paycheck, even though it was my mother who paid the bills in our house. I also think that A.J. was constantly jealous and suspected her of cheating on him, because he was always cheating on her. If my mom came home late from work, A.J. would accuse her of being out with someone else. This was totally ridiculous — my mother was a hard worker and would come home from the factory with bits of chicken all over her. She couldn't have been any place other than work, but A.J. would think she was doing something she shouldn't be doing.

Exhibit 16, ¶¶ 10-16.

114. As a result of counsel's unreasonable failure to prepare Mrs. Ross to testify, counsel failed to

elicit vital information about how their parents' divorce impacted Mr. Hall and his younger brothers. At trial, she explained merely that the boys "were in between the two. Part of the time they would live with my dad, the other half they would live with my mom, just back and forth." R. 32:139-40. Had counsel conducted a professionally reasonable investigation and exercised appropriate care in preparing Mrs. Ross to testify, she would have informed the jury that Orlando was left as a teenager to raise his two younger brothers because their mother went off to "sow wild oats," that the boys were neglected emotionally and financially by both parents during this period of time, and that Orlando's responsibility to provide for the younger boys was what led him into selling drugs:

> My parents split up shortly after we left Orlando back in El Dorado. For me, that was one of the happiest days of my life. I was ready to have a party. I didn't know it would actually get worse for the others, but for the boys my parents' divorce created a different, worse situation because they were basically abandoned. After my parents divorced, I think my mom felt she had to sow some wild oats and, after a while, started seeing a man who lived in Smackover, Arkansas. She pretty much left the boys to themselves and they started to run wild. Even though Pam was living in El Dorado, she wasn't helpful because she had her own problems. Things got left to Orlando and I know that he wasn't coping very well with trying to run the house and raise Tracy and Demetrius. I would hear reports from friends that the boys had no food and that the electricity had been cut off. I would hear from the boys that they didn't have lunch or didn't have clothes. They were eating a loaf of white bread and a sack of potatoes every few days. . . . Orlando didn't become involved in selling drugs until after my parents split up and abandoned the boys. I think that it all started with his having to look after his younger brothers. Orlando and I talked about his involvement in drugs several times, because I was very upset that he was doing that. I know that he was not happy about it either. He kept telling me that he was on the verge of getting out of the business and going straight.

Exhibit 16, ¶¶ 24-25.

115. As a result of counsel's failure to conduct an appropriate investigation and failure to prepare Mrs. Ross to testify, counsel also failed to elicit any meaningful testimony regarding Mr. Hall's

love for his children and his generous and compassionate nature. Asked about whether his children love Mr. Hall, Mrs. Ross she testified: "Yes, they do. He has two girls and two boys, and they come visit. If not, they talk on the phone. One is here now outside so — ," R. 32:140. She further explained that she loves her brother and that "he's caring. He's caring. He's there for his children. He loves his children, that's why I don't understand what happened, because he's a caring person." R. 32:140-41.

116. Ms. Ross attempted to interject that Mr. Hall was remorseful for his role in this crime. Mr. Ware's failure to ask her about Mr. Hall's expressions and manifestations of remorse suggests that he had so little contact with this witness (and other potential witnesses) prior to her examination that he was not even aware of this as a topic to explore. His failure to ask Ms. Ross about Mr. Hall's remorse prompted an objection from the Government to the witness' "narrative," which effectively cut off her testimony on this subject.

117. Had counsel conducted an appropriate investigation and properly prepared this witness to testify, she could have told the jury compelling anecdotes conveying Mr. Hall's good qualities and loving nature, to give meaningful content to the conclusory statements elicited by counsel that Mr. Hall was "a caring person." Moreover, counsel could have explored in moving terms the remorse that Mr. Hall expressed for his role in the offense:

> Orlando came and stayed with me in Copperas Cove shortly after I moved to Texas. He lived with me for one semester of high school when he was about sixteen. He was doing much better in school there and seemed to be really happy. He was also really good with my baby, Marco. He would drop him off at the babysitter's on the way to school and pick him up at the end of the school day. Orlando would play with Marco and even changed his diapers. I really wanted for him to stay. But I was very young and had an infant and was going to college at the time. Jerry didn't make much money in the service and my parents didn't help out financially at all. Jerry

and I realized that we couldn't continue to support Orlando in our home. We took Orlando with us on a trip to Arkansas when we went to pick up furniture that Jerry's parents had bought for us and we left him there without telling him that we would do that. This was devastating for Orlando. I think it left him with the feeling that he could never escape El Dorado.

Even though he was making money illegally, Orlando was always very generous. He would buy things for people in the family — for instance, he bought Pam a trailer home and A.J. a riding lawn mower and paintings for his house. Orlando's children had great toys. He wanted to give them the things that he never had. He also paid for Pam and her son to travel to Dallas for a trip to Six Flags with his own children. But you didn't have to be family for Orlando to want to help out. I remember him giving fifty dollars to some guy at the laundromat who was trying to get a dollar from me with his life's story.

It is so hard for me to understand Orlando's involvement in this crime because he has always been such a sweet and caring person. I visited him a lot before trial when he was incarcerated at Mansfield and FMC, and he was wracked with guilt and remorse. He couldn't sleep because he constantly had bad dreams. I know one was a recurring dream about Lisa Rene's mother coming to him and asking him why he did this. Although he has always avoided talking to me about what happened, he has told me that it shouldn't have happened, that Lisa Rene was innocent. I recall that LaTonya's sister would sometimes sing a spiritual to him on the phone, I think it was "I Know the Lord, He Heard my Cry," and he would cry every time.

Exhibit 16, ¶¶ 23, 26-27.

118. In addition to failing to prepare Ms. Ross to testify on direct examination, trial counsel failed to anticipate or prepare to respond to the prosecutor's questions about whether her father's abuse was ever aimed at the children, R. 32:143, and how she could have turned out well if she grew up in the same environment as Mr. Hall. R. 32:144-46. These were predictable topics of inquiry on cross-examination and counsel performed deficiently in failing to address them in the presentation of the case at punishment, including in preparing Mrs. Ross to testify:

Part of preparing defense witnesses for cross-examination is anticipating likely subjects of cross-examination by the Government. In 1995, reasonably effective counsel in a death penalty case would have anticipated that if the defense presented

mitigating evidence to show that the defendant was raised in a turbulent home environment marked by violence, the prosecution would attempt to rebut this evidence, in part, by focusing on the lives of any siblings who had grown to adulthood without committing violent crimes. The Government pursued this line of questioning and argument with Mr. Hall's sister Cassandra Ross, who testified as a mitigation witness at punishment. Had Ms. Ross been properly prepared for cross-examination, she could have neutralized the effect of this theme by pointing out that each of her siblings has led a troubled and unsuccessful life, and that she has succeeded in life only by going to great lengths to distance herself from her family and enjoyed, through her childhood and adolescent years, the love and support of the man who became her husband and his family. Those important facts went unpresented.

Exhibit 12, ¶27; *see also* Exhibit 14, ¶ 51 ("In 1994-1995, it was well known in the capital defense community that preparing to explain this sort of differential impact of traumatic experience, and anticipating prosecutorial cross-examination and argument directed to these areas, was an essential part of preparing to tell the client's story of childhood trauma to the jury.").

119. Had Ms. Ross been prepared for this line of questioning, rather than being caught off guard because defense counsel had never given her any idea of what to expect from the Government, Ms. Ross could have explained to the jury that no one in the family had escaped unscathed from their upbringing and that her tenuous hold on a stable life was the direct result of keeping her childhood at a great distance from her adult life and the support she receives from her husband and his family:

The violence in my parents' marriage scarred all of us [children] in different ways. Scotty became and remains a drug addict and an abuser himself. Pam has had her own problems with drug abuse and has been in a series of unsuccessful relationships with men; she only started getting her life together since she moved to Dallas two years ago and still has a long way to go. All three of the younger boys have gotten into drug dealing and been in trouble with the law.

The reason I appear to have succeeded is that I left home as soon as I could. If I had stayed there, I would have drowned. I married my husband, Jerry Ross, on October 11, 1986, and moved first to his parents' house in El Dorado while Jerry was in basic training in the military and then moved to Texas with him. If I hadn't married Jerry, I would have joined the military. I have put a great deal of energy and effort into keeping the events of my childhood at a distance from me. There was a period of time when I would not go back to Arkansas at all. Then later, when I went back, I would only visit with my brothers. Even today, when I visit El Dorado, I will only stay with my husband's family. I won't stay at the home of either of my parents, nor will I let my son Marco stay with either of them.

Exhibit 16, at ¶¶ 19-20; *see also* Exhibit 14, ¶ 51 (explaining how such "protective factors" can help account for "how one child in a family who is exposed to trauma may suffer grave long-term harm, and yet another child reared in the same environment may appear to overcome it.").

120. Adequate pretrial investigation and development of Mrs. Ross as a witness, moreover, would have revealed that severe physical violence in the family extended beyond A.J. Hall's attacks on Betty. The children in the Hall family were subjected to brutal beatings by both parents, which the children interpreted as routine punishment. *See* Exhibit 14, at ¶¶ 42-43; Exhibit 17 (Declaration of Pamela Palmer), at ¶ 6; Exhibit 18 (Declaration of Scotty Hall), at ¶ 7; Exhibit 19 (Declaration of Tracy Hall) at ¶ 3. Had counsel conducted an adequate mitigation investigation, they would have been aware of this fact. Armed with this knowledge, counsel could have prepared Mrs. Ross as a witness to describe the violent whippings, directed particularly at the boys. This evidence would, of course, have been mitigating in its own right. *See, e.g.*, Eddings, 455 U.S. at 105. It would, moreover, effectively have countered the prosecution's suggestion that the children could not have been scarred by the environment in which they were raised because they were not the object of their father's brutality:

Both A.J. and my mother could be harsh disciplinarians in the house. I rarely got beaten, though I recall one whipping when I was eleven when A.J. hit me with a slipper. I acted like he was killing me and I don't think that he hit me again. . . . But the boys would get harsh whippings from both of our parents with belts and switches and stuff. A.J. was definitely tougher with the boys than he was with Pam or me. A.J. would tell the boys to go pick their switch for a beating and if the one about to be whipped didn't run to get a switch immediately, someone else would go and grab a switch out of fear that A.J. would get madder and whip everyone. If A.J. was using a belt, he would hold whoever was getting hit by one hand so they couldn't run away, and whip them with the belt in the other hand. Those licks were so hard the boys would try to get away, but couldn't; they would go round and round in circles trying to get away as they were being struck. If you were really going to get a whipping, they took two switches and braided them together. The switch would leave welts on you that went away in a day or so, and everyone could tell you'd been whipped. The welts would be all over because you'd try to get away and mom and dad would miss your bottom and get your legs and calves and arms. If you could pick what you'd get whipped with, you'd pick a belt because the switch felt like it was cutting into you like a knife. Sometimes when A.J. was whipping someone, he would say, "I brought you into this world; I can take you out."

Exhibit 16, ¶¶ 17-18.

121. Betty Hall and Cassandra Ross were the *only* witnesses called to inform the jury about *who* Mr. Hall was — the central issue in determining punishment. Despite the fact that counsel's development and presentation of this evidence fell below the standard of reasonably professional assistance demanded of counsel entrusted with a defendant's life, one juror found that Mr. Hall's upbringing and "any other aspect calling for a sentences less than death" were mitigating circumstances. Special Findings Form, R. 6:1377-89. No juror, however, found the mitigating factors of remorse and acceptance of responsibility. *Id.*[27] Despite these relatively weak findings in mitigation, the jury spent *over ten hours* deliberating as to punishment. *See* Supp. R. Vol. 20-

---

[27] The only other mitigating factor found was that equally culpable co-defendants would not be sentenced to death, which was found by nine jurors.

A: 113; R. 6:1351, 1376.

122.  Had Betty Hall and Cassandra Ross been adequately developed as witnesses and properly prepared by counsel prior to testifying, there is a reasonable possibility that one or more jurors would have determined that the mitigating evidence of Mr. Hall's upbringing and his personal characteristics justified the imposition of a life sentence.  Moreover, had meaningful evidence of Mr. Hall's expressions of remorse been presented to the jury, rather than Mrs. Ross' unadorned conclusion that he was remorseful, there is a reasonable probability that one or more jurors would have found the mitigating factors of remorse and acceptance of responsibility. Meaningful evidence of Mr. Hall's remorse, moreover, would have undermined the strength of Larry Nichols' testimony that Mr. Hall bragged about his role in the kidnapping, rape and murder of Lisa Rene, which would have undercut the reliability of the remainder of Nichols' harmful testimony, concerning Mr. Hall's alleged plans to execute a violent escape from jail.[28] Finally, it is reasonably probable that if counsel had not performed deficiently in these respects, Mr. Hall would not have been sentenced to death.

**Trial Counsel Failed To Introduce Documentary Evidence Obtained In The Investigation Which Corroborated Testimony Of Defense Witnesses**

123.  An emergency room record contained in defense team's files documents Betty Hall's

---

[28] Studies have shown that the mitigating factor of remorse is one of the most crucial to the jury's determination of whether a capital defendant lives or dies. Garvey, *Aggravation and Mitigation in Capital Cases:  What Do Jurors Think?*, 98 Colum. L. Rev. 1538 (1998) (noting conclusion that capital jurors found "lack of remorse" to be a "significant aggravating factor[]"); Eisenberg, Garvey, and Wells, *But Was He Sorry?  The Role of Remorse in Capital Sentencing*, 83 Cornell L. Rev. 1599, 1600 (1998) (noting conclusion that jurors' perceptions of whether the defendant is remorseful "generally" appear to influence the sentence imposed).

treatment on May 19, 1968 for "lacerations and contusions to her forehead, top of scalp and occipital area -- left front, left thigh and buttocks & right [illegible]." According to the statement of complaint, "Pt. states she & husband had a fight & he hit her with handle of pistol on forehead and back of head, stomped foot & [illegible] Rt forefinger swollen." Exhibit 20.

124.  Counsel's files also contain a copy of records documenting A.J. Hall's arrest on April 13, 1974 (when Orlando was almost three years old) for assault and battery "on warrant by Betty Hall." Exhibit 21.

125.  Counsel made no attempt to introduce these documents during the punishment phase of the case, despite the fact that they corroborate the scant testimony counsel elicited from Betty Hall and Cassandra Ross concerning A.J. Hall's abuse of his wife. This failure was objectively unreasonable. *See, e.g.* Hart v. Gomez, 174 F.3d 1067, 1070-71 (9th Cir. 1999)(trial counsel ineffective for failing to present documentary evidence corroborating witness's testimony that she accompanied defendant to ranch on weekends that victim claimed to have been sexually abused); Cunningham v. Zant, 928 F.2ed 1006, 1018 (11th Cir. 1991)(trial counsel ineffective in failing, *inter alia*, "to substantiate the existence of [petitioner's head injury] or its effects on Cunningham by introducing Cunningham's medical records . . . ."). This documentary evidence corroborates Betty Hall's testimony that she was beaten with the butt of a gun, R. 32:1143, and that the police arrested A.J. only once, R. 32:116. There could be no strategic reason to refrain from introducing contemporaneous records establishing these facts.[29]

---

[29]  In the same fashion, counsel performed deficiently in failing to offer other documents which would have corroborated other assertions by defense witnesses at punishment. For example, as noted, Cassandra Ross testified that Mr. Hall "love[d] his children." R. 32:141. Counsel had in their

126. The failure to present this documentary proof, on the other hand, was clearly prejudicial. Only one of Mr. Hall's jurors found that the circumstances surrounding his upbringing constituted a factor militating against the death penalty. As the Fifth Circuit observed in the appeal of this matter, given the weak evidence presented in the penalty phase, jurors were free to reject this mitigating circumstance. <u>United States v. Hall</u>, 152 F.3d 381, 413 (5th Cir. 1998)("In support of his claim that he experienced an upbringing that militated against the imposition of the death penalty, Hall offered only the testimony of two of his family members, which the jury was free to believe or disbelieve."). Trial counsel's failure to present objective corroboration of the abuse in Mr. Hall's childhood was unreasonable and prejudiced his penalty phase case.

**Trial Counsel Unreasonably Failed To Call Available Witnesses Who Attended The Trial And Who Could Have Testified Concerning The Circumstances Of Mr. Hall's Upbringing And His Good Characteristics.**

127. Several individuals familiar with Mr. Hall and his family were present at the courthouse during the penalty phase and could have been called to testify on Mr. Hall's behalf. These included Rev. D.L. Hegler, who pastors the church attended by the Hall family and has known the family for approximately two decades, and Rev. Willie Ray Norful and his wife, Teresa, into whose custody Mr. Hall had been released when he was paroled from prison in Arkansas. Each of these witnesses could have provided meaningful testimony concerning positive aspects of Mr. Hall's character.

---

files, but failed to introduce, at least two compelling documents to accompany Ross' testimony about Mr. Hall's relationship with his children: a touching handwritten letter from Mr. Hall to his daughter Te'Aushia, expressing his hopes for her to grow up into a successful and well-respected woman, and a birthday poem Mr. Hall sent Te'Aushia in 1992.

128. Rev. Norful, the son of one of the women who fathered two of A.J. Hall's children outside his marriage to Betty Hall, had known Orlando Hall all of his life. He assisted in Mr. Hall's early release from Arkansas prison by giving him a job at his church in Pine Bluff, Arkansas. Rev. Norful could have testified that everyone who came in contact with Mr. Hall, including members of Norful's congregation, liked him, and that Norful's wife and children were very fond of Mr. Hall. Rev. Norful could also have testified that even though Mr. Hall, without his knowledge, had gotten drawn back into the drug trade, Mr. Hall had made a conscious effort to keep Norful's youngest son out of any involvement in drugs, despite the boy's admiration for Mr. Hall and his desire to hang out with him. Rev. Norful could further have testified to his absolute shock when he found out that Mr. Hall was accused of this crime, as the offense was so out of character, as well as to Mr. Hall's remorse for his role in the kidnapping and death of Lisa Rene and his repeatedly expressed wish that he had been "man enough to have stopped it." Rev. Norful's wife could have testified to similar facts.

129. Rev. Hegler would have been a compelling witness on behalf of the defense on a broad range of topics. Indeed, as a spiritual leader in his community with a long-standing relationship to the Hall family, Rev. Hegler had a unique vantage point from which to inform the jury of the forces that shaped Mr. Hall through his childhood, adolescence and young adult years. Rev. Hegler is an articulate, poised and educated man, and no one who spends time with him can doubt that his testimony would have carried a lot of weight with Mr. Hall's jury. *See* Exhibit 22 (Declaration of D.L. Hegler ), ¶¶ 1-4.

130. Based on his observations over the many years he knew the Hall family, Rev. Hegler could

have told the jury about the violent relationship between Mr. Hall's family and its impact upon

Mr. Hall and his siblings:

I met the Hall family when I became pastor at Douglas Chapel. I met Betty first, because at that time she was the only member of the family who was attending church. However, I soon met A.J. and all the children in the family, because I married in 1980 and my wife and I moved to Kearing Street, where the Halls lived, shortly thereafter. We stayed there for about two years, living just two houses down from the Halls, so I had regular contact with the whole family from about that time.

In addition, after I had been in El Dorado for a year, I started teaching at El Dorado High School. For years, I taught students in the 10th and 12th grades. My wife teaches at Westwood Elementary School in El Dorado. At El Dorado High, I taught several of the Hall children – Pam, Orlando, and Demetrius.

I first got to know Pam Hall, Orlando's sister, because she would come down to our house pretty often. When she was a young teenager, in fact, Pam asked us to adopt her, and at least once asked her own mother whether she could come live with me and my wife. Pam told me that she felt her own parents were not giving her the right kind of guidance, and that she believed my wife could teach her to be a lady. Sometimes we let her spend the night with us, when she seemed especially anxious to be out of the Hall home. I learned from my conversations with her that she was ashamed and frightened by what went on from time to time between her parents.

I was aware that there was a great deal of physical violence between Mr. and Mrs. Hall, and that their home was full of emotional discord as a result. I knew this not only from Pam and her sister Cassandra, but also from my contacts with Mrs. Hall and just from living in the same neighborhood with them. It was no secret that A. J. and Betty Hall fought constantly. From time to time, I saw Betty with black eyes after she and A.J. had been fighting. I know that Pam suffered emotionally from being in that environment and that her experiences in the home had a lot to do with her seeking refuge with me and my wife.

The violence between A.J. and Betty was severe and frequent. It took place in front of the children even when they were very small. I am not sure what sparked these explosions, but I know there was a lot of drinking involved and that the marriage was roiled by infidelity and accusations of infidelity. Whatever caused the violence, it was serious. A.J. and Betty fought not just with their fists, but, by their children's account, with whatever weapons were at hand.

Despite having endured this environment, the Hall boys worship their mother and

downplay the violence perpetrated by their father. The boys make the family sound like the Cleavers, but I know full well that they are not telling the truth about how things were in those days. I also heard from family members that when A.J. and Betty got after the boys, they would hit them with whatever was available. Despite the severity of these beatings, the kids considered them to be punishment, not abuse.

Exhibit 22, ¶¶ 5-10.

131. Reverend Hegler also could have vividly depicted the hopelessness and poverty pervading El Dorado, the small Arkansas town where Mr. Hall spent his youth. According to Rev. Hegler, El Dorado is a town still ravaged by the effects of racial discrimination, which offers a bleak future to its African American youth and makes the temptation of easy money from the burgeoning drug trade especially attractive. Through his deep understanding of the community in which Mr. Hall grew up, and his personal interactions with Mr. Hall especially in his turbulent adolescent years, Hegler could have provided insight to the jury about how Mr. Hall became involved in the drug trade -- and Mr. Hall's ambivalent feelings about his drug dealing:

> While I was surprised at Orlando's involvement in this crime, I was not surprised that he became sucked into the drug business in El Dorado. The African-American community in El Dorado faces a huge struggle in trying to hold on to its young people and provide them hope. I have an intimate familiarity with our town's young African-Americans, not just from my role as a pastor and a schoolteacher but from other activities in which I spend a lot of time with teenagers and get to know what they are thinking and feeling.

> Without excusing for a moment their involvement in illegal activities, I feel it is important to understand why young African-American men in our community can end up in the drug trade, as Orlando and his younger brothers did. I believe that a great deal of that activity can be traced to the fact that a lot of the black kids here feel that they have no future. You can see it when you look at them, even at a very early age. The broader culture they are exposed to does not give them meaningful positive role models, and the local economy does not offer them any opportunities for stable, long-term employment at a reasonable income. Their job options are extremely limited. Unless they have connections in one of the few high-paying plants in the area – and few black people have those connections -- all they can do is work on the

"production line" cutting up chickens at Con Agra, or perhaps get a low-paying position at a fast-food restaurant. The few kids who make it to college, if they make it through college, don't come back to El Dorado. If they don't complete college, they come back here and things are even worse, because they couldn't manage to escape. The ones who stay here graduate from school into poverty and hopelessness, just looking to get by.

As a result of this pervasive feeling of hopelessness, many of the children of the African-American community, as they grow older, begin to believe that the only goal they can realistically pursue is making money through dealing drugs. That life is tempting because it looks easy and glamorous, and it appears to offer these kids not just material goods, but something they can't get in other parts of their lives – a way to command respect, even if it's for the wrong reasons.

In part, the lack of hope among the young people in the African-American community in El Dorado is also a result of the continuing terrible toll exacted by racial prejudice. You can see its consequences in the economy, for example. When I first came to El Dorado, there were virtually no black-owned businesses. Yet, I know from talking to older people in the community that at one time in the relatively recent past there were such businesses. Now, the only businesses thriving in the black community are liquor stores – and they practically surround our neighborhoods. And no one should think that there's no money at all in El Dorado – on the contrary, there may be no other city in Arkansas with so much money concentrated in the hands of so few families. But the vast majority of those families are white. And even for black families that work hard to attain middle-class status, there is a strong resistance to people getting "out of their place." The opportunities for advancement, in the workplace and in the community generally, are foreclosed above a certain level. As a result, I have seen talented middle-class African-Americans leave El Dorado because they were being denied the opportunity to rise according to their ability.

The effects of racial prejudice make themselves felt in other ways. When I came to El Dorado in 1979, I believe I was the only African-American man of my age in the city with a college degree. At that time, there wasn't a single black teacher in the English department at El Dorado High School. For ten years, I was the only one. Even now, very few black teachers are employed at El Dorado High School, and not one of our local schools has a black principal, despite the fact that a majority of the students are African-American. In contrast, many of the private schools in the area – Westside Christian School and Holy Redeemer, for example – are almost all-white. One destructive consequence of the lack of African-American teachers and administrators is that our young black people lack positive role models in the environment where they spend most of their time during their formative years.

Again, I do not in any way excuse or condone the illegal activities of the young black people in our community who choose to become involved in selling drugs. Nor would I ever deny the destructive influence that such drugs have had on our community, by addicting many African-American people and ruining their lives. But I think it is unrealistic to condemn the drug trade without recognizing that the young people who get drawn into it, like Orlando Hall, are not totally responsible for their own involvement. Their decisions are influenced by the lack of opportunities available to young African-Americans to build meaningful lives and futures in El Dorado, and by the absence of positive parental role models and daily adult supervision to provide discipline and structure during their most vulnerable years.

Exhibit 22, ¶¶ 15-20.

132. Hegler could also have testified regarding Mr. Hall's expressions of remorse while incarcerated pending trial and his positive character traits:

I know the Hall boys well enough to say that I was completely taken by surprise when I learned of Orlando's involvement in this crime. I strongly suspected that he had become involved in selling drugs, and he had practically admitted as much to me on several occasions when he came to me in confidence. But of the boys in the Hall family, I would have described Orlando as the least likely to become involved in a violent crime. In part, that is because I knew that Orlando was torn about his continuing involvement in the drug trade and that he sometimes wanted very badly to get off the streets and go straight. I recall one night in particular, when Orlando came to my house at 1:00 a.m., wanting to talk to me. I have an "open door" policy at my home, and kids in the community know that they are welcome to seek me out anytime. So I visited with Orlando that night, and I remember him finally admitting he was involved in selling drugs and saying that it would almost be a relief to get caught, do his time, and be through with the life he had become entangled in. But at the same time, he was still seduced by the easy money and the superficial glamour of the lifestyle he was leading, so I was not surprised he never managed to make that clean break with his past.

One reason I was so surprised by Orlando's involvement was because he was never, to my knowledge, violent. He never raised his voice and never got angry, even when other fellows would try to provoke him. Once, I saw another young man trying to prod Orlando into fighting him over some girl. This fellow pushed Orlando in the chest several times, trying to get him to strike back. Orlando just laughed and brushed it off.

But it was more than just not being violent; Orlando had many strong, positive

personality traits.   I saw him around almost every day in school and I was well acquainted with those characteristics.  You couldn't dislike Orlando.  He was good-natured, outgoing, and warm.  He had no "mean streak;" he might pull pranks on other students, but it was never malicious.   He always impressed me as compassionate and willing to reach out to people who were in need.  He treated his classmates with respect, even the ones who were "outcasts," and his attitude toward those kids helped them gain acceptance because Orlando was so popular.  He was also devoted to his brothers and sisters, and concerned for their well-being.  Although he did not apply himself to his studies and lacked confidence in his academic ability, I remain convinced that he had the native intelligence to do almost anything he set his mind to.

While Orlando was in jail awaiting trial on this charge, I corresponded with him.  In one letter, Orlando expressed feelings of great shame and remorse for his involvement in the crime.  He said he knew he had hurt many people by his actions, and had disappointed everyone.  He said he couldn't forgive himself for what he had done, and didn't believe anyone else should forgive him.  He also asked me to pray for him, to take care of his mother and his children, and to come talk with him if I could.

When I was in Fort Worth for Orlando's trial, I was allowed to visit with him alone. In speaking with me, Orlando expressed great remorse for his role in Lisa Rene's death.  He told me he was unable to sleep and that he could not close his eyes without seeing her.  Orlando blamed himself because he felt he should have "taken over" and saved her life.  He told me that he still heard her pleading to him to save her, and that he felt enormous guilt over that.  Orlando also said he didn't expect Lisa Rene's family to forgive him, and that he could not forgive himself because Lisa was a black woman with many gifts who represented a hope for her people.  He said he wanted to say he was sorry, but was afraid it would insult her survivors for him to do so.

We also prayed together and talked about Orlando's salvation.  In addition to expressing his feelings of remorse about Lisa Rene, he spoke of his great concern for his children and for his brother Demetrius.  He was definitely not focusing on himself, but on others.

Exhibit 22, ¶¶ 12-15, 26-28.

133.    Rev. Hegler was present at the courthouse in compliance with trial counsel's representation that he was being subpoenaed for the following day.  In the course of two days, he made the long trip from El Dorado to Fort Worth twice with the expectation that he would be called to the

stand. He was never called. Instead, at the conclusion of the penalty phase, Michael Ware explained to him that they would not put him on the stand, but that he would probably testify in some future "appeal." Exhibit 22, ¶¶ 24-25

134. It was objectively unreasonable for trial counsel to fail to present the testimony of Rev. Hegler and other available witnesses with personal knowledge of Mr. Hall and his background. Mr. Hall's character and background, after all, *should have been the primary focus* of the penalty phase. "Mitigating evidence concerning a particular defendant's character or background plays a constitutionally important role in producing an individualized sentencing determination that the death penalty is appropriate in any given case." Moore v. Johnson, 194 F.3d 586, 612 (5th Cir. 1999). As a result of counsel's failure to call Rev. Hegler, Rev. Norful and others as witnesses, the jury did not hear mitigating evidence that likely would have persuaded at least one juror to vote for life.[30]

**As A Result Of Counsel's Failure To Conduct An Adequate And Timely Investigation Into Their Client's Background, They Failed To Discover and Present Other Mitigation Witnesses Or To Obtain Additional Documents That Should Have Been Presented To The Jury**

135. Trial counsel's failure to commence the mitigation investigation until two weeks before the trial started resulted, not surprisingly, in their failure to discover additional witnesses and documentary evidence that should have been presented to the jury in the penalty phase. Trial

---

[30] Further, if counsel based their decision not to call relevant mitigation witnesses on an expectation that such omission would be addressed in post-conviction proceedings (the "appeal," perhaps, to which Mr. Ware alluded in his comment to Rev. Hegler), such a strategy was objectively unreasonable. *See, e.g.,* Huynh v. King, 95 F.3d 1052, 1057 (11th Cir. 1996) ("[N]o competent lawyer would choose deliberately to 'set up' an ineffective assistance of counsel claim whereby that lawyer's own incompetence would serve as cause for defaulting a claim").

counsel's delayed investigation prevented counsel from being able to develop and present mitigating evidence from even the most readily available sources -- other members of Mr. Hall's immediate family besides Betty Hall and Cassandra Ross. Mr. Hall's father and his three brothers and sister, Pamela Palmer, were all available witnesses who could have provided important testimony regarding, *inter alia*, Mr. Hall's upbringing, the pervasive violence in the family, and Mr. Hall's warm and generous personality. Numerous other witnesses -- extended family members, friends and neighbors -- could likewise have provided extensive mitigating testimony regarding Mr. Hall's character and background.

136. Trial counsel's failure to commence a timely investigation of the case also prevented them from exploring ways in which Government witnesses who were familiar with aspects of Mr. Hall's character and background, such as Demetrius Hall, LaTonya Anders and Wendall Holden, could have presented crucial mitigating evidence to the jury.

### *Members of Mr. Hall's immediate family whom competent counsel would have developed as witnesses and called to testify on Mr. Hall's behalf*

137. Pamela Palmer, the daughter of Betty Hall and her first husband, Rev. Raymond Palmer, is the oldest child raised in the home of Betty and A.J. Hall, and was six and a half when Orlando was born. Exhibit 17 (Declaration of Pamela Palmer), at ¶ 1. She could have provided a wealth of information to the jury about life in the Hall household and positive aspects of her brother Orlando.

138. Had she been called to testify, Pam could have described to the jury the brutality of the beatings that her step-father A.J. inflicted on her mother throughout the course of their marriage,

including the fact that A.J. would force Betty to have sex after he had savagely beat her and that the children could hear this happening:

> For as far back as I can remember, Betty and A.J.'s relationship was stormy and violent. A.J. was jealous and wanted to run things, and would become physically and mentally abusive to our mother. He would call her "bitch," "whore" and "slut" in front of us kids. He would often become physically violent. I remember once he hit my mom in the head with a .38 caliber gun in the back yard. I think that sent her to the hospital. On another occasion, he threw her through the plate glass picture window in the front of our house on Kearing St. in El Dorado. I remember one time I was sitting on the floor with my mom in the den and A.J. was sitting there. All of a sudden he jumped down and started beating her for no reason. Often the abuse would happen when A.J. was drinking, but not always. He was just mean – and still is.

> Our parents frequently fought at night, when we were in bed. We could hear the yelling and hitting, but couldn't do anything because we were just little children. I remember feeling sad, angry, terrified, helpless – I loved both of them. When I was old enough to figure it out, I realized that A.J. often forced my mom to have sex with him after beating her to a pulp. I could hear it, lying in my bed.

> A.J. was only taken to jail once for beating my mom. That was in 1974. His brother T.J. got him out and Betty never pressed charges again. I think she figured there was no point because A.J. would just be madder if she did. On my dad's side, all the men were like that and beat their women. They also all cheated on their women. T.J. was married to Lillie Mae, but had a girlfriend, Dorothy, on the side. A.J. cheated on my mother – not only by going around with other women, but by keeping money in a secret bank account. We only learned about that after my mom left him.

> The abuse took its toll on my mother. She suffered from lots of headaches and migraines and had high blood pressure. She was depressed and tired all the time. She didn't want people to know she was being beaten and would try to hide her bruises. I remember that she had a blood clot or aneurysm in her brain in the late 1970's or early 1980's.

Exhibit 17, at ¶¶ 2-5.

139. Like her siblings, Pam could also have told the jury about the physical abuse that both parents inflicted on the children, particularly the boys -- a fact about which the jury was materially

misled at trial:

> The violence in our home was not only between my mom and A.J. Both our parents could be harsh disciplinarians, but A.J. was the worst. He would whup our asses with a belt or a switch when we did something wrong. The switches left big welts. He would make one of us run to get a switch for the beating. A.J. hit the boys more than he hit Cassandra and me. Sometimes, he didn't know when to stop and it was like he had gone crazy. Mom would try to get him to stop when he was totally out of control.

Exhibit 17, at ¶ 6.

140. Like her younger sister Cassandra and her brother Scotty, Pam tried to escape the family home, asking Rev. Hegler and his wife if she could move in with them when she was fifteen, but didn't manage to move out of the house until eight or so years later, when she got her own place. Exhibit 17, at ¶ 7. Shortly thereafter, her mother left A.J.; she took the youngest boys with her but then, in essence, abandoned them, leaving Orlando to look after his younger brothers. Pam could have described to the jury how Betty's abandonment of the children impacted their lives and explained how Orlando's drug dealing had its roots in his need to care for his younger brothers:

> My mom moved out when Demetrius was thirteen and old enough to understand what was going on. I think that was in 1988 as well, after I had already left. Scotty and Cassandra had long since left home as well. Betty just packed up and moved out one day. She got a place for herself and the three youngest boys on El Dorado Avenue. Later she moved to School Street.

> Things fell apart for the boys after Betty moved out with them. She needed to be strict with them, but instead she went buck wild. She met a man named John Powell and started seeing him. Eventually she moved in with him in Strong, Arkansas, and pretty much left the boys to fend for themselves. I can understand what she did – she had stayed married to A.J. through 24 years of abuse – but I would never put a man before my children. When Betty met John Powell, she was in "la-la land." The boys were left to take care of themselves and had no supervision. There were times when the electricity was turned off and there was no food in the house. To this day, my

mom and I are not real close because I became so angry at her on account of how she abandoned the boys during that time.

Orlando got a job at Sav-Mor, a grocery store in El Dorado, but started hanging out with the wrong crowd. I think he got into selling drugs in 1989. It's not hard to understand why it happened – Orlando could see that the guys selling drugs had nice clothes and cars and women when he was having trouble making sure his younger brothers were fed. And since Betty was busy running around with her man, there wasn't anyone to set any limits for him. Even though he started making money the wrong way, Orlando was always generous with his money. He didn't mind helping anyone and would do good with the money he made – he used the money to help his family and friends. He made sure that his children were clothed and fed.

Exhibit 17, at ¶¶ 8-10.

141. Pam, as well, could have described Orlando's generous character and his act of heroism in jumping from a second-story balcony to save her toddler son from drowning -- aspects of Orlando's character that the jury never heard about:

Orlando was always a generous person. Even as a child, he was sweet and very giving. If he had a piece of candy and another child didn't, he would give away his candy. He was active and energetic and liked to be on the go. I think that he did okay in school, but like the rest of us (except Tracy and San), he was in remedial classes.

Orlando saved the life of my child Syroid in 1994 when Syroid was around three years old. We were all in Baton Rouge, Louisiana, to celebrate the law school graduation of my half-sister Vada's husband, David Smith, and were at a Holiday Inn on Airline Highway. I heard a scream and saw someone jump off a balcony by the pool. I learned that it was Orlando, who had seen that Syroid had fallen into the pool and was drowning. Orlando had jumped to the ground from the second floor to go in the pool and rescue him. When I got to the pool, a white man was there giving Syroid CPR. My mom had passed out from a seizure or something, and she and Syroid were taken to a Baton Rouge hospital. Syroid was there for two days.

Exhibit 17 at ¶ 12.[31]

---

[31] Orlando's rescue of his nephew was also witnessed by his oldest son, Eric Hampton (*see* Exhibit 23 (Declaration of Eric Hampton)); Veda Smith, whose husband's law school graduation the Hall family was celebrating at the time, and LaTonya Anders, Orlando's girlfriend, who was called by the

142.    In the aftermath of the crime and her brothers' arrests, Pam fell into a deep depression. Exhibit 17 at ¶ 13.  Nonetheless, competent counsel would have worked with her so that she could have given the jury this important information about her brother's character and background in an attempt to save his life. Exhibit 17 at ¶¶ 14-15.

143.    Scotty Hall, Orlando's oldest brother, could likewise have provided vivid testimony describing the pain and fear that all the Hall children experienced growing up in their home:

> I feel like I pretty much grew up in the streets.  Even though I had a roof overhead and food and clothes, my parents were always working and Pam was too much of a bully.  There wasn't a real sense of family.  For instance, we didn't have dinners together; there wasn't any real family time at my home.  The things I talk about with my own children weren't discussed in my house growing up.
>
> Cassandra and I distanced ourselves from home by playing a lot of sports and doing well in school.  I played football, basketball and baseball, and ran track.  That kept me going in my youth because home was a miserable place to be.  My parents' relationship was very violent as far back as I can remember.  If I was in school or playing sports, the problems at home disappeared.  When I got home, it would all hit me.
>
> I grew up seeing my dad hit my mom.  If my mom had an opinion of her own that he didn't agree with, there would be a fight.  But my dad didn't even need a reason.  I remember being at the home of my mother's niece, Robbie Charles, one day when my dad had been drinking.  He came in and just lit into my mom, hitting her with his fists in her face and anywhere he could.  I felt scared and helpless watching the woman I loved being beaten down.  I felt guilty because I couldn't help her.  If we kids tried to intervene, my dad would throw us off and then get back at her.  When I was in the 10th grade, I was older and stronger and would tell my dad not to put his

---

Government to testify against him in the penalty phase and who could have testified to this and other positive aspects of Mr. Hall's character.  In addition, records from Our Lady of the Lake Hospital in Baton Rouge, LA, confirm that Betty Hall and Syroid were hospitalized following Syroid's near drowning.  *See* Exhibit 24 (Betty Hall's emergency room records from Our Lady of the Lake Hospital).

hand on my mom. One time he did and I knocked him to the floor. My dad was less violent when he wasn't drinking, but it seemed like he drank -- hard liquor and beer -- pretty often.

My dad's violence ate away at my mother. She had a beautiful singing voice and churches would pay her to sing at revivals. But my mom was battered so much she didn't have any self-esteem. Even though my mom made more money than my dad, he made all the decisions. My mom used to be very fair skinned, but now her eyes are black from the beatings she used to get. She had headaches a lot. I remember her as very nervous and high-strung. She smoked three packs of cigarettes a day and drank lots of coffee. I think she was depressed. When her mother died, my mom was really depressed. She would sit in the dark crying. My grandmother had been her backbone and my mom really grieved. I think Orlando was eight or nine at the time.

The violence in the home was also directed at us kids. Both our parents could be harsh disciplinarians, but my father was the worst. My dad would whip us with a leather belt or a switch. He though[t] the leather belt made you tough, but the switch would cut you. As we got older, it wasn't a belt or switch; it was his fists. My mom couldn't protect us, because he would whip her to. But my mom sometimes would whip us as well or she'd tell our dad what we'd done, so he could whip us later. I remember laying in bed in terror, waiting for whippings that I knew were coming, but didn't know when. At the time, I thought all black families were like that.

Exhibit 18, at ¶¶ 3-7.

144.    Scotty Hall, as well, could have told the jury about the violence Orlando experienced in the world beyond their home -- something the jury never heard about, and a circumstance which can have profoundly damaging effects on a child's development (*see, e.g.,* Exhibit 14, at ¶ 45):

Life in El Dorado was violent, too. Orlando and I have seen murders. My uncle TJ had a club right behind our house, Anybody's Club. Our dad's first cousin, Harry J., who was the original owner of the club, died right outside it. He had been poisoned and his car was set on fire with him in it. Orlando and I both saw the burning car with Harry J. inside. Another time, we were with Eric Steele when he was shot twelve times. Other friends of Orlando's, like Corey Brown, were shot and killed. Corey had spent the night with us and in the morning I dropped him off at his house. He was coming back to our house when he was robbed and shot in the head. Other friends of ours, like Steve Gentle and Sandy, died of drug overdoses. Seeing people die so casually made you feel like you didn't have much of a chance to survive.

Exhibit 18, at ¶ 8.

145.   Like his sister Cassandra Ross, Scotty Hall did manage to leave home as a young adult in order to escape the violence and stress of his home life.  He was less successful at getting his life together than his younger sister, however, and became addicted to drugs while serving in the Army, stationed in Germany.  He is currently incarcerated at the Cole State Jail in Bonham on a five-year sentence for drug possession.  Exhibit 18, at ¶ 1.  Had Scotty been developed as a witness, he could have described to the jury how the harsh upbringing suffered by the Hall children affected both himself and Orlando:

> The violence and lack of structure in my childhood has definitely impacted me for the worse.  I think that watching my father beat my mother contributed to my doing the same thing to women in my life.  I have four children, all by different women living in Arkansas.  Three of my children were born the same year and are around fourteen. The fourth is eleven.  I have had serious drug addiction problems for years that I am hoping my current incarceration and treatment will help me finally escape.  A lot of the men in my dad's family, including my dad, have had problems with drug and alcohol abuse, as well.  I try to talk to my children about taking responsibility and not making the same mistakes that I have made all my life.
>
> Our childhood impacted Orlando differently.  My parents split up when I was in Germany in the service.  My mom got involved with a man and left the younger kids to fend for themselves.  Cassandra had already gotten married and moved to Texas.  Orlando had to look after Tracy and Demetrius.  He worked at the Save More and then left school.  Jobs are hard to find for a black man in Arkansas; it's hard to feed and clothe three kids on minimum wage.  When Orlando was old enough to get out, he got caught up in the drug trade instead.
>
> Exhibit 18, at ¶¶ 10-11.

146.   Although Tena Francis met briefly with Scotty Hall prior to Orlando's trial, she had little time to develop any relationship with him or to draw out the foregoing information.  Exhibit 18, at ¶ 12.  A properly conducted investigation that commenced at or near the time of counsel's

appointment would have allowed Tena Francis, or a similarly experienced mitigation specialist, to develop this evidence in mitigation.

147. Tracy Hall, who is a couple of younger than Orlando, was never contacted by Mr. Hall's trial team about testifying at his brother's trial. At the time of the crime and the trial, he was incarcerated in an Arkansas prison on drug charges. Exhibit 19 (Declaration of Tracy Hall) at ¶ 14. His testimony, had it been sought, would have provided the jury important insights into his older brother's suffering in childhood; his involvement in the drug business and efforts to provide for Tracy and Demetrius after Betty Hall left them to fend for themselves; and Orlando's positive characteristics.

148. Like his siblings, Tracy Hall could have told the jury about the physical violence inflicted on his mother Betty Hall by his father A.J. and the toll that this abuse took on her, Exhibit 19 at ¶¶ 2, 6, although he managed to avoid exposure to a lot of this abuse by staying at his Aunt Luella's much of the time. Exhibit 19 at ¶ 4. More significantly, Tracy could have informed the jury about the fear and suffering caused to the boys, and particularly Orlando, by their parents' harsh punishments:

> My mom and dad definitely believed in physically punishing us kids. We got our butts whupped, with a belt or a switch, for whatever we did. Both mom and dad would whup us, but sometimes one of them put it off on the other. My mom was especially heavy-handed. Sometimes, we would know we were going to get a whupping but we didn't know when it was coming. My dad would just let us wait; sometimes we would lie in bed and wonder when it was going to happen. Me, my brother Demetrius (whom everybody in the family calls "Jack"), and Lan all shared a bed. Sometimes Lan would wet the bed because he was so scared thinking and wondering about whether he was going to get a whupping, and when he did he got whupped for that.

Exhibit 19 at ¶ 3.

149. Tracy could have told the jury about how Betty Hall's abandonment of the boys, when she finally left her husband, left them feeling unwanted and hopeless, and saddled Orlando with the responsibility for caring for his younger brothers:

> Lan wasn't that good in school, and neither was Jack. I think that Lan may have had a hard time learning. I did well in school for a long time. I think I worked especially hard to get my mom's attention. For several years, my grades were nearly good enough for the honor roll. When my mom and dad split up, though, I quit caring about school. I didn't think it was that serious at first, but soon it became obvious that their marriage was over for good. When my mom went to be with John Powell, and left Lan, Jack and me alone, I felt nobody cared. And I felt that if nobody else cared, I didn't care either.
>
> When Lan, Jack and I were left on our own, Lan still made me go to school. It was a difficult time because we didn't have any money to live on and neither of our parents was helping us. I didn't have much to wear, and the electricity and phone were turned off at times because the bills weren't paid. There was not much food to eat, either. I felt deserted, and Lan and Jack felt the same way.
>
> That was when Lan started selling drugs. I think he felt he had to pay the bills and take care of Jack and me, and nobody else in the family was stepping forward to take responsibility for us. I know Lan felt responsible for me and Jack. If it hadn't been for Lan, it would have been a lot worse for us after my mom left us. Lan sold drugs for survival -- to help us and the family survive.
>
> Exhibit 19 at ¶¶ 7-9.

150. Tracy could also have helped the jury to understand that, even though Orlando was involved in selling drugs, he did not think that it was a good way to earn money and unsuccessfully tried to keep both of his younger brothers away from the business. Exhibit 19, at ¶¶ 10-11. Tracy could also have described to the jury Orlando's warm and loving relationship with his children and Tracy's love for his brother. Exhibit 19 at ¶¶ 12-13.

151. A.J. Hall was another potential witness who, properly developed, could have immeasurably strengthened the defense case. Although counsel may have asked A.J. about testifying at trial, he

plainly invested no time in getting to know A.J. for the purpose of developing him as a mitigating witness. Had trial counsel spent the necessary time and effort to develop his testimony, he could have gotten A.J. to accept responsibility for the damage that he caused to his family -- as he has in his attached declaration. *See* Exhibit 25 (Declaration of A.J. Hall) at ¶¶ 18-27, 30. Counsel could also have presented information concerning A.J. Hall's background as a sharecropper's son, *id.* at ¶¶ 3-8; his philandering ways throughout his life (which clearly set a destructive example for his sons), *id*. at ¶¶ 9-14; the serious health problems that Betty Hall suffered while the Hall children were young; *id*. at ¶ 15; and Orlando's health and learning problems in his childhood. *Id.* at ¶¶ 16-17.

152. Counsel's failure to investigate and develop this readily available source of mitigating evidence was objectively unreasonable. Moreover, the importance that the testimony of these additional immediate family members would have had at Mr. Hall's trial cannot be undervalued. Each of these family members would have given the jury a slightly different view of Mr. Hall that would have provided them a full and nuanced portrait of the man whose fate they were called upon to decide. Each of the family members would have been able to convey to the jurors, moreover, their strong love for Mr. Hall -- a factor that the jury was certainly entitled to consider. Additionally, contrary to the impression that the Government sought to create during Cassandra Ross's testimony -- that she had escaped from any childhood horrors unscathed, and thus that life in the Hall family could not have been that bad -- the testimony of Mr. Hall's siblings would have offered strong proof of the corrosive effects of their childhood, as each of the Hall children carries very apparent signs of their traumatic childhoods to this day. Had counsel presented

testimony from Mr. Hall's immediate family members, there is a reasonable possibility that at least one of Mr. Hall's jurors would have concluded that a life sentence was the appropriate punishment.

### *Additional relatives, friends and neighbors whom competent counsel would have developed as witnesses and called to testify on Mr. Hall's behalf*

153.     The defense team failed to pursue numerous, easily located individuals who could have provided important mitigating evidence about Mr. Hall's background and character.  These include additional relatives outside the immediate family, friends, and neighbors, many of whom could have provided disinterested, corroborative evidence of the substantial physical abuse that Betty Hall endured at the hands of her husband, as well as testimony regarding Mr. Hall's positive character traits.

154.     Cassandra Ross's in-laws, Rev. Jerry and Gracie Ross, lived for several years on the same street as the Hall family and observed first-hand the violence between Betty and A.J. Hall.  As Rev. Ross recalls,

> The relationship between A.J. and Betty was pretty turbulent and everyone in the neighborhood was aware that there was a lot of violence between them.  . . . One reason I was aware of the frequently violent nature of A.J. and Betty's marriage was because they often fought in the yard in front of their house, where everyone in the neighborhood could hear and see clearly what was going on.  They apparently would start fighting inside, and then take it out in the yard, usually when Betty was trying to leave and get away from A.J.  They would yell and scream and curse at one another and A.J. would sometimes hit Betty with his fists.  When these fights occurred, the Hall children were always right there watching, even when they were very small. . . . Another reason that Gracie and I knew that Betty was beaten by A.J. was because we saw her in the neighborhood just about every day, and she very often had bruises on her face. Sometimes her eyes were blackened and swollen.

Exhibit 26 (Declaration of  Rev. Jerry Ross) at ¶¶ 2-4.

155. His wife's memories of the violence in the Hall household are equally disturbing:

> I would describe A.J. and Betty's relationship as frequently unhappy and marked by violence. This was no secret. A.J. and Betty fought a lot, and often did so in front of their house, just a few yards away from where we were living. We could, and did, see and hear most of what went on. It seemed that the fights would start inside the house, and then they would kind of spill outside into the yard. A.J. and Betty would yell and scream and swear at one another. A.J. often struck Betty with his fists, right there in the yard where everyone could see. When these fights occurred, the Hall children were always right there watching, even when they were very small.

> I recall specifically one occasion when Betty attempted to escape during one such fight, by getting into their car and driving off. A.J. tried to prevent her from doing so by climbing right up on the hood of the car and beating on the windshield with his fists.

> I saw Betty in the neighborhood just about every day, and it was obvious that she was being beaten. She was usually bruised up and sometimes her eyes were swollen. This happened so frequently that it did not surprise me when I saw it. A.J. even beat Betty when she was pregnant.

> I know that A.J. drank, but I don't know if that had anything to do with the way he treated Betty. In my opinion, that is just the way A.J. treated women. The reason I believe that is because I have spoken to Vera Thomas, who is the mother of some of A.J.'s other children, and Vera confided that A.J. used to hit her, too.

> Exhibit 27 (Declaration of Gracie Ross) at ¶¶ 2-5.

156. At the same time, both Rev. Ross and his wife could have confirmed that Mr. Hall showed positive character traits despite having grown up under such appalling circumstances. Rev. Ross remembers the teenage Orlando Hall as "well-mannered and polite," respectful to adults, and "very good with [his young nephew] Marco;" Orlando was even entrusted with taking care of Marco from time to time. Exhibit 26 at ¶ 5; *see also* Exhibit 27 at ¶ 6 (same).

157. Neither of these potential witnesses were ever approached by anyone from the defense team, even though, as the in-laws of Hall's sister Cassandra, they were easy to find. Exhibit 26 at ¶ 6;

Exhibit 27 at ¶ 7.  Indeed, the failure of the defense team to locate the Rosses underscores how little meaningful contact anyone from the defense had with Cassandra Ross -- one of the only two members of Mr. Hall's family called by the defense at punishment -- prior to Mr. Hall's trial.

158.    Numerous other available witnesses were not contacted, interviewed, developed, and/or presented at trial. Co-workers of Betty Hall's from her years at the Con-Agra poultry plant, such as Jerline Hill and Betty Jo Roberson, could have confirmed that Betty came to work bruised, black-eyed, and ashamed on a regular basis. *See* Exhibit 28 (Declaration of Jerline Hill) (detailing her recollection of Betty Hall's beatings; the difficult work she and Betty performed at the chicken processing plant where they worked; the harsh economic realities of El Dorado and the limited opportunities presented to young African American men and the resulting allure of the illegal drug trade).

159.    Other family members could have added their own richly detailed accounts, both of the violence that disfigured the Hall home, of Orlando's warmth and generosity, and other facts relevant to the jury's sentencing decision.  Luella Crow, one of A.J. Hall's older sisters, could have informed about the Hall family's history and how the family name was given to them when her grandfather was sold in slavery to the (white) Hall family in Alabama.  She could have described the rugged life she and her siblings endured as the children of sharecroppers and the intense whippings her father administered when the children behaved badly.  Luella could also have told the jury about Betty Hall's bouts of ill health, including an aneurysm that laid her up for a long time, and the damaging effects these health problems had on the Hall children; about how she (Luella), her sister, Mary Alice, and Betty Hall's sister, Velma, all looked after different

groups of the Hall children and how she pretty much raised Tracy; and about Betty and A.J.'s stormy, violent relationship and its ill effects on their children.

160. Robbie Charles, the daughter of one of Betty Hall's sisters, could have testified in detail about the violence that A.J. Hall perpetrated on Betty. Robbie Charles not only witnessed some of the violence, but saw Betty on numerous occasions after she'd been beaten. She could have described to the jury how her parents, on occasion, would have to nurse Betty for days at a time when she came to their home beaten up. She could have testified to the pain and difficulties A.J.'s cruelty caused the Hall children. Robbie Charles could have explained that, although A.J. drank frequently, a lot of his violence was just plain meanness. She could have testified to Betty Hall's depression and the feelings of bitterness and anger that arose from the stress of her marriage. Robbie Charles could also have told the jury about much courage Betty Hall needed to leave A.J. because she was scared he would kill her if she did; and that, once she had left A.J., she essentially abandoned her three youngest sons to be with her new beau John Powell. Ms. Charles could also have described Orlando's caring and respectful nature; his mature and loving relationship with his own children -- despite the young age at which he became a father -- and the shock and devastation she experienced when she found out that Orlando had been charged with this crime.[32]

161. At least two of the mothers of Orlando's children (in addition to LaTonya Anders) were

---

[32] File notes from Hall's original trial counsel, Mark Daniel, indicate that Mr. Daniel knew that Ms. Charles possessed relevant mitigating information about Hall and his family background, since Mr. Daniel met with her during his one trip to Arkansas in November 1994. Thus, Mr. Ware and Mr. Kearney, who were responsible for familiarizing themselves with the work done prior to their involvement in the case, had a duty to explore whether to call Ms. Charles as a witness.

available and willing to testify on Orlando's behalf. Jamie Garrett Whiddon, the mother of

Orlando's daughter Te'ausha, was spoken to briefly by Tena Francis and indicated her willingness

to testify on Orlando's behalf, but was never actually asked to testify. Exhibit 29 (Declaration of

Jamie Garrett Whiddon) at ¶ 12. She would have provided the jury with a moving portrait of

Orlando's relationship with his children, particularly Te'Aushia:

> Orlando and I started seeing each other and I became pregnant with our daughter, Te'ausha. Orlando was at the hospital either at the time she was born (on September 13, 1990) or right after. Orlando and I continued seeing each other after Te'ausha's birth, and even lived together for a while. The relationship had problems, though, because Orlando saw other women. I moved out when Te'ausha was six months old, but Orlando and I saw each other off and on even after that.
>
> Orlando was always a very loving and supportive father. At one point, when I was living with my sister (who lived a block away from Orlando's mother), Orlando would be at my house every morning and every evening. He did everything to care for Te'ausha — changing her diapers, feeding her, bringing her clothing, diapers and shoes. Orlando financially supported our daughter until he went to prison in July 1992. Sometime in 1991, I moved to Illinois. After I returned to El Dorado in 1992, Orlando would again come to visit every day until he went to prison. After that, I would visit him in prison with Te'ausha until he got out in 1993.
>
> After Orlando's release from prison, we maintained contact, although by that time I had given birth to my son by the man I eventually married. I was going to barber school in Pine Bluff, where Orlando was living, and Te'ausha spent a lot of time with him in Pine Bluff. Orlando always took good care of her.
>
> Orlando has been a loving and concerned father to all of his children. He never hit Te'ausha or any one of his children. They are all very important to him and he wants to know everything about them. Even now, he remains involved with all of his children to the best of his ability. Te'ausha, who cannot remember Orlando from before he went to prison, talks to him regularly now on the phone. Orlando calls at least once a week and writes 2-3 letters to Te'ausha every couple of weeks. He tells her to do well in school and keep her grades up and to be good and mind me. Te'ausha cherishes his attention, and sends her report cards, school work and pictures to him. She has visited her daddy three times in Texas and twice now that he is in

Indiana.

Orlando's active concern with Te'ausha's education has been particularly important because Te'ausha has a learning disability and her father's encouragement helps to keep her motivated. Te'ausha was having problems at school because she couldn't sit still, was constantly moving around and was easily distracted. I took her to a psychologist in 1995, when she was in first grade, and learned that Te'Ausha had Attention Deficit Hyperactivity Disorder (ADHD). She is now on Ritalin, which makes a difference, although I don't give her the medication during the summer.

Exhibit 29 at ¶¶ 4-9.

162. In addition, Ms. Whiddon could have told the jury about Orlando's difficulties finding gainful employment in El Dorado and how he eventually succumbed to selling drugs to make a living, Exhibit 29 at ¶ 9; how he was always generous with the money that he earned in this fashion but wanted to get out of the business, Exhibit 29 at ¶10; and that A.J. Hall's abuse of Betty remained common knowledge at the chicken processing plant and a topic of gossip when Ms. Whiddon worked there, even though this was after Betty had left A.J. Exhibit 29 at ¶ 11.

163. Cynthia Hampton Braggs, the mother of Mr. Hall's oldest son Eric Hampton, also could have provided the jury with persuasive and moving testimony concerning Mr. Hall's relationship with his children and the efforts he makes, even from prison, to make sure that Eric gets his education and does not follow in his father's footsteps:

Orlando is the father of my son, Eric Hampton. Eric was born when I was 13. Orlando was just about the same age. Because Orlando and I were so young when Eric was born, you could say we have all grown up together. Even at that young age, Orlando always saw Eric and spent time with him despite the fact that Orlando and I never had a real relationship.

Orlando was a good father. Eric spent every weekend or every other weekend with Orlando and his mother, Betty.

When Eric was 2, Orlando made sure that Betty bought Eric Easter presents with the

Easter money she would otherwise have spent on Orlando. Orlando would always ask me what I wanted him to get Eric for Christmas and other occasions.

As the years went on, Orlando always continued to be a good father to my son and tried to take care of him financially. Orlando would take him places like Disney World and let him experience things that a lot of children in our community did not get a chance to do. He also bought Eric clothes and gave me money when he could. He would always encourage Eric to do the right thing. Orlando was proud of being a father and he took this role very seriously.

Orlando would tell Eric to mind me, but he <u>never</u> physically disciplined Eric. Orlando probably didn't even approve of my spanking Eric. Orlando was never a violent person – I have never known him to do anything violent.

I knew and everyone knew that Orlando was dealing drugs. I never confronted him about where he was getting his money. Back in the late eighties and the early nineties in El Dorado, if you were a young African-American man making money, you were probably a drug dealer. Although Orlando had a nice car and other things, he did not live the "high life." He always took care of his family.

When crack arrived in El Dorado, it was an opportunity that many young black men found difficult to resist. There weren't many opportunities for young black men so they were easily tempted by the drug business. My brother and several of his friends ended up dealing drugs as well. If you ended up in jail just one time, it became nearly impossible to find a legitimate job after you got out.

After Orlando went to prison in 1994, Eric was very hurt and upset. He saw a counselor at his school because of his depression.

Orlando wrote a letter to Eric, in late 1994, pleading with him not to make the same mistakes he had made. The letter was very sad and it touched me because it was written with such sensitivity. When Orlando was younger, he had tried to hide his sensitive side, but he let it show for his son. Orlando wrote that he wanted Eric to do all of the things that he had never done. He wanted Eric to graduate from high school, play sports, and stay away from drugs and the drug life.

Eric suffers from learning disabilities which began to give him increasing trouble with his school work in about 1998. He was evaluated at this time, but he was not placed on any medications. He has since been placed in a lot of remedial classes, but he keeps his grades up. He will be in the 12th grade at El Dorado High School starting in the fall of 2002 and is in special education classes for a speech problem and learning disabilities. Orlando and I have always been very serious about Eric's

education. Eric plans to enter the military after his high school graduation.

Orlando continues to stay in touch with Eric and remains an important part of his life.

Exhibit 30 (Declaration of Cynthia Hampton Braggs).

164. Because trial counsel did not leave adequate time to conduct a thorough and probing investigation of Mr. Hall's background, they never discovered additional witnesses familiar with Mr. Hall. Thus, for instance, no one from the defense team ever met with Emanuel Porchia, an African-American educator who teaches history and social studies at Rogers Middle School in El Dorado. Mr. Porchia was also responsible at times for supervising detention hall and "Saturday school" and recalled Orlando from some of these detention settings. Mr. Porchia could have testified that he had never known Orlando to behave in a violent or confrontational manner and that he knew Orlando to respond well to supervision and discipline. Like many others, Mr. Porchia would have attested to the absolute shock he felt upon learning that Orlando was involved in this crime. Moreover, as someone very familiar with the neighborhood Orlando grew up in, Mr. Porchia could also have conveyed to the jury the economic and socially deprived environment that existed in El Dorado during Mr. Hall's youth and early adulthood (and that still exists). For many of the children in that neighborhood, there is no meaningful parental supervision because both parents must work to make ends meet. This is a common circumstance in the African-American community in El Dorado. These economically dictated patterns of family interaction mean that even where parents work different shifts, providing appropriate guidance and supervision is difficult for the parent who must take the children after coming home from work exhausted.

165. Counsel's failure to investigate, develop, and present this evidence fell below objective standards for reasonably effective representation by capital defense lawyers in 1995, and there is a reasonable probability that, but for counsel's omissions, Mr. Hall would not have been sentenced to death.

### *Competent counsel would have developed the testimony of Government witnesses who could have provided mitigating information to the jury*

166. Trial counsel failed to explore ways in which witnesses who were called by the Government in order to testify against Mr. Hall could nonetheless have been used to present important mitigating circumstances to the jury -- without jeopardizing the witness's position *vis a vis* the Government. These witnesses included, but were not limited to, Demetrius Hall, LaTonya Anders and Wendall Holden -- all of whom would have offered additional, helpful testimony that would have provided jurors further reasons to vote against the imposition of a death sentence.

167. Demetrius Hall, Orlando's youngest brother, who was also charged in this matter and ultimately agreed to testify for the Government in exchange for a sentence less than death, could have told the jury about the deprivations the Hall children suffered in their home; that Orlando had done his best to look after Tracy and Demetrius after their mother had left them on their own after leaving her abusive husband; and how Orlando had tried unsuccessfully to stay away from the drug trade after getting out of prison in Arkansas.

168. LaTonya Anders, as well, could have provided the jury with positive information about Orlando that would have countered the callous image the Government sought to paint through her testimony. Among other things, she could have testified about Mr. Hall's efforts to get her and their daughter Shanté moved to Dallas in the hopes of starting a new life working in a

legitimate business.  She could also have attested to Mr. Hall's warm and loving relationship with all of his children.  Had trial counsel explored ways in which Ms. Anders could have provided testimony helpful to Mr. Hall, they could have diffused the damaging aspects of her penalty phase testimony for the Government.

169.    Wendall Holden, an El Dorado school official who was called as a Government reputation witness, also could have provided evidence that would have assisted the jury in understanding Mr. Hall's background.  As an educator with years of experience in El Dorado, he could have explained to the jury the pervasive and pernicious drug problem that had developed in El Dorado by the time Mr. Hall was reaching adolescence and the impact that it was having on the community, including the prospects of young African American men.

170.    Reasonably competent counsel would have investigated how they could use Government witnesses familiar with Mr. Hall or aspects of his background to provide the jury with information that would mitigate against imposition of the death penalty.  Had counsel done so, they would have discovered that such witnesses could provide testimony that, not only would constitute independent mitigating information, but that would diffuse the negative aspects of their testimony on behalf of the Government.  Had trial counsel  presented this evidence, there is a reasonable possibility that at least one of Mr. Hall's jurors would have concluded that life was the appropriate sentence.

### Counsel Failed Effectively To Cross-Examine The Government's Key Witness At Punishment, And Failed To Investigate Effectively To Prepare To Counter The Evidence Presented Through That Witness' Testimony

171.    Counsel performed deficiently in cross-examining Government witness Larry Nichols at the

penalty phase. Nichols was a vitally important witness for several reasons.

172.   First, Nichols' testimony provided the only evidentiary basis for the Government to argue that Mr. Hall "constitute[d] a future danger to the lives and safety of other persons" in the controlled environment of a prison, as opposed to in the "free world."   Nichols served this purpose because he alleged that Mr. Hall had been planning to attempt an escape from custody until Nichols foiled him by informing the authorities, and claimed that Mr. Hall was secreting weapons in the jail toward that end. *See* R. 31:224-227.  According to Nichols, Mr. Hall had told him that "coming [from] the Fort Worth courtroom to the car, it [would be] easy to escape" because his ankles were not cuffed. *Id.*  Mr. Hall supposedly told Nichols that if his lawyers came to see him, he would try to escape by putting a "homemade knife" to his lawyer's neck and taking him hostage. *Id.*  Nichols also claimed Mr. Hall talked of taking a female guard hostage. *Id.*  Nichols further related that inside the common area to which all inmates in the same part of the Mansfield facility had access, there were two such "shanks," one short and the other long. *Id.* The short one, he claimed, was "real, real sharp at the edge of it." *Id.*  Nichols claimed Mr. Hall had also declared that if he were "found guilty of the crimes," he would "hold [the] judge hostage, also," and "attempt to stab the judge." R. 31:228-231.  Nichols said he'd seen Mr. Hall remove one shank from its hiding place and then put it back. *Id.*  He also claimed he'd seen Mr. Hall sharpening one of the shanks on the concrete ceiling. R. 31:231-35.

173.   Second, Nichols painted a tremendously damaging portrait of Mr. Hall as boastful, unrepentant, and cruelly coarse toward the victim, as well as violent towards women generally and homicidal toward one of his co-defendants.  According to Nichols, Mr. Hall bragged about

having raped Lisa Rene, boasting that he "used 100 rubbers on her." R. 31: 219-222. Mr. Hall was "macho and proud about it." *Id.* Mr. Hall also expressed his intent to kill Steve Beckley, whom he called a "bitch." *Id.* Nichols further claimed that Mr. Hall also referred to LaTonya Anders, his girlfriend and the mother of his child, as a "bitch," and that Mr. Hall talked about "beating up on" other girls. R. 31:222-223.

174. For all these reasons, reasonably professional counsel would have regarded destroying Nichols' credibility in the eyes of the jurors as vital. Exhibit 12 at ¶ 36. In cross-examining Nichols, however, Mr. Hall's counsel unreasonably failed to employ the best proof that Nichols was a liar – prior sworn testimony by Nichols that contradicted his testimony in Mr. Hall's trial. Counsel's cross-examination was objectively deficient because counsel failed to impeach Nichols on important points after eliciting denials from the witness, with available prior inconsistent sworn testimony that Nichols gave as a Government witness in the trial of his co-defendants.

175. For example, one of defense counsel's themes on cross-examination was that Nichols was knowledgeable about how to reduce his sentence by cooperating with the Government. Pursuing that theme, counsel asked Nichols whether "some inmates out there at Mansfield" had "helped" Nichols to "know how to take certain steps to help yourself in the legal system." R. 31:257. Nichols denied it. *Id.* Counsel twice repeated the same inquiry, "in the trial you testified in in Dallas, did you say there was some inmates out there that helped you learn to take steps to help yourself?" R. 31:257. Nichols repeated his denials. *Id.* Counsel moved on, without impeaching Nichols on this point.

176. The transcript of Nichols' testimony from the Dallas trial would have permitted counsel to demonstrate to the jurors that Nichols was lying to them. In his testimony in the Dallas trial, Nichols admitted explicitly that in sending a letter to one of his co-defendants and asking him to sign a false affidavit exculpating Nichols, he was following "steps to go by" which were given him by other prisoners at Mansfield. Exhibit 31 (Excerpts from trial testimony of Larry D. Nichols from United States v. Miller and Reliford, No. CR3-94-343-G (N.D. Tex.)) at 9 (Nichols admitting that, in attempting to influence his co-defendant to lie for his benefit, he was "going by things that guys in [jail] told me. Steps to go by."). Nichols also admitted in that trial that he had gone "to the law library" for information and was getting "advice from [his] fellow inmates" about how to "get out of this jam." *Id.* at 151. Nichols repeated substantially the same admission *seven different times* during his testimony in the Dallas trial. *Id.* at 9; 151; 6 (Nichols told his co-defendant to keep mum because that was what the "guys at Mansfield told me to tell him"); 11 (Nichols asked co-defendant for a false exculpatory affidavit based on what Nichols had heard "inside the jail cells at Mansfield"); 13 (Nichols followed this plan because of "guys in [his] cell" who were "filling [his] head with things"); 153 (Nichols sought the false affidavit from his co-defendant at the urging of "guys in the prison system filling [his] head with all kinds of deals"); 190 (Nichols was taking cues from "jail house lawyers"). Reasonably effective counsel would have impeached Nichols on this point with Nichols' own prior testimony.

177. Counsel also asked Nichols whether he had "used some of that money [from the robberies] to buy some drugs for resale." R. 31:252. Nichols answered, "No." *Id.* Counsel persisted, asking whether Nichols "ever told anyone that [he] used some of that money [obtained in the robberies]

to buy drugs with to resell the drugs?" *Id*. Nichols' answer: "No, I didn't." *Id.* Counsel asked Nichols whether he was "sure about that," and Nichols answered, "Positive." *Id.* Counsel moved on to a different subject without impeaching Nichols.

178. Reasonably effective counsel would have employed the transcript of Nichols' testimony from the Dallas trial to demonstrate to the jurors that Nichols was lying to them. In that trial, Nichols admitted that he purchased and re-sold illegal drugs with his part of the proceeds from the robberies, and in fact that he did so "after every robbery." Exhibit 31 (second volume) at 23-24 (Question by the Government: "Did you buy any drugs with the money that you robbed for?" Answer by Nichols: "Yes." Question by the Government: "What drugs did you buy?" Answer by Nichols: "Marijuana." Question by the Government: "And what did you do with that marijuana?" Answer by Nichols: "Sold it and also used it." Question by the Government [after a colloquy between the Court and counsel]: "When did you buy these drugs?" Answer by Nichols: "After every robbery.").

179. More generally, in Mr. Hall's trial Nichols attempted in answering defense counsel's questions to minimize his own involvement in the robberies that gave rise to his federal exposure, claiming that he never went inside any of the establishments that were robbed and only participated in two robberies in any event. *See, e.g*., R. 31 at 243. Nichols also left the jury with the impression that he owned or possessed only two firearms. R. 31:257.

180. Faced with these representations by Nichols, reasonably competent counsel would have used Nichols' own testimony from the Dallas trial to establish for the jurors that (1) prior to committing the robberies, Nichols was living on "drug proceeds," by "selling dope," Exhibit 31

(first volume) at 6; (2) that Nichols, after participating in the Louisiana robberies, accompanied his robbery cohorts on a trip to Florida with the intent to rob a bank there, but the plan went awry, Exhibit 31 (first volume) at 21 (Nichols admits that he and co-defendants "planned to go to Florida and rob a bank down there but the plans was unsuccessful and I later came back [to] Dallas"); (3) that Nichols and another man had stolen two Jet Ski watercraft, which they took across state lines from Louisiana to Florida in order to sell them, Exhibit 31 (second volume) at 108-109; (4) that Nichols was involved in defrauding merchants by passing fraudulent checks, including writing a fraudulent check for $1700 to purchase a car, and that charges based on that conduct were foregone as part of his plea deal to testify against his co-defendants in the robbery case, Exhibit 31 (second volume) at 117-118, 166; (5) that Nichols owned or possessed no fewer than five firearms at various times: a .44 caliber Beretta, a 9 mm Ruger, a .380 caliber Taurus, a 12-gauge Mossberg shotgun, and a 9 mm Glock, Exhibit 31 (second volume) at 124-125; (6) that Nichols acquired the Glock by trading illegal drugs for it, Exhibit 31 (second volume), at 126; and (7) that Nichols had used other names, and had purchased at least one gun under a different name. Exhibit 31 (second volume) at 173. All these facts – previously admitted under oath by Nichols – would have helped the jury understand who Nichols really was. Contrary to his claim to be a wayward youth who had gotten mixed up in a couple of robberies as the getaway driver and was now earnestly trying to straighten himself out, Nichols' own testimony revealed him to be a manipulative and deceptive offender with a varied criminal history and a sophisticated appreciation of how to turn the system to his own advantage.

181. Counsel also performed deficiently in not pointing out for the jury that the content of

Nichols' testimony at trial went far beyond the content of what Nichols revealed in his conversation with FBI agents Oakley and Bersano and AUSAs Roper and Macaluso on March 7, 1995. *See* Exhibit 2. According to the FBI-302, Nichols advised at the end of the interview that he had provided in that interview "all the information he could furnish." Counsel should have cross-examined Nichols to point out how extensively Nichols was embellishing his allegations against Mr. Hall. For example, in the March 7 interview Nichols failed to mention, *inter alia*, (1) two of the three "shanks" he later described in his trial testimony; (2) any statements by Mr. Hall about stabbing the trial judge, as Nichols later claimed at trial; or (3) the claim that Mr. Hall bragged of using "100 rubbers" in sexually assaulting the victim, which Nichols repeated at trial.[33]

182. In sum, counsel could have shown the jury definitively that Nichols was not to be trusted regarding any of his claimed conversations with, or observations of, Mr. Hall. It was objectively unreasonable, given Nichols' importance to the Government's case, for Mr. Hall's counsel not to take every opportunity to undermine Nichols' credibility with the jury. Counsel's performance in this regard was deficient and an effective cross-examination is reasonably probable to have resulted in a different outcome at the punishment phase. Exhibit 12 at ¶¶ 36-41. *See, e.g.*, Sparman v. Edwards, 26 F.Supp.2d 450 (E.D. N.Y. 1997) (counsel ineffective for failing, *inter alia*, to cross-examine child sex abuse victims with prior inconsistent statements), *aff'd* 154 F.3d 51 (2nd Cir. 1998); Tucker v. Prelesnik, 181 F.3d 747, 757 (11th Cir. 1999) (counsel was

---

[33] Because Nichols was already in protective custody and segregated from Hall by the time he was interviewed by the Government on March 7, and thereafter was never again in contact with Hall, Nichols could not have claimed that the embellishments came from other, subsequent conversations

ineffective in failing to impeach victim with medical records reflecting his faulty memory of the crime); <u>Driscoll v. Delo</u>, 71 F.3d 701, 711 (8th Cir. 1995) (counsel ineffective in failing to impeach the testimony of an important state's witness using witness' prior inconsistent statements), *cert. denied*, 519 U.S. 110 (1996); <u>Smith v. Wainwright</u>, 799 F.2d 1442 (11th Cir. 1986) (counsel ineffective for failing to use prior inconsistent statements to impeach State's witness whose credibility was essential to the State's case).

183.    Counsel also performed deficiently in neglecting to investigate the Government's "escape plot" allegations against Mr. Hall until October, when trial was already underway.  Counsel of course were aware of the existence and nature of these allegations, because the "escape plot" claim led to counsel's appointment in the case in the first place.  To provide reasonably effective assistance with respect to this issue, counsel had a duty to undertake an aggressive investigation of the surrounding circumstances sufficiently in advance of trial to permit the results of investigation to be used in Mr. Hall's defense.  Counsel failed to do so.  Additional witness could have been developed through timely and diligent investigation to counter Nichols' claims, including but not limited to at least two other inmates who were present in the same "tank" at Mansfield with Mr. Hall and Nichols. Both would have contested the Government's claims about Mr. Hall's behavior and attitude at Mansfield.

184.    Inmate Charles May would have testified as follows:

> During 1995, I was an inmate at the Mansfield Detention Center.  I recall another inmate by the name of Orlando Hall who was being held there also.  Orlando Hall and I were in the same tank for a couple of weeks.

---

with Hall.

Orlando was always very quiet and I never heard him talk about his case, to me or anyone else. Orlando was very suspicious of other inmates on the unit and did not trust anyone. During a card game, he once warned me about another inmate who was talking a lot and trying to get others to talk about their cases.

Based on my observations of Orlando, I do not believe that he would have ever talked with anyone about details of his case or any secret plans that he may have had. He never talked about having a plan to escape and I never heard anyone else say that Orlando had talked of such plans. Orlando never bragged about his involvement in his case nor did he say anything vulgar about the victim. I never saw Orlando with any weapon of any type while in the unit, and no one else in the unit ever told me that Orlando had any weapon whatsoever.

Exhibit 32 (Declaration of Charles May) at ¶¶ 2-4.

185. Inmate Javier Solis would likewise have disputed Nichols' claims. According to Solis, he saw Mr. Hall "every day" in the day room, or common area of the tank. Exhibit 33 (Declaration of Javier Solis) at 1. Mr. Hall never talked about escaping or abducting his lawyers or a jail guard in order to do so. *Id*. Solis never knew Mr. Hall to have a shank or any other weapon in the tank. *Id.* Mr. Hall "didn't talk much" and never "brag[ged] about his case [or] about killing a girl." *Id.* Based on the way Mr. Hall acted and talked, Solis drew the conclusion that Mr. Hall "was sorry about what happened in his case" and that "he felt bad about it." *Id.*[34]

186. Counsel's deficient performance in investigating the "escape plot" allegations prejudiced Mr. Hall at the sentencing phase. It is reasonably likely that, had counsel developed and presented all the available evidence to counter Nichols' claims, the jury would not have concluded that Mr. Hall was a "future danger" in prison, and on that basis would have sentenced him to life

---

[34] It should also be noted that, had counsel conducted an appropriately timely and broad investigation into these circumstances, counsel would have been prepared to present witnesses other than Alonzo Airy when Airy suddenly retreated from the helpful testimony counsel had expected him to provide.

imprisonment without the possibility of release.

**Counsel Failed Effectively To Present Evidence Of Mr. Hall's Prior Successful Adjustment To Incarceration.**

187. Counsel performed deficiently in failing to investigate, present and argue available, affirmative evidence of Mr. Hall's successful adjustment during his prior incarcerations in Arkansas and elsewhere. Even before the Supreme Court confirmed that the Constitution entitles a capital defendant to present such mitigating evidence, Skipper v. South Carolina, 476 U.S. 1 (1986), reasonably competent capital defense counsel recognized the importance of showing jurors that a defendant had lived peacefully and productively in a prison environment. This was certainly true at the time of Mr. Hall's trial. Exhibit 12, ¶ 42 ("Reasonably competent capital defense counsel in 1995 would be aware of *Skipper* and would, as part of their investigation into mitigating evidence, have pursued developing and presenting such evidence.").

188. Although a few pages from Mr. Hall's Arkansas penitentiary records were placed in evidence by the Government, *see* Government Exhibit 100, and one of Mr. Hall's attorneys referred briefly to those records in arguing at the penalty phase that, had Mr. Hall been violent in prison, the Government would have pointed this out, Supp. R. Vol. 20-A at 54, defense counsel failed to provide jurors any guidance in understanding them, or, indeed, even to guarantee that the jurors read them or gained any real familiarity with their contents. This constituted deficient performance. Exhibit 12, at ¶ 43 ("[I]t was not reasonable for defense counsel to count on the jurors to be able to understand the full mitigating significance of the [DOC] records without testimony from defense witnesses."); *see also* Turpin v. Lipham, 510 S.E.2d 32, 42 (Ga. 1998) (counsel was ineffective for, *inter alia*, failing to present witness testimony to assist jury in

understanding and evaluating medical records, rather than simply "implor[ing] the jury in closing argument to read and utilize the records" and "expect[ing] the jurors to digest and understand the records by themselves").

189. Moreover, defense counsel's argument mistakenly suggested to the jurors that the only significance of Mr. Hall's prison record was the *absence* of evidence that he had misbehaved. Supp. R. Vol. 20-A at 54 ("[I]f there was one iota of evidence that Orlando Hall had breathed wrong, had disciplinary problems, had been any problem at all within the confines of the penitentiary, you would have heard about it [from the Government]. . . . [W]ithin the confines of the penitentiary, there was absolutely no evidence that he was anything but a well-behaved inmate"). A reasonable juror might have been skeptical of defense counsel's argument, surmising that Mr. Hall's behavior in prison might not have been carefully scrutinized. Contrary to defense counsel's argument, however, Mr. Hall's prison records did not just support a negative inference of "no bad conduct," but *affirmatively established* that Mr. Hall had spent his time in prison constructively and productively. Counsel's failure to develop this evidence and communicate it to the jurors, including introducing Mr. Hall's complete Arkansas DOC file, was objectively unreasonable and fell below the standard of reasonably professional assistance in a capital case.

190. For example, Mr. Hall's Arkansas prison records show that Mr. Hall was assigned as a "C-2 trusty" during his prior incarceration. Exhibit 34 (Declaration of Charles Chastain) at ¶ 4. A qualified witness with experience in Arkansas corrections could have explained to the jury that this classification indicated that Mr. Hall was in the category of offenders receiving the most

good-time credit, and that he had earned a trusted status because "C-2" trusties were actually allowed outside the prison walls with an escort. *Id*. Lower-grade trusties, in contrast, were forbidden to leave the prison grounds. *Id*. In addition, such a witness could have testified that Mr. Hall achieved this trusty status more quickly than other inmates, demonstrating the prison authorities' confidence that he had a low propensity for violence and other misbehavior in the prison setting. *Id*. Such a witness could also have pointed out that Mr. Hall's record of zero disciplinary infractions, a record to which defense counsel did not even specifically direct the jury's attention, indicates that he was "an ideal inmate." *Id.*

191. In addition, Mr. Hall's incarceration record establishes that he was successful in obtaining release under "Act 814," an Arkansas law providing for certain inmates to be placed in the community on work-release status. *Id*. at ¶ 6. An appropriately qualified witness could have emphasized to the jury that offenders were carefully scrutinized for this type of release and that no inmate obtained it unless the Department of Correction viewed his behavior as above reproach. *Id*. Mr. Hall's counsel were aware of his early release from the Arkansas DOC, which should have alerted them to the potential availability of such evidence. Counsel's failure to develop and present this evidence constituted deficient performance. Exhibit 12 at ¶ 42.

192. Mr. Hall's Arkansas DOC records also offered counsel other important opportunities to humanize their client, of which they unreasonably failed to take advantage. The records show, for example, that on several occasions Mr. Hall made urgent requests to telephone home and check on his family when other family members underwent unexpected health crises. *See* Exhibit 35 (excerpts from Mr. Hall's Arkansas DOC records); Exhibit 12 at ¶ 44-45. This

information could have helped corroborate the views of other defense witnesses (whom counsel also failed to call) that Mr. Hall was capable of generosity and compassion. *Id.*

193.    In addition, relying on cold documents alone is unreasonable where there are available live witnesses to corroborate them and add credibility to the defendant's cause. Exhibit 12 at ¶ 45. Testimony from actual guards, officers, or correctional personnel who had observed Mr. Hall as a prisoner, in different facilities and under varying circumstances at different times, was available. For example, police officer Cleo Jamerson, formerly a deputy sheriff in Mr. Hall's hometown, would have been willing to testify as follows:

> During my service as a deputy sheriff, I had contact on several occasions with Orlando Hall. I placed Mr. Hall under arrest on at least one occasion, and I was on duty at the jail where he was housed for a period of time. I also transported him on at least one occasion from El Dorado to the state prison in Pine Bluff. … In my dealings with Mr. Hall, he never gave me any problems as a prisoner or a detainee. When I arrested him, he did not attempt to flee or evade me. He did not resist arrest. He did not express anger or hostility toward me. He took no violent actions. … When Mr. Hall was in jail, he was what I would call a good inmate. He kept to himself and did not incite conflict with other inmates. He did not lead other inmates into trouble by encouraging them to break the rules. In the jail, we periodically conducted searches for contraband and weapons, to maintain the security of the facility. Mr. Hall was never found to be in possession of contraband, such as drugs. He was never found to be in possession of any weapon. I do not recall him ever being placed on "lock down" or losing privileges as a result of misbehavior. He was never involved in any plan or attempt to escape from custody. If all our inmates had behaved like Mr. Hall, we would have had an orderly and peaceful jail at all times. … In my capacity as deputy sheriff, I was authorized to approve the amount of "good behavior" time which an inmate was entitled to claim against his state sentence for having behaved himself in the county jail before being transferred to state custody. If an inmate acted violently or broke the rules while in the county jail, they would not receive such credit. On one occasion in 1992, I signed such a document for Orlando Hall, indicating that he was entitled to meritorious good time credit as a result of having conducted himself in a positive manner while he was in the county jail. … In my own observations of Mr. Hall, I never knew him to commit any act of violence either in jail or when he was in my immediate custody.

Exhibit 36 (Declaration of Cleo Jamerson) at ¶¶ 3-7.

194.    Similarly, Keith Hill, a veteran of fourteen years as an Arkansas correctional officer, would

have testified as follows:

> After I left El Dorado and began to work as a corrections officer, I would hear from
> time to time, when I visited El Dorado, that Lan was beginning to get into trouble
> with the law. I know a lot of people his age who got in trouble selling drugs, and that
> was what I was hearing about Lan. … Later, I was assigned to transportation duty,
> which involved transporting inmates from one location to another for court
> appearances, transfers, medical care, and so on. While I was assigned to
> transportation, I was in and out of the Pine Bluff facility regularly. It was at Pine
> Bluff that I ran into Lan a number of times. Whenever I took an inmate to or from a
> facility, I would usually have an opportunity to visit with officers there, or even with
> inmates. Whenever I saw Lan in prison, I would talk to him to see how he was
> doing. Since he was from El Dorado, and had always seemed like basically a good
> kid, I was interested in how he was doing. I also heard from the officers there how he
> was behaving himself, so I had a good sense of what was going on. … Lan did very
> well in prison. Of course, when he first came in, he had to settle down, like any other
> inmate. When a person first comes into the prison system, other inmates will "test"
> them to see if they are weak or can be manipulated. If the new inmate stands up for
> himself, that situation resolves itself and usually there isn't any trouble after that.
> After just a short time, Orlando was what I would call a "role model inmate." His
> classification improved steadily, which is an indication that he was not having any
> serious disciplinary problems. An inmate who gets into trouble and has to be put "in
> the hole" will be set back in his classification and will not advance in the way that
> Lan did. I never heard from Lan or anyone else that he had any major disciplinary
> cases for infractions such as possessing contraband or weapons, or acting out
> violently. Everything I saw and heard indicated that Lan had made a very successful
> adjustment to confinement. … I have been advised that at Lan's trial, a prisoner
> testified that Lan had been making weapons in jail and intended to take a hostage in
> an escape attempt. In my opinion as an experienced correctional officer, Lan's
> record and behavior are entirely inconsistent with such an allegation. Nothing about
> Lan's successful prior record as an inmate suggests that he would do such a thing. In
> addition, my experience as a correctional officer makes me deeply skeptical of such
> testimony, because I know that certain inmates routinely invent stories about other
> inmates in order to help themselves.

Exhibit 37 (Declaration of Keith Hill) at ¶¶ 6-9.

195. In addition, other witnesses were available who could have attested to Mr. Hall's excellent behavior as a prisoner. Dr. Jim Womack, a psychiatrist at the Federal Medical Center in Fort Worth, where Mr. Hall was incarcerated from March 1995 through the end of trial, would have testified that he saw Mr. Hall approximately once per month on his "rounds" at the FMC; that Mr. Hall was a "model detainee," that he posed no problems to the prison staff, and that Dr. Womack foresaw no problems for the Bureau of Prisons in managing Mr. Hall as an inmate in the future. Exhibit 38 (Declaration of Stacey Dineen) at ¶ 7. Toni Corbett, then Jail Administrator at the FMC, would have testified that she had daily contact with the inmates at the facility, including Mr. Hall, as well as having a direct role in disciplinary proceedings involving inmates who caused trouble; she would have testified that Mr. Hall was a non-violent prisoner, had no serious rule violations on his record, and caused no problems in the FMC. Indeed, Ms. Corbett actually confirmed for the U.S. Probation Office, when contacted and asked for her views during the preparation of Mr. Hall's Presentence Report, that her facility had had no disciplinary problems whatsoever with Mr. Hall. PSR at 11, ¶ 52. Case manager Jan Wood would have confirmed these positive descriptions of Mr. Hall's performance as an inmate at the FMC, as would counselor James Thomas, as well as providing additional testimony that Mr. Hall had adjusted positively to confinement. Each of the Lieutenants who completed periodic Special Housing Review reports regarding Mr. Hall -- Gary Gagne, P. Roberts, and L. Murphy -- would likewise have confirmed that Mr. Hall was a non-violent prisoner, that he was never found in possession of contraband, that he did not start trouble with other inmates, and that his disposition was generally positive and his attitude constructive. All these witnesses, as well as other FMC

personnel who had regular contact with Mr. Hall, were available to testify and could have provided vital mitigating testimony at trial.[35]

196.    These witnesses would have increased the persuasiveness of the documents themselves as well as providing independent mitigating evidence about Mr. Hall's character.  Counsel's failure to investigate, develop, and present such witnesses was deficient and prejudicial.  *See, e.g.*, Williams v. Taylor, 529 U.S. 362, 395 (2000) (counsel ineffective for, *inter alia,* failing to present favorable prison records and failing to present "the testimony of prison officials who described Williams as among the inmates 'least likely to act in a violent, dangerous, or provocative way'"); Moore v. Johnson, 194 F.3d 586, 614 (5th Cir. 1999) (counsel ineffective for not presenting evidence to help jurors interpret and understand defendant's penitentiary records), 618 (counsel ineffective for "failing to capitalize on the opportunity to argue Moore's early release from prison as a factor mitigating against an affirmative response on the special issue of future dangerousness"); Valdez v. Johnson, 93 F.Supp.2d 769, 784 (S.D. Tex. 1999), *aff'd in part and vacated in part sub nom. Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001)(counsel was ineffective in part for not having investigated whether witnesses were available to testify

---

[35] Undersigned counsel attempted to interview certain witnesses who had contact with Mr.Hall while he was in the custody of the Bureau of Prisons (BOP), only to be advised that they would not speak to counsel without the permission of the legal department of the BOP. *See, e.g.,* Exhibit 38 at ¶ 8. Counsel then spoke with attorney Lisa Sunderman of the South Central Regional Office of the BOP. Based on that conversation, it is counsel's understanding that the BOP takes the position that 28 C.F.R. § 16.21 (a) (2) prohibits BOP employees (past and present) from providing information (whether in the form of participating in an interview, providing a written statement, or providing testimony) unless "a subpoena, order, or other demand …of a court or other authority is issued for such material or information."  We expect to move the Court to issue a "subpoena, order, or other demand" to permit us to interview past and present BOP personnel regarding information they have concerning Mr. Hall, to facilitate presentation of that information at an evidentiary hearing on Mr.

concerning the defendant's good behavior in the county jail); <u>Ex parte Land</u>, 775 So.2d 847, 854 (Ala. 2000) ("[T]rial counsel may be found ineffective for failing to present evidence of adjustment to incarceration …."); <u>Horton v. Zant</u>, 941 F.2d 1449, 1463 (11th Cir. 1991) (finding <u>Strickland</u> "prejudice" from counsel's failure to present evidence that defendant had, *inter alia*, "successfully adjusted to previous stays in prison").

197.     Defense counsel's failure to develop and present "<u>Skipper</u> evidence" in Mr. Hall's case is noteworthy for two additional reasons. First, the Government was asking the jury to condemn Mr. Hall to death based on his alleged "future dangerousness." The Supreme Court emphasized in <u>Skipper</u> that evidence of a defendant's successful adjustment to prison can powerfully rebut a prosecutorial claim of future dangerousness. *See also* <u>Moore</u>, 194 F.3d at 618 (same). Under these circumstances, reasonably effective counsel were obliged to obtain and present such available evidence. Exhibit 12 at ¶ 46 ("Knowing that future dangerousness would form an important part of the Government's case for the death penalty, counsel were under a special obligation to develop and present available evidence that Mr. Hall had been a "model prisoner" in the past.").

198.     Second, counsel knew that the Government intended to rely on specific allegations from jail inmate Larry Nichols that Mr. Hall had plotted to escape from custody while awaiting trial, and that he had planned to take his own attorneys hostage with a homemade knife in order to do so. Defense counsel argued that the jurors should reject Nichols' "cock and bull story," Supp. R. Vol. 20-A at 53, but had little evidence to which they could point to rebut it. In failing to

---

Hall's claim of ineffective assistance of counsel at the punishment phase.

investigate, develop, and present available <u>Skipper</u> evidence, counsel unreasonably abandoned a valuable weapon that would have helped them convince the jury not to believe Nichols' testimony. Exhibit 12 at ¶ 46 ("Reasonably effective counsel, anticipating this evidence from the Government, would have developed and presented the readily available "*Skipper* evidence" in order to bolster their argument that Mr. Hall's prior history was reason to disbelieve the Government's allegations.").

**Counsel Were Ineffective In Failing To Request A Continuance Or Re-Interview Anticipated Defense Witness Alonzo Airy After Airy Unexpectedly Appeared To Have Changed His Story.**

199.    Counsel performed deficiently in failing either to request a continuance or re-interview anticipated defense witness Alonzo Airy, who previously had provided the defense with information strongly impeaching Government witness Larry Nichols, after Airy inexplicably appeared to have changed his story and sided with the Government in the middle of Mr. Hall's punishment hearing.

200.    As noted, Nichols was an important Government witness who claimed at trial to have been Mr. Hall's confidante while the two were in jail at Mansfield in early 1995. *See generally* R. 31:210-237. According to Nichols' testimony, Mr. Hall had confided numerous details of his plans to escape from custody by arming himself with a homemade knife and taking a hostage (either a female guard or his own attorney). *Id.* Nichols also claimed that Mr. Hall had made numerous other threats of violence against people ranging from his girlfriend LaTonya Anders to his co-defendant Steve Beckley to the judge presiding in Mr. Hall's own trial, in addition to "bragging" in a "macho" fashion about how he raped Lisa Rene before she was killed. *Id.*

201. On October 22, 1995, defense investigator Tena Francis interviewed Alonzo Airy, another inmate from the same tank where Nichols and Mr. Hall had been incarcerated. In that interview, Airy told Francis that Mr. Hall never discussed any escape plan and that Mr. Hall was extremely remorseful -- indeed, suicidal -- in jail. Exhibit 7, Appendix A at ¶ 11. Airy also provided Francis with a great deal of information about how Nichols was constantly discussing his desire for a "5K1.1"[36] reduction in his sentence, bragging about how easy it was for an inmate to lie about other inmates in order to get a 5K1.1, and observing that Mr. Hall's case was viewed by a number of conniving inmates as their "get out of jail free" card, since the case was so important to the Government. *Id*. Airy had previously testified to impeach Nichols in another trial, and Francis had been informed by the federal public defender who used Airy that he was unshakeable as a witness. *Id.* Based on Francis' interview with Airy, defense counsel intended to call Airy to rebut Nichols' claims.

202. However, on November 2, the morning after Nichols finished his testimony, the Government moved the Court for permission to add Airy to its own witness list, and proffered to the defense an FBI-302 (report of investigation) purporting to describe an interview with Mr. Airy on October 30, 1995, by FBI SA Paul Shannon and AUSA Paul Macaluso. According to this report, which was not a statement from Airy but simply a summary of what he had allegedly told

---

[36] Section 5K1.1 of the U.S. Sentencing Guidelines provides that, upon motion of the Government, a defendant who "has provided substantial assistance in the investigation or prosecution of another person who has committed an offense" may obtain (at the sentencing court's discretion) a downward departure from an otherwise applicable Guideline sentencing range. The phrase "5K" is often used as shorthand not only to refer to this Guideline provision, but to the analogous provisions of 18 U.S.C. § 3553(e) and 28 U.S.C. § 994(n), which permit sentences below otherwise applicable statutory "mandatory minimum" sentences to reward "substantial assistance."

the Government, Airy was prepared to testify to numerous damaging facts about not Nichols, but

*Hall*, including that Mr. Hall had no remorse, that he claimed to have been the "big man" in the

offense, that he bragged about having raped and killed Lisa Rene, that he spoke of killing

LaTonya Anders and Steve Beckley, that he talked of escaping by taking his attorney or a guard

hostage, and that he possessed a weapon in the jail. Exhibit 39 (FBI-302 re: Alonzo Airy, dated

10/30/95).

203. Defense counsel objected to the Government's motion to call Airy as its own witness. R. 32: 4-14. After some discussion, the Court denied the Government's motion to add Airy to its witness list. R. 32:14.

204. Defense counsel did not request a continuance to attempt to investigate further what had happened with Airy and why he had changed his story. Defense counsel did not speak with Airy, or have Ms. Francis do so on their behalf, or take any other steps in order to find out what could account for Airy's sudden 180-degree reversal. Defense counsel performed deficiently in this regard:

> Counsel performed deficiently in failing to request a continuance when the Government suddenly proffered a previously undisclosed FBI 302 indicating that anticipated defense witness Alonzo Airy [had] changed his story . . . . Counsel were evidently surprised by this turn of events and managed to persuade the trial court not to permit the Government to call Airy in its own case. However, simply keeping Airy off the stand did not assist counsel in undermining Nichols; it just avoided further immediate damage to Hall's case. Because convincing the jury that Nichols was a liar was so important to defeating the Government's case for the non-statutory future dangerousness aggravator, reasonably effective counsel would have requested a continuance in order to assess whether other witnesses were available to rebut Nichols, or to explore other options regarding Airy.

Exhibit 12 at ¶ 58; *see also* <u>State v. Kunkel</u>, 452 N.W.2d 337 (N.D. 1990) (trial court abused

discretion in refusing to grant continuance to defendant after key defense witness changed his testimony from exculpating defendant to incriminating him).

205. Had counsel investigated and spoken to Airy, counsel would have learned that Airy claimed never to have made the statements alleged in the 302 which the Government brandished before defense counsel in court. *See* Exhibit 40 (Affidavit of Alonzo Airy). Moreover, had counsel obtained a continuance to conduct necessary investigation and/or conducted an appropriate and timely investigation in the first place, counsel could have located and developed additional witnesses who resided in the same tank at Mansfield during the relevant time period, who would have testified consistent with Airy's original account to Ms. Francis, and contrary to Nichols' self-interested claims about Mr. Hall. *See* Exhibits 32, 33. Counsel's deficient performance with respect to this important matter prejudiced Mr. Hall at the sentencing phase.

### Counsel Performed Deficiently In Failing To Make A Closing Argument At The Guilt Phase Of Trial, Which Prejudiced Mr. Hall At The Punishment Phase

206. Counsel performed deficiently in waiving closing argument at the guilt phase of trial. In the factual context of this case, counsel's decision to waive closing was objectively unreasonable. Although counsel's failure to make a closing argument at guilt probably had no effect on Mr. Hall's being convicted of a death-eligible offense, it was prejudicial with respect to the jury's decision actually to impose the death penalty. It is reasonably probable that, if counsel had not performed deficiently in this regard, the outcome of the sentencing phase would have been different. *See* Moore v. Johnson, 194 F.3d 586, 619 (5th Cir. 1999) ("reject[ing] the notion" that "deficient performance occurring at the guilt phase of a capital trial may not be deemed to prejudice a capital defendant during the punishment phase").

207. Because the guilt-phase jury will also impose sentence in capital cases, defense counsel in any federal capital trial must be alert to the need to "build a bridge" between the two phases of trial. *See* Exhibit 12 at ¶ 35. This is true regardless of whether counsel is, as a practical matter, conceding the client's guilt on the capital charge. The dynamics of trial dictate that defense counsel not appear to concede the prosecution's specific factual arguments at the guilt phase, if those same allegations will form an important part of the basis upon which the prosecution will demand the death penalty at sentencing. This is especially true where the crime involves multiple defendants and there are disputed facts about exactly who did exactly what in the commission of the offense, as well as questions of leadership role, etc. *Id.* at ¶ 32.

208. In Mr. Hall's trial, that is exactly what happened. The Government, in its guilt-phase closing, placed central weight on one inference – that Mr. Hall was the man who "made the decision that Lisa Rene was going to die," and thus the person ultimately most responsible for her death. R. 30:40. If the jury accepted this argument, the defense would face an insurmountable task at punishment in urging the primary mitigating circumstance upon which defense counsel had previously decided to base Mr. Hall's penalty-phase defense: that "equally culpable" co-defendants were not facing death for their part in the crime. *See* Exhibit 7 at ¶ 3.[37] Obviously, for any juror who accepted the Government's declaration that Mr. Hall "made the decision" that Lisa Rene would be killed, it would be next to impossible to find Mr. Hall's co-defendants "equally culpable" and their disparate sentences a reason for extending leniency to Mr. Hall.

---

[37] Even as we make this argument, we continue to maintain that counsel's singular focus on this particular mitigating circumstance, to the exclusion of other mitigating factors for which persuasive evidence was readily available, was objectively unreasonable because it was not based on, or

Accordingly, it was mandatory that the defense respond to the Government's factual assertions that Mr. Hall was uniquely the "person who got the wheel rolling," who "set this thing in motion," and who ultimately "made the decision that Lisa Rene was going to die." R. 30:38, 40. By waiving closing argument at the guilt phase, and in effect conceding the Government's view of the facts as to the "relative culpability" of the participants, "defense counsel left the jurors with only the Government's theory of the case to structure and shape their receipt and consideration of evidence at the sentencing phase." Exhibit 12 at ¶ 35.

209. Another critically important part of the Government's guilt-phase closing argument which later became an integral part of its emotional demand for the death penalty was its insistence that Mr. Hall had been the first person to rape Lisa Rene. R. 30:36. The Government included this claim in its guilt-phase summation with the plain intent of supporting the inference that Mr. Hall was the most culpable among the defendants. Indeed, the prosecutor's assertions that Mr. Hall "got the wheel rolling" and "set this thing in motion" could as easily have referred to his alleged role in initiating the sexual torture that continued while Lisa Rene was held captive. And, by failing to deliver any response while the accusation hung in the air, the defense effectively "conceded the truth of [the Government's claim] on this vital question." Exhibit 12 at ¶ 33.

210. However, defense counsel could and should have encouraged the jurors to treat this claim with great skepticism. The allegation that Mr. Hall was the first to rape Lisa Rene originated in the testimony of Steven Beckley. However, during defense counsel's cross-examination of Beckley, they had elicited the fact that his claim to have seen Mr. Hall rape the victim was

informed by, a reasonable investigation into the facts.

inconsistent with every FBI report of the agents' first *five* interviews with Beckley, which took place over a period of two months. Those reports confirmed that Beckley had consistently admitted raping Lisa Rene, and had discussed both Demetrius Hall's and Webster's having committed the same acts, but prior to December 1994 had *never* claimed to have seen Mr. Hall rape Lisa Rene. Counsel's failure to address these matters in summation at the guilt phase amounted to a surrender at the punishment phase as well.

211.    In much the same way, counsel could have pointed out the extensive involvement of Marvin Holloway in all the events surrounding the kidnapping and death of Lisa Rene, and argued the strong inference that Holloway, not Mr. Hall, was the "big man" in the overall operation who may well have "made the decision" that Lisa Rene would die. There was testimony that Mr. Hall had to "think up a story" about how the money had gone missing because he didn't want to tell Holloway that the money had been taken from him. R. 26: 140-41. The first place Beckley, Demetrius Hall, and Bruce Webster went after arriving in Pine Bluff with Lisa Rene as their hostage was Marvin Holloway's house. *Id.* at 180; 27:173. It was Marvin Holloway who gave them money for the motel room where they first held Lisa Rene captive in Pine Bluff, *id.*, and when they panicked after a security guard there nearly found them out, it was Marvin Holloway's house where they fled for instructions about what to do. R. 26:205-06. After Lisa Rene was killed, all the participants went first to Marvin Holloway's house, where he gave instructions for cleaning up the vehicle and later reassured Steve Beckley that Beckley had done "what [he] had to do." R. 26:219; 27:208. In addition, testimony indicated that the marijuana which Mr. Hall and his confederates were involved in distributing was always kept at Marvin Holloway's house

after being transported to Pine Bluff.  R. 27: 121-22.  Other evidence indicated that Holloway and Webster had known one another for a long time, having grown up together in Pine Bluff.  R. 26: 232-33.  All these facts, woven together, could have given jurors pause about whether Mr. Hall was, as the Government insisted, the person who, alone, "decided" that Lisa Rene would die.

212.    These instances do not comprise an exhaustive list of the compelling points which could have been made in reply to the Government's guilt-phase closing argument, but they illustrate that the material for an effective closing was at hand:

> Even in a case focused on punishment, reasonably effective counsel would not forego an opportunity to talk to the jurors at the close of the guilt phase about what weight the testimony of different witnesses deserved.  This is especially true where the defense fully intends to contest at the penalty phase the Government's view of who was the most culpable defendant, and where so many facts crucial to resolving that dispute were brought before the jury through Government witnesses whose credibility could be challenged without counsel's losing their own.  The fact that the defense apparently conceded Hall's guilt as a party to the offense did not require them to refrain from making any guilt-phase summation at all.  On the contrary, since the outcome of the penalty phase might well turn on the jury's view of Hall's precise role in the events of the crime, it was objectively unreasonable not to make a closing argument directed to that issue.

Exhibit 12, ¶ 34.[38]

---

[38] In addition, counsel performed deficiently in cross-examining the medical examiner, Dr. Peretti. Reasonably effective counsel expecting to pursue a theory of "relative culpability" at the punishment phase would have taken care to develop that theory with each witness, where possible. With Dr. Peretti, counsel failed to point out for the jury that Dr. Peretti could not establish via his scientific analysis who had done what to Lisa Rene, or in what order some of the most important events took place, or indeed whether some of them had happened at all.  Failure to make these points, particularly in light of counsel's waiver of closing argument, only increased the risk that the jury would improperly base some part of their conclusions about the credibility of other Government

**<u>Counsel Peformed Deficiently In Failing To Argue Effectively That Mr. Hall Should Be Allowed To Make A Statement In Allocution</u>**

213. Counsel fell below an objective standard of reasonable performance in their efforts to persuade this Court to allow Mr. Hall to make a statement in allocution before the jury retired to deliberate at the penalty phase. The record in this case, and experience in other federal death penalty trials around the country, demonstrates that this Court could have properly exercised its discretion to permit such a statement. Counsel failed to provide reasonably effective assistance in the manner in which they presented and argued this request to this Court.

214. Following the close of the Government's case, the defense moved the Court orally to allow Mr. Hall to make a statement in allocution to the jury. R. 32:45-47. The Government opposed the motion, arguing initially that the capital sentencing statute supplanted the right of allocution articulated in Fed. R. Crim. P. 32. R. 32:47-49. The Court initially agreed and denied the request. R. 32:49. The defense, however, then pointed out that the right of allocution was a traditional and time-honored practice predating the Rules of Criminal Procedure.

215. In response, this Court asked Mr. Hall's attorneys: "Is there case law based on state experience where death penalties are assessed where the defendant is allowed to — to give his testimony without cross-examination before a jury passes on sentence?" R. 32:50. The Government's lawyer responded that he hadn't "found one," and that he didn't "think they [the defense] can provide any case law showing it." *Id.* The defense offered nothing in response to the Court's question, and the Court accordingly denied the motion again. R. 32:50. Defense counsel then requested the opportunity to make a proffer at a later point of what Mr. Hall's

witnesses on the testimony of Dr. Peretti.

statement in allocution would have been and were granted permission to do so.  R. 32:51.

216.    First, the Court had the discretion to permit allocution by Mr. Hall.  Other courts have exercised this discretion in the defendant's favor, when properly requested to do so.  *See, e,g.,* United States v. Kehoe (E.D. Ark. No. LR-CR-97-243) (Eisele); United States v. Nichols (W.D. Okl. No. M-95-98-H) (Matsch); United States v. Battle (N.D. Ga. No.1:95-CR-528) (Evans); United States v. Johnson (N.D. Ill. No. 96-CR-379) (Conlon); United States v. Beckford (E.D. Va. 3:96-CR-66-01 (Payne)); *see also* Exhibit 12, ¶ 48 (expressing the same view).

217.    Second, where a trial judge faces a discretionary decision, "reasonably professional representation must encompass making appropriate and timely efforts to persuade the presiding authority to exercise its discretion to the benefit of one's client."  Exhibit 12, ¶ 49.  This duty obliges counsel, *inter alia*, to locate favorable case authority and urge the Court to consider it. *Id.; see also, e.g.,* State v. Ross, 951 P.2d 236, 246 (Utah Ct. App. 1997) ("Knowledge of the law is a basic prerequisite to providing competent legal assistance.  If an attorney does not investigate clearly relevant law, then he or she has objectively failed to provide effective assistance.").

218.    Reasonably effective defense counsel, in seeking to persuade the court to exercise its discretion in their client's favor on such a vitally important issue, would have taken two steps Mr. Hall's attorneys failed to take.  First, "reasonably effective counsel would have researched previously the question whether any state-court decisions from death penalty jurisdictions had endorsed the practice of allocution by a capital defendant, and would have had those favorable cases or citations available for the trial judge upon making the request."  Exhibit 12, at ¶ 50. Once the Court specifically expressed its interest in knowing the answer to this question,

"reasonably effective counsel would have made such inquiries [and asked] the Court to delay its ruling until such support for the request could be provided." *Id.* Mr. Hall's attorneys did not take this necessary step, nor did they subsequently provide the relevant caselaw and make a timely request for reconsideration. This would have constituted the "minimum" performance expected of reasonably effective counsel. *Id.*

219. Cases illustrating that many death-penalty states permit allocution by capital defendants were readily at hand. *See, e.g.*, State v. McCall, 770 P.2d 1165, 1171 (Ariz. 1989), *cert denied*, 497 U.S. 1031 (1990); People v. Davis, 794 P.2d 189, 191 (Colo. 1990), *cert. denied*, 498 U.S. 1018 (1991); Harris v. State, 509 A.2d 120 (Md. 1986); Homick v. State, 825 P.2d 600, 604 (Nev. 1992); State v. Zola, 548 A.2d 1022, 1046 (N.J. 1988), *cert. denied*, 489 U.S. 1022 (1989); State v. Young, 853 P.2d 327 (Utah 1993); State v. Mak, 718 P.2d 407, 429-30 (Wash.), *cert. denied*, 479 U.S. 995 (1986); *see also* State v. Clark, 772 P.2d 322, 339 (N.M.)(discussing capital defendant's allocution), *cert. denied*, 493 U.S. 923 (1989); Tomlinson v. State, 647 P.2d 415, 417 (N.M. 1982)(allocution statute "extends the common law doctrine of allocutus to non-capital felonies . . . ."). Counsel fell below an objective standard of reasonableness in failing to provide any such authority to the Court in support of their request. Exhibit 12, at ¶ 50.

220. Second, counsel unreasonably failed to make either an oral or written proffer of the contents of Mr. Hall's proposed statement in allocution at the time the trial court addressed their motion. Exhibit 12, at ¶ 51. Reasonably effective counsel would have anticipated a Government objection that an allocution would create unfair prejudice, confuse the issues, or mislead the jury. *Id.* Indeed, during the colloquy the Government suggested that defense counsel were asking the

Court to let Mr. Hall "stand up and give his – essentially his version of the whole offense in the sentencing phase" without being cross-examined. R. 32:48.

221. However, the record establishes that defense counsel never contemplated having Mr. Hall tell "his version of the whole offense." Instead, the anticipated statement in allocution was the following: "I want to apologize to my family and ask them to forgive me, and I hope somehow they can forgive me. I want to apologize to Lisa Rene's family and ask them to forgive me, even though I know that there is no possible way they can forgive me and I understand that. I want to ask God to forgive me, however, I question in my own mind whether even God can forgive me." R. 6:1445. Thus, the proposed allocution, contrary to the Government's suggestion, was not a lengthy, fact-based recitation. The standard of reasonably effective practice required counsel to make that distinction clear for the court. Exhibit 12 at ¶ 52.

222. The record shows that this Court was open to persuasion on the issue of whether Mr. Hall should have been allowed to make a statement in allocution. However, because defense counsel failed to provide available and relevant legal authority from death-penalty jurisdictions in support of the request, or to proffer the contents of the proposed statement in allocution in order to rebut the suggestion that Mr. Hall sought to tell his "version of the offense" without being subjected to cross-examination, the opportunity to persuade the trial court was lost. Counsel's performance was deficient and there is a reasonable probability that, had counsel performed adequately, the Court would have permitted Mr. Hall to make a statement in allocution, which in turn is reasonably likely to have resulted in a different outcome at the penalty phase.

223. On June 30, 1995, trial counsel filed an *ex parte* motion seeking funds for the appointment, *inter alia*, of both a psychiatrist and psychologist. The Court addressed this motion at an *ex parte* hearing on July 14, 1995. Counsel explained:

> Mr. Ware: I have talked to at least one mitigation specialist. Jeff and I have talked about it. *We are really more interested in getting a psychologist and a psychiatrist. The particular psychiatrist we have in mind probably could effectively subplant the need for a, quote-unquote, "mitigation specialist."* And that's really what we're more interested in right now, I think the psychologist and psychiatrist, than the mitigation specialist. Evidently, they are all the rage now, and it may come at some point that we have to ask for one just because we feel like we need to.
>
> The Court: Now, a psychologist or a psychiatrist, you're saying "or"?
>
> Mr. Kearney: No. We want both.
>
> The Court: A psychologist and a psychiatrist for the purpose — what did I say?
>
> Mr. Kearney: I though you said "or." I think what we're asking for is both.
>
> The Court: Okay. A psychologist and a psychiatrist to examine your claim [sic] and to report to the jury?
>
> Mr. Kearney: And report to us.
>
> The Court: And report to you.
>
> Mr. Kearney: And then we will decide whether or not we want to use any of that information in front of the jury. We are simply not trained to make those kinds of determinations. I think that if we want a psychologist to examine and test our client for our own information and see whether or not there is information in there that we thinks would mitigate, if there is, we would want to try to present it.
>
> And we would also want to have a psychiatrist that could examine — the examination by the psychiatrist would not be near as extensive as the psychologist. We can do all the testing. We would have the psychiatrist look at him, and I just think that we would want to have a psychiatrist if we did offer evidence before the

jury. I think a psychologist carries more weight than a psychiatrist, if they are on the same page and their opinions are consistent if we decided to present it, to have a psychiatrist and a psychologist.

The Court: What is your thought that his usefulness would be? I know that's hard to say.

Mr. Kearney: I think the issue might be towards any of the mitigating factors in the statute. If they could find something in there that would give us some help, also, as to future dangerousness, you know. I think that they could help us with that issue.

\* \* \*

The Court: Okay. *If you get these, you're going to want these right away?*

Mr. Kearney: *Yes, sir.*

The Court: Do you have somebody in mind.

Mr. Ware: Yes, sir, we do.

Mr. Kearney: Psychologist Dr. Randy Price,

The Court: And the psychiatrist?

Mr. Ware: We're thinking about James Grigson.

The Court: *Dr. Death*.

R. 11:10-12 (emphases added).

224.  On July 20, 1995, the Court granted counsel's request for funds to obtain the services of a psychiatrist and psychologist. Exhibit 4.

225.  Despite counsel's representations that they needed a psychiatrist and a psychologist "right away" and thought that "the particular psychiatrist we have in mind probably could effectively [supplant] the need for [a] 'mitigation specialist,'" counsel did not obtain the services of a psychiatrist until late September, right before the trial started. It now appears that Mr. Hall was never evaluated or tested by any psychologist.

226. Trial counsel's selection and use of experts was objectively unreasonable in several respects. Counsel was objectively unreasonable in determining the type of expert they needed in this case without first conducting any mitigation investigation; and then waiting until it was too late to determine whether an individual with expertise in a field other than psychiatry could more appropriately tie together and explain the mitigating evidence developed in the case. Moreover, when counsel decided not to put Dr. Lisa Clayton, the retained psychiatric expert, on the witness stand because of this Court's ruling that doing so would entitle the Government to conduct its own mental health evaluation of Mr. Hall prior to the guilt phase, counsel made no effort to obtain the assistance of another expert who could have explained to the jury how the dynamics of Mr. Hall's upbringing could have rendered him more likely to become involved in this crime.

227. While obtaining the services of a mental health professional to evaluate a capital defendant may be a reasonable means of *initiating* an investigation into mitigation, it is objectively unreasonable to make a final decision as to the appropriate selection of experts without any knowledge of the mitigating evidence to be presented. Here, counsel chose the type of expert they wanted, in part on the theory that a psychiatrist could conduct the necessary mitigation investigation, and then waited until the eve of trial to have the psychiatrist interview their client and begin work on the case. As a result of counsel's unreasonable delay in investigating their client's background, counsel had no time to analyze the types of expert testimony necessary to present the case in light of mitigating evidence developed over the course of investigation, the course dictated by the applicable standard of practice for capital defense in 1995. Exhibit 14 at ¶ 31; Exhibit 13 at ¶ 5.

228. Information obtained in the course of the social history investigation conducted by Tena Francis suggested the possibility that Mr. Hall may suffer from an organic brain dysfunction. This possibility was suggested by the facts that his mother was beaten severely while she was pregnant with Mr. Hall and may have been abusing alcohol at the time; that he performed poorly at school, even in remedial classes; and that as a child he was diagnosed with hearing problems and suffered from a poor memory. This information would have prompted competent counsel to retain the services of a neuropsychologist to evaluate Mr. Hall for brain damage.

229. Counsel apparently did arrange for the assistance of Dallas neuropsychologist Randy Price, but failed to perform reasonably thereafter in the manner in which they pursued the issue:

> In the course of my investigation, I uncovered numerous facts which suggested, based on my knowledge, experience, and training as a mitigation investigator, that neuropsychological testing of Mr. Hall was indicated. His mother Betty was beaten severely while she was pregnant with Mr. Hall and may have been abusing alcohol at the time; Mr. Hall performed poorly at school, even in remedial classes; and as a child he was diagnosed with hearing problems and suffered from a poor memory. In conversations with Mr. Ware, I repeatedly pointed out the potential significance of these facts (both that they indicated possible neuropsychological impairment and that such impairment had significant potential as a mitigating factor), and the need for neuropsychological testing to confirm or refute the possibility of impairment.
>
> I had been advised by Mr. Ware in one of our earliest conversations that the court had approved payment for a psychologist to work on Mr. Hall's case, and that Mr. Ware had lined up Dallas neuropsychologist Randy Price to evaluate Mr. Hall. Throughout much of my work on Mr. Hall's case, I assumed that Dr. Price would be an important part of the defense team and that he was 100 percent involved. Although the subject of neuropsychological testing came up repeatedly in my conversations with Mr. Ware and I was aware that testing had not yet been performed, he never indicated that there were any difficulties with Dr. Price. That was one part of the case that I thought was under control, although I do recall expressing dissatisfaction to Mr. Ware at some point after September 23 that Dr. Clayton had already seen Mr. Hall, but that Dr. Price had not yet evaluated him.
>
> On more than one occasion since my appointment to the case, I had tried

unsuccessfully to contact Dr. Price by phone to discuss the results of my ongoing investigation. I complained to Mr. Ware and, later, to Mr. McNally that Dr. Price was not returning my calls. However, I did not come to understand that there was any problem with Dr. Price's participation in the case until after *voir dire* began (*i.e.,* sometime after October 2, 1995). Kevin McNally had come to Fort Worth for a short visit, to observe jury selection and offer his assistance to Mr. Ware and lead counsel Jeff Kearney. At some point, I was present at Mr. Ware's office along with Mr. McNally and Mr. Hall's attorneys. It was then that I learned for the first time that there was a serious problem with getting Dr. Price to move forward on Mr. Hall's case. Mr. McNally, who had worked with Dr. Price on an earlier case, said that he would call him to speak with him directly about Mr. Hall's situation. He did so, from Mr. Ware's office. After he hung up the phone, Mr. McNally said words to the effect that Dr. Price had gotten "cold feet" about the case. It was my understanding from Mr. McNally's description of his conversation with Dr. Price that Dr. Price's reluctance to work on Mr. Hall's case arose from his personal reaction to the facts of the crime. I do not know what further contact, if any, defense counsel had with Dr. Price after that point. I did have a conversation later with Mr. Ware in which he said that he guessed that Dr. Price had been the "wrong guy," that they should have discovered the reason for his reluctance to work on the case, and that they should have gotten a different neuropsychologist.

Exhibit 7 at ¶¶ 18-20.

230. Mr. McNally's recollections are consistent with Ms. Francis's:

[I was in Fort Worth] around the time jury selection began, on October 2, 1995. While I was there, I discussed the status of the needed neuropsychological testing of Mr. Hall. It was my understanding that counsel had or were going to retain Dallas neuropsychologist Randy Price for that purpose. I had worked with Dr. Price in the past on a capital case in Oklahoma and felt he was a competent expert. I may have recommended that counsel contact him. In Fort Worth, however, I learned that there was some problem with Dr. Price, and that he had not been responsive to inquiries from Tena Francis about the status of his work, if any, on Mr. Hall's case. I offered to speak to Dr. Price myself, and telephoned him using the phone in Mike Ware's office. I do not recall the specifics of my conversation with Dr. Price, but I came away with the impression that Dr. Price was reluctant to assist Mr. Hall's defense due to the allegations and perhaps attendant publicity. I communicated Dr. Price's response to Mr. Hall's defense team. Due to the fact that trial had begun, or was about to, I again urged counsel to seek a continuance due to the need for neuropsychological testing and many other reasons. I believe counsel made such a motion, although I do not know the grounds stated.

Exhibit 13 at ¶ 11.

231.    Counsel performed deficiently in not pursuing neuropsychological assessment far enough ahead of trial to permit them to obtain the assistance of a different expert when Dr. Price proved unable to work on the case.  If trial counsel had not waited until July -- almost *four months* after they were appointed, and after half their total time to prepare for trial had evaporated -- to *start* thinking about what experts they might need to consult for Mr. Hall's defense, they could have located another appropriate expert once it became apparent that Dr. Price was out of the picture.

232.    Counsel's deficient performance in this regard was highly prejudicial to Mr. Hall.  Had appropriate neuropsychological testing been performed sufficiently in advance of trial for the results to have been incorporated into a meaningful case in mitigation, the results would have been favorable to Mr. Hall's defense.  Dr. Michael M. Gelbort has conducted a thorough neuropsychological assessment of Mr. Hall:

> At the request of counsel for Orlando Hall, I conducted a comprehensive neuropsychological assessment of Mr. Hall at the United States Penitentiary in Terre Haute, Indiana, on April 13, 2001. …
>
> The purpose of the present examination was to determine whether Mr. Hall has neuropsychological dysfunction and to specify the severity and nature of any such impairment. Clinical neuropsychological testing assesses the behavioral expression of an individual's brain function.  Appropriately interpreted, neuropsychological assessment is a fundamental part of a reliable and comprehensive clinical evaluation of brain integrity and functioning.
>
> …
>
> Mr. Hall has a history replete with "marker variables," historical symptoms and signs which are highly correlated with neuropsychological impairment and, most often, neurological impairment or nervous system damage.  These symptoms, when described by patients, family members, or discovered by health care professionals, clinically give rise to (or "trigger") further evaluation to better understand the extent

and nature of the deficits so as to document and understand the pathology, as well as to permit doctors to appropriately treat the condition and reverse or rectify the damage as best as they are able. Most patients do respond to intervention and their behavior is brought closer to the norm. Unfortunately for everyone, this did not occur in Mr. Hall's case prior to late 1994, as it is reasonably likely that had Mr. Hall been so diagnosed and treated before that time, he would not have become involved in the situation which has brought him into contact with the criminal justice system, or might have been able to resist the pressure to participate in the tragedy that ultimately occurred.

In evaluating Mr. Hall, I employed a series of formal, standardized evaluation techniques which were available and clinically warranted at the time of his original trial in 1995, and which remain in widespread use today as well-accepted tools used by mental health professionals to assess neuropsychological impairment.

In his performance, Mr. Hall shows indications of neuropsychological impairments. On formal testing, Mr. Hall produced results that placed him at approximately the fortieth percentile in terms of verbal intellect and at approximately the twelfth percentile on non-verbal abilities, a disparity which is consistent with other measures showing impaired brain functioning. Mr. Hall's visual information processing abilities were impaired in most instances and tests of higher cognitive abilities involving frontal lobe functions were also impaired for anything but the most basic tasks. Measures of learning and memory, functions which are extremely sensitive to brain and cognitive dysfunction, were variable, ranging from performance in the mildly impaired or borderline range through abilities that were superior. These scores are significant. The low scores on some of the tests directly reflect neuropsychological impairment. In addition, the fact that Mr. Hall's scores vary significantly reveals an asymmetry in his brain functioning that does not appear in a normal brain.

Overall, my formal comprehensive neuropsychological evaluation of Mr. Hall found data indicative of neuropsychological impairment most affecting the non-dominant cerebral hemisphere, with dysfunction likely being more anterior (*i.e.*, in the front of the brain) than posterior. This area of the brain includes those centers within the brain which are responsible for abstract reasoning, judgment, the ability to understand "if – then" relationships or to plan adaptive and socially acceptable/adaptive behavior, and to anticipate the consequences of ones' actions. These aspects of neurocognitive functioning are sometimes called "executive functions" because they play a supervisory role -- monitoring, initiating, inhibiting, and shifting of behaviors and cognitive sets.

These are the brain centers and abilities needed to exercise judgment, to plan

independently and successfully, and which allow individuals to autonomously make and implement decisions which are goal-directed, appropriate, and conform to societal expectations. In the academic setting, these kinds of deficits show up as problems in learning; in the real-world setting of adult interaction, they manifest themselves as pervasively maladaptive behavior. It should be understood that Mr. Hall is not so damaged that he is unable to "fit in" or behave in some semblance of a normal manner. Rather, he is significantly *less* capable, due to his deficits and damage, than a *normal* individual would be to make sensible plans or anticipate the consequences of his conduct, abilities which enable most people to conform their behavior to acceptable social norms. Again, his inabilities in this regard result from his cerebral dysfunction.

These deficits, based on test data and review of the historical information, were present at the time of Mr. Hall's crime and were treatable then as they are treatable now. ...

Mr. Hall's impairments would have had a significant affect on his capacity to recognize the potential outcomes of the activities in which he became involved. People with deficits like Mr. Hall's often learn through a "hands-on" approach where they must experience a mistake before they can learn from it. This is to say that they have more difficulty anticipating consequences and further trouble generalizing from one situation or event to others. Such persons clearly benefit from, and respond to, supervision. Again, it is unfortunate that in this case it appears that the available "supervision" may have come from more predatory and ill-intentioned people. Mr. Hall, as a result of his cognitive impairments and prior life experiences, was easily (mis-)led and possessed limited abilities -- again, as contrasted with normal, non brain-impaired individuals -- to choose other behaviors or resist those with whom he was interacting, especially when doing so under stress.

The validity of a neuropsychological evaluation depends on the effort that the individual puts forth during the evaluation. In the course of evaluating Mr. Hall, I assessed his level of effort using measures designed to identify lack of effort and malingering. The results were indicative of a valid, non-malingering profile and provide a high degree of confidence that other measures are likewise valid.

Exhibit 41 (Declaration of Michael M. Gelbort, Ph.D.) at ¶¶ 4-14.[39]

233.    In this case, moreover, one of the most compelling areas of mitigating evidence unearthed

---

[39] For the sake of legibility, we attach a clean copy of Dr. Gelbort's declaration at the front of this Exhibit, followed by the signed facsimile copy which is somewhat harder to read.

just before and during the trial was that Mr. Hall had grown up in a family marked by extreme physical violence. In order to present this evidence as compelling mitigation, counsel needed to obtain the services of an appropriately qualified professional who could credibly explain to the jury how the violence and other environmental factors in the Hall family affected Mr. Hall's development and rendered him more susceptible to becoming involved in drug dealing in general and this crime in particular. *See, e.g.* <u>Russell v. Collins</u>, 998 F.2d 1287, 1292 (5th Cir. 1993), *cert. denied*, 114 S. Ct. 1236 (1994) (observing that "evidence of a defendant's background is constitutionally relevant mitigating evidence only if the crime committed by the defendant is in some sense 'attributable' to that background."). Such expert testimony is typically presented not by a psychiatrist, whose area of expertise is the medical treatment of mental disorders, but by, for example, a forensic or clinical social worker, whose professional focus is on an analysis of the social forces shaping the individual. As Dr. Clayton's description of the field of forensic psychiatry demonstrates, she lacked the expertise to provide an opinion on such matters:

Q. Can you explain for the record just briefly what forensic psychiatry is?

A. It's basically how psychiatry interacts with the law in both civil and criminal matters. You get trained to deal with what we would call, I guess, psychiatrically antisocial personality disorders. I think the lay term usually is sociopath.

You're also trained as far as learning to assess if someone is telling the truth, if they are being honest or forthright. You assess, I guess — you learn to assess if they are what we call malingering, meaning faking a psychiatric illness for [sic] whether it's criminal matters or civil. Sometimes that happens.

You also deal with taking care of mentally ill inmates who have been either accused of a crime and are awaiting conviction or convicted of a crime. Basically, it's more that you're trained as far as in the criminal matters to deal

> with the criminal, which is somewhat different than your regular run-of-the-mill psychiatric patient.

R. 35:4-5.[40]

234.    Even assuming that it was reasonable for counsel to determine in a vacuum (*i.e.*, without conducting a reasonable background investigation of their client) that they needed a forensic psychiatrist to anchor their penalty phase, counsel's decision to limit themselves to Dr. Clayton's expert testimony based on her brief evaluation of Mr. Hall in late September 1995 was objectively unreasonable once counsel had decided they would not present Dr. Clayton's testimony in the penalty phase because of the Court's October 19, 1995 Order compelling a mental health evaluation of Mr. Hall prior to the guilt phase in the event the defense presented "expert testimony from mental health experts as mitigation evidence, which testimony is based upon Defendant's verbal responses to their questions. . . ." R. 5:1228-31. *See also* R. 25:16-18 (trial counsel indicating that Mr. Hall would not submit to a Government mental health examination and thus would not present psychiatric mitigation). Trial counsel did not attempt thereafter to obtain or present the testimony of *any* expert witness who could explain in general terms the impact domestic violence has on a young boy's development, the risk factors for adult criminality created by the type of environment in which Mr. Hall was raised, and the reasons why

---

[40] Notably, trial counsel apparently chose Dr. Clayton because they viewed her as a "protégée" of the infamous Dr. Grigson, *see* Exhibit 7 at ¶ 14, who was trial counsel's first choice for a psychiatric expert. R:11 at 10-12. Counsel's enthusiasm for "Dr. Death" simply highlights the extent to which their performance departed from the national standard of practice for defending capital cases in 1994-1995. Exhibit 13 at ¶ 8 (capital defense expert consultant Kevin McNally was "stunned" to hear that trial counsel would even consider using the "unprofessional" Dr. Grigson as their expert, not least because "he would not be doing the necessary investigation needed" and which no other person on the defense team was then performing).

one or more of the defendant's siblings may have developed into more successful adults despite

being raised in the same environment as the defendant. Such testimony could have been

presented on the basis of general information about the dynamics of Mr. Hall's family and the

community of El Dorado, without any need for the expert to conduct a formal evaluation of Mr.

Hall, as illustrated by the comments of Jill Miller, M.S.S.W., in her declaration of April, 2000:

> I have been advised that Hall was repeatedly exposed to trauma as a child, regularly witnessing violent assaults on his mother by his father. Chronic exposure to violence and trauma can have profound effects on the development of a child. It affects the child's sense of safety and security, and his ability to grow into an emotionally healthy adult. Parents cannot be viewed as providing safety for the child when they are also the inflictors of violence. A child, especially a son, who witnesses the abuse of his mother develops feelings of guilt, helplessness, powerless, and low self-esteem. To develop into an emotionally healthy adult, a child's basic physical and emotional needs must be met. Among these needs are predictability, stability, positive modeling, and opportunities to develop a positive sense of self. If that child is frequently exposed to his father's violent battery of his mother, the child will lack the safety, predictability, and consistency which are vital to healthy emotional development.
>
> Children who experience or witness violence suffer a variety of mental health symptoms or trauma reactions as a result. Exposure impacts on the child's development and can negatively impact cognition, including learning, memory, and school performance. Research indicates that as the number of risk factors or stressors in the child's life increases, performance on IQ tests deteriorates. Chronic trauma also affects personality development and behavior, and can lead to decreased impulse control. According to one leading researcher, the extent of the effect on the child of chronic trauma or exposure to violence is a function of the types of trauma, number of traumas, and extent of exposure. The accumulation of risk factors has a multiplier effect. There is a dose-response relationship. The age and development level of the child are also important. Children who experience their first trauma before age eleven are three times more likely to develop psychiatric symptoms than those who are older. It is the accumulation of risks and stressors that enhances the likelihood of adverse effects on the child. The context in which the child experiences the trauma is important as well. The impact of trauma on a child is compounded by an environment of poverty, family disruption, and community disintegration. Among the risk factors that enhance the likelihood of adverse effects, including psychiatric disorders, are: severe marital distress; low socio-economic status; large families with

overcrowding; maternal mental illness, and paternal criminality.

There are some factors or conditions that enhance a child's resiliency and ability to cope with chronic trauma. Ameliorating factors include: cognitive competence; experiences of self-efficacy; positive early relationships; self-confidence and self-esteem; community support and encouragement; and role models for active coping strategies. Protective factors include: stable emotional relationship with at least one parent or significant other person; an open and supportive educational climate; parental modeling of behavior that encourages constructive coping; and social supports outside the family. When these protective factors are lacking or absent, children are more likely to be negatively impacted by chronic trauma.

Understanding the nature of risk factors and protective factors, and directing the social history investigation toward identifying them, is essential to explaining for a lay jury how one child in a family who is exposed to trauma may suffer grave long-term harm, and yet another child reared in the same environment may suffer somewhat less. Research indicates, for example, that boys and girls react differently to the experience of witnessing trauma as children; as a result, a girl who grows up watching her mother daily assaulted by her father may suffer somewhat less psycho-social damage than a boy raised in the same environment and witnessing the same traumatic violence. Every child in a family suffers different consequences from the experience of trauma, even when all experience it at the same time. The extent to which each child, in growing to adulthood, experiences or avoids criminality, substance abuse, relationship problems, or the like, and the severity of those experiences, depends on the unique combination of protective factors and risk factors affecting him or her during childhood. In 1994-1995, it was well known in the capital defense community that preparing to explain this sort of differential impact of traumatic experience, and anticipating prosecutorial cross-examination and argument directed to these areas, was an essential part of preparing to tell the client's story of childhood trauma to the jury.

I have been advised that Hall was raised in an economically depressed area of Arkansas and became involved in the illegal drug economy as an adolescent and remained involved in that economy, at least during certain periods of time, as a young adult prior to his arrest in this case at age twenty-three. In 1994-1995, it was understood by reasonably competent capital defense attorneys that the involvement of young black men in the illegal drug economy, and their concomitant failure to pursue or maintain legitimate employment, could be explained by reference to a series of economic, social, and political factors. For example, a number of respected leaders in the African-American community believe that a lack of meaningful local employment at a decent wage is a key factor. In addition, the very pervasiveness of the drug trade in poor black neighborhoods creates a destructive cycle in which

youngsters grow up knowing they can make money easily. This perception is encouraged by the local big suppliers, who for their part view young black men as expendable resources, who can be swiftly replaced if they are jailed or killed. Deficiencies in the educational system and legacies of employment discrimination, often stretching back for generations, contribute to the problem. Where young men cannot see legitimate avenues for achieving success, they nevertheless need to possess outward symbols of success. Such symbols (including cars, clothing, and the like) function as a confirmation that the person who possesses them is important and deserves respect – an attitude that otherwise may rarely be extended to young black men. In this country, many African-Americans equate self-worth with material possessions; those who don't have access to such means feel unworthy and alienated. Young black men are believed to be especially vulnerable to the lure of easy money in the illegal drug economy because they often see no future for themselves. Given high rates of lethal violence and incarceration in their communities, they don't expect to live long or remain on the streets, and therefore have less motive to work toward long-term goals, financial or otherwise. In short, a great deal of powerful ethnographic research supports the view that the lure of the illegal drug economy is less about greed for money than about the search for self-worth, the desire for dignity, and the hunger for respect. In 1994-1995, there was extensive information of this type available to provide a lay jury with this perspective on the reasons a young black man like Hall might have ended up selling drugs rather than working at the local poultry processing plant .

*See* Exhibit 14, Appendix A, ¶¶ 26-30.

235. The use of such experts, sometimes called "teaching witnesses," as mitigation witnesses in the penalty phase of capital trials was well-established nationally by 1994-1995, and counsel thereby could have avoided the perceived problems associated with Dr. Clayton's testimony while providing indispensable mitigating context for the facts of Mr. Hall's life history. Reasonably competent counsel would have at least explored such an option.

**Trial Counsel Knew They Were Unprepared For Trial, Yet Failed To Set Forth Adequate Grounds For Relief In Their Several Motions For A Continuance**

236. Trial counsel moved for a continuance four times prior to and during the course of the trial. On August 2, 1995, counsel filed "Defendant Orlando Cordia Hall's First Motion for

Continuance of Trial Date and Waiver of Speedy Trial." Docket No. 252, 2:487-93. Unlike the majority of motions filed in the case, this document was written, signed and filed by lead counsel, Mr. Kearney, rather than by Mr. Ware. The motion details Mr. Kearney's overwhelming trial schedule from the middle of May through the first week of July, 1995, and the last half of August and first half of September, 1995, as the basis for counsel's need for a continuance, but makes no mention of Mr. Ware's schedule from the time of appointment through the scheduled trial date of October 2, 1995.

237. The motion requests "at least thirty (30) days to allow Defendant's attorney to complete the above trial schedule, review the discovery and prepare for trial," R. 2:490, urging that such time is necessary to allow counsel to investigate the penalty phase and to review discovery. It further stresses that a mitigation investigation had not been undertaken because *Mr. Kearney*'s trial schedule[41] had precluded his supervision and direction of such an investigation:

> 4) Because of Jeff Kearney's overwhelming trial schedule, counsel has not been able to devote the necessary time to the preparation of this death penalty case. In particular, counsel has not had sufficient time to interview the Defendant in detail regarding his background and the facts surrounding this case. Counsel met with the Defendant briefly at the federal courthouse at the time of his appointment to this case and met with Defendant again, on this date, for the purpose of having Defendant execute a Waiver of Speedy Trial. *It will be necessary for counsel to spend many more hours with the Defendant in order to prepare for trial. A complete investigation of Defendant* **ORLANDO HALL'S** *background needs to be made under*

[41] It is evident from the context that this motion uses the word "counsel" in the singular, referring only to Mr. Kearney and not the team of lawyers (Kearney and Ware) working on the case. Paragraph 4, regarding the lack of a mitigation investigation, documents that "counsel" had only met with the client twice as of August 2, 1997, a fact which cannot apply to Mr. Ware and which corresponds to the roughly three hours that Mr. Kearney interviewed Hall from the time of appointment through the end of trial. The motion further states that "counsel met with the Defendant at the federal courthouse at the time of *his* appointment to this case...." R. 2:490.

*the close supervision and direction of counsel to discover and develop any evidence that may mitigate against the death penalty. This has not been done, and said investigation is a prerequisite to render effective assistance of counsel.* Counsel's trial schedule does not allow for such preparation prior to the October 2, 1995 trial date.

*Id.* (emphasis added).

238. Because the first motion for continuance failed to disclose any basis upon which the Court could find that Mr. Ware's work schedule likewise precluded him from vigorously working to prepare the case during the period in which Mr. Kearney's trial schedule prevented him from doing so, the Court denied the motion. As the Court observed: "Defendant's current counsel were appointed . . . on March 21, 1995, over four months ago. Additionally, as required by law, Defendant *was appointed two attorneys, and his motion is silent regarding his second attorney's schedule for the next two months.*" Docket No. 261; R. 3:508 (emphasis added).

239. Counsel orally renewed their motion for continuance on October 2, 1995, the first day of trial:

> Mr. Kearney: And last, judge, I hate to bring this up, but we again renew our motion for continuance that we have filed. We are not ready to proceed to trial. We were the last lawyers in this case and the first ones to be forced to trial. Defendant Webster's counsel have been in the case much longer than we were. The Court granted them a continuance because they needed additional time. Now we're being forced to trial because we got into the case late.
>
> We are requesting that the Court grant us additional time, and we would like to at some point in time make a showing outside of the — ex part [sic] outside of the hearing of the government of things we still have to do, that we're not ready to go to trial in this case.
>
> And also we object to the fact on behalf of Mr. Hall to the fact that the Court let his other lawyers off who were into this case and done a lot of work on it without really there being any evidence before the

Court to support the allegations. Mr. Webster [sic] did not request that his lawyers be excused. He wasn't given any say-so in it. He wasn't represented by anybody else at that hearing. There absolutely was nothing other than hearsay and unreliable information that the Court based his decision on. There wasn't any testimony from any witnesses or anything like that, and the Court relieved Mr. Hall of his lawyers who had been working on this case and had gotten a lot of work done on it, and then gave him new lawyers and he was forced to go to trial before his new lawyers are ready all based on just some allegations that had never been substantiated at all. And because of all those reasons we ask the Court to give us a continuance and some additional time.

(Sotto voce between Court and law clerk.)

The Court: Your motion for continuance is denied.

R. 14:14-15.

240. The Court thereafter granted permission for Mr. Ware to absent himself from *voir dire* so that he could "continue to work on getting the case ready as far as the evidentiary presentations are concerned in the trial of the case in the guilt or innocence or punishment phase." R. 14:17. Much of the lengthy and critical individual *voir dire* process was conducted with Mr. Hall represented by only one lawyer in the courtroom.

241. Counsel twice renewed the motion for continuance during the penalty phase of the trial. At the conclusion of proceedings on November 1, 1995, the first day of the sentencing hearing, Mr. Ware stated: "prior to the time that the government's rested in its punishment case in chief and at the time the defendant has been called to begin its case in chief, we would like to renew our ongoing motion for continuance for all the reasons we've previously articulated and for the additional reason of getting or having sufficient amount of time to get the witnesses together in order to present them in Hall's portion of the punishment case." R. 31:270. The Court

summarily denied this motion.  *Id.*

242.    The following day, after the Government rested, counsel again renewed their "ongoing motion":

Mr. Ware:    In addition, Your Honor, we would — we would like to renew — before we're required to begin presenting our case, renew our motion for continuance for at least 30 days for all the reasons we previously articulated.

The Court:    Denied.

Mr. Ware:    In the further alternative, we would renew our motion for a continuance for at least — at least one day before we're required to being presenting witnesses or any kind of evidence.

The Court:    Denied.

R. 32:45.

243.    Two months before trial began, Mr. Kearney realized that the defense would not be prepared for trial on October 2, 1995, and made representations to that effect to the trial judge.  *See also* Exhibit 13 at ¶ 14 ("Mr. Hall's attorneys knew they were not ready to proceed.  [Mr. Ware] admitted in conversations with me that he knew there was much work still to be done").  By the time of trial, counsel were well aware that they had not properly prepared Mr. Hall's defense, particularly for the punishment phase, as demonstrated by their moving for a continuance three times in the course of trial.  As the ineffective assistance of counsel claims raised *supra* and *infra* demonstrate, counsel indeed were unprepared for trial.  Yet, at no time in their motions for continuance did counsel present a legally sufficient basis to merit the Court's grant of a continuance.  It is well established that a district court's denial of a continuance warrants reversal only upon a showing that the denial caused serious prejudice to the defendant.  *See, e.g.*, United

States v. Dupre, 117 F.3d 810, 823 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 857 (1998); United States v. Castro, 15 F.3d 417, 423 (5th Cir. 1994). Counsel's failure to establish the prejudice that would (and did) ensue from forcing them to trial virtually guaranteed the failure of their motions for continuance, and insulated those discretionary decisions on appeal. United States v. Hall, 152 F.3d 381, 419-420 (5th Cir. 1998), *cert denied*, 526 U.S. 1117 (1999).

244. The Fifth Circuit's reasoning on appeal is instructive and reflects precisely that Mr. Hall's trial counsel -- by waiting until trial was nearly (or actually) underway before attempting to conduct an investigation into evidence for the penalty phase -- fell below the national standard of practice for defending capital cases in 1994-1995. The Court of Appeals emphasized that both in terms of "the amount of preparation time available" and "whether the defendant took advantage of the time available," Mr. Hall's trial attorneys had no one to blame but themselves. 152 F.3d at 420. They were given "over six months in which to prepare for trial," in a case where counsel's efforts would plainly be "focused solely on the penalty phase." *Id.*[42]

245. It was objectively unreasonable for counsel in their first motion for continuance not to include any mention of Mr. Ware's scheduling conflicts over the same pre-trial period or to explain why Mr. Kearney's oversight of the investigation was so critical. Without such information, the Court clearly was entitled to, and did, conclude that one member of the defense team would be able to prepare adequately for trial, while Mr. Kearney attended to his other

---

[42] For this reason, the Fifth Circuit's observation that "the government's discovery in the case was voluminous" likewise provides no basis for trial counsel's failure to make good use of the six months they had to prepare for trial. Because relatively little of the Government's discovery related to the penalty phase issues, counsel could profitably have focused and streamlined their review of those materials.

obligations. *See* <u>Hall</u>, 152 F.3d at 420 (no abuse of discretion in denying continuance, "given that Hall's motion for a continuance indicated no scheduling conflicts on the part of Michael Logan Ware").

246. Counsel throughout the trial were likewise objectively unreasonable in failing to document for the Court precisely how they were unprepared to present a penalty phase defense. As set forth in detail *supra*, counsel's failure to commence an investigation of Mr. Hall's background until the eve of trial unsurprisingly resulted in their failure to identify appropriate witnesses, prepare witnesses to testify, select appropriate experts, choose a reasonable penalty phase strategy, make effective use of their peremptory challenges during *voir dire*, and generally protect Mr. Hall's Eighth Amendment right to an individualized determination of his sentence. As a consequence of trial counsel's failure to set forth adequate, existing grounds for their requests for continuance, they were forced to trial unprepared, and their client was prejudiced as a result.

## Counsel Was Ineffective In Arguing To The Jury Why Mr. Hall's Life Should Be Spared

247. Defense counsel's closing argument in the penalty phase fully reflects and is the predictable consequence of counsel's failure adequately and timely to investigate, develop and present mitigating evidence. Out of the twenty-eight pages of the transcript of the defense closing, only three pages addressed any positive reasons for the jury to spare Mr. Hall's life: (1) that the Government's failure to point out any misconduct while Mr. Hall was incarcerated in an Arkansas penitentiary showed that "there was absolutely no evidence that [Hall] was anything but a well-behaved inmate"; (2) that counsel "can't imagine a more horrible upbringing than one

where you witness your father beat your mother unmercifully time and time again"; and (3) that the death penalty would punish Mr. Hall's four young children and Mr. Hall's mother, Betty. Supp. R., 54-56.  The bulk of the closing argument informed Mr. Hall's death-qualified jury that a death sentence in this matter would simply "reward" Larry Nichols and the co-defendants who testified against Mr. Hall, Supp. R. Vol. 20-A: 56-57; and attacked the federal government for seeking the death penalty through the use of the "confessed liars and criminal" cooperating witnesses.  Supp. R. Vol. 20-A: 59-78.[43]

248.    Counsel's failure to develop and present evidence that would meaningfully have humanized Mr. Hall and provided the jury a basis to understand both his background and his involvement in the crime precluded them from focusing on aspects of their client that would provide jurors with positive bases on which to vote for a life sentence.  Without this evidence, counsel could only urge the jury to spare their client's life on the negative bases of the Government's unfair power to select which co-defendants should face the death penalty and its use of cooperating criminals to obtain the death penalty.  The argument, thus, failed to focus on the central question of whether Mr. Hall, as an individual, should receive death or life, but became rather an indictment of the

---

[43] The closing, which was given by both attorneys, was also inconsistent.  Mr. Ware concluded his portion of the argument by telling the jurors: "what we're talking about here in determining what the appropriate sentence is, is . . . whether you 12 folks are so determined to walk out of here with Orlando Hall's blood on your hands that you will vote for the death sentence even though life without the possibility of parole, without the possibility of any release whatsoever, is the alternative."  Supp. R. Vol. 20-A: 57.  Virtually the first words out of Mr. Kearney's mouth when he rose to give his closing flatly contradicted Mr. Ware's argument: "And no matter what verdict you return, you're not going to have the blood of anybody on your hands if the verdict you return is a verdict that you believe is absolutely right."  *Id.* at 58.  This apparent strong disagreement between defense counsel could only serve to discredit the defense in the jurors' eyes.

Government for its prosecution of a criminal the jury had already found guilty of a horrible crime.

249. Had counsel presented an adequate penalty phase that revealed to the jury Mr. Hall's sympathetic, human qualities, they would have had ammunition to give a persuasive closing argument that Mr. Hall's life should be spared. The failure to do so here gave the jury little basis to impose a life sentence. Given that the jury deliberated for more than ten hours on the question of whether Mr. Hall should live or die, there is a reasonable possibility that a compelling argument in favor of life, based on evidence that should have been presented, would have resulted in at least one juror's rejection of the death penalty.

### **Counsel Failed To Conduct An Adequate *Voir Dire***

250. Counsel's failure to conduct a timely investigation of mitigation in this case not only crippled their ability to present a persuasive case for life in the penalty phase, but precluded them from conducting a thorough *voir dire*. *Voir dire* plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury by enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges. *See* Mu'Min v. Virginia, 500 U.S. 415, 431 (1991); United States v. Lancaster, 96 F.3d 734, 738 (4th Cir. 1996) ("[t]he principal purpose of *voir dire* is to probe each prospective juror's state of mind to enable the trial judge to determine actual bias and to allow counsel to assess suspected bias or prejudice")(quoting Scott v. Lawrence, 36 F.3d 871, 874 (9th Cir.1994)); *see also* Milton v. Procunier, 744 F.2d 1091, 1095-96 (5th Cir. 1984)("[o]ne purpose of *voir dire* is to gain information important to the exercise of peremptory challenges. Yet, and perhaps nearly always,

another purpose is to provide a spring-board for the advocate."), *cert. denied*, 471 U.S. 1030 (1985).

251.    Counsel's delay in beginning the investigation into Mr. Hall's background until two weeks before jury selection began meant that counsel lacked an informed mitigation theory with which to question and select prospective jurors.  "[C]ompetent capital defense lawyers try to develop a sentencing strategy well before *voir dire* to allow them to question potential jurors about mitigating evidence that will be offered in the sentencing phase." Valdez v. Johnson, 93 F.Supp.2d 769, 785 (S.D. Tex. 1999), *aff'd in part and vacated in part sub nom. Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001).  As the court in Valdez went on to observe:

> [T]he voir dire alone demonstrates that . . . counsel had not developed such a strategy.  Counsel categorically failed to ask the prospective jurors any questions about their feelings regarding mitigating evidence, their ability to distinguish guilt from the special issues relating to deliberateness and future dangerousness, the use of psychiatric evidence and testimony, or any other matters pertinent to the sentencing phase. . . .

> *Id.*  The same can be said here.

252.    As a result of counsel's failure to investigate timely, counsel lacked information necessary to question prospective jurors' attitudes competently and to exercise cause and peremptory challenges in an informed manner. The failure to do so prejudiced Mr. Hall's chances of obtaining a life sentence in this matter.  *See* Exhibit 12 at ¶ 30 ("[I]nvestigation must be substantially complete before trial to inform counsel's decisions during the formation of the jury. . . . If counsel has only a vague idea during jury selection what kind of information about the client's character and background the defense will present at sentencing, and, indeed, has no idea what witnesses will testify for the defense and what their manner and the content of their

testimony will be, counsel will have a difficult time . . . attempting to seat jurors who might respond personally to those witnesses and their stories. At a minimum, counsel whose penalty-phase theory and investigation are barely underway during jury selection will be handicapped in exercising peremptory challenges to remove jurors who pose too great a risk of unfairness toward the defendant's case.").

**Deficient Performance Of Mr. Hall's Counsel Prejudiced Him At The Sentencing Phase**

253. Strickland v. Washington, 466 U.S. 668 (1984), and Williams v. Taylor, 529 U.S. 362 (2000), set the standard by which this Court must assess whether the acts and omissions of Mr. Hall's counsel denied him a fair sentencing hearing. Those cases entitle Mr. Hall to relief if (i) counsel's performance fell below an objective standard of reasonableness and (ii) counsel's errors "prejudiced" Mr. Hall's defense by depriving him of a fair sentencing hearing, *i.e.*, a proceeding whose result is reliable.

254. Mr. Hall has set out in detail *supra* the different ways in which counsel's performance failed to constitute "reasonably effective assistance," in that counsel did not perform in a manner consistent with the standard of practice for defending capital cases in 1994-1995. *See generally* Exhibit 12; Exhibit 14; Exhibit 13. He incorporates each of those allegations of fact, and each allegation of fact set forth in the Exhibits to this motion for relief, here as if set forth fully.

255. Mr. Hall has also discussed *supra* how counsel's various acts and omissions harmed the case actually presented at punishment, as well as how counsel could, by performing reasonably, have developed a far more powerful and persuasive case to present. However, it is appropriate here to review some of the legal standards governing this Court's review of the "prejudice" component

of Mr. Hall's claim of ineffective assistance of counsel. In light of the facts of this case, those standards compel the conclusion that Mr. Hall is entitled to a new sentencing hearing.

256. "Prejudice" is established if, had counsel not performed deficiently, there exists a "reasonable probability" that the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to *undermine confidence* in the outcome." Strickland, 466 U.S. at 694 (emphasis added). Strickland does not require that Mr. Hall prove that counsel's deficient conduct "more likely than not altered the outcome in the case." *Id*. at 693-94. As the Fifth Circuit has recognized, Strickland's prejudice prong imposes "a lower burden of proof than the preponderance standard;" even where the reviewing court cannot conclude that it is more likely than not that a different result would have obtained absent counsel's errors and omissions, the court can still be "confident that it meets the 'reasonable probability' standard." Bouchillon v. Collins, 907 F.2d 589, 595 (5th Cir. 1990) (citing Strickland).

257. Although a reviewing court owes strong deference to counsel's trial decisions under Strickland, such deference presupposes that the attorney's trial decisions represent "a proper exercise of judgment based on adequate knowledge" of the facts and relevant law. United States v. Cronic, 839 F.2d 1401, 1404 (10th Cir. 1988); *see also* McDougall v. Dixon, 921 F.2d 518, 537 (4th Cir. 1991) (a "strategic" choice by counsel is one "made with full knowledge of the facts and the law, and the options available to him"). Genuinely strategic decisions, *i.e.*, "choices between alternatives that each have the potential for both benefit and loss," are almost always upheld. Profitt v. Waldron, 831 F.2d 1245, 1249 (5th Cir. 1987). But the Fifth Circuit has directed that this measure of deference not be "watered down into a disguised form of

acquiescence.'" <u>Bouchillon v. Collins</u>, 907 F.2d 589, 595 (5th Cir. 1990) (quoting <u>Profitt</u>, 831 F.2d at 1248).

258.    "Prejudice" exists if, but for counsel's deficient performance, there is a reasonable probability that Mr. Hall would not have been sentenced to death.  As noted, the <u>Strickland</u> "prejudice" standard does *not* require that Mr. Hall show that "counsel's deficient conduct more likely than not altered the outcome of the case." <u>Nealy v. Cabana</u>, 764 F.2d 1173, 1178 (5th Cir. 1985).  This Court's "prejudice" analysis regarding errors respecting the *sentencing* decision in Mr. Hall's trial must ask only whether there is a reasonable probability that a single juror's mind could have been changed had counsel performed effectively.  *See* <u>Jones v. United States</u>, 527 U.S. 373, 380-81 (1999) (under the Federal Death Penalty Act, in the event of a hung jury, the court imposes any lesser sentence [than death] authorized by law); 18 U.S.C. § 3593(h)(2)(C); <u>Mak v. Blodgett</u>, 970 F.2d 614, 619-21 (9th Cir. 1992) (considering the effect of Washington death penalty statute's "single holdout juror" provision in analyzing a <u>Strickland</u> claim); *cf.* <u>Kirkpatrick v. Whitley</u>, 992 F.2d 491, 497 (5th Cir. 1993) ("[G]iven the unanimity required at the Louisiana punishment phase, the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death.").

259.    In measuring whether Mr. Hall has shown such an impact, the Court must consider the cumulative effect of all the alleged deficiencies taken together, rather than judging the effect of each in isolation.  <u>Moore v. Johnson</u>, 194 F.3d 586, 619 (5th Cir. 1999) ("the question [under <u>Strickland</u>] is whether the cumulative errors of counsel rendered the jury's findings, either as to

guilt or punishment, unreliable"); <u>Livingston v. Johnson</u>, 107 F.3d 297, 308-309 (5th Cir. 1997) (noting that district court correctly considered whether habeas petitioner had suffered cumulative harm from various claimed instances of deficient attorney performance); *see also, e.g.*, <u>Williams v. Washington</u>, 59 F.3d 673, 682 (7th Cir.1995) ("a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was [prejudicial]"); <u>Rodriguez v. Hoke</u>, 928 F.2d 534, 538 (2d Cir.1991) (a "claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions"); <u>Mak v. Blodgett</u>, 970 F.2d 614, 622 (9th Cir.1992) (finding that "significant errors . . . , considered cumulatively, compel affirmance of the district court's grant of habeas corpus"); <u>Cooper v. Fitzharris</u>, 586 F.2d 1325, 1333 (9th Cir.1978) (observing that "prejudice may result from the cumulative impact of multiple deficiencies").

260. It is important also for the Court to examine whether, even if the "prejudice" from counsel's deficient performance at the sentencing phase, standing alone, is insufficient to undermine confidence in the outcome, the *combined* prejudice resulting from counsel's errors and omissions *and* from any other constitutional error(s) in this case require relief. <u>Phillips v. Woodford</u>, 267 F.3d 966, 985 (9th Cir. 2001) (considering, in deciding whether to grant relief, the cumulative prejudice resulting from counsel's deficient performance and from testimony admitted in violation of <u>Giglio v. United States</u>); <u>Gonzales v. McKune</u>, 247 F.3d 1066, 1078 (10th Cir. 2001) ("we can see no basis in law for affirming a trial outcome that would likely have changed in light of a combination of <u>Strickland</u> and <u>Brady</u> errors, even though neither test would individually support a petitioner's claim for habeas relief"). Here, the combined prejudicial impact of

counsel's deficient performance at the punishment phase and every other constitutional error

alleged in Mr. Hall's 2255 Motion, and all those errors considered cumulatively, requires relief.

261. Finally, <u>Williams</u> illustrates the proper application of these principles, and further

demonstrates why the facts of Mr. Hall's case demand relief. First, one of the key factors relied

upon by the Supreme Court in finding that Williams' attorneys performed deficiently at the

sentencing phase was that his lawyers "did not begin to prepare for that phase of the proceeding

[*i.e.*, the sentencing hearing] until a week before the trial." <u>Williams</u>, 529 U.S. at 395. In Mr.

Hall's case, his attorneys did not begin to prepare for the sentencing hearing until mid-

September, when they finally made an *ex parte* request for necessary investigative assistance and

obtained the appointment of Tena Francis to undertake an investigation into Mr. Hall's

background. That date (mid-September) was essentially two weeks prior to the beginning of trial

on October 2. Counsel's failure to prepare for the sentencing phase until trial was upon them, in

light of <u>Williams</u>' closely analogous facts, strongly supports a finding that counsel performed

deficiently.

262. Second, Williams' counsel failed to conduct an adequate investigation, which would have

uncovered extensive mitigating evidence about Williams' background. <u>Williams</u>, 529 U.S. at

363-364. Among the evidence Williams' counsel should have uncovered was evidence that he

had behaved well in prison, apparently "thriv[ing] in a more regimented and structured

environment." *Id.* Again, Mr. Hall's counsel similarly failed to investigate, develop, or present

available evidence establishing his successful adjustment to incarceration in the Arkansas prison

system and in other jail and prison settings, and indeed generally failed to conduct any timely and

meaningful investigation into their client's background.  According to <u>Williams</u>, such inaction constitutes an inexcusable failure to "fulfill [counsel's] obligation to conduct a thorough investigation of the defendant's background."  *Id.* at 364.

263.    The Supreme Court's ultimate conclusion in <u>Williams</u> that the result of the sentencing hearing was unreliable – that it is "reasonably probable" that, had counsel performed adequately, Williams would not have been sentenced to death – has particular significance in light of the highly aggravated character of Williams' crime and his serious prior criminal history.  Williams was convicted of murder for beating a drunken, helpless man in the chest with a mattock, apparently rendering him unable to breathe and thereby causing his death, after which Williams took three dollars from the man's wallet and walked out of the house as the victim lay dying, gasping for breath.  <u>Williams</u>, 529 U.S. at 367-368.  In the months following the capital murder for which he was ultimately condemned to death, Williams "savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw." *See* <u>Williams v. Taylor</u>, 163 F.3d 860, 868 (4th Cir. 1998).  The elderly woman he assaulted barely survived, and at the time of Williams' sentencing was in a "vegetative state" and not expected to recover.  <u>Williams</u>, 529 U.S. at 368.  Williams also had prior convictions for armed robbery, burglary, and grand larceny.  *Id.*  In short, Williams both committed a highly aggravated (senseless, violent) crime and then went on a violent crime spree, repeatedly attacking innocent persons.  He acted alone in each incident.  He had a serious prior criminal history including a conviction for a violent crime.

264. The Supreme Court found that Williams had established "prejudice" under <u>Strickland</u>, despite these highly aggravating facts. The Court emphasized the potential for mitigating evidence to "influence[] the jury's appraisal of the defendant's moral culpability," and thereby persuade the jury to impose a life sentence even where the jurors were also certain to find the existence of serious aggravating factors. <u>Williams</u>, 529 U.S. at 398 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case.").

265. The ultimate prejudice suffered by Mr. Hall is well illustrated by a few excerpts from the Declaration of Jill Miller, M.S.S.W., who has continued to investigate and develop the cumulative case in mitigation which reasonably competent counsel would have presented in this case:

> The social history investigation undertaken by post-conviction counsel, which could have been accomplished by trial counsel and their investigator had they pursued it in a timely manner, reveals extensive and important mitigating information about Orlando Hall which the jury that sentenced him to death never heard and which would both have humanized Orlando and given the jury a more sympathetic explanation for his conduct than the Government presented. Among the facts that have been uncovered in the post-conviction investigation (which are all discussed in greater detail below) are the following:
>
> ■ There is substantial evidence concerning the degree of violence in Orlando's home and its corrosive effect upon him and his family which was not adequately or even accurately brought out at trial. Contrary to the image presented at trial, Orlando was himself a victim of serious physical abuse as a child at the hands of both his parents. Moreover, he was a witness to much more extensive and traumatic abuse of his mother and his siblings than the trial testimony indicated. Orlando and his siblings all currently exhibit symptoms consistent with the trauma of being exposed to family violence from a young age.

- Orlando additionally was exposed to additional violence as a child and young adult, and experienced traumatic loss in the deaths of relatives and the violent deaths of friends.

- Orlando's mother Betty suffered from serious health problems and depression, which resulted in her being emotionally unavailable and dependent on medication – as well as gambling – as a way to escape the painful parts of her life.

- Orlando suffers from neurocognitive impairments, with accompanying learning disabilities, which undermine his judgment and reasoning ability, especially when he is under stress, and which deprived him of important protective mechanisms for coping with the chaos and debilitating effects of his upbringing.

- When Betty Hall eventually took her three youngest children, including Orlando, and left her abusive husband, she quickly abandoned Orlando and his younger brothers Tracy and Demetrius, leaving them to fend for themselves, with no parent in the home to supervise their behavior or to provide necessities, such as food, clothing or electricity.

- As a result of his abandonment by his mother and the responsibilities towards his younger brothers that this placed on him, as well as Orlando's cognitive deficits and the limitations they placed on his employability, and the lack of meaningful economic opportunities for an African-American teenager in El Dorado, Orlando turned to selling drugs to help his family survive.

- When Orlando was inevitably arrested and imprisoned for selling drugs, he was a compliant and non-violent prisoner who adjusted successfully to confinement and posed no threat to other inmates or correctional staff.

- At the time this crime occurred, Orlando had expressed his desire to leave the drug trade and was making efforts to do so, and to leave Arkansas and obtain gainful employment.

- Despite having suffered a traumatic upbringing, Orlando nevertheless has positive qualities which are acknowledged by everyone who has come into contact with him:  he is generous and warm; loves his children deeply; cares for his family and feels responsible for taking

> care of them; and is even capable of acts of heroism, as when he leapt from a second-floor balcony to rescue his nephew Syroid from drowning in a motel swimming pool.

Orlando apparently suffers from an undiagnosed learning disability, which would have had significantly harmful psychological, social and emotional consequences (including effects on judgment and decision-making, particularly under stress). Orlando's frustration with school likely resulted from the difficulty he had learning -- especially as he moved into the higher grades, where limitations on his ability to process and comprehend information increasingly impeded him. His placement in remedial classes and his early withdrawal from school are both consistent with this inference. [A diagnosis of Attention Deficit Disorder] would also be consistent with much of the information presently known about his own background and that of his family … . If so, his use of marijuana may, at least in part, be attributed to self-medication … .

While the physical abuse of Orlando's mother Betty by his father A.J. was described, to some extent, in the penalty phase testimony of Betty Hall and Cassandra Ross, both those witnesses denied that the children in the family were "abused." This left the jury free to conclude that because the children themselves were not "abused," they suffered no negative effects from the experience and thus that it could not mitigate or help explain Orlando's involvement in the crime. First, this characterization -- that the Hall children were not "abused" -- was incorrect. The physical discipline imposed on the children in this family, by both parents, was unduly harsh and rose to the level of abuse. The children were whipped with switches and a belt, to the point that the beatings left welts on their skin. They were targeted for such punishment unpredictably, with the degree of punishment varying arbitrarily according to the temper of the parent imposing it. A.J. Hall has admitted that his abuse of alcohol led him on occasion to lose control and beat his children with unrestrained rage. A.J. and Betty's practice of "delaying" punishment, by letting the children knew they were going to be whipped but not telling them when the punishment would occur, exacerbated the children's feelings of helplessness and terror. Dreading such "delayed" punishment, Orlando often wet the bed, a physical response to terror which he could not control. When his parents whipped him for this involuntary action, it only worsened his fear and shame. When discipline produces physical injury, is unpredictable, is inflicted in response to behavior the child physically cannot control, and reflects the mood or condition of the person inflicting it rather than the severity of the child's misbehavior, then it constitutes abuse, not correction.

Because such treatment was all the Hall children knew, they understandably saw it as normal punishment, not "abuse." As Scotty Hall has put it, the children simply

thought that was how black families were.  The tendency to regard one's own childhood experience as "normal" is understandable, and is demonstrably familiar to professionals who work regularly with victims of family violence.  It means, however, that the dynamics and effects of family violence cannot be uncovered simply by asking someone if she was "abused."  Instead, one must inquire about the specific methods of discipline employed within the family, and the circumstances surrounding discipline.  Counsel's examination of these witnesses reflects a failure to grasp this basic principle of social history investigation and witness preparation in a capital sentencing hearing.

At the same time, the true extent and severity of the physical beatings visited on Betty Hall, the unpredictability of A.J. Hall's outbursts toward her, and the far-reaching consequences for Betty's own physical and mental health and that of her children, were not communicated by the testimony actually presented at Orlando's penalty phase.  A.J. Hall's abuse of Betty caused her to require medical attention at times and resulted in the police coming to intervene on several occasions, although A.J. apparently was charged only once.  Interviews with Betty and the Hall children confirm that A.J.'s violence against Betty reached startling extremes -- he scarred her face, he beat her eyes until the skin around them permanently darkened, he shoved her through a plate glass window, he climbed onto the hood of their car and beat at the windshield with his fists, he pummeled her until the police were called.  The violence, though a constant feature of their life together, flared unexpectedly.  Betty feared for her life, and yet compulsively attempted to placate A.J. to avoid further beatings.  As a result of the stress and trauma, she sank into depression, which she attempted to remedy with prescription medications and a desperate fondness for gambling.  As a consequence of all these factors, as her children grew older Betty was less and less emotionally available to them, and unable to give them appropriate care, supervision, and support.

It is highly significant that the Hall children regularly saw A.J. brutalizing Betty.  The destructive effects of repeatedly witnessing physical violence can be as severe as the effects of being subjected to it.  Chronic exposure to violence and trauma can have profound effects on a child's development.  It undermines his sense of safety and security, and his ability to grow into an emotionally healthy adult.  Parents cannot be viewed as providing safety for the child when they are also the inflictors of violence.  A child, especially a son, who witnesses the abuse of his mother develops feelings of guilt, helplessness, powerless, and low self-esteem.  To develop into an emotionally healthy adult, a child's basic physical and emotional needs must be met.  Among these needs are predictability, stability, positive modeling, and opportunities to develop a positive sense of self.  If that child is frequently exposed to his father's violent battery of his mother, the child will lack the safety, predictability, and consistency which are vital to healthy emotional development.

Traumatic events in Orlando's life include his having witnessed the violent abuse of his mother and having been the target of abusive physical discipline by both parents, both on a chronic basis. In addition, Orlando suffered the traumatic loss of his grandmother and aunt, who had served as sources of positive regard and emotional reinforcement. His grandmother died when he was young, at a time when the loss would have had greater traumatic impact. Orlando was also directly exposed to other traumatic deaths/losses. For example, he saw his father's first cousin, Harry J., burned to death inside his truck -- at "Anybody's Club," the rundown nightclub located immediately behind the Hall family home and run by Orlando's uncle, T.J. He was present when his friend Eric Steele was shot twelve times. Another friend, Corey Brown, was robbed and shot in the head near the Hall home after having stayed overnight with the Halls, and died from his injuries. Two other friends died of drug overdoses. In addition, Orlando's involvement in the illegal drug business for an extended period was itself traumatic; Orlando's brother Tracy recalls that he and Orlando both lived in anxiety and fear as a result of seeing friends come to violent ends and knowing that they could be the target of violence; both thought they could die at any time. Their perception that El Dorado was a lethally violent place is consistent with newspaper accounts which state that major crimes in the city increased significantly from 1986 to 1993 (one police official indicated that the crime rate "quadrupled" in that interval).

Such traumatic losses affect a child's sense of security, safety and stability, as well as his sense of the future. Chronic trauma, especially that which begins at an early age and involves multiple types of trauma, can lead to feelings of hopelessness and futurelessness. All the male children in the Hall family have experienced these intense feelings of futurelessness. Children or adolescents who experience or witness violence/trauma can suffer from a variety of mental health symptoms, which can include depression and Post Traumatic Stress Disorder (PTSD) or trauma syndrome. Chronic exposure to violence can affect cognition, undermining learning, memory and school performance. Orlando's school records and his performance on recent tests of his academic ability reflect distinct problems consistent with chronic exposure to violence in the home. Chronic trauma also affects personality development and behavior, and can lead to decreased impulse control. The extent of the effects of chronic trauma is a function of the types of trauma, number of traumas, extent of exposure, and such factors as age, sex, cognitive competence, availability of support services, and the presence of other risk factors or protective factors (explained below). The impact of trauma on a child is compounded by an environment of poverty, family disruption, and community disintegration. While both A.J. and Betty Hall were employed full-time, their wages were not high and they had a house full of children to feed. In addition, it appears that A.J. Hall did not always contribute his earnings to supporting the household. The resulting economic

pressure on the family, especially in the context of the persistent violence between the parents and the physical abuse visited on the children by the parents, is consistent with other evidence suggesting that the impact of the trauma on the Hall children was substantial.

Certain risk factors, if present, enhance the likelihood that a child who experiences trauma will suffer damaging mental health consequences. A number of such risk factors are present in Orlando's background, including severe marital distress, overcrowding in the home due to large family size (Orlando and his three brothers and two sisters shared two bedrooms in the family's small, three-bedroom home), and maternal psychiatric disorder (his mother Betty's depression). A.J. Hall's alcoholism aggravated the risk factor of marital distress by introducing unpredictable violence into the home. In addition, low cognitive functioning and brain impairment (such as Orlando exhibits) enhance the likelihood of adverse effects.

Moreover, the timing and number of traumatic events in a person's childhood may dramatically impact the injurious effects of trauma on a child's intellectual and behavioral development. The age and development of the child has a significant effect on the debilitating effects of trauma. A child who, like Orlando, experiences his first trauma before age eleven is three times more likely to develop psychiatric symptoms than one who first suffers trauma at a later age, when an individual's coping mechanisms are more fully developed. Research indicates that as the number of risk factors or stressors in the child's life increases, performance on IQ tests deteriorates. According to one leading researcher, the extent of the effect on the child of chronic trauma or exposure to violence is a function of the types of trauma, the number of traumas, and the extent of exposure. There is a "dose-response" relationship – in other words, each added trauma has a multiplier effect so that the impact of successive traumas is far greater than the sum of each part. The accumulation of the risks and stressors in a child's life enhances the likelihood of adverse effects on the child.

The presence of protective or ameliorating factors can decrease the likelihood that destructive mental health consequences will result from chronic trauma. Unfortunately, few such factors existed in Orlando's case. Protective factors can include cognitive competence (Orlando's intelligence is in the low average range and his academic ability, even as an adult, is well below the norm); experiences that promote the child's positive sense of self (Orlando's environment provided few such opportunities); community support and encouragement (these were not available), and role models for active and constructive coping strategies (his parents did not provide such models). Orlando did have a stable emotional relationship with his mother, as well as positive early relationships with his grandmother and aunt. After the death of his grandmother, however, and due to his mother's increasing physical

and emotional unavailability, Orlando did not have the continuous level of emotional support which would have helped him deal constructively with the experience of trauma. Resources were also markedly absent outside the family, other than, to some extent, Rev. Hegler. The experience of Orlando's sister Cassandra Ross provides a significant contrast. From an early age, Ms. Ross found refuge in the family of her boyfriend Jerry Ross, whom she later married and with whom she has had a stable and emotionally healthy long-term relationship. Ms. Ross' relationship with Jerry, in fact, dates back to her childhood -- he was her elementary school sweetheart. Ms. Ross acknowledges the role of the Ross family in providing her with emotional and material resources, and it is plain that Jerry's parents provided positive models in a way that her own parents did not. At the same time, Ms. Ross's cognitive ability led to successes in school which Orlando lacked; her cognitive ability itself, and the positive regard it brought her in the school setting, were protective factors which reduced the impact of family trauma on Ms. Ross. Even so, it would be a mistake to assume that Ms. Ross has not suffered, and does not continue to suffer, from the trauma that characterized the Hall household.

Understanding the nature of risk factors and protective factors, and directing the social history investigation toward identifying them, is essential to explaining for a lay jury how one child in a family who is exposed to trauma may suffer grave long-term harm, and yet another child reared in the same environment may appear to overcome it. Research indicates, for example, that boys and girls react differently to the experience of witnessing trauma as children; as a result, a girl who grows up watching her mother daily assaulted by her father may suffer somewhat less psycho-social damage than a boy raised in the same environment and witnessing the same traumatic violence. Every child in a family suffers different consequences from the experience of trauma, even when all experience it at the same time. The extent to which each child in Orlando Hall's family, in growing to adulthood, experienced or avoided criminality, substance abuse, relationship problems, or the like, and the severity of those experiences, depends on the unique combination of protective factors and risk factors affecting him or her during childhood. In 1994-1995, it was well known in the capital defense community that preparing to explain this sort of differential impact of traumatic experience, and anticipating prosecutorial cross-examination and argument directed to these areas, was an essential part of preparing to tell the client's story of childhood trauma to the jury.

Betty Hall exhibits many symptoms of PTSD and could probably be diagnosed as suffering from it. All the children in this family exhibit multiple symptoms of trauma syndrome. While trauma syndrome is less pervasively disabling than "full-blown" PTSD, the presence of this extensive symptomatology nevertheless reflects and corroborates the traumatic experiences that Orlando and his siblings endured.

Trauma symptoms fall into three categories, and a subject must exhibit symptoms in all three areas before a diagnosis of PTSD may be made. The first category of symptoms is *re-experiencing*. Re-experiencing occurs through nightmares, flashbacks, or memories triggered by certain events, words or experiences that are linked to the traumatic event. The person has recurrent or intrusive distressing recollections of the events, and acts or feels as if she is experiencing the trauma all over again. In response to these recollections, the person experiences intense feelings of distress such as terror or helplessness. Betty Hall and several of the Hall children reported suffering nightmares about their traumatic childhood experiences after being encouraged to talk about them.

The second category of symptoms is *persistent avoidance of stimuli associated with the trauma and general numbing of feelings*. These symptoms include the person's efforts to avoid thoughts, feelings, conversations, or activities associated with the trauma; inability to recall an important aspect of the trauma; feelings of detachment or estrangement from others; restricted range of affect (emotional expression); and a foreshortened sense of the future. Persons who experience these symptoms often manifest depression and turn to alcohol or drug use as a means of emotional escape. Orlando and each of his brothers exhibit the foreshortened sense of the future characteristic of this symptom group. All of the Hall children also report that they actively resist thinking or talking about the experiences of trauma in their family background. Orlando's brother Scotty and his sister Pam both appear to have suffered from depression and to have sought solace in alcohol or drugs, although Scotty's reliance on such substances has been much more pronounced and long-term in its destructive impact on his life. Orlando himself has used marijuana as a strategy to avoid thinking about or focusing on the painful experiences he endured as a child.

The third category of trauma symptoms is *persistent symptoms of increased arousal*. These symptoms may appear as, for example, difficulty falling or staying asleep; irritability or outbursts of anger; difficulty in concentrating; hypervigilance; and exaggerated startle response. Persons exhibiting these symptoms often say that, when in a room, they have to sit facing the door, with their back to the wall. They jump when they hear a loud noise. They are always looking over their shoulder, or scanning the horizon when out in public. All of the Hall children manifest one or more of these arousal symptoms.

Betty Hall exhibited, in her relationship to Orlando's father A.J., symptoms of co-dependency as it related to A.J.'s alcoholism. She tolerated his alcoholic and abusive behavior by working long hours to provide financial support for her family while A.J. "drank up" his own earnings or hid them (Orlando's brother Scotty reports that A.J. kept money in an out-of-town bank to which Betty apparently had no access). Betty

also invested a great deal of time and energy in monitoring A.J.'s moods and behavior, hoping to avoid provoking him into outbursts of physical violence toward her. Along with her work schedule and her own escapist activity (gambling), this constant focus on A.J. made her both unavailable to her children and unable to protect them. Often, people who grew up in an alcoholic and violent home say that it felt like "walking on eggshells." Several of the Hall children used precisely this phrase to describe their emotional response to their home environment.

All of the Hall children exhibit characteristics of adult children of alcoholics. Children of alcoholics are prone to a range of psychological problems, including learning disabilities, attention deficit disorder, depression, and anxiety. When alcohol abuse is combined with violence, as in the Hall home, the children grow up in an atmosphere of chaos, inconsistency, unpredictability, and fear. They can develop an inability to trust, an extreme need to control, excessive sense of responsibility, and denial or repression of feelings. This can lead to low self-esteem, depression, isolation, guilt, and difficulty establishing and maintaining satisfying and healthy relationships. These children have a need to please others; they seek approval and affirmation. They can be either overly dependent (a consequence of having had normal needs for dependency and nurturance go unmet) or prematurely adult (as a result of having been forced to surrender childhood to take on adult roles in family). Adult children of alcoholics can be immature and impulsive, and often have poor problem-solving skills. They exhibit an increased incidence of alcohol and/or drug abuse, and often marry or get involved with someone who abuses.

Among the roles which children in alcoholic families may assume are: the "responsible one"/parent figure, the placator or mediator, and the scapegoat. Orlando's sister Cassandra presents a classic example of a person with an extreme need for order and control in her life. His sister Pam, and indeed Orlando himself, went through periods of being prematurely adult and responsible -- Pam as a result of their parents' work schedule, and Orlando as a result of having been abandoned by their mother after she finally left A.J. Several of the children have abused alcohol and drugs. Several exhibit difficulty establishing and maintaining relationships of trust and intimacy. Sometimes, children in alcoholic families will act out to draw attention to themselves, disrupting the family but providing a distraction from the issue of alcoholism. At other times, they will try not to draw attention to themselves, and to simply "fade into the woodwork", especially if the alcoholic parent is also abusive. These children do poorly in school, abuse alcohol or drugs, and act out in other unacceptable ways.

Orlando's entry into the drug economy can best be understood as a function of several different influences acting upon him at once. One primary factor was that few economic opportunities existed for legitimate work in El Dorado in 1989; even five

years later, when the national economy was booming, a deputy prosecuting attorney for a regional drug task force described the area as "economically depressed." Moreover, most positions available to young African-American men in 1989 were in menial labor or service sector jobs paying at most minimum wage. Significantly, Orlando attempted to hold such jobs for a time, working as a shelf stocker at the "Sav-Mor" grocery store and at the giant Con Agra chicken processing operation in El Dorado before abandoning those efforts at making ends meet through the legitimate economy. A second factor making it difficult for young African-American men to obtain stable, long-term employment work at a reasonable wage was (and is) racial discrimination in employment, as well as in economic development in El Dorado generally. Community leaders such as Rev. Hegler attest to the persistent and pervasive influence of racial discrimination in limiting the economic opportunities available to young African-American men in south central Arkansas. A third factor operating as a barrier to Orlando's finding appropriate employment was his lack of skills, in combination with his poor academic achievement and cognitive impairment, all of which made finding legitimate work far more difficult.

In addition, the very pervasiveness of the drug trade in poor black neighborhoods like El Dorado's "Thunderzone" -- described in a 1994 news article as "the hub of a thriving drug trade" in southern Arkansas -- creates a destructive cycle in which youngsters like Orlando grow up knowing they can make money easily. This perception is encouraged by the local big suppliers, who for their part view young black men as expendable resources, who can be swiftly replaced if they are jailed or killed. Deficiencies in the educational system in El Dorado, which longtime observers such as Rev. Hegler attribute in part to the legacy of racial discrimination, as well as the comparable history of employment discrimination stretching back for generations, would contribute to the problem.

As a result of his history of trauma, Orlando lacked the feelings of self-worth which develop in a child raised in a normally supportive and nurturing environment. This deficit of emotional well-being, too, apparently contributes to the attractiveness of selling drugs. Where young African-American men cannot see legitimate avenues for achieving success, they nevertheless need to possess outward symbols of success, because such symbols (*e.g.*, cars, clothing, and the like) function to confirm that the person who possesses them is important and deserves respect. Those who don't have access to such symbolic possessions feel unworthy and alienated. By satisfying his need for respect, the money he earned selling drugs likely provided Orlando benefits that were as much emotional and psychological as material.

Another recognized consequence of the experience of trauma is a sense of futurelessness - the sense that there is no point in creating plans or expectations of satisfaction because trauma has shown that at any moment they could be destroyed.

At the time Orlando became involved in the drug trade, precisely such a sense of futurelessness dominated his perceptions of his own life chances. Research indicates that young men raised in similar circumstances, seeing high rates of lethal violence and incarceration in their communities, do not expect to live long or remain on the streets. This lack of a belief in one's own future tends to undermine any motive to work toward long-term goals, financial or otherwise. Young black men like Orlando who see no future for themselves are believed to be especially vulnerable to the lure of easy money in the illegal drug economy, and unable to transcend their own immediate circumstances to appreciate the potential long-term disadvantages of such behavior.

Perhaps most important, family members agree that Orlando's original involvement in drug dealing was motivated by his desire to take care of his family, rather than by greed. Abandoned along with his two younger brothers when his mother left his father and took up with another man, Orlando faced an urgent need for money to survive -- to pay for food, clothing, and the electric bill. This immediate and uniquely personal motivation, in addition to the social and psychological factors described above, helps explain why Orlando gave up on the limited opportunities available in the legitimate economy to a young, uneducated African-American man in El Dorado and moved instead into the drug trade.

For all these reasons, a strong argument could have been made that the lure of easy money in the drug trade was more than Orlando -- frustrated with his inability to learn, limited by his academic and cognitive deficits, feeling responsible for his brothers and his own children, earning minimum wages in menial jobs, hungry for respect and self-esteem, and burdened by a sense of futurelessness -- could resist. Such circumstances would have helped the jury understand how Orlando was drawn into the drug business.

A great deal of powerful ethnographic research supports the view that the lure of the illegal drug economy is less about greed for money than about the search for self-worth, the desire for dignity, and the hunger for respect. In 1994-1995, there was extensive information of this type available to provide a lay jury with this perspective on why Orlando ended up selling drugs rather than gainfully employed at a legitimate job. Further, it was understood in the capital defense community that it was essential to present such a perspective so that jurors would understand that economic, social, and political factors -- rather than simply greed -- contributed to the involvement of young black men like Orlando in the drug trade. This explanation would take on even greater mitigating force in Orlando's case because additional factors unique to his family circumstances -- *i.e.,* his sudden responsibility for providing for his younger brothers when they were abandoned by their mother -- acted in combination with these larger forces.

Several people corroborate that at the time of this crime (the kidnapping and murder of Lisa Rene), Orlando wanted to get out of the drug business and was taking steps to do so. His sister Cassandra, for example, reports that Orlando seemed increasingly anxious to relocate from Arkansas to Texas. His then-girlfriend LaTonya Anders likewise indicated that he planned to leave Arkansas. His brother Demetrius indicates that Orlando told him repeatedly that he wanted for them both to stop dealing drugs as soon as they had enough money to launch a legitimate business. This information would also have helped the jury place Orlando's involvement in the drug trade into proper perspective -- not as his ambition, but as an activity into which circumstances and the lack of other opportunities had propelled him, and from which he hoped to escape.

Exhibit 14, at ¶¶ 40-66.

266. In sum, Mr. Hall has shown that his counsel performed deficiently. Had counsel conducted an appropriate and timely investigation, they could have presented a wealth of powerful mitigating evidence that both rebutted the Government's case for Mr. Hall's "future dangerousness" in an institutional setting and gave the jurors persuasive reasons to find that a sentence less than death was appropriate. Counsel's performance denied Mr. Hall his right to the effective assistance of counsel under the Sixth Amendment. Because the result of his sentencing proceeding was thereby rendered unreliable, this Court should grant a new sentencing hearing.

## III-V

**THE INTRODUCTION OF EXTRANEOUS EVIDENCE OR INFORMATION INTO THE JURY'S PUNISHMENT-PHASE DELIBERATIONS VIOLATED MR. HALL'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

**A JUROR'S *EX PARTE* CONTACT WITH ONE OR MORE MEMBERS OF LISA RENE'S FAMILY VIOLATED MR. HALL'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

**AN UNACCEPTABLE RISK EXISTS THAT AT LEAST ONE JUROR WAS OVERWHELMED BY EMOTION AND VOTED FOR DEATH BASED ON HER SYMPATHY FOR LISA RENE AND HER FAMILY, RATHER THAN BASING HER VERDICT ON THE EVIDENCE, IN VIOLATION OF MR. HALL'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, AS WELL AS HIS RIGHTS UNDER 18 U.S.C. § 3595**

267.   After closing argument at the punishment phase, the Court made brief remarks to the jurors before they retired to deliberate whether to condemn Mr. Hall to die for his role in the kidnapping and murder of Lisa Rene.  Supp. R. (Trial Transcript Vol. 20-A) at 98. The Court explained why, late on a Friday afternoon, it wanted the jurors to at least begin their deliberations:

> I don't want to wait … .  Let me tell you why.  There's too much publicity and there's too many opportunities, too many temptations for you to try to talk to people around you.  And I know that's hard, and the people I want you to talk to are yourselves, so I'm going to suggest to you that you begin deliberations tonight. …
>
> *Id.*

268.   Thus, at 4:55 p.m. on Friday, November 3, 1995, the jury retired to deliberate. *Id.* at 99.  The jury deliberated until late in the evening without reaching a verdict.  At about 11:15 p.m., the jurors were discharged for the weekend.  Before releasing the jurors, however, the Court had a brief colloquy with the attorneys in which it discussed how to proceed.  Defense counsel expressed concern that jurors might "talk to their spouses or family members" if permitted to separate, and noted that he had seen jurors go home under similar circumstances only to be pressured into a verdict by comments from a loved one. *Id*. at 110.  Unsurprisingly, given its earlier worry that the temptation to talk might be too much for some jurors, the Court agreed -- expressing its intention to "threaten them within an inch of their lives, or warn them at least." *Id*.

The Court thereafter instructed the jurors "thoroughly. . . to avoid any media coverage and discussing the case with anyone." R. 34:4. As the Court put it,

> Now, if we go home for a – a weekend, 48 hours or better, and return here Monday morning, you're going to spend some well-deserved time with your loved ones, and the temptation to discuss the case with your loved ones, especially if you're married with your spouse, will be enormous. *And if you do that, it will affect your judgment in this case. There's no way you could avoid it.* And your spouse or whoever your closest friend is has not heard what you've heard, and you could not begin to tell that person everything that you've heard so that they would be a reliable consultant. *So if you were to do that, you would be not only violating the Court's orders and the law, you would – and your oath, but you would be denying and violating the basic duties of fairness, because you would be bringing into the jury room a person who has not heard the evidence.* . . . . Now, I've described what you have to do. Is there anyone among you that would find it just impossible to spend the weekend at home and not discuss the case with someone? By your silence I'm assuming that all of you can [do so].

> Supp. R. Vol. 20-A: 111-112 (emphases added).[44]

269. Jurors returned on Monday, November 6, at 9:00 a.m. to resume deliberations. Before they reached a decision, defense counsel made a motion on the record. R. 34: 2-3. The preceding day, KDFW-TV had aired a segment on its evening newscast (which ran from 5:00 p.m. to 6:00 p.m.) including a "news story about the Lisa Rene trial and Orlando Hall and the status of the trial as of the end of business on Friday night." R. 34:2. Immediately following the news story, KDFW ran a point-counterpoint debate on the merits of imposing the death penalty for rape. *Id.* The defense had obtained a videotape of the newscast and requested that the Court view it. The

---

[44] It is apparent, of course, that jurors do not always obey even such careful and detailed instructions not to expose themselves to the potential contamination of outside information and influences. For example, during voir dire, the Court admonished the venire repeatedly to avoid all media coverage. The Court discovered afterward that some prospective jurors flouted these instructions and read news reports on the case anyway, even after having been specifically directed not to do so. *See, e.g.,* R. 18: 47-48, 96-97 (Sandra Hardin, Juror No. 32); 18:124 (Paul Long, Juror No. 33).

Court did so, admitting the tape as Court's Exhibit 10. Defense counsel then moved the Court "to make an inquiry about whether or not any of the jurors had seen [the broadcast] or heard anything about it or discussed it with anyone," and also moved for a mistrial. R: 34:4 The Court denied both requests. *Id*.

270. A few minutes later, just after 1:30 p.m., the jury returned its death verdict.

271. Shortly thereafter – probably the evening of the same day the death verdict was returned -- Hall's sister Cassandra Ross viewed a television newscast[45] during which a female juror was interviewed by a reporter. *See* Exhibit 42 (sworn declaration of Cassandra Ross). The juror told the reporter that, during the weekend break in deliberations, the juror had celebrated her daughter's birthday by holding a party. At the party, the juror explained, she had put a candle on the birthday cake to honor Lisa Rene's memory, and she and the guests prayed for Lisa Rene.

272. Ms. Ross contacted Michael Ware and gave him this information, as documented by a note in Mr. Ware's case file:

> Cassandra Ross
> 214/ 642-0523
> Channel 4 or 5
> On date sentencing
> Verdict / 6:00 or
> 11:00 /

Exhibit 43.[46]

---

[45] According to Ms. Ross, the newscast likely aired on Channel 4, Channel 5, or Channel 8.

[46] A second note in Mr. Ware's file, dated November 16, 1995, corroborates this claim:

> 11-16-95 Orlando / says listening to

273.    On June 10, 2001, a writer with the screen name and email address JHolmes712@aol.com

posted a message to the website "Death Row Speaks" (www.deathrowspeaks.net), a site

primarily focusing on prisoners on the federal death row.  *See* Exhibit 44 (copy of email dated

Sunday, June 10, 2001).  It read as follows:

> I was the jury foreman in the trial of Orlando Cordia Hall in November 1995.  When
> I was notified that I was chosen to serve, I had no idea that the experience would
> haunt me forevermore.  Or that it would change my destiny, even the way I view life.
>
> I had no problem convicting Mr. Hall for his crimes, for the evidence against him
> was overwhelming.  However, when the penalty phase of the trial began, I struggled
> with sentencing Mr. Hall to death.  I was the final holdout.  The tally was 11 for --
> and only me against.  I have two sons very close in age to the defendant, and my heart
> went out to his mother.  But, the photos of the victim and the horror that she suffered,
> and the fact that Mr. Hall attempted to cover up his crime right up until he was
> caught, convinced me that there was no remorse.  It was all about covering his own
> hide and saving himself.  Ultimately, I voted in favor of sentencing Mr. Hall to death.
>
> In the years since, I have struggled with this decision. If I had it to do over again,
> would I do it differently?  I honestly don't know.  I know that it would still be one of
> the hardest decisions I have ever made.  My experience continues to trouble me, even
> after all this time.

---

             radio afterwards to jurors
             (a.m. station) heard one woman
             say celebrated Lisa's birthday
             on Saturday (between
             deliberations) -----
     [see if we can get tape
    of program]
    [file motion to interview jurors!]

Exhibit 10. Kevin McNally, Federal Death Penalty Resource Counsel, spoke to Hall a day later, on
November 17.  In that conversation, Hall told Mr. McNally about the broadcast and confirmed that
he had communicated that information to Mr. Ware.

> I do know that a beautiful young girl is dead. That her family will suffer the pain and loss for the rest of their lives. I will always remember the pleas from her father to deliver justice and the sadness in her mother's eyes will remain with me forever. But I also remember the sadness in the eyes of Orlando's mother. And her loss will also forever be a part of me.
>
> There are no winners when someone is sentenced to die. Maybe I have answered my own question here. But it's too late.

*Id.*

274. In mid-June, 2001, Mr. Hall received a letter. It was dated June 11, 2001, and purported to be from "Jana Holcomb," who gave her return address as "5011 Osage Dr., Arlington, Texas, 76018." *See* Exhibit 45 (June 11, 2001 letter from "Jana Holcomb" to Mr. Hall, with copy of front of envelope).

275. Ms. "Holcomb" indicated in her letter that she had "followed the events of [Mr. Hall's] trial in Ft. Worth." *Id.* She stated that she was "the mother of two sons close to [his] age," and that she was "very curious to know how such [a person] could end up on death row." *Id*. She stated that she "was present in the courtroom" when Mr. Hall's mother had testified. *Id.* She pressed Mr. Hall for details about how his mother was doing and whether Mr. Hall was still in contact with her. *Id*.

276. Ms. "Holcomb" also stated that she had had contact with Lisa Rene's mother at court:

> Mr. Hall, please don't be offended by what I am about to write. *But I also met Lisa Rene's mother in the hallway of the courthouse.* Also a very lovely lady with a broken heart. I feel that I must ask if you have considered the impact you and your friends have had on her family as well. After reading your profile [on the website], I already know that the answer is yes. You must feel remorse about what happened.
>
> *Id*. (Emphasis added). In closing, Ms. "Holcomb" asked Mr. Hall to consider writing her

back:

I know you must have received many letters since posting your address on the internet. I am interested in hearing from you. I want to learn more about you as an individual, your views on the death penalty, family, children. But I must be honest, I also want to learn more about your life and the events that led you to death row. Would you consider writing to me? If you do choose to correspond with me, I will share more about myself and my own views if you are interested. … Perhaps we could provide some insights to one another. I will be awaiting a response.

*Id*.

277. Mr. Hall next received a two-page letter, dated July 24. *See* Exhibit 46 (July 24, 2001 letter from "Jana Holcomb" to Mr. Hall, with copy of front of envelope). Ms. "Holcomb" asked Mr. Hall a lot of additional questions about his family, his relationship to them, the federal death row facility, his tastes in reading, and the status of his case on appeal. *Id.* She provided some additional brief information about herself, and told Mr. Hall that she would "love to hear from [him]." *Id.* She again indicated her return address as "5011 Osage Dr., Arlington TX 76018." *Id.*

278. Mr. Hall responded. In reply, he received a third letter from Ms. "Holcomb," dated August 3. *See* Exhibit 47 (August 3, 2001 letter from "Jana Holcomb" to Mr. Hall, with copy of front of envelope). She indicated that she "want[ed] to write a longer letter," but could not because her step-children were about to visit. *Id.* She stated that she had "many things to tell [him] -- and to ask [him]." *Id.* She praised his previous letter as "awesome," and expressed appreciation that Mr. Hall wanted to correspond with her. *Id.* With a "promise to write again soon," she closed the letter, "Jana." *Id.* Her August 3 letter contained three enclosures: a humorous story captioned "Keeping Yourself Busy In Prison," a second humorous item titled "Cats Diary," and a poem, "When I Am An Old Woman." *Id.* As before, her letter bore the return address "5011

Osage Dr., Arlington TX 76018." *Id*.

279.  On April 18, 2002, a "Jackie Holmes" with email address jholmes245@attbi.com posted an email message to www.deathrowspeaks.net.  *See* Exhibit 48 (email text). It read:

> Orlando Hall was profiled on your web site previously.  But now his profile is gone.  Do you know why?
>
> *Unfortunately, I was the jury foreman in this young man's trial and followed his journey quite closely.  I corresponded with him annonamously [sic] for awhile, but was overwhelmed by the emotions it evoked and could not continue.*  I am still very interested in keeping up with him, but now there is no information about Mr. Hall on your web site.
>
> I know that you must be inundated by requests, but anything you could tell me about Mr. Hall's current status would be appreciated.
>
> Thank you for your efforts at maintaining such a useful source of information.
>
> *Id.* (Emphasis added).

280.  These events involving members of Mr. Hall's jury individually and cumulatively demonstrate that Mr. Hall's death sentence was the product of extraneous influences and arbitrary factors, in violation of federal law.

**The Introduction Of Extraneous Evidence Or Information Into The Jury's Punishment-Phase Deliberations Violated Mr. Hall's Rights Under The Fifth, Sixth, And Eighth Amendments**

281.  The woman juror interviewed by reporters after the sentencing verdict admitted that she and other persons unknown prayed over Lisa Rene's fate during the break in deliberations between when the court excused the jurors late Friday night and when they returned to resume deliberations on Monday.[47]  The juror engaged in such conduct despite having been expressly

---

[47] The identity of this juror remains unknown to Mr. Hall, as a result of the Court's refusal to permit

and vigorously warned by the Court that talking about the case *at all* during the weekend break "would be not only violating the Court's orders and the law, [but also] denying and violating the basic duties of fairness," as well as breaking the juror's solemn oath.

282.    While it is not known exactly what was said by the participants, either before, during, or after the prayer in question, it is evident that speaking about the events that led to Lisa Rene's death, or expressing the community's outrage and grief over her fate, or musing over the appropriate punishment for the man convicted of taking part in those events, would be a natural reaction when people were moved to pray about Lisa Rene.  In addition, it is not unusual for group prayer to consist of seriatim remarks by a number of people, as when members of a family say "grace" by turns over a meal -- such that even if *only* a prayer occurred, with no other discussion about the case before or afterward, several participants in the prayer itself may have expressed their views during the course of that act alone.  What we know is that, after express and repeated orders from the Court not to do so, this juror communicated with others about Lisa Rene -- whether by speaking aloud herself, listening as others spoke aloud, or both.  What we also know -- or must admit, if we are honest -- is that there is a terrible risk that additional conversation about the case would accompany such prayer.   These facts establish a *prima facie* case that outside influences affected the jury's sentencing decision.   Such outside influences are presumptively prejudicial.  As the Fifth Circuit observed in United States v. Gonzales, 121 F.3d 928, 944-45 (5th Cir. 1997):

discovery which would confirm which juror made these statements.  That said, there is a significant probability that the juror in question was Jacquelyn Holmes -- who reported on the juror information questionnaire that she had two daughters who were 16 and 10 years old respectively at the time of

> This court takes a dim view of permitting jurors to consider items that were not properly admitted into evidence. "It is firmly established in this circuit that a defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room 'unless there is no reasonably probability that the jury's verdict was influenced by the material that improperly came before it.'" [Citations omitted.] There is a rebuttable presumption of prejudice; consequently, the conviction must be reversed unless the government establishes that the error was harmless.

283. In a highly publicized and emotional case where the jurors were specifically directed not to discuss the case outside court, a juror nevertheless conducted an impromptu prayer service for the victim in a group setting with other people. Such conduct violated Hall's rights to due process, his right to trial by a fair and impartial jury, and his right to a reliable determination of his sentence. A new sentencing hearing is required. *See, e.g.,* United States v. Maree, 934 F.2d 196 (9th Cir. 1991) (juror's discussion with friends, who shared their opinion that "people like" the defendant should be incarcerated, required new trial); Stockton v. Commonwealth of Virginia, 852 F.2d 740 (4th Cir. 1988) (jurors' exposure to third party's extrajudicial comment that capital defendant should "fry" required new sentencing hearing). The introduction of extraneous influences violates the Fifth Amendment right to due process and the Sixth Amendment guarantee that evidence and argument produced against Mr. Hall would come from the witness stand and in the courtroom, where his rights of confrontation, cross-examination, and the assistance of counsel would be protected. Turner v. Louisiana, 379 U.S. 466 (1965). An impartial jury must be capable and willing to decide the case solely on the evidence before it. Smith v. Phillips, 455 U.S. 209, 217 (1982). Improper conduct on the part of any juror which damages his or her impartiality effectively destroys an accused's right to a fair trial. United

---

trial.

States v. Gaffney, 676 F. Supp. 1544, 1556 (M.D. Fla. 1987) ("if just one juror receives prejudicial off-the-record information the prejudicial effect spills over and is viewed as having tainted all jurors").  Therefore, if a single juror votes for death based on consideration of improper evidence or information, then such misconduct is harmful.  *See* Gaffney, 676 F. Supp. at 1556; United States v. Delaney, 732 F.2d 639, 643 (8th Cir. 1984); United States v. Rattenni, 480 F.2d 195, 198 (2d Cir. 1973) (defendant entitled to twelve fair and impartial jurors).

284.   In addition, courts have recognized that due process specifically prohibits the Government from arguing that God expects a particular individual to be condemned to death.  *See, e.g.*, Sandoval v. Calderon, 241 F.3d 765 (9th Cir. 2000); Romine v. Head, 253 F.3d 1349 (11th Cir. 2001); *see also* Carruthers v. State, 528 S.E.2d 217, 221 (Ga. 2000)("The problem is that biblical references inject the often irrelevant and inflammatory issue of religion into the sentencing process and improperly appeal to the religious beliefs of jurors in their decision on whether a person should live or die.  Moreover, many passages in the Bible, Talmud, and other religious texts prescribe or command a sentence of death for killing.  By quoting these texts during closing arguments, prosecutors may 'diminish the jury's sense of responsibility and imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions.").  If any participant in the prayer for Lisa Rene urged the same view upon this juror, due process and the Eighth Amendment would be violated in the same manner and for the same reasons.[48]

---

[48] The risk of allowing the victim's religion to influence the jury's decision regarding the appropriateness of a death sentence was recognized by the four dissenting Justices in South Carolina v. Gathers, 490 U.S. 805 (1983), who later crafted the rule of Payne v. Tennessee, 501 U.S. 808 (1991).  They emphasized that while evidence that Gathers's victim was a good person should be admitted, due process prohibited asking the jury to sentence Gathers to death because of the victim's

285. The risk of such a violation is heightened because the Government's victim impact testimony included repeated and specific references to Lisa Rene's religious faith, which makes it more probable that the prayer likewise emphasized her devotion. *See* R: 32:18 (Lisa Rene attended the Church of Christ in Saint Croix, was "very active" in "the youth program" there, attended church at the North Davis Church of Christ even "more often" after coming to the United States, and told her mother that her church attendance there was "a good influence on her life"). Under such circumstances, where the Government had placed Lisa Rene's religious devotion before the jury as a factor relevant to their sentencing decision, there is every reason to fear that the group prayer for Lisa Rene in which the juror participated during deliberations had the impermissible effect of urging her to give even greater weight to this consideration.

### A Juror's *Ex Parte* Contact With One Or More Members Of Lisa Rene's Family Violated Mr. Hall's Rights Under The Fifth, Sixth, And Eighth Amendments.

286. The information set out *supra* leaves little doubt that Mr. Hall, without knowing it, corresponded in the summer of 2001 with juror Jacquelyn Holmes, in an exchange of letters initiated by Ms. Holmes. The only return address used by "Jana Holcomb" -- 5011 Osage Dr., Arlington TX, 76018 -- is the address currently listed on www.infospace.com for Ms. Holmes. *See* Exhibit 49 (printout of address information from website, showing "Jackie Holmes" at "5011 Osage Dr." in "Arlington TX 76018"). "Jackie Holmes," describing herself as "the jury foreman" in Mr. Hall's trial,[49] emailed "Death Row Speaks" acknowledging that she had

---

religious beliefs. Gathers, 490 U.S. at 821 (O'Connor, Scalia and Kennedy, JJ., and Rehnquist, C.J., dissenting).

[49] The record reflects that Ms. Holmes was the foreperson at the guilt phase. *See* R. Vol. VI at 1332-

"corresponded with [Mr. Hall anonymously]." *See* Exhibit 48. "Jana Holcomb's" initial letter to Mr. Hall was dated the day after "JHolmes712" posted an email stating that she was "the jury foreman in the trial of Orlando Cordia Hall." The June 10 email from juror Holmes emphasized the importance of whether Mr. Hall felt "remorse," and the June 11 letter from "Jana Holcomb" asked whether he had "considered the impact you and your friends have had on [Lisa Rene's] family as well." *See* Exhibit 44; *cf.* Exhibit 45. According to her juror information questionnaire, juror Holmes has two step-sons. *Cf.* Exhibit 47 ("Jana Holcomb" notes impending visit from step-children). And, of course, "Jana Holcomb" and "Jacquelyn Holmes" have the same initials ("J.H."). Simply put, juror Holmes has now had extensive contact with Mr. Hall concerning the case, although counsel and Mr. Hall were unaware of it at the time, and she remains interested in obtaining information about his "current status." Exhibit 48.

287. Juror Holmes states that she "*met Lisa Rene's mother in the hallway of the courthouse.*" Exhibit 45 (Emphasis added). That meeting included communications between Juror Holmes and Lisa Rene's mother, and/or other members of Lisa Rene's family.[50] Those communications influenced Juror Holmes -- the lone holdout for a life sentence, by her own account, *see* Exhibit 44 -- to change her vote and vote for death. The *ex parte* contact between juror Holmes and Lisa Rene's mother and/or other members of Lisa Rene's family violated Mr. Hall's Fifth, Sixth, and

---

1333 (Dkt. # 446); *cf.* Dkt. # 466 (special findings at punishment phase, signed by penalty-phase foreperson Billy Dean).

[50] During Mr. Hall's trial, members of the victim's family were generally present in the courthouse in a group, rather than alone. Thus, it is likely that when Juror Holmes had contact with Lisa Rene's mother, she had contact at the same time with other relatives, friends, or supporters of the victim's family as well.

Eighth Amendment rights. *See, e.g.,* <u>United States v. Maree</u>, 934 F.2d 196 (9th Cir. 1991); <u>Stockton v. Commonwealth of Virginia</u>, 852 F.2d 740 (4th Cir. 1988); <u>Ex Parte Pilley</u>, 789 So.2d 888 (Ala. 2000); *see also* <u>Fullwood v. Lee</u>, __ F.3d __ 2002 WL 1020683 (4th Cir. 5/21/02) (remanding for evidentiary hearing in capital habeas proceeding on allegations that juror's husband may have pressured her to return death sentence and that jurors were made aware of facts outside the record). To the extent that juror Holmes based her sentencing verdict in any fashion on the information she obtained in this contact or her own emotional reaction to it, it also violated Mr. Hall's Eighth Amendment right to a sentence based on reason rather than on sympathy, passion, prejudice, emotion, whim, mistake, caprice, or any other arbitrary factor. <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976); <u>Gardner v. Florida</u>, 430 U.S. 349, 357-58 (1977); <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). It also violated his right under 18 U.S.C. § 3595 to a sentence not "imposed under the influence of passion, prejudice, or any other arbitrary factor." This Court should grant relief from Mr. Hall's death sentence.

**An Unacceptable Risk Exists That At Least One Juror Was Overwhelmed By Emotion And Voted For Death Based On Her Sympathy For Lisa Rene And Her Family, Rather Than Basing Her Verdict On The Evidence, In Violation Of Mr. Hall's Rights Under The Fifth, Sixth, And Eighth Amendments, As Well As His Rights Under 18 U.S.C. § 3595**

288. As reflected by her statement that she was "overwhelmed by the emotions … evoked" by her correspondence with Mr. Hall, Juror Holmes' participation in the jury's deliberations over Mr. Hall's sentence, and her ultimate vote for a death sentence, including but not limited to her contact with Lisa Rene's mother, was impermissibly influenced by emotion, passion, sympathy,

or other arbitrary factors in violation of the Sixth and Eighth Amendments and 18 U.S.C. § 3595. As noted, one of the members of the jury, during the weekend break that interrupted the penalty-phase deliberations, celebrated her daughter's birthday by holding a party at which candles were placed on the birthday cake to honor Lisa Rene's memory, and both the juror and other guests prayed for Lisa Rene. Juror Holmes had contact with Lisa Rene's mother in violation of the Court's repeated admonitions to the contrary; a juror who would violate the Court's express instructions once, whether intentionally or through confusion, is likely to have done so more than once. All this evidence points to Juror Holmes as the juror who prayed for Lisa Rene along with her party guests during the weekend break in deliberations before sentencing Mr. Hall to death.

289. Juror Holmes' emails concerning Mr. Hall's case reveal that she was torn by the prospect of sentencing him to death and was ultimately the last juror persuaded to vote to condemn him. *See* Exhibit 44. They report that she "struggled" with the decision and that it continues to haunt her. *Id*. They confirm, too, that she was "overwhelmed by the emotions it evoked" when she began to correspond with him anonymously. Exhibit 48. These admissions, in combination with the fact that Juror Holmes met Lisa Rene's mother and/or other family members in the courthouse and very likely prayed for Lisa Rene with other people during the weekend break in deliberations, contrary to the express instructions of the Court, collectively indicate that Juror Holmes' conflicted decision to vote for death was the product of unrestrained sympathy, emotion, passion, or other arbitrary factor rather than a reasoned moral response to the evidence. *See* Penry v. Lynaugh, 492 U.S. 302, 319 (1989)(individualized sentencing required by Eighth Amendment requires that jurors be able to express their "reasoned moral response" to the evidence); *cf.* Saffle

v. Parks, 494 U.S. 484, 495 (1990)("[t]he objectives of fairness and accuracy [are] threatened" when sentence turns on "strik[ing] an emotional chord in a juror" rather than "whether the defendant, in the eyes of the community, is morally deserving of the death sentence").

290. A juror may become incompetent to serve and is properly removed where extreme emotions threaten the impartiality of the jury's decisionmaking. See, e.g., United States v. Huntress, 956 F.2d 1309, 1312 (5th Cir. 1992)("it is within the trial judge's sound discretion to remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired"; court did not abuse its discretion in releasing juror whose mental illness interfered with his ability to serve); United States v. O'Brien, 898 F.2d 983, 986 (5th Cir. 1990)(trial court did not abuse its discretion in discharging juror due based juror's depression); State v. Miller, 388 A.2d 218 (N.J. 1978)(juror's removal warranted where juror's nervous and emotional condition renders him or her unable to render a fair verdict."). A death sentencing resting on such emotions is likewise incompetent.

291. The influence of such factors on Juror Holmes violated Mr. Hall's Fifth Amendment right to due process, his Sixth Amendment right to an impartial jury, his Eighth Amendment right to a reliable determination of sentence, and his right under 18 U.S.C. § 3595 to a sentence not based on an arbitrary factor. This Court should grant relief from Mr. Hall's death sentence.

**VI.**

**THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY AND MITIGATING INFORMATION CONCERNING WITNESS LARRY NICHOLS, IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS**

292. The Government failed to disclose exculpatory and/or mitigating information concerning its jailhouse informant witness Larry Nichols, in violation of the Fifth and Sixth Amendments.

293. The record of Nichols' testimony from his own case, United States v. Miller and Reliford, No. CR3-94-343-G (N.D. Tex.), contains Nichols' admission to extensive criminal activity, including but not limited to the following: engaging in drug trafficking; engaging in theft of personal watercraft; engaging in the illegal acquisition of weapons; transportation of stolen goods across state lines; possession and sale of stolen goods; transportation of stolen vehicles across state lines; fraud by check; armed robbery; and bank robbery. The record of the same proceeding reflects that Nichols had been debriefed by Government agents, pursuant to his plea agreement, and had advised them of all criminal activity in which he has engaged.

294. Upon information and belief, the Government failed to disclose the full extent of Nichols' prior criminal conduct to Mr. Hall's attorneys. The information the Government did disclose concerning Nichols' prior criminal conduct was not disclosed in a sufficiently timely fashion for defense counsel to make meaningful use of that information in cross-examining Nichols at the punishment phase of Mr. Hall's trial. All information concerning Nichols' prior criminal conduct was relevant to his bias and motive to testify in a manner favorable to the Government (*i.e.,* to falsify and exaggerate his allegations about statements by Mr. Hall), and therefore was fair game for questioning whether or not any of those incidents resulted in a conviction.

295. Further, the Government failed to reveal that Nichols was cooperating as a witness not only against Vernon Miller, Eric Reliford, and Orlando Hall, but also against other persons, had done so in the past, and was continuing to do so at the time he testified against Mr. Hall. Nichols'

status as a "career informer" was also information the Government was obliged to disclose to counsel for Mr. Hall.

296. In addition, the FBI-302 recounting the February 28, 1995 conversation between FBI SA Grovner and Nichols refers to Nichols as "LARRY DONNEL NICHOLS (protect)." Upon information and belief, the FBI-302's reference to "(protect)" indicates that Nichols was already in protective custody prior to the time he became an informant against Mr. Hall, contrary to the impression Nichols conveyed in his testimony at Mr. Hall's trial. *See, e.g*., R. 31: 236-237 (Nichols testimony that he was placed in protective custody "[a]fter leaving [his] meeting" with AUSAs Roper and Macaluso on March 6, 1995, and that he was "virtually placed in protective custody immediately upon [his] return" to Mansfield). The Government failed to reveal the relationship between the Government and Nichols represented by SA Grovner's use of the term "(protect)" in connection with Nichols, and failed to reveal that Nichols was already in protective custody on or before February 28, 1995.

297. In addition, upon information and belief, Vernon Miller attempted to cooperate with the Government in hopes of reducing his own sentence after he was convicted in the trial in which Nichols testified. In the process of attempting to earn the Government's favor, Miller was interviewed by federal law enforcement agents and officials. During those interviews, he advised the Government of additional criminal conduct by Larry Nichols which the Government did not disclose to counsel for Mr. Hall. Miller also advised the Government of other relevant impeaching facts concerning Mr. Nichols which the Government did not disclose to counsel for Mr. Hall.

298. Due process demands that the prosecution disclose any evidence favorable to the accused, where the evidence is "material either to guilt *or to punishment. . . .*" Brady v. Maryland, 373 U.S. 83, 87 (1963) (emphasis added). In holding that Brady was entitled to relief from his death sentence, but not his murder conviction, the Supreme Court reasoned, "[I]t would be too dogmatic for us to say that the jury would not have attached any significance to this evidence *in considering [Brady's] punishment*." *Id*. at 88 (emphasis supplied by Supreme Court, quoting opinion of court below); Calley v Callaway, 519 F.2d 184, 221 (5th Cir. 1975) (*en banc*) (Brady requires "the disclosure of material evidence *favorable in the sense of mitigation*") (emphasis added). It is also settled that Brady extends to evidence that impeaches the credibility of prosecution witnesses. Giglio v. United States, 405 U.S. 150 (1972).

299. The Government's failure to disclose the types of information described above concerning Larry Nichols violated these principles. The violation was harmful and warrants relief.

**VII.**

**THE GOVERNMENT FAILED TO CORRECT FALSE TESTIMONY BY ITS WITNESS LARRY NICHOLS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS**

300. The Government failed to correct false testimony by its jailhouse informant witness Larry Nichols in violation of the Fifth, Sixth, and Eighth Amendments.

301. During his testimony at Mr. Hall's trial, Nichols made at least two statements of material fact which were directly and irreconcilably contradicted by statements of material fact he had earlier made in his testimony in his own case, United States v. Miller and Reliford, No. CR3-94-343-G (N.D. Tex.), tried in the same District Court and prosecuted by the same U.S. Attorney's office.

302. First, in Mr. Hall's trial, Nichols was asked by defense counsel whether "some inmates out there at Mansfield" had "helped" Nichols to "know how to take certain steps to help [himself] in the legal system." R. 31:257. Nichols denied it. *Id.* Counsel twice repeated the same inquiry, "in the trial you testified in in Dallas, did you say there was some inmates out there that helped you learn to take steps to help yourself?" R. 31:257. Nichols repeated his denials. *Id.* Defense counsel did not impeach Nichols.

303. The transcript of Nichols' testimony from the Dallas trial establishes that Nichols explicitly admitted in that proceeding that when he wrote his co-defendant Miller and asked Miller to sign a false affidavit exculpating Nichols, he was following the advice of other prisoners at Mansfield. Exhibit 31 (Excerpts from trial testimony of Larry D. Nichols from United States v. Miller and Reliford, No. CR3-94-343-G (N.D. Tex.)) at 9 (Nichols admitting that, in attempting to influence his co-defendant to lie for his benefit, he was "going by things that guys in [jail] told me. Steps to go by."). Nichols also admitted in that trial that he had gone "to the law library" for information and was getting "advice from [his] fellow inmates" about how to "get out of this jam." *Id.* at 151. Nichols repeated substantially the same admission *seven different times* during his testimony in the Dallas trial. *Id.* at 9; 151; 6 (Nichols told his co-defendant to keep mum because that was what the "guys at Mansfield told me to tell him"); 11 (Nichols asked co-defendant for a false exculpatory affidavit based on what Nichols had heard "inside the jail cells at Mansfield"); 13 (Nichols followed this plan because of "guys in [his] cell" who were "filling [his] head with things"); 153 (Nichols sought the false affidavit from his co-defendant at the urging of "guys in the prison system filling [his] head with all kinds of deals"); 190 (Nichols was

taking cues from "jail house lawyers").

304.  Second, in Mr. Hall's trial Nichols was asked by defense counsel whether he had "used some of that money [from the robberies he committed with his co-defendants in the Dallas case] to buy some drugs for resale."  R. 31:252.  Nichols answered, "No." *Id.* Counsel persisted, asking whether Nichols "ever told anyone that [he] used some of that money [obtained in the robberies] to buy drugs with to resell the drugs?" *Id.*  Nichols' answer: "No, I didn't."  *Id.*  Counsel asked Nichols whether he was "sure about that," and Nichols answered, "Positive." *Id.*  Counsel did not impeach Nichols.

305.  The transcript of Nichols' testimony from the Dallas trial squarely demonstrates that Nichols testified falsely in Mr. Hall's trial.  In the Dallas trial, Nichols admitted that he purchased and re-sold illegal drugs with his part of the proceeds from the robberies, and in fact that he did so "*after every robbery*."  Exhibit 31, at 23-24  (Question by the Government: "Did you buy any drugs with the money that you robbed for?"  Answer by Nichols: "Yes."  Question by the Government: "What drugs did you buy?"  Answer by Nichols: "Marijuana."  Question by the Government: "And what did you do with that marijuana?"  Answer by Nichols: "Sold it and also used it."  Question by the Government [after a colloquy between the Court and counsel]: "When did you buy these drugs?"  Answer by Nichols: "After every robbery.").

306.  The record before the Court demonstrates that in Mr. Hall's trial, Nichols testified falsely concerning these matters of material fact.  The prosecutors in Mr. Hall's trial had either actual or constructive knowledge that this testimony was false, by virtue of their own familiarity with Nichols' prior testimony, their privity with the prosecutors who actually tried the Dallas case,

and/or the knowledge of investigative agents acting under the direction of one or both groups of AUSAs. The prosecuting authority in both matters (<u>Miller and Reliford</u> in the Dallas Division and <u>Hall</u> in the Fort Worth Division) was the United States Attorney for the Northern District of Texas, and as a result the AUSAs prosecuting Mr. Hall are, at a minimum, legally responsible for the knowledge of the other members of their office who prosecuted Miller and Reliford and sponsored Nichols as a witness in doing so.

307. The prosecutors' failure to correct Nichols' false testimony at the penalty phase of Mr. Hall's trial violated due process. <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935); <u>Napue v. Illinois</u>, 360 U.S. at 264 (1959). *See also* <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Due process was also violated because Nichols' testimony left a materially false impression with the jury, and the prosecution knew that impression was false. <u>See</u> <u>Miller v. Pate</u>, 386 U.S. 1 (1967); <u>Alcorta v. Texas</u>, 355 U.S. 28 (1957). Nichols' false testimony in Mr. Hall's trial was material, because there is some reasonable likelihood that the false testimony could have affected the judgment of the jury about whether a death sentence was warranted for Mr. Hall. <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976). For all the foregoing reasons, relief is warranted.

## VIII.

### THE GOVERNMENT USED JAIL INMATE LARRY NICHOLS TO ELICIT INFORMATION FROM MR. HALL, IN VIOLATION OF THE SIXTH AMENDMENT

308. Jailhouse informant Larry Nichols, at the direction or with the encouragement of Government agents, elicited information from Mr. Hall outside the presence of Mr. Hall's attorneys and without a waiver of Mr. Hall's Sixth Amendment right to counsel. Statements obtained thereby

were introduced against Mr. Hall at trial, in violation of the Sixth Amendment.

309.    On February 28, 1995, Nichols had an in-court conversation with FBI Special Agent Arthur Grovner, in which Nichols allegedly told Grovner that Mr. Hall had previously confided to Nichols that he was planning an escape from custody while being transported from Mansfield Correctional Center to court.  *See* Exhibit 1 (FBI-302 concerning February 28, 1995 conversation between Grovner and Nichols).

310.    Upon information and belief, during that in-court conversation SA Grovner encouraged, urged, directed, counseled, or otherwise instructed Nichols to continue his conversations with Mr. Hall and to obtain additional information about Mr. Hall's alleged plans to escape.  If SA Grovner did not directly advise or instruct Nichols to take such steps, he made statements to Nichols which communicated to Nichols that it would benefit Nichols to obtain additional information regarding  Mr. Hall's alleged escape plans, and did so with the expectation that his statements would prompt Nichols to seek to obtain such information from Mr. Hall.   Nichols also had other contacts with Government agents, in person or by telephone, in which it was similarly suggested to Nichols that he should seek to obtain additional information regarding Mr. Hall's alleged escape plans.

*311.*    Between February 28, 1995, and March 5, 1995 (the day before Nichols was fully debriefed by AUSAs and other FBI agents concerning his knowledge of Mr. Hall's alleged escape plans), Nichols had conversations with Mr. Hall in which Nichols either directly questioned Mr. Hall, or made statements or took other actions which were reasonably likely to, and did, elicit incriminating statements from Mr. Hall.

*312.* Because Mr. Hall never waived his Sixth Amendment right to counsel prior to being interrogated or otherwise questioned or prompted for information by Nichols, and Mr. Hall's attorneys were not present during Nichols' attempts to elicit information from Mr. Hall, the admission of Mr. Hall's statements at the sentencing phase of trial violated the Sixth Amendment. Massiah v. United States, 377 U.S. 201 (1964); Maine v. Moulton, 474 U.S. 159, 176 (1985); Brewer v. Williams, 430 U.S. 387 (1977). Because the illegally obtained statements allegedly made by Mr. Hall were material to the jury's decision to sentence him to death, Mr. Hall's death sentence must be reversed.

## IX.

**MR. HALL'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE GOVERNMENT PROFFERED AN FBI 302 CONTAINING FALSE INFORMATION TO DETER THE DEFENSE FROM CALLING A WITNESS WHO WOULD HAVE DYNAMITED THE CREDIBILITY OF STAR WITNESS LARRY NICHOLS**

313. At punishment, the Government's star witness was jail inmate Larry Nichols, who testified regarding statements he alleged Mr. Hall made to him while both were incarcerated at Mansfield Correctional Center in early 1995.

314. Nichols claimed to have befriended Mr. Hall at Mansfield sometime in late February 1995. 31:215-219. According to Nichols, Mr. Hall bragged about having raped Lisa Rene, boasting that he "used 100 rubbers on her." 31: 219-222. Mr. Hall was "macho and proud about it." *Id*. Mr. Hall also expressed his intent to kill Steve Beckley, whom he called a "bitch." Id. Mr. Hall talked about dope deals he had done in Houston and Arkansas, including "beating a drug dealer out of some money" and paying someone to leave town in Arkansas so that robbery charges

against Mr. Hall would be dropped. *Id.*

315. Nichols further claimed that Mr. Hall also referred to LaTonya Anders, his girlfriend and the mother of his child, as a "bitch," and that Mr. Hall talked about "beating up on" other girls. 31:222-223.

316. Nichols detailed Mr. Hall's alleged plans to escape from custody. 31:224-227. He claimed Mr. Hall had said that "coming [from] the Fort Worth courtroom to the car, it [would be] easy to escape, because they only handcuff you on your hands." *Id.* Hall also said it would be easy to "escape from the attorney room" by "holding somebody hostage," namely, "his lawyer." *Id.* Mr. Hall supposedly told Nichols that "if his lawyers came to see him, [he]would try to escape," armed with a "piece of metal," a "homemade knife" called a "shank," by "putting it on his [lawyer's] neck." *Id.* Nichols also claimed Mr. Hall talked of taking a female guard hostage. *Id.*

317. Nichols related that inside the "zone," *i.e.*, the common area to which all inmates in the same part of the Mansfield facility had access, there were two "shanks," one short and the other long. *Id.* The short one, he claimed, was "real, real sharp at the edge of it." *Id.* Nichols claimed Mr. Hall had also declared that if he were "found guilty of the crimes," he would "hold [the] judge hostage, also," and "attempt to stab the judge." 31:228-231. Nichols said he'd seen Mr. Hall remove one shank from its hiding place and then put it back. *Id.* He also claimed he'd seen Mr. Hall sharpening one of the shanks on the concrete ceiling, and that Mr. Hall told him he would use the short shank to take a guard hostage or attack his lawyer. 31:231-35.

318. Nichols testified that at some point, he told FBI agent Art Grovner about the information he had. 31:235-38. He claimed that he later met with a federal prosecutor and was placed in

protective custody the next day. *Id.*

319.    On October 22, 1995, defense investigator Tena Francis interviewed Alonzo Airy, another inmate from the same tank where Nichols and Mr. Hall had been incarcerated. In that interview, Airy told Francis that Mr. Hall never discussed any escape plan and that Mr. Hall was extremely remorseful -- indeed, suicidal -- in jail. Exhibit 7, ¶ 11. Airy also provided Francis a great deal of information about how Nichols was constantly discussing his desire for a 5K1.1 reduction in his sentence, bragging about how easy it was for an inmate to lie about other inmates in order to get a 5K1.1, and observing that Mr. Hall's case was viewed by a number of conniving inmates as their "get out of jail free" card, since the case was so important to the Government. *Id.* Airy had previously testified as an impeachment witness against Nichols, and Francis had been informed by the federal public defender who used Airy that he was unshakeable as a witness. *Id.* Based on Francis' interview with Airy, defense counsel intended to call Airy to rebut Nichols' claims.

320.    However, on November 2, the next morning after Nichols finished his testimony, the Government moved the Court for permission to add Airy to its own witness list, and proffered to the defense an FBI-302 (report of investigation) purporting to describe an interview with Mr. Airy on 10/30/95 by FBI Special Agent (SA) Paul Shannon and AUSA Paul Macaluso. According to this FBI-302, Mr. Airy was prepared to testify to numerous damaging facts about not Nichols, but Mr. Hall, including:

- that Mr. Hall was "a remorseless and extremely cold individual" with a "gangster attitude;"

- that Mr. Hall's co-defendants were "his followers" and that "he was the big man in the operation;"

- that Mr. Hall "would like to kill the brothers of the girl he had killed;"

- that Mr. Hall said he "killed the bitch" and (twice) that he would "kill her again;"

- that Mr. Hall used vulgar language in describing how he sexually abused the victim, stating that he "fucked the bitch" and that she "sucked dick;"

- that Mr. Hall wanted to kill Steven Beckley, whom Hall described as "a snitch;"

- that Mr. Hall wanted to kill his present girlfriend, to whom he referred as "a bitch;"

- that Mr. Hall spoke about escape plans, including a plan to abduct his attorney or a jail guard in order to make an escape;

- that he saw Mr. Hall in possession of a "shank, a crude knife made from a pen," and that Mr. Hall "had access to at least one other object that could have been a weapon;"

- that he could provide no information suggesting that Nichols was a liar and no positive information whatsoever concerning Mr. Hall.

Exhibit 39 (FBI-302 re: Alonzo Airy, dated 10/30/95).

321. Defense counsel immediately objected to the Court's allowing the Government to call Airy as its own witness. R. 32: 4-14. After some discussion, the Court denied the Government's motion to add Airy to its witness list. R. 32:14 Defense counsel thereafter did not interview Airy about why he had apparently completely changed his version of events.

322. In a sworn statement, obtained by Mr. Hall's current counsel, however, Alonzo Airy maintains he never made the statements alleged in the 302 which the Government brandished before defense counsel in court. *See* Exhibit 40 (Affidavit of Alonzo Airy). The details of Airy's sworn account are worth reviewing in full:

I did not tell the federal agents [who interviewed me] that Orlando Hall was remorseless or an extremely cold individual. I did not say that Hall saw nothing

wrong with going out and getting someone if that person took his money. I did not say that Hall believed it was absolutely necessary to go after someone who had ripped you off. The reason I did not tell the agents these things is because Hall never said any of those things to me.

I did not tell the federal agents that Hall told me that the other people involved in the kidnapping and subsequent murders were his followers. The reason I did not tell the agents this is because Hall never said it to me.

I did not tell the federal agents that Hall told me he wanted to kill the brothers of the victim in his case. I did not tell the federal agents that Hall told me he had "killed the bitch" or that if he had it to do over, he would "kill her again." I did not tell the federal agents that Hall expressed no remorse. The reason I did not tell the agents these things is because Hall never said any of them to me. The truth was that I never heard Orlando Hall brag about the crime or make light of it in any way. Based on the way Orlando Hall discussed the crime, it was my impression that he was truly sorry for what happened to the victim. In my opinion, it was eating him up inside.

I did not tell the federal agents that Hall told me he had sex with the victim in his case. I did not tell the federal agents that Hall told me that the victim had "sucked dick" or that he had "fucked the bitch." The reason I did not tell the agents these things is that Hall never said either of them to me.

I did not tell the federal agents that Hall told me he wanted to kill a member of his gang named Beckley. I did not tell the federal agents that Hall told me that Beckley was a "snitch" or that if he had known Beckley were going to "snitch," he would have killed Beckley at the gravesite along with the victim. The reason I did not tell the agents these things is because Hall never said any of them to me.

I did not tell the federal agents that Hall told me about escape plans. I did not tell the federal agents that Hall talked about abducting his attorney or a jail guard to make an escape. I did not tell the agents that Hall talked about killing his attorney. The reason I did not tell the agents these things is because Hall never said any of them to me.

I did tell the federal agents that I believed Larry Nichols would lie if he felt it would help himself.

While we were in jail together, I heard Nichols brag on many occasions about how he was able to manipulate his co-defendant, Vernon Miller, into committing the bank robberies they were both charged with. Nichols also stated to me that he intended to attempt to obtain a 5K1 motion by telling the Government that Miller's mother and girlfriend had received some of the money stolen in the robberies Nichols and Miller

committed. I believed Nichols was following through on his plan to obtain a 5K1 motion, because he was taken out of his cell several times to speak to Government representatives.

I was not asked by the federal agents to provide any information that could have put Orlando Hall in a positive light.

If I had been asked by the federal agents to provide any such information, I would have told them [that] Orlando Hall was truly sorry for what he had done and that I believed it was eating him up inside. He even talked a lot about committing suicide.

I was never asked by the federal agents who interviewed me to review their notes or any written statement based on their interview with me. I did not sign anything. I was not given a copy of any report produced by the agents concerning their interview with me in October, 1995.

I was never shown a copy of the federal agents' report of their interview with me in October, 1995. I was never asked by Orlando Hall's attorneys whether the statements in the federal agents' report were true.

Exhibit 40.

323. The statements in the Government's FBI-302 regarding Airy are false. The Government relied on the false allegations in Exhibit 39 to panic defense counsel into opposing the Government's request to call Airy as a witness, and into discarding their own plan to call Airy to rebut Nichols. The Government's actions violated Mr. Hall's Fifth Amendment right to due process, his Sixth Amendment right to a fair trial, and his Eighth Amendment right not to be subjected to cruel and unusual punishment.

## X.

### THE GOVERNMENT INTERFERED WITH MR. HALL'S RIGHT TO COUNSEL, IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS, BY PROMOTING THE FALSE ACCUSATIONS OF LARRY NICHOLS

324. As a result of the Government's promoting the false accusation by Larry Nichols that Mr. Hall was planning an escape attempt, Mr. Hall's right to counsel was arbitrarily interfered with. Mr. Hall's original attorneys, Mark G. Daniel and Michael Heiskell, with whom Mr. Hall had a good working relationship and in whom he had confidence, and who were, in fact, working diligently to investigate his case (work which came to a halt with their withdrawal and did not resume for several months), were induced to withdraw from representing Mr. Hall as a result of the Government's actions. The Government's interference with Mr. Hall's right to counsel violated the Fifth and Sixth Amendments.

325. Upon information and belief, the Government had reason to believe, at the time the Government communicated Larry Nichols' story to Mr. Hall's attorneys, that Nichols was an unreliable witness. This information about Nichols' lack of reliability was not communicated to Mr. Daniel or Mr. Heiskell. If Mr. Hall's attorneys had received true and complete information about Nichols' credibility at the time the Government communicated the story that Nichols later told at trial, Mr. Hall's attorneys would not have been persuaded of the truth of Nichols' claims regarding Mr. Hall and would not have moved to withdraw. Counsel would have continued to represent Mr. Hall; had the Government persisted in presenting Nichols as a witness at Mr. Hall's trial, defense counsel's continued presence on the case would have effectively communicated to the jury that Nichols' wild claims were false.

326. The Government's failure to communicate true and complete information about the reliability of Larry Nichols -- with the result that Mr. Hall's attorneys were misled into believing that Mr. Hall posed a genuine threat to their safety, destroying their relationship with him and leading

them to withdraw from the case -- violated Mr. Hall's rights under the Fifth and Sixth Amendments.

**XI.**

**THE FEDERAL DEATH PENALTY, AS ADMINISTERED BY THE GOVERNMENT, VIOLATES THE FIFTH AND EIGHTH AMENDMENTS.**

327. Sixteen years ago, the federal death penalty was reintroduced; in the eight years since Mr. Hall was indicted in this matter, it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel (FDPRC) as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the defendant's race, in violation of equal protection and the Eighth Amendment. *See* Exhibit 50 (Affidavit of Kevin McNally, dated 5/12/00). The statistics maintained by FDPRC indicate the following:

- Of the one hundred and ninety-nine (199) individuals against whom the DOJ has authorized or directed local authorities to seek the death penalty, seventy-six percent (76%) are non-white and fifty-two percent (52%) are black;

- The death penalty is authorized by DOJ more than three times as often against non-whites as against whites; the death penalty is authorized by DOJ more than twice as often against blacks as against whites;

■ Of those cases for which DOJ has authorized the death penalty to be sought, 47.5% of all white defendants obtain a plea resulting in a sentence less than death, while only 27.2% of all blacks are permitted to plead to sentences less than death and only 29.1% of non-whites as a whole are permitted to plead guilty in exchange for a sentence less than death;

■ White defendants thus receive non-death sentences in exchange for pleas at 1.7 times the rate of black defendants and 1.65 times the rate of non-white defendants as a whole;

■ There are three times as many blacks, and four times as many non-whites, as whites among the condemned on the federal death row.

328. These numbers create a startlingly strong inference that Government decisions regarding who will face the death penalty — at both the selection stage and the plea bargaining stage — are impermissibly influenced by the race of the defendant. The disparate impact of these decisions is clear — despite the fact that whites are arrested for homicide in roughly the same numbers as blacks, they occupy only twenty percent of those condemned to die under federal law, while blacks account for sixty percent of federal death row.

329. Prior to trial, Mr. Hall filed a "Motion to Dismiss the Government's Request for the Death Penalty Because of Racial Discrimination in Capital Charging by the Government and Request for Discovery of Information Pertaining to the Government's Capital Charging for Purposes of an Evidentiary Hearing." Docket No. 187; R. 1:225-30. The Government opposed the motion, arguing in part that "no one has actually been prosecuted under the newly enacted Federal Death Penalty Act. Moreover, the number of federal prosecutions, including the drug-related death penalty cases, is so small as to make any such argument speculative." R. 4:831. This Court

denied the motion on September 7, 1995, "for the reasons urged in the government's response to the motion." R. 4:932.

330. The current statistics regarding the application of the federal death penalty constitute new evidence that warrants revisiting this claim. It is no longer possible to dismiss this claim on the basis that the "small" number of cases renders statistical disparities inconsequential. Although a racially disproportionate pattern of capital charging, standing alone, is insufficient to demonstrate purposeful discrimination on the basis of race, <u>McCleskey v. Kemp</u>, 482 U.S. 920 (1987), the numbers here warrant discovery concerning the Government's authorization process and plea bargaining decisions. *See* <u>United States v. Bass</u>, 266 F.3d 532 (6th Cir. 2001) (no abuse of discretion in ordering discovery on claim that race played role in deciding which defendants were charged with death-eligible offenses); *see also* <u>East v. Scott</u>, 55 F.3d 996, 1001-02 (5th Cir. 1995) (district court must order discovery in habeas proceeding if such discovery is essential to the full development and fair consideration of the material facts of the petitioner's claims for relief). Moreover, at least with respect to the authorization process, this case is materially distinguishable from <u>McCleskey</u>. There, the analysis of prosecutorial decisions to seek the death penalty surveyed the decisions not of a single governmental body, as is the case here, but of the multiple prosecuting authorities in the State of Georgia. This distinction alone renders the numbers revealed by the attached statistics all the more probative of discrimination. The Court should grant relief from Mr. Hall's death sentence because the Government's charging and plea practices are influenced by the race of defendants and victims, in violation of the Fifth, Eighth, and Fourteenth Amendments.

**XII.**

**MR. HALL'S DEATH SENTENCE IS BASED ON MATERIALLY FALSE OR INACCURATE INFORMATION, IN VIOLATION OF THE EIGHTH AMENDMENT**

331. The Eighth Amendment forbids basing a death sentence on materially false or inaccurate information. The Supreme Court has held that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a *special need for reliability* in the determination that death is the appropriate punishment in any capital case." Johnson v. Mississippi, 486 U.S. 578, 584 (1988) (citations and internal quotations omitted; emphasis added). Accordingly, while there is no "perfect procedure for deciding in which cases governmental authority should be used to impose death," the Court "[has] made it clear that such decisions *cannot be predicated [on] factors that are constitutionally impermissible or totally irrelevant* to the sentencing process." *Id.* (emphasis added).

332. In Johnson, the Court reiterated that one such "constitutionally impermissible" factor is materially false or inaccurate information. That recognition reflected a principle established in the law at least since Townsend v. Burke, 334 U.S. 736 (1948) (due process requires resentencing where "materially untrue" allegations form part of the basis for the defendant's sentence), and which had been forcefully restated on numerous occasions since Townsend. *See, e.g.,* United States v. Tucker, 404 U.S. 443 (1972*). See also, e.g*., Roussell v. Jeane, 842 F.2d 1512, 1524 (5th Cir. 1988) (where "the sentencing authority relies on incorrect or unsupported assumptions [and] such reliance is manifest in the record due process requires that the defendant

be resentenced," citing <u>Tucker</u>); <u>Bourgeois v. Whitley</u>, 784 F.2d 718, 721 (5th Cir. 1986) (due process entitles defendant to resentencing if court is "unable to find that the invalid [prior] convictions did not influence" the sentence imposed for a subsequent offense, citing <u>Tucker</u>).

333. This Circuit has endorsed the principle that due process is violated, even in a non-capital case, where "the sentence rests on a foundation of confusion, misinformation, and ignorance of facts . . . ." <u>United States v. Espinoza</u>, 481 F.2d 553, 556-557 (5th Cir. 1973) (quoting, with approval, <u>United States v. Malcolm</u>, 432 F.2d 809, 816 (2nd Cir. 1970)). "If justice is to be done, [the sentencer] should know all the material facts," because the "[f]air administration of justice demands that the sentencing judge will not act on surmise, misinformation and suspicion. . . ." *Id*. The <u>Malcolm</u> court put it succinctly: "[M]aterial false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." <u>Malcolm</u>, 432 F.2d at 816 (citing <u>Burke</u>).

334. As Mr. Hall has demonstrated elsewhere in this petition, material portions of the testimony of Government witness Larry Nichols were false. *See* Claim III, *supra*. All factual allegations made in support of that ground for relief, or made anywhere else in this petition, asserting that Nichols' testimony at Mr. Hall's trial was false and/or unreliable are incorporated here by reference as if set forth fully. Mr. Hall's death sentence, because it is based in full or in part on Nichols' false and/or fundamentally unreliable testimony, violates the Eighth Amendment.

335. In addition, Mr. Hall's death sentence is based in part on assumptions or assertions about his role in the kidnapping and death of Lisa Rene, made by Government witnesses, which were materially false or unreliable. Upon information and belief, key Government witness Steven

Beckley has made statements since the conclusion of Mr. Hall's trial which strongly suggest that Beckley's testimony about his own role in the offense was materially misleading, *i.e.*, that Beckley "set up" Webster and Mr. Hall, by cooperating with the Government and testifying falsely that Mr. Hall was the leader in the events that led to Lisa Rene's death. Mr. Hall's death sentence, because it is based in full or in part on Beckley's false and/or fundamentally unreliable testimony, violates the Eighth Amendment.

## CONCLUSION and PRAYER FOR RELIEF

Wherefore, Defendant ORLANDO CORDIA HALL respectfully prays that this Court

1.  Vacate his unlawfully obtained death sentence;

2.  Order that Mr. Hall be relieved from the illegal restraint of his liberty, such restraint being founded upon an unlawful and unconstitutional conviction and sentence;

3.  Permit Mr. Hall to file such amendments to this Motion as might be necessary to bring all proper matters before the Court and avoid piecemeal litigation of his challenges to the legality and constitutionality of his death sentence;

4.  Grant Mr. Hall an evidentiary hearing on all claims raised herein;

5.  Pursuant to Rule 6 of the Rules Governing Section 2255 Cases in the United States District Courts, grant Mr. Hall leave to pursue such discovery as would be available under the Federal Rules of Civil Procedure, pending a hearing on his claims; and

6.  Grant such other relief as law and justice require.

### RESPECTFULLY SUBMITTED,

Pursuant to 28 U.S.C. § 1746, the undersigned declare under penalty of perjury that the foregoing is true and correct to the best of their knowledge and belief.

Executed on September 16, 2002.

ROBERT C. OWEN
Texas Bar No. 15371950
510 South Congress Avenue, Suite 308
Austin, Texas 78704
512-320-0334 voice
512-320-8027 fax

_with express permission_

MARCIA A. WIDDER
Louisiana Bar No. 23367
636 Baronne Street
New Orleans, Louisiana 70113
504-529-5955 voice
504-558-0378 fax

COUNSEL FOR ORLANDO CORDIA HALL

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Second Amended Motion Of Orlando Cordia Hall To Vacate Conviction And Sentence And For New Trial Pursuant To 28 U.S.C. § 2255 And Rule 33 Of The Federal Rules Of Criminal Procedure*, with two volumes of Exhibits, was served on counsel for the United States by being placed into the United States Mail, first-class postage pre-paid, addressed to:

Office of the United States Attorney
801 Cherry Street, Suite 1700
Fort Worth, Texas, 76102

on the 18th day of September, 2002.

Robert C. Owen

# Exhibit 3

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 2 4 2004

CLERK, U.S. DISTRICT COURT
BY _____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| ORLANDO CORDIA HALL, | § |
|     Petitioner, | § |
| VS. | § CIVIL ACTION NO. 4:00-CV-422-Y |
| | § (Criminal No. 4:94-CR-121-Y) |
| UNITED STATES OF AMERICA, | § |
|     Respondent. | § |

MEMORANDUM OPINION AND ORDER
DENYING AMENDED MOTION TO VACATE CONVICTION AND SENTENCE

Petitioner Orlando Cordia Hall (Hall) is a federal prisoner under a death sentence who, having been being convicted of capital murder in this Court, has filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255. The government filed a brief opposing the motion and Hall replied. The Court denies Hall's motion.

I

*History of the Case*

On October 31, 1995, because of Hall's involvement in the kidnapping and death of Lisa Rene, a sixteen-year-old high-school student, a jury convicted Hall of kidnapping in which a death occurred, conspiracy to commit kidnapping, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and carrying a firearm during a crime of violence. After a subsequent punishment hearing, the jury, after finding certain aggravating and mitigating factors to be present, recommended, by a unanimous vote, that Hall receive the death penalty. This Court formally imposed

1

Certified a true copy of an instrument
on file in my office on 8/24/04
Clerk, U.S. District Court,
Northern District of Texas
By _____ Deputy

the death penalty on February 12, 1996.  The case was appealed to
the Fifth Circuit Court of Appeals, which affirmed Hall's conviction
and sentence. *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998),
*cert. denied*, 526 U.S. 1117 (1999).

Hall filed an initial motion to vacate in May 2000.  In June,
this Court granted Hall's request to file a discovery motion, and
Hall filed a motion for discovery in August and a supplemental motion
for discovery in May 2001.  In April 2002, this Court denied his
motions for discovery. Hall then filed an amended motion to vacate
in June and a second amended motion to vacate in September 2002.
The government filed its response in January 2003, and Hall filed
a reply in March.  This Court conducted an evidentiary hearing on
June 7, 2004, regarding Hall's third through fifth claims for relief.

The Fifth Circuit Court of Appeals recited the following factual
background in its opinion on direct appeal:

> Orlando Cordia Hall, along with Bruce Webster and
> Marvin Holloway, ran a marijuana trafficking enterprise
> in Pine Bluff, Arkansas. They purchased marijuana in
> varying amounts in the Dallas/Fort Worth area with the
> assistance of Steven Beckley, who lived in Irving, Texas.
> The marijuana was transported, typically by Beckley, to
> Arkansas and stored in Holloway's house.
> On September 21, 1994, Holloway drove Hall from Pine
> Bluff to the airport in Little Rock, Arkansas, and Hall
> took a flight to Dallas, Texas to engage in a drug
> transaction.  Beckley and Hall's brother, Demetrius Hall
> (D. Hall), picked up Hall at the airport. Later that day,
> Hall and Beckley met two local drug dealers, Stanfield
> Vitalis and Neil Rene (N. Rene), at a car wash and gave
> them $4700 for the purchase of marijuana.  Later that day,
> Beckley and D. Hall returned to the car wash to pick up
> the marijuana, but Vitalis and N. Rene never appeared.
> Later, when Hall got in touch with Vitalis and N. Rene by

2

telephone, they claimed they had been robbed of the $4700. Using the telephone number that Beckley had used to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car that they had driven to the car wash, which they claimed was stolen from them along with Hall's $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about having been robbed.

On September 24, 1994, Hall contacted Holloway and had him drive Webster to the Little Rock Airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and Webster returned to the Polo Run Apartments in a Cadillac Eldorado owned by Cassandra Ross, Hall's sister. Hall and Webster were each armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. The four men approached the apartment that they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door of the apartment and knocked. The occupant of the apartment, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and 911. After Webster unsuccessfully attempted to kick in the door, he and D. Hall went around to a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the glass door with his baseball bat, Webster entered the apartment, tackled Lisa Rene, and dragged her to the car.

Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving, Texas. Once there, they exited the Cadillac and forced Lisa Rene into the backseat of Beckley's car. Hall got into the backseat as well. Beckley got in the driver's seat, and Webster got in the front passenger seat. The group then drove off again. During the drive, Hall raped Lisa Rene and forced her to perform oral sex on him. The group later returned to Ross's apartment.

From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. Once Beckley, D. Hall, and Webster reached Pine Bluff, they obtained money from Holloway to get a motel room. In the motel room, they tied Lisa Rene to a chair and raped her repeatedly.

3

Hall and Holloway arrived at the motel room on Sunday morning, September 25, 1994.  They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes. When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much." Hall, Holloway, and Webster then left the motel.

Later that afternoon, Hall and Webster went to Byrd Lake Park and dug a grave.  That same evening, Hall, Webster, and Beckley took Lisa Rene to Byrd Lake Park, but could not find the grave site in the dark.  They then returned to the motel room.  In the early morning of Monday, September 26, 1994, Beckley and D. Hall moved Lisa Rene to another motel because they believed that the security guard at the first motel was growing suspicious.

Later the same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park.  Lisa Rene's eyes were covered by a mask.  Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders.  At the grave site, Hall turned Lisa Rene's back toward the grave and placed a sheet over her head.  He then hit her in the head with a shovel.  Lisa Rene screamed and started running.  Beckley grabbed her, and they both fell down.  Beckley then hit Lisa Rene in the head twice with the shovel and handed it to Hall.  Webster and Hall then began taking turns hitting her with the shovel.  Webster then gagged Lisa Rene and dragged her into the grave.  He covered her with gasoline and shoveled dirt back into the grave.  Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

On September 29, 1994, an arrest warrant issued out of the City of Arlington for Hall, D. Hall, and Beckley for Lisa Rene's kidnapping. D. Hall, Beckley, and Webster were subsequently arrested. On September 30, 1994, Hall surrendered to Pine Bluff authorities in the presence of his attorney.  On the advice of counsel, he did not give a statement at the time of his arrest, but indicated that he would talk with law enforcement agents after he was transported to Texas.  On October 5, 1994, following his transfer to the Arlington County jail, Hall gave a written statement to FBI and Arlington County officials in which he substantially implicated himself in the kidnapping and murder.

*Hall*, 152 F.3d at 389-90.

4

## II.

### *Standard of Review*

Title 28, U.S.C. § 2255 provides that a federal prisoner may move the convicting court to vacate, set aside, or correct a conviction or sentence based on its being imposed in violation of the Constitution or the laws of the United States. *See* 28 U.S.C. § 2255. A petition under § 2255 "may not do service for an appeal," and it is presumed that a defendant stands fairly and finally convicted. *United States v. Shaid*, 937 F.2d 228, 231-32 (5ᵗʰ Cir. 1991) (en banc), *citing United States v. Frady*, 456 U.S. 152, 164 (1982). Therefore a defendant may not raise even constitutional or jurisdictional issues for the first time on collateral appeal without establishing both cause for failing to raise the issue on direct appeal and actual prejudice resulting from the error. *Id.* A defendant must meet this cause-and-prejudice standard even where he alleges a fundamental constitutional error. *Id., citing Murray v. Carrier*, 477 U.S. 478, 493 (1986). Other types of error may be raised for the first time under § 2255 only if the defendant establishes that the error could not have been raised on direct appeal *and*, if the error were condoned, it would result in a complete miscarriage of justice. *United States v. Pierce*, 959 F.2d 1297, 1301 (5ᵗʰ Cir. 1992).

Moreover, claims that were also raised, and rejected, on direct appeal are also barred from federal habeas review. *United States v. Rocha*, 109 F.3d 225, 229 (5ᵗʰ Cir. 1997). A federal habeas petitioner

5

cannot, however, be expected to have raised a claim based on a Supreme Court case before that case was handed down. *Id.*  Furthermore, ineffective assistance of counsel on appeal does satisfy the cause-and-prejudice standard. *Id.*  And, finally, the Supreme Court has recently held that claims that counsel was ineffective at trial can be raised on habeas review under § 2255 regardless of whether or not the claims were previously raised on direct appeal. *United States v. Massaro*, 538 U.S. 500, 123 S.Ct. 1690, 1693-94, 155 L.Ed.2d 714 (2003).

## III

### *Issues Presented*

In his second amended motion to vacate his conviction and sentence, Hall raises the following nine issues in twelve claims for relief:

A.  Hall's rights under the Fifth Amendment were violated because the indictment against him did not allege any aggravating factors that rendered Hall eligible for the death penalty (claim one).

B.  Hall was denied his Sixth Amendment right to the effective assistance of counsel (claim two).

C.  A juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated Hall's rights under the Fifth, Sixth, and Eighth Amendments. (claims three through five).

D.  The government violated Hall's rights under the Fifth and Sixth Amendments by failing to disclose exculpatory and mitigating information concerning government witness Larry Nichols (claim six).

6

E.  Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated because of false testimony given by government witnesses Larry Nichols and Steven Beckley (claims seven and twelve).

F.  The government violated Hall's Sixth Amendment rights by using jail inmate Larry Nichols to elicit information from Hall(claim eight).

G.  Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated when the government provided a statement to the defense made by Alonso Airy that contained false information for the purpose of dissuading the defense from calling Airy to the stand(claim nine).

H.  The government interfered with Hall's Sixth Amendment right to counsel when it advised his initial defense attorneys about information that Hall intended to kidnap the attorneys in an escape attempt (claim ten).

I.  Hall's rights under the Fifth And Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme (claim eleven).

Hall also requests an evidentiary hearing before this Court on all of his claims.

## IV

### *Procedural Bars*

In its response to Hall's petition, the government asserts procedural bars to this Court's consideration of many of the claims that Hall raises in his petition.  The government asserts that Hall is procedurally barred from raising all but his second and part of his third through fifth claims for relief because the claims were

7

not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default.

In his reply, Hall asserts that these claims are not procedurally barred from this Court's review because the claims are based on new factual or legal bases.  Hall further asserts that he can establish cause and prejudice to overcome any procedural bar because his counsel were ineffective on direct appeal.  With respect to Hall's third through fifth, and ninth through eleventh claims for relief, this Court agrees that these claims are based on new facts not previously available to Hall, including affidavits obtained from various individuals during the habeas process. Specifically, Hall's eleventh claim, a selective-prosecution claim, is based on statistics that were not available at the time of his trial or appeal.  Moreover, Hall's first claim for relief is based on cases decided by the Supreme Court after Hall's direct appeal was final.  Accordingly, none of these claims are procedurally barred from habeas review.  Furthermore, as noted earlier, Hall's second claim for relief, alleging numerous ineffective-assistance-of-counsel claims, is cognizable on habeas relief.  Finally, in the interests of justice, this Court will address Hall's sixth, seventh, eighth, and twelfth claims, although they were not raised on direct appeal and are not based on new law or facts, as Hall has alleged that his appellate counsel was ineffective for not raising these claims.

8

**V**

***Discussion of Claims***

**A.   <u>Ring v. Arizona Claim</u>**

In his first claim for relief, Hall contends that his conviction and death sentence violate the Fifth Amendment.  Specifically, Hall asserts that, under the Supreme Court's recent cases *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the indictment against him violated his Fifth Amendment rights because it did not allege the aggravating circumstances and the culpable mental state that made Hall eligible for the death penalty under the Federal Death Penalty Act (FDPA).  The government responds that Supreme Court precedents do not require that these things be alleged in the indictment and that, in any event, this claim is unavailable to Hall at the habeas level because it is barred by *Teague v. Lane*, 489 U.S. 288, 310 (1989).

*Applicable Statutory Law*

Under 18 U.S.C. § 1201(a)(1), a person who unlawfully kidnaps a person and transports her to another state *shall* be punished by either life imprisonment or death where the death of any person results from the kidnapping.  In order for a person found guilty of such a kidnapping to be sentenced to death, the government must prove beyond a reasonable doubt at a sentencing hearing that the defendant either intentionally killed the victim, intentionally inflicted serious bodily injury that resulted in the death of the victim,

9

intentionally participated in an act that resulted in the victim's death where the defendant contemplated that a life would be taken, or intentionally engaged in an act of violence with reckless disregard for human life where the act caused the death of the victim. 18 U.S.C. § 3591(a)(2).

Furthermore, under 18 U.S.C. § 3593(a)(1), the government must provide timely notice of its intent to seek the death penalty in a case where the death penalty is a possible sentence. This notice must set forth the aggravating factor or factors that the government intends to prove at the sentencing hearing. *See* 18 U.S.C. § 3593(a)(2), (b). Several aggravating factors are set forth in 18 U.S.C. § 3592(c), but the jury may consider other non-statutory aggravating factors if notice has been given.[1] At the conclusion of the sentencing hearing, the jury must make special findings setting forth which aggravating and mitigating circumstances, if any, it finds. Any findings with respect to an aggravating circumstance must be unanimous. 18 U.S.C. § 3593(d). If the jury unanimously finds the existence of at least one aggravating factor under § 3592(c), the jury must weigh all aggravating factors with any mitigating factors and must by unanimous vote determine that the aggravating factors outweigh any mitigating factors in order for a defendant to be sentenced to death. 18 U.S.C. § 3593(e).

_____

[1]

The statute also sets forth a number of mitigating circumstances to be considered by the jury in determining whether a sentence of death should be imposed. 18 U.S.C. § 3592(a).

10

*Applicable Case Law*

In *Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999), a federal case involving a defendant who was convicted of carjacking, the Supreme Court held that, under the Fifth And Sixth Amendments, any fact, other than a prior conviction, that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt. In *Apprendi v. New Jersey*, a case involving a defendant sentenced for shootings under a hate-crimes statute, the Supreme Court extended this rule to state convictions under the Due Process clause of the Fourteenth Amendment. *Apprendi*, 530 U.S. at 491.  The Supreme Court noted in *Apprendi*, however, that Apprendi had not raised a constitutional claim that the Fifth Amendment required that any factor that might enhance his sentence had to be presented in an indictment. Rather, Apprendi had raised only a claim that he had a right to trial by jury under the Due Process clause of the Fourteenth Amendment. *Id.* at 477, n. 3. The Supreme Court has subsequently reiterated that, under *Jones* and *Apprendi*, any fact, other than a prior conviction, that increases the penalty of a federal crime beyond its statutory maximum must be charged in the indictment. *United States v. Cotton*, 535 U.S. 625, 627 (2002).

Subsequently, in *Ring v. Arizona*, the Supreme Court in effect extended the rule announced in *Apprendi*, holding that under the Sixth and Fourteenth Amendments capital murder defendants are entitled to

11

a jury determination on any fact that increases their maximum punishment, such as aggravating circumstances that make a capital defendant eligible for the death penalty. *Ring*, 536 U.S. at 589. Again, however, Ring had not argued before the Supreme Court that his indictment was constitutionally defective under the Fifth Amendment because it did not charge the aggravating circumstances which made him eligible for the death penalty, and the case was not decided on that basis. *Id.* at 597, n. 4; *see also United States v. Bernard*, 299 F.3d 467, 489 (5th Cir. 2002) ("*Ring* did not hold that indictments in capital cases must allege aggravating and mental state factors.")

Recently, in *United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004), a direct appeal by another criminal defendant who received the death penalty in this court, the Fifth Circuit held that, following *Ring v. Arizona*, the Fifth Amendment requires the federal government to charge, by indictment, the statutory aggravating factors it intends to prove in order to render a defendant eligible for the death penalty. *Id.*, slip op. at 4. The Fifth Circuit further held, however, that such *Apprendi* error is susceptible to a harmless error review because it is not a structural error. *Id.*, slip op. at 5-6. The Court then held that the error was harmless beyond a reasonable doubt under the harmless-error test set forth in *Chapman v. California*, 386 U.S. 18 (1967), because the government provided notice of the statutory aggravating factors it intended to prove at trial

12

four months prior to trial and because any rational grand jury would have found probable cause to charge Robinson with at least one of the aggravating factors that were omitted from his indictment. *Robinson*, slip op. at 8-9.

### *Analysis*

At the punishment phase of Hall's trial, the jury found beyond a reasonable doubt that Hall intentionally engaged in conduct intending that Lisa Rene be killed or that lethal force be employed against her and her death was a result of this conduct, a mental state that made him eligible for the death penalty. (R. Nov. 6, 1995:5). Furthermore, the jury unanimously found the existence of two statutory aggravating factors and two non-statutory factors. Some jurors found the existence of four mitigating factors and, after weighing the aggravating and mitigating factors, the jury unanimously recommended the death penalty. (R. Nov. 6, 1995:5-7.)

Hall does not contend that his Sixth or Fourteenth Amendment rights were violated by the sentencing structure of the Federal Death Penalty Act. As required by *Apprendi* and *Ring*, the jury made the determination beyond a reasonable doubt that Hall had the requisite mental state that made him eligible for the death penalty, and the jury made the determinations regarding the aggravating factors, the existence of at least one being required in order for the death penalty to be imposed. Instead, Hall maintains that the indictment against him was "fatally flawed" under the Fifth Amendment because

13

it did not allege the mental state the government intended to prove under 18 U.S.C. § 3591(a)(2) and because the indictment did not allege what aggravating factors that the government intended to prove at sentencing pursuant to 18 U.S.C. § 3592(c). (Second Amended Petition at 25.)

As noted earlier, the Fifth Circuit has recently expanded the rulings in *Apprendi* and *Ring* to require not only that the jury make the findings regarding sentencing but also to require that the grand jury indictment set forth the mental state and aggravating factors intended to be proven by the government at sentencing. *See Robinson*, slip op. at 4. *Robinson*, however, was a direct-appeal case. The Fifth Circuit has specifically held that the rule announced in *Apprendi* is a new criminal procedural rule that is not retroactively applicable under the exceptions set forth in *Teague v. Lane*, 489 U.S. 288 (1989). *See United States v. Brown*, 305 F.3d 304, 309-10(2002). Accordingly, *Apprendi* is not applicable to initial petitions under § 2255. *Id.* And the Supreme Court recently ruled that the rule in *Ring* is a new procedural rule that does not be apply retroactively to cases on habeas review. *Schirro v. Summerlin*, __ U.S. __, 124 S.Ct. 2519, 2526 (2004). If a federal habeas petitioner cannot apply retroactively the rulings in *Apprendi* nor *Ring* to a conviction that was final before these cases were handed down, under *Teague* the Fifth Circuit's ruling in *Robinson* is not applicable to Hall, whose conviction was final well before these cases were handed down by the

14

Supreme Court and the Fifth Circuit.  Accordingly, this claim is *Teague*-barred.

With regard to Hall's substantive claim, the Fifth Circuit has held that *Apprendi* error, even on direct appeal, is subject to a harmless-error analysis.  *See United States v. Matthews*, 312 F.3d 652, 665 (5th Cir. 2002); *United States v. Baptiste*, 309 F.3d 274, 278-79(5th Cir. 2002).  In *Matthews*, the Fifth Circuit applied the *Chapman v. California*, 386 U.S. 18 (1967), harmless-error standard that is applicable on direct appeal and held *Apprendi* error to be harmless where, looking at the evidence presented at trial, it is clear that any rational jury would have charged the defendant with all of the elements of the crime. *Matthews*, 312 F.3d at 665-66.  And, most recently, the Fifth Circuit applied the *Chapman v. California* harmless-error standard in *United States v. Robinson*.

Applying the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1992), which the Supreme Court established for use in federal habeas cases involving an allegation of constitutional error at trial, it was harmless not to include in the indictment against Hall the intent element or the statutory aggravating factors. Under this standard, in order to be entitled to habeas relief, a petitioner must prove that an error had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637-8.  Hall has not shown a substantial and injurious effect or influence.  He has not shown that, given the evidence presented to

15

the petit jury, the grand jury would have declined to include in the indictment the specific intent element or at least one statutory aggravating factor. After all, the jury that decided Hall's sentence unanimously found the existence of requisite intent beyond a reasonable doubt and unanimously found the existence of several aggravating factors. Moreover, Hall has not shown that he was harmed by a lack of notice on these issues. The government provided the required statutory notice to defense counsel, setting forth both the specific intent and the aggravating factors it intended to prove at trial. Hall is therefore not entitled to relief on this claim, and his first claim for relief is denied.

**B.   Ineffective-assistance Claims**

In claim two, Hall asserts that his trial counsel were ineffective in numerous respects. Specifically, Hall contends that they were ineffective for: 1) failing to conduct a timely investigation into potential mitigating evidence, thereby emphasizing some evidence while not presenting more persuasive mitigating evidence through additional witnesses and presenting ill-prepared witnesses; 2) failing to present documentary evidence at the punishment phase of the trial to corroborate testimony; 3) failing to call available and known witnesses to testify at punishment; 4) failing to question government witnesses in order to present additional mitigating evidence; 5) failing to appropriately cross-examine government witness Larry Nichols at the punishment phase; 6) failing to re-interview

16

a potential defense witness after he appeared to have altered his testimony; 7) failing to make a closing argument at the guilt phase of the trial; 8) failing to argue effectively that Hall should have been allowed to make a statement in allocution; 9) making uninformed and unreasonable decisions regarding their choice and use of witnesses; 10) failing to adequately argue their motions for continuance; 11) making an ineffective closing argument at the punishment phase; and 12) failing to conduct an adequate *voir dire*.

*Standard of Review*

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980). In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington,* 466 U.S. 668 (1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. 466 U.S. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. *See also Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993) (habeas petitioner must show that trial result was unreliable or

17

proceeding fundamentally unfair due to deficient performance of counsel).

Recently, in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the Supreme Court applied the *Strickland* standard to a claim that counsel was ineffective by failing to investigate potentially mitigating evidence. In *Wiggins*, the Court stated that the appropriate inquiry is whether the investigation supporting counsel's decision not to present certain mitigating evidence was itself reasonable. *Wiggins*, 123 S.Ct. at 2536. This analysis is done by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial. *Id.*

*Analysis of Ineffectiveness Claims*

1.  Failure to Investigate

Hall first contends that his trial counsel were ineffective for failing to conduct a timely investigation regarding potential mitigating evidence. Specifically, Hall faults counsel for not conducting adequate investigation on their own between the time they were appointed on March 21, 1995, and the beginning of Hall's trial, and for failing to seek the assistance of a mitigation expert until September 7, 1995, and not meeting with the appointed mitigation expert until September 15, 1995, when the voir-dire portion of Hall's trial began on October 1, 1995. Hall maintains that: because his trial counsel failed to timely investigate potential mitigating

18

evidence, they unreasonably made the decision to rely on the "equally-culpable-co-defendants" statutory mitigating factor, rather that investigating mitigating evidence about Hall's deprived background; the defense witnesses who did testify about Hall's background at the punishment phase of the trial were ill-prepared; and trial counsel failed to present testimony from numerous other witnesses.

With regard to a capital sentencing proceeding, defense counsel has the obligation to conduct a "reasonably substantial, independent investigation" into potential mitigating circumstances. *Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003), *citing Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002). If counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753 (5th Cir. 2003), *cert. denied*, __ U.S. __, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).

*Facts Applicable to First Ineffectiveness Claim:*
*Failure to Investigate*

As support for his assertions, Hall points to vouchers submitted by defense counsel, Michael Ware and Jeffrey Kearney; and the defense investigator, Danny LaRue; as well as affidavits from the mitigation specialist, Tena Francis; a defense attorney who assisted trial

19

counsel in this case, Kevin McNally; a well-known defense attorney, Michael Tigar; and a social worker, Jill Miller; this Court's orders appointing a mitigation specialist and authorizing a total of $7500.00 for that specialist's services; declarations from Betty Hall and Cassandra Ross, both defense witnesses at trial; and declarations from numerous persons outlining their potential testimony, had they been called as witnesses by the defense. (Hall's Exhibits #3, 5, 6-9, 12-19, 23, 25-30, 34-38; Hall's Reply Exhibits 2-5, 7-8, 10-11.) In response, the government has submitted affidavits from both Ware and Kearney.  (Government Exhibits E & F.)

A review of these documents submitted by the parties, as well as the record of the trial reveals that, prior to Ware and Kearney's being appointed to represent Hall, Hall had been represented by prior counsel.  He had interviewed Hall and had required him to complete a nineteen-page questionnaire entitled "Client Background Information," in which Hall answered numerous questions about his social, vocational, scholastic, and medical history.  He also traveled to Hall's hometown of El Dorado, Arkansas, where he interviewed Hall's mother and other family members, a Reverend Hegler, Hall's adult probation officer from a prior criminal conviction, Hall's parole officer, and Hall's previous attorney. (Government Exhibit E at p. 2-3 and attached exhibit A.)  Prior counsel turned over to Hall's trial counsel both his notes of these interviews and the questionnaire. Defense counsel filed a motion requesting the appointment of

20

various experts, including a psychiatrist, a psychologist, a jury consultant, a forensic pathologist, and a mitigation expert.  In a hearing held on July 14, 1995, believing that a jury consultant was of greater importance than a mitigation specialist, defense counsel dropped their request for a mitigation specialist.[2]  This Court authorized funds for defense counsel to hire a psychiatrist, a psychologist, and a pathologist, but denied counsel's request for a jury consultant. (Government Exhibit E at 5-7.)

In August of 1995, an attorney who specialized in death penalty cases, Kevin McNally, provided defense counsel with the name of a mitigation specialist, Tena Francis.  She was officially appointed by this Court on September 14, 1995, and she first met with defense counsel on September 15, 2005.  She and defense counsel also met with Hall that day.  Prior to the meeting with Francis, defense counsel Ware had met and spoken with Hall's mother, Betty Hall, and his sister, Cassandra Ross, in his office; and he had also spoken with Hall's previous Arkansas attorney, James Bennett. (Government Exhibit E at pp. 12-13, 19; Hall's Exhibits 11, 13.)  Later, Ware traveled to Arkansas and again conferred with Betty Hall. (Government Exhibit E at p. 20.)

---

[2] In his affidavit, defense counsel Ware explains that he had, prior to Hall's case, never used a mitigation specialist in any of the several capital cases he had tried before, choosing instead to use the services of private investigators, mental health experts, and paralegals, as well as his own labor in order to discover and develop mitigating evidence. (Government Exhibit E at p. 10.)

21

After being hired, and prior to the punishment phase of the trial, which began on November 1, 1995, Tena Francis submitted two investigative memoranda to Michael Ware, dated October 23 and October 25, 1995.  In the October 23rd memo, Francis outlines the substance of her interview with Tracy Hall, Hall's brother, who was at that time confined in a prison in Arkansas for aggravated assault. (Government Exhibit E, attached exhibit C.)  In her October 25th memo, Francis outlines information that, as she states in the body of the memo, was gleaned through "extensive interviews with members of [Hall's] family, his minister, officials at school, neighbors, and other significant persons from [Hall's] life (for example, girlfriends)."  This included information about Hall's: mother and father, A.J. Hall, including the violence in the home, their substance abuse, and their subsequent divorce; siblings Pamela, Scotty, Cassandra, Tracy, and Demetrius, as well as some half-siblings; birth and medical history; personality; relationship with his family; having four children by four different women; school history; limited work history; and criminal history, including parole from Arkansas state prison in 1993.  At the end of the October 25, 1995 memo, which was entitled "Client Social History," Francis expressed her belief that the report was incomplete because there was not enough time to locate other witnesses; several members of the family were hesitant in answering the questions; and several members of the family were

22

hesitant to speak because of their knowledge and participation in Hall's drug activities. (Hall's Reply Exhibit #13 at pp. 1-13.)

At the punishment phase of the trial, defense counsel presented testimony from: an FBI agent and a police detective who testified about Beckley's and Demetrius Hall's involvement in the crime (R. 18:52-60); a police lieutenant and a highway patrolman from Arkansas who testified about Bruce Webster's involvement in the crime and his extremely violent history (R. 18:80-97); an operations manager from the federal detention center where Hall was housed, who testified, among other things, that he had no record of any disciplinary problems with Hall (R. 18:98-102); an employee of Kroger's who testified about Beckley's prior discharge for dishonesty (R. 18:106-08); and Hall's mother and sister, who testified about A.J. Hall's severe physical abuse of Betty Hall, Hall's good relationship with and love for his children, his good behavior while in prison in Arkansas, and his remorse for the crime. (R. 18:111-147.)

During the punishment phase, defense counsel questioned several government witnesses at the punishment phase of the trial about the fact that they had previously spoken with either defense counsel or the defense investigator, including: LaTonya Anders, the mother of one of Hall's children (R. 17:97-8); Sylvia Henry, Bruce Webster's girlfriend (R. 17:130); David Butler, a prosecutor from Arkansas who testified to Hall's bad reputation (R. 17:166); and Carolyn Dikes,

23

a lieutenant in the El Dorado police department who also testified about Hall's bad reputation (R. 17:177.)

*Analysis of First Ineffectiveness Claim:*
*Failure to Investigate*

While Hall criticizes his attorneys for failing to conduct enough investigation on their own and for failing to hire a mitigation specialist earlier, the record before this Court reveals that defense counsel had done a substantial amount of investigation into mitigating evidence prior to trial, including interviewing government witnesses and members of Hall's family, and that the mitigation specialist had over six weeks between the time of her appointment and the punishment phase began to investigate and develop potential mitigating evidence. Indeed, her investigation included traveling to Arkansas and, according to her own memo to defense counsel, interviewing numerous people there. And, while Francis and the other experts who submitted affidavits in support of this claim contend that a far greater amount of investigation was needed in this case, this Court would have been unwilling at the time of trial to authorize an unlimited amount of funds with which to conduct further investigation, especially where that investigation would have involved contacting witnesses who had minimal contact with Hall. This Court instead concludes that Hall's counsel performed a reasonably substantial and independent investigation into potential mitigating circumstances and therefore did not provide ineffective assistance. *See Lewis v. Dretke*, 355 F.3d at 367.

24

Hall next contends that his trial counsel made an unreasonable decision to emphasize, in the punishment phase of the trial, the statutory mitigating circumstance of "equally culpable co-defendants" and that they failed to adequately prepare Betty Hall and Cassandra Ross prior to their giving testimony at trial.  Under federal law, the fact that equally culpable co-defendants will not be punished by death is a mitigating factor that, if proven, *shall* be considered by the jury in determining whether a death sentence shall be imposed. *See* 18 U.S.C. § 3591(a)(4).  Defense counsel believed that it was a good trial strategy to emphasize this mitigating factor because Hall's co-defendants, Demetrius Hall;  Marvin Holloway; and most especially, Steven Beckley; were arguably equally culpable and had reached plea agreements with the government and would not be eligible for the death penalty.  Defense counsel Michael Ware believed, based on his experience, that jurors disliked the government "striking deals" with co-defendants and that North Texas jurors in particular tend to be conservative jurors who might therefore be more open to the equally-culpable-co-defendants mitigating factor as opposed to "excuse defenses" in a case such as Hall's where the facts were particularly gruesome. (Government Exhibit E at pp. 14-5.)

The Supreme Court noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 2065.  In

25

viewing counsel's decisions from their perspective at the time of trial, the strategy of heavy reliance on the statutory mitigating factor, "equally culpable co-defendants," was a reasonable one. From the bench it was clear that defense counsel were making the argument most likely to be persuasive to the jury--an appeal to its sense of fundamental fairness--and that the jury was attentive and responsive to it. Besides, other statutory mitigating factors, such as duress, minor participation, absence of a prior criminal record, victim's consent, and impaired capacity, were not available to Hall. (Government Exhibit E at pp. 16-18.) Also, it was a reasonable trial strategy for counsel to rely on their experience as criminal defense attorneys in reaching this decision. And, finally, counsel also submitted non-statutory mitigation factors to the jury, such as Hall's age, his remorse, and the circumstances of his upbringing, so that the defense did not rely on one mitigation factor to the exclusion of all others. (R. 20A:25.)  Defense counsel were not ineffective in this regard.

Hall also contends that Betty Hall and Cassandra Ross were inadequately prepared as witnesses. As support, he points to the length of their testimony and their being effectively cross-examined on certain issues, and to affidavits from both women. (Hall's Exhibits #15, 16.)  In their affidavits, Betty Hall and Cassandra Ross state that they had limited contact with the defense team, but also acknowledge that they met with defense attorney Michael Ware on more

26

than one occasion, met with mitigation specialist Tena Francis, and met with a psychiatrist who had been hired by defense counsel. They also state in their affidavits that they felt unprepared for giving their testimony, as they were not informed by Michael Ware until the same day as their testimony that they were going to testify about Hall's upbringing and the violence in the household. And, finally, they state in their affidavits that they would have given further information detailing the violence in the Hall household. (Hall's Exhibit #15 at pp. 1-3, 5-8; Hall's Exhibit #16 at p. 1-2, 4-6.)

The Fifth Circuit has cautioned that a reviewing court should be wary of claims that an attorney failed to present **enough** evidence of a certain type. *Smith v. Cockrell*, 311 F.3d 661, 669 (5th Cir. 2002), *citing Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000). While Betty Hall and Cassandra Ross criticize the time that they spent with defense counsel and maintain that they were ill-prepared, the record of the trial reveals that they testified to much of what is contained in their exhibits. Specifically, at trial, Betty Hall testified that: A.J. was abusive towards her during most of their marriage including when she was pregnant; that she had been beaten with the butt of a gun, by a two-by-four, and with fists; that her teeth were knocked out; that she was dragged out of bed and beaten and beaten after getting home from work or from a store; that this was all done in front of the children; that the children tried to intervene, but would get knocked around themselves; that the police

27

were called several times, but arrested A.J. on only one occasion; that Hall would physically protect her from her husband; and that she stayed with her husband because she had small children and had no place to go, but she left when Demetrius was old enough to look after himself. (R. 18:113-116.) Cassandra Ross testified that: there was a lot of physical and verbal abuse during her childhood; that A.J. would beat her mother with boards and anything else he could get his hands on; that all of the children tried to stop the abuse and would call the police, but their father would snatch the telephone away; that she left the home at age eighteen, married and moved to Texas; and that she had Hall come and live with her for a while and go to school in Texas at one point. (R. 18:137-40.)  While the government did cross-examine both women about Hall's criminal history, his lack of an employment history, the fact that all of the children were fed, clothed, and sent to church, and the fact that Cassandra Ross had never been in trouble even though she was raised in the same household, this type of cross-examination was to be expected and would have occurred no matter how many times the women met with defense counsel.  Hall's mother and sister gave substantial testimony about Hall's upbringing, and Hall has not shown that his trial counsel were ineffective for failing to elicit further, similar testimony from them or for failing to question them in a more effective manner.

Hall further argues that his trial counsel failed to develop and present mitigating evidence from Hall's father, A.J. Hall, his

28

two brothers, Scotty and Tracy, and his sister Pamela Palmer. (Second Amended Petition at 74-85.)[3] Defense counsel Michael Ware, however, explains in his affidavit that he made the strategic decision not to call these family members as witnesses. In particular, he decided not to call A.J. Hall as a witness because, although Ware had met with Hall's father, he was "absolutely opposed" to testifying and would not have likely made an effective witness, given Betty Hall's testimony about his violence towards her. (Government Exhibit E at p. 25.) Ware made the decision not to call Tracy or Scotty Hall, two of Hall's brothers, based on interviews that Tena Francis conducted with them. In particular, Tracy Hall, who at the time of the interview was in prison for firing a gun into a crowd and injuring nine people, was an admitted crack-cocaine dealer in El Dorado, Arkansas. He told Francis that Hall had "taken him under his wing" in the drug-dealing business, that they had shared the drug-dealing business in El Dorado, and that Hall had taught him how to be smart about drug dealing. (Government Exhibit E at pp. 23-4, attached exhibit C at pp.1-2.) Scotty Hall was also in prison for drug possession when he was interviewed by Francis, and Francis had learned that Scotty was a spouse batterer. (Hall's Exhibit 18 at p. 3, Hall's.

---

[3] Hall has submitted declarations from these individuals and contends that A.J. could have testified about the problems in his marriage and his own bad behavior, and Tracy, Scotty, and Pamela could have testified about their upbringing and about how they were disciplined harshly by their father, witnessed the abuse of their mother, and were exposed to drug dealing and other criminal behavior while growing up. (Hall's Exhibits #17-9, 25).

eply Exhibit 13 at p. 5.)  Ware made the decision not to call Pamela Palmer as a witness because she was very unwilling to speak at length to Francis, as she was very angry at the time at Hall for lying to her about his involvement in the crime and for involving Demetrius Hall in the crime. (Government Exhibit E at pp. 22-23, Hall's Reply Exhibit 13 at p. 5.)  It was reasonable for trial counsel to opt not to call as witnesses a father who was opposed to testifying, two brothers who were imprisoned criminals themselves, and a sister who at the time remained hostile to her brother, notwithstanding what they now state they would have testified to at trial.

Hall also asserts that his trial counsel failed to develop and present mitigating testimony from: Cassandra Ross's in-laws, Reverend Jerry and Gracie Ross, who were neighbors of the Hall family and could have testified about the violence in the Hall household (Hall's Exhibit #26, 27); Betty Hall's co-workers, who saw her at work after being beaten (Second Amended Petition at 87); A.J.'s sister, who could have testified about the slave history of their family and the abuse she endured as a child, as well as Betty Hall's illnesses (Second Amended Petition at 87); one of Betty Hall's sisters, who could have testified about A.J.'s violence towards Betty and about Betty's abandonment of her children after she left A.J. (Second Amended Petition at 88); two additional women with whom Hall fathered children, who could have testified about Hall's love for his children and his financial support of his children (Hall's Exhibit #29, 30);

30

and a teacher from the middle school Hall attended, who could have testified about his shock at hearing about the crime (Second Amended Petition at 92.)   Much of this evidence would have been cumulative of the testimony given by Betty Hall and Cassandra Ross and merely would have been further evidence of A.J. Hall's abuse of Betty Hall, something that the government did not dispute.   Some of this evidence, such as evidence about A.J. Hall's upbringing, would have been of little, if any, assistance to the jury in reaching its decision. And, with regard to some of this potential testimony, such as testimony from mothers of Hall's children and a middle school teacher about Hall's general good character, it is so attenuated that there is no reasonable probability that the outcome would have been affected by such testimony. *See Carter v. Johnson*, 131 F.3d 452, 465 (5th Cir. 1997) (holding that Carter was not prejudiced by counsel's failure to investigate, discover and present the testimony of character witnesses, as there was no reasonable probability that testimony that he was a "good and peaceful person" would have resulted in a life sentence, given that Carter had confessed to two murders).   Hall has not established any prejudice as a result of his trial counsel's failure to discover and present this testimony.

Finally, Hall asserts that his trial counsel were ineffective for failing to investigate and present records from Hall's imprisonments in Arkansas and in federal prison and supporting testimony from prison guards and prison experts illustrating his good

31

behavior in prison in both the Arkansas state prison and federal prison. (Hall's Exhibit #34-38.)  As noted earlier, defense counsel did present testimony from an officer at the federal detention center that there was no record of any disciplinary problems with Hall while he was housed there.  Hall contends, however, that his trial counsel should have offered further evidence to support this, as well as testimony and evidence from Arkansas prison guards about his good conduct while incarcerated there.  In his affidavit, Michael Ware explains that he was hesitant to present such testimony because such witnesses would have had to concede on cross-examination that, in his earlier incarceration in Arkansas, Hall had been eligible for early release for "good time."  Moreover, Ware had been informed that Hall had actually continued his drug dealing business while in prison in Arkansas, and he was also aware that the government had rebuttal expert witnesses ready to testify about prison conditions and did not want to open the door to that testimony.  Instead, defense counsel opted to argue at closing that Hall would not be a future danger to society because his records from both stints in prison revealed no disciplinary problems and because there is no parole in the federal prison system. (Government Exhibit E at pp. 25-6; R. 20A:53, 78.)  Counsel exercised reasonable trial strategy in this regard, and Hall has not shown how further testimony on this subject would have resulted in a life sentence.  Hall has failed to establish ineffective assistance of counsel under the *Strickland* standard based on his

32

contention that his counsel failed to conduct an adequate investigation into potential mitigating evidence.

2.    Failure to Present Documentary Evidence

Hall also contends that his trial counsel were ineffective for failing to place certain documentary evidence into evidence at the punishment phase of the trial. Specifically, Hall asserts that trial counsel should have placed into evidence a hospital emergency-room record that documented injuries Hall's mother Betty Hall received in 1968 at the hands of his father, A.J. Hall, the record of his father's arrest in 1974 for assault and battery on Betty Hall, and a handwritten letter and a poem Hall sent to his daughter.

As noted earlier, trial counsel presented uncontested evidence, through the testimony of Betty Hall and Cassandra Ross, that Betty Hall was severely physically abused by her husband, that the police came to the house three times and A.J. Hall he was arrested once because of this abuse, and that Hall was a concerned and involved father. (R. 18:113-16, 119, 138-41.) Accordingly, the documentary evidence Hall contends should have been offered into evidence was cumulative of testimony that was given at trial. *See Brown v. Cain*, 104 F.3d 744, 751 (5th Cir. 1997) (holding that counsel was not ineffective for failing to locate and present additional evidence that would have been cumulative to the testimony of the defendant's mother and sister regarding his difficult past). Moreover, the government never contested the fact that Betty Hall was severely

33

physically abused by her husband, but instead argued that the abuse did not extend to Hall and that, even if it did, it did not excuse his actions. (R. 20A:92.)  Accordingly, defense counsel were not ineffective for failing to present documentary evidence that was cumulative of testimony already presented at trial and on a topic that was never in dispute.

3.   Failure to Call Available Witnesses

Hall complains further that his trial counsel were ineffective for failing to call as witnesses certain people who were known to counsel and were available to testify.  Specifically, Hall argues that counsel should have called Reverend D.L. Hegler, who was the Hall family's pastor during Hall's childhood, and Reverend Willie Ray Norful and his wife, the couple into whose custody Hall was released when he was paroled from prison in Arkansas. All of these people were in attendance at Hall's trial.  As support for this claim, Hall has submitted an affidavit from Reverend Hegler.

Hall contends that Norful and his wife could have testified that Norful gave Hall a job at his church so that he could be paroled from prison, the people in the church and the Norful family liked him, Hall kept Norful's son out of his drug trade when he began it again after being paroled, and that they believed that the crime was very out of character for Hall.[4]  Hall further contends that Hegler could

---

[4] This Court does not find in the record any declarations that Norful and his wife provided to habeas counsel indicating their willingness to testify on Hall's

34

have testified about the physical violence between Hall's parents as well as the alcohol abuse and infidelity; the poverty, drug trade, and racism in El Dorado, Arkansas; Hegler's surprise that Hall was involved in such a violent crime; and Hall's expressions of remorse to Hegler. (Hall's Exhibit #22.)

In his affidavit submitted as an exhibit with the government's response, defense counsel Michael Ware explains that he chose not to call Reverend Hegler as a witness for the defense because mitigation specialist Tena Francis interviewed Hegler on October 9, 1995, and in that interview Hegler stated, among other things, that: Hall was bright, but did not apply himself; Hall dropped out of school in order to pursue his drug dealing; Hall believed that he could beat the system and would therefore not get caught dealing drugs; Hall had a "lot of boys" selling cocaine for him in El Dorado; Hall was still dealing drugs while in an Arkansas state prison; the elderly people who lived near Hall's father were afraid of Hall; Hall's parents "went wrong" by always being there to bail him out of trouble; and Hegler felt that Hall used him to get released on parole when he had no intention of leading a legal life when he was released. (Government Exhibit E at pp. 21-2.)  Notwithstanding what Reverend Hegler now says about Hall a number of years after Hall's trial, defense counsel exercised reasonable trial strategy not to call as

---

behalf and outlining their proposed testimony, and Hall does not refer to any such exhibits in his petition.

a witness someone who had this many negative things to say about their client.   They were not ineffective in refusing to call Hegler as a witness and, had they done so and had the government performed competent cross-examination of Hegler, doubtless Hall would now be asserting counsel's incompetence for placing Hegler on the stand.

With regard to defense counsel's failure to call Reverend Norful or his wife as a witness, Hall has failed to establish either deficient representation or prejudice.   While Ware does not specify his reasons for not calling Norful or his wife as witnesses, the information that Hall alleges that these potential witnesses could have provided is not necessarily mitigating evidence.   For example, while Norful gave Hall a job at his church so that Hall could be paroled from Arkansas state prison, the record reveals that Hall in actuality returned to drug dealing.   And, while the Norful family and the people in the church might have liked Hall personally, Hall obviously took advantage of their kindness and continued to violate the law on several occasions. Additionally, regardless of what Norful and his wife believed about Hall's character, Hall was clearly quite capable of raping, physically attacking, and burying alive an innocent sixteen-year-old girl.   Their belief that he was not is immaterial. Thus, Hall has failed to show either prong of the *Strickland* standard with respect to his counsel's failure to call Reverend Norful or his wife as witnesses at trial.   This claim is without merit.

36

4.   <u>Failure to Adequately Question Government Witnesses</u>

Hall also argues that his trial counsel were ineffective in their cross-examination of certain government witnesses.   Specifically, Hall contends that his trial counsel could have elicited from Hall's brother, Demetrius Hall, testimony about their deprived childhood; could have elicited from LaTonya Anders, Hall's girlfriend, testimony about his concern for her, their daughter, and his other children; and could have elicited from Wendell Olden, an official from the school district where Hall attended school, testimony about the drug problem that pervaded El Dorado, Arkansas.

Demetrius Hall testified for the government at the guilt phase of the trial, while LaTonya Anders and Wendell Olden testified for the government at the punishment phase of the trial.   Demetrius Hall testified about his involvement in the crime.   On cross-examination, defense counsel elicited from Demetrius Hall testimony that Hall had turned himself in to the police, that Hall told Demetrius to tell the truth to the police, that the original plan was to get the money from the "Jamaicans" and no one knew that Webster was going to take the victim from her apartment, that Hall was not present when Webster, Beckley, and Demetrius sexually assaulted Lisa Rene, and that Demetrius believed that his brother was sorry for what he had done. (R. 13:230, 239-46.)

LaTonya Anders testified at punishment about a $13,500 cocaine purchase she attempted to make on Hall's behalf in Houston, after

37

she had given birth to Hall's daughter, when Hall was not allowed to leave Arkansas because he was on parole.  She also testified that she and another friend of Hall were robbed at gunpoint before they completed the transaction.  She further testified that she transported crack cocaine from Houston three different times for Hall and later helped transport marijuana for him, as well. (R. 17:57-71.)  Anders testified regarding her knowledge about the kidnapping. (R. 17:77-91.) On cross-examination, defense counsel elicited from Anders, among other things, that Hall was a good father to her child, that Hall had always been good to her other child that was not his, that Hall treated his other three children well, and that Hall treated her and the other mothers of his children well. (R. 17:100-101, 111.)

Finally, Wendell Holden testified that he was the assistant principal at Rogers Middle School in El Dorado, Arkansas, as well as a city-council member, that he had known Hall since he was in junior high school, and that he had heard people speak about Hall and that Hall had a bad reputation in the community. (R. 17:169-71.) Carolyn Dykes, a lieutenant with the El Dorado police department also testified at punishment that Hall had a bad reputation in the community.  On cross-examination, Dykes acknowledged that she had known Hall's family for a long time and knew that Hall's father had been a crack dealer for a long time. (R. 17:175-78.)

Hall has established neither deficient representation nor prejudice from the failure to further question Demetrius Hall, LaTonya

38

Anders, and Wendell Holden in an effort to elicit more mitigating evidence.  As noted above, Demetrius Hall and LaTonya Anders gave very damaging testimony about Hall.  While Hall faults his trial counsel for failing to question them about Hall's upbringing and specific instances of care he showed his daughter, their testimony illustrated that Hall was willing to involve his younger brother and the mother of his child in his drug dealing, even where their lives were in danger.  Thus, defense counsel's representation was not deficient, as both of these witnesses gave mitigating testimony on cross-examination about Hall's remorse, about his lack of original intent to kidnap the victim, and about his love for his children. *Prejean v.  State*, 889 F.2d 1391, 1898-9 (5th Cir.), *cert. denied*, 494 U.S. 1090 (1990) (holding that, where defense counsel did place certain evidence before the jury, counsel was not ineffective for failing to present more of the same).  And, Hall has not shown a reasonable probability that any further testimony would have resulted in a life, rather than a death sentence.

Moreover, while Hall criticizes defense counsel for failing to question Holden about the drug culture in El Dorado, defense counsel did elicit from another government witness the fact that Hall's father was also a drug dealer.  In any event, Hall has not shown how further testimony on this issue would have been mitigating evidence.  After all, Hall committed murder partly in retribution for one of his drug deals having gone bad.  Hall has not shown a reasonable probability

that any testimony about the fact that other young men were drug dealers in Hall's hometown would have lessened Hall's culpability in the minds of the jurors.  Hall has not established either prong of the *Strickland* standard with regard to this claim.

5.   Failure to Adequately Cross-Examine Larry Nichols

Hall contends that his trial counsel, Jeff Kearney, was ineffective in his cross-examination of government witness Larry Nichols at the punishment phase of the trial.  Specifically, Hall asserts that Kearney failed to impeach Nichols with his prior testimony from a trial of his co-defendants in a bank robbery in which he testified for the government.  Hall asserts that counsel failed to impeach Nichols with his previous testimony that he learned tips in improving his situation from other inmates in federal prison, that he was a drug dealer, that he committed numerous robberies other than the bank robbery for which he was arrested, that he owned at least five guns, and that he passed fraudulent checks.  Hall further asserts that his trial counsel was ineffective in failing to cross-examine Nichols about differences between the original statements he gave the FBI about Hall and his trial testimony.

At the punishment phase of Hall's trial, Nichols testified that he and Hall were fellow inmates in the Mansfield Correctional Center in the months leading up to Hall's trial.  Nichols further testified that Hall bragged about raping Lisa Rene, spoke about being a drug dealer in Arkansas, talked about a man he attempted to rob in

40

Arkansas, and spoke about beating women.  Nichols also testified that Hall told him that he would kill Steven Beckley if he ever got the chance and told him that he had a plan to escape from custody that involved taking either one of his lawyers or a female guard hostage and using one of the shanks that was hidden in the jail. (R. 17:220-27.)

On direct examination, Nichols acknowledged that he had been charged with the armed robbery of three banks and, in exchange for his testimony at the trial of his co-defendants, had pled guilty to two counts of using a weapon during a crime of violence. (R. 17:210-12.)  Nichols also testified that, while the minimum sentence for the crimes for which he pled guilty was twenty-five years, there was a provision whereby his sentence could be lowered because of his cooperation in the case against his co-defendants. (R. 17:213-14.)

On cross-examination, Nichols further admitted that: his prior plea agreement also "settled up" five or six robberies he had committed in Louisiana; he had purchased the car used in the bank robberies from the proceeds of other robberies; he also had federal charges against him for transporting a stolen vehicle across state lines; in the robberies he carried either a .380 automatic or a Tech 9 assault rifle; he had also robbed fast-food places and convenience stores; and he had previously tried to convince one of his co-defendants in the robbery cases to sign a false affidavit stating that Nichols had nothing to do with the robberies. (R. 17:242-45,

248.)   Nichols also admitted on cross-examination that, while the sentence for the two crimes he had pled guilty to was twenty-five years, he had not yet been sentenced.  He further acknowledged that the government had already filed a motion with the judge presiding over his case for downward departure on his sentence due to his cooperation in that case and that he would like for the judge in his case to know about his cooperation with the government in Hall's case before he was officially sentenced. (R. 17:252, 256, 260-62, 268-69.)

In an affidavit submitted with the government's response, defense attorney Jeff Kearney explains that he had a copy of Nichols's testimony from the bank robbery trial, that he reviewed this testimony, Nichols's plea agreement, and the prosecution's file in that case, and that he questioned Nichols regarding several aspects of his testimony from that trial.  He also states in his affidavit that, in furtherance of his cross-examination of Nichols, he toured the Mansfield prison facility where Nichols and Hall were housed together and interviewed the jailers who found the hidden shanks that Nichols told the government about.  Finally, Kearney explains that, although Nichols denied some of his previous testimony, he admitted much of it, and Kearney made the decision not to "pin down" Nichols on all of his prior testimony because Kearney believed that the jury knew that Nichols was self-motivated and knew he was lying, and Kearney had determined that doing so would destroy the mood and tempo

42

of the cross-examination and would risk alienating the jury by "beating a dead horse." (Government Exhibit F.)

This Court finds that defense attorney Kearney made a reasonable strategic decision not to impeach Nichols on every difference between his prior testimony and his testimony at Hall's trial. This decision was made after fully reviewing Nichols's prior testimony and was therefore made with knowledge of inconsistencies in Nichols's testimony. The decision was also made in order to streamline cross-examination and therefore make it more effective. But counsel did elicit from Nichols his substantial criminal history, his previous attempt to have a co-defendant perjure himself in an affidavit, and his admitted desire to improve his own situation in life by testifying against Hall. Such a strategic choice, when it is made after a thorough investigation of the relevant facts, is virtually unchallengeable. *See Strickland v. Washington*, 466 U.S. at 690-91. Hall's trial counsel was not ineffective in his cross-examination of Larry Nichols.

6. <u>Failure to Interview Alonzo Airy</u>

Hall next asserts that his trial counsel were ineffective for failing to seek a continuance in order to re-interview inmate Alonzo Airy, a potential punishment witness for the defense, after defense counsel were informed that Airy had been interviewed by the government and had apparently changed his story about Hall's behavior while incarcerated in federal prison. Hall further asserts this his trial

43

counsel were ineffective for failing to conduct further investigation and thereby discover other federal inmates who could have presented testimony favorable to Hall.

Before the government had concluded its case-in-chief at the punishment phase of the trial, but after federal inmate Larry Nichols had concluded his testimony for the government, during which he testified about Hall's lack of remorse while in federal prison and Hall's plan to escape from prison, the government requested that it be permitted to amend its witness list to add Alonzo Airy. Assistant U.S. Attorney (AUSA) Richard Roper explained to this Court that Alonzo Airy had only recently been interviewed by the government because he was on the defense's witness list that had been filed with the Court on the first day of trial. (R. 18:4.) Roper further stated that he wished to call Airy as a witness for the government because he had corroborated Nichols' testimony when he spoke to FBI Agent Paul Shannon and AUSA Paul Macaluso a couple of days earlier. (R. 18:5-6; Hall's Exhibit #39.) Defense counsel objected to the government's attempt to amend its witness list because the testimony would be cumulative of Nichols's testimony, because Nichols had not been impeached regarding Alonzo Airy as of yet, and because the government could cross-examine Airy if and when he was called by the defense. (R. 18:8.) This Court denied the government's request to add Airy as a government witness (R. 18:14), and the defendant did not call him.

44

Airy had been listed as a defense witness because he had been interviewed by mitigation specialist Francis on October 22, 1995, when he told her that Hall had never discussed any escape plan and was extremely remorseful. Airy had also informed Francis that Nichols was constantly discussing his desire to have his sentence reduced and had stated that it was easy for an inmate to lie for the government in order to obtain a recommendation from the government that a sentence be lowered. (Hall's Exhibit 7.) Hall has included as an exhibit with his petition an affidavit signed by Airy on April 10, 2000, stating, in essence, that he never told Agent Shannon and Macaluso much of the information Agent Shannon included in an FBI-302 statement dated October 30, 1995.[5] Specifically, in his new affidavit, Airy asserts that, contrary to what is stated in the FBI statement, he never told the government representatives that Hall was cold or remorseless, never told them that Hall said that the others followed him, never said that Hall told him that he wanted to kill Beckley because he was a "snitch," never said that Hall spoke of the victim in disparaging language, and never told the agents that Hall spoke to him about an escape plan in which he would kidnap and/or kill his attorney. (Hall's Exhibit #40.)

In response, the government has submitted affidavits from Macaluso and Shannon. In Macaluso's affidavit, he states that he

---

[5]

Airy does not appear to dispute that he had a conversation with federal agents that day, but instead disputes what was said.

45

and Shannon interviewed Airy on October 30, 1994, because the defense had listed him as a possible witness. Macaluso further states that he recalls that Airy made very disparaging comments about Larry Nichols and viewed Nichols as someone who had taken advantage of his own co-defendants. However, Airy confirmed the accuracy of Nichols's comments regarding Hall and what Hall had told Nichols about the kidnapping and murder of Lisa Rene. Finally, Macaluso states in his affidavit that Shannon's statement that was prepared after the interview was accurate. (Government's Exhibit C.) Likewise, in his own affidavit, Shannon states that his previous statement outlining the interview with Airy on October 30, 1995, is correct. (Government's Exhibit D.)

Hall contends that defense counsel were ineffective for not requesting a continuance so Airy could be re-interviewed and a determination made on whether he would give testimony that would be helpful. Also, with a continuance, Hall thinks other inmates could have been interviewed who would have been able to give testimony corroborating Airy's testimony about Nichols.[6] Putting aside the question of whether this Court would have granted a mid-trial continuance for this reason when two other similar requests for continuance had been denied, Hall has failed to establish any

---

[6]

Hall has also submitted affidavits from two other inmates of the prison where Hall was housed prior to trial. These inmates state generally that Hall never spoke to them about any escape plans and never bragged to them about the crime, and that Nichols was known as a "snitch." (Hall's Exhibits #32, 33.)

46

prejudice as a result of defense counsel's failure to re-interview Airy and/or discover other federal inmates to testify for Hall. In this regard, even had the defense re-interviewed Airy and determined that Airy was willing to testify in a matter contrary to what was contained in the FBI statement, had he been called as a defense witness, the government would have, presumably, been able both to question Airy about the interview with Shannon and Macaluso and to call Shannon as a witness in order to impeach Airy. Hall has not shown that a credibility determination between Airy, a convicted federal felon, and Shannon, an FBI agent, would have been settled in Hall's favor.

Moreover, with regard to any other inmates who might have testified on Hall's behalf, Hall has failed to establish that, even had these inmates been located, their testimony would have so effectively impeached Nichols testimony that Hall would not have received the death penalty. First, as noted earlier, defense counsel already effectively impeached Nichols during cross-examination about his self-interested motivation. Second, these inmates could only testify about what Hall told them, not what Hall might or might not have said to Larry Nichols. Because Hall has not established the prejudice prong of the *Strickland* standard, this claim is without merit.

7.   Failure to Make a Closing Argument at the Guilt Phase

Hall argues that his trial counsel were ineffective in their decision not to make a closing argument at the guilt phase of the trial. Hall contends that, had trial counsel made a closing at the guilt phase of the trial, they could have "built a bridge" between the guilt and the punishment phases of the trial. Thus, even though counsel were in effect conceding that Hall was guilty of the offenses for which he was charged, counsel could have raised questions in the closing argument about the veracity of the testimony given by Hall's co-defendants and could have begun to argue at closing that these co-defendants were equally culpable.

As support for this claim, Hall points to two affidavits submitted by defense attorney Michael Tigar, one with the amended petition and one with Hall's reply to the government's response. In these affidavits, Tigar opines that defense counsel were ineffective for failing to give a closing statement at the guilt phase of the trial. Specifically, Tigar states that trial counsel should have given a closing statement at the guilt phase of the trial, highlighting co-defendant Steven Beckley's plea agreement, as well as his previous lies to the police and the inconsistencies between his previous statements to the police and his trial testimony. Tigar further states that trial counsel's decision not to make a closing statement at the guilt phase of the trial left the jury with only the government's theory of the case and did not adequately emphasize the defense's argument that Beckley was an equally culpable defendant

48

who was not going to receive the death penalty. (Hall's Exhibit 12 at pp. 9-12.)  And, Tigar states that, while the government would be expected to "land a few blows" in rebuttal, defense counsel were ineffective for not making a closing statement at the guilt phase in order to address those jurors not yet set on a death sentence for Hall. (Hall's Reply Exhibit 5 at pp. 19-20.)

In his affidavit, defense attorney Michael Ware states that he was aware of the concept of "building a bridge" between the guilt and punishment stages of the trial. He believed, however, that prosecutors are fully capable of doing the same and therefore he made a strategic decision not to make a closing statement at the guilt phase of the trial so that the government could not give another closing statement in rebuttal, which would have been the last argument the jury would have heard at the guilt phase. (Government Exhibit E at p. 28.)  Instead, defense counsel made an opening statement at the punishment phase of the trial, before the government opened its case-in-chief, in which counsel emphasized that Hall accepted responsibility in his confession, that there were others who were equally culpable against whom the death penalty was not sought, that Hall had four young children and had been a good father, that Hall had witnessed the physical abuse of his mother by his father, that Hall grew up hard and dealt drugs, but that this was a case of a situation getting out of hand and the appropriate sentence was life

in prison without the possibility of release rather than death. (R. 17:8-11.)

This Court finds that Hall's trial counsel did not render ineffective assistance of counsel in deciding not to make a closing statement at the guilt phase of the trial. This decision was made by experienced criminal defense attorneys, was made because the defense was not contesting Hall's guilt but was instead concentrating on the punishment phase of the trial, and was made for the strategic purpose of not providing the government an opportunity to give a rebuttal argument which would be the final argument the jury heard at the guilt phase. Moreover, Hall's concern that, because of this decision, the defense did not establish the framework for the punishment phase of the trial is answered by the fact that defense counsel made an effective *opening* statement at the punishment phase of the trial. Defense counsel were not ineffective in this regard. Besides, Hall has also not established that he was prejudiced by this decision, as he has not shown a reasonable probability that, by relying primarily on an opening statement at the punishment phase to make the case for life over death rather than upon a closing statement at the guilt phase, Hall received a death rather than a life sentence.

## 8.   Failure to Effectively Argue Right to Allocution

Hall contends that his trial counsel were ineffective for failing to effectively argue his alleged right to allocute before the jury.

Before the defense presented its witnesses at the punishment phase of Hall's trial, defense counsel argued to this Court that Hall had an absolute right to make a statement to the jury before the jury reached its decision on punishment under Rule 32(c) of the Federal Rules of Criminal Procedure.  They also cited a Fifth Circuit case, albeit a non-death penalty case, as support for this argument.  This Court denied defense counsel's request to allocute before the jury without being subjected to cross-examination on the basis that the federal death penalty statute did not provide for such a right and that Hall had no constitutional right to allocute. (R. 18:45-50.) On direct appeal, Hall argued that he had a right to make a statement of remorse to the jury under Rule 32(c) or, in the alternative, under common law.  Furthermore, Hall contended on appeal that he had a constitutional right to allocute and that, even if such a constitu-tional right did not exist, this Court had violated Hall's due-process rights by allowing the government to present victim impact statements that were not subject to cross examination, but did not give Hall the same opportunity. *Hall*, 152 F.3d at 391.  The Fifth Circuit denied each of these claims, holding that Hall did not have a federal statutory, common-law, or constitutional right of allocution and that this Court did not abuse its discretion in declining to permit the allocution. *Id.*, 152 F.3d at 391-98.

Hall now contends that his defense counsel were ineffective because, had counsel cited state death-penalty cases where the trial

court permitted such an allocution, there is a reasonable probability that this Court would have exercised its discretion and allowed Hall to make a statement of remorse to the jury without being subject to cross-examination. Hall further contends that, had defense counsel presented the proposed statement to this Court at the time the point was argued, rather than waiting until after trial to place the statement into evidence, this Court would have been persuaded to allow Hall to make the brief statement of remorse.

Contrary to Hall's argument, regardless of what state case law defense counsel might have presented to the Court supporting his position that a court has the *discretion* to allow a defendant in a death penalty case to allocute before the jury, this Court would not have granted Hall's request to allocute before the jury, no matter the content of the statement, without subjecting himself to cross-examination by the government. And, more importantly, on direct appeal the Fifth Circuit held that it was not error for this Court to deny Hall's request. Counsel were not ineffective for failing to argue more strenuously a point that was without merit. *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) (noting that the Fifth Circuit has consistently held that counsel is not ineffective for failing to make futile motions or objections).

9.  Unreasonable decisions regarding expert witnesses

Hall next argues that his trial counsel were ineffective in their request and use of experts with respect to the punishment phase of

52

the trial.  Specifically, Hall contends that his trial counsel were ineffective in first requesting a psychiatrist and psychologist rather than a mitigation specialist, in requesting a mitigation specialist too late in the process, by not having him examined by a neuropsychologist, and by failing to have someone testify about the impact that Hall's upbringing had on his behavior.

On July 14, 1995, defense counsel sought, and obtained, funds from this Court with which to hire both a psychiatrist and a psychologist to examine Hall.  Defense counsel also sought, but were denied, funds with which to hire a jury consultant, but were given funds to hire a forensic pathologist. (July 12, 1995, hearing at 10-13; Government Exhibit E at 5-6.)  Defense counsel hired forensic psychiatrist Dr. Lisa Clayton and neuropsychologist Dr. Randy Price. Subsequent to this, in September of 1995, defense counsel sought, and obtained, funds with which to hire a mitigation specialist.  Dr. Clayton examined Hall and was prepared to testify for the defense, but the defense opted not to have her testify because this Court had ordered that, were she to do so, the government had the right to have Hall examined by its own expert. (Government Exhibit E at 7-8.)  Dr. Price examined numerous documents relating to Hall, but evidently did not examine Hall and was either unwilling to testify on Hall's behalf or felt that he was unable to give any testimony that would assist Hall. (Hall's Exhibits 7 & 13, Government Exhibit E at 8-9.)

53

Hall contends that there was evidence before defense counsel that indicated that he should be examined by a neuropsychologist, based on the fact that the mitigation specialist had discovered that Hall's mother was beaten when she was pregnant with Hall and may have also been abusing alcohol; and that Hall performed poorly in school, had been diagnosed with hearing problems as a child, and had a poor memory. (Hall's Exhibit #7 at 18-20.)  Defense counsel, however, did in fact hire a neuropsychologist so, in essence, Hall faults his counsel for not hiring another psychologist to examine him.

Hall also contends that an expert should have testified at trial regarding the effects that Hall's upbringing had on his personality and offers an affidavit from a social worker as support for this claim. (Hall's Exhibit 14.)  An offer of proof made by defense counsel after the trial, however, illustrates that this was the type of evidence that Dr. Clayton was prepared to give, but that she was not called to the stand because defense counsel made the strategic decision not to allow Hall to be examined by an expert hired by the government. (November 21, 1995 hearing; Government Exhibit E at 7-8.) Thus, Hall faults his trial counsel for not hiring *another* expert to testify generally, without having examined Hall, about how a history of family abuse and poverty caused Hall to enter the illegal drug trade.

First, Hall has failed to establish that his trial counsel were ineffective in their use of experts.  Defense counsel sought the

54

assistance of more experts than this Court authorized.  While Hall contends that the mitigation specialist was not hired in a timely matter, this Court concluded earlier in this opinion that counsel were able to utilize the mitigation specialist.  And, while neither the psychologist nor the psychiatrist testified on behalf of Hall, this was not due to any ineffective assistance on the part of defense counsel. *See Lewis v. Dretke*, 355 F.3d 364, 366 (5th Cir. 2003) (holding that counsel was not ineffective in making a strategic, informed decision to forego a psychiatric evaluation of the defendant to forestall the testimony of the state's expert psychiatric witness).

Second, Hall has failed to establish that he was prejudiced by the decisions that defense counsel made with respect to the use of experts.  As Michael Ware notes in his affidavit, defense counsel were not allowed an inexhaustible amount of money with which to hire experts to assist them in their defense of Hall. (Government Exhibit E at pp. 5.)  In fact, this Court denied defense counsel's request for a jury consultant when the government pledged not to use one; and defense counsel were not permitted to hire expensive experts at will and without a benefits analysis.  While defense counsel might have reasonably argued to this Court that they should be permitted to hire another psychologist because their psychologist was either unwilling or unable to testify on Hall's behalf, it is highly doubtful that this Court would have entertained a request to hire a social worker to testify about Hall's upbringing after having already given

55

defense counsel funds with which to hire both a psychologist and a psychiatrist.

Even had this Court permitted defense counsel to hire another neuropsychologist to examine him *and* a social worker to testify generally about the effect his upbringing had on his behavior, Hall has failed to establish a reasonable probability that these experts would have discovered and testified about information that would have mitigated against the imposition of the death penalty such that Hall would have received a life, rather than a death, sentence.  Hall has submitted declarations from a neuropsychologist who examined him on April 13, 2001; and from a social worker who reviewed Hall's and his siblings' education records, records of Hall's parents' divorce, his mother's medical records, unemployment data from El Dorado, a summary of the testimony in the case, Hall's previous arrest and prison records, and the numerous declarations that Hall has submitted from Hall's friends and relatives.

In his declaration, the psychologist does not state that Hall suffers from any mental disorder or is mentally retarded.  Instead, Dr. Michael Gelbort states that, due to "markers" that Hall exhibited, he believes that Hall suffers from "neuropsychological impairment." Gelbort bases his opinion on the fact that, in the testing performed on him, Hall scored in the fortieth percentile in verbal intellect and the twelfth percentile in non-verbal abilities. Because of this, Gelbort believes that Hall has a lesser ability to exercise judgment

56

and to anticipate the consequences of his actions and would be someone who would benefit from supervision. (Hall's Exhibit #41 at pp. 3-4.)[7]

In her declaration, Jill Miller states that Hall was a victim of severe physical abuse at home and his mother suffered from health problems and depression; that Hall has learning disabilities; and that Hall was abandoned by his mother when she left his father and thus had responsibilities towards his younger siblings. She concludes, consequently, that these are some of the reasons why Hall began selling drugs. Miller also states in her affidavit that Hall was a good prisoner in Arkansas and that, at the time of Lisa Rene's murder, Hall had indicated that he wanted to leave the drug trade and obtain "gainful employment." (Hall's Exhibit #14 at pp. 15-16.) Miller also states that, because of his history of trauma, the lack of good role models during his upbringing, and the pervasiveness of the drug trade in his hometown of El Dorado, the lure of the drug trade was something that Hall could not resist. (Hall's Exhibit at pp. 24-25.)

Even had both of these experts testified at Hall's trial about the information contained in their declarations, there is no reasonable probability that the result would have been different. Quite simply, although this Court does not deny the claims that Hall

---

[7] There is a second declaration from Dr. Gelbort that was submitted as an exhibit with Hall's reply to the government's response. In this declaration, Gelbort explains why Hall's neurological impairment would not have been evident to defense counsel when speaking to Hall. (Hall's Reply Exhibit #15.)

is of below-average intelligence and that his upbringing was deprived, the facts of the crime and the witnesses who testified for the government at punishment belie the contentions that Hall was incapable of exercising judgment or that he only entered the drug trade to provide for his family and wanted to exit it as soon as possible. In fact, after Lisa Rene was abducted from her apartment, Hall was the one who directed that she be transported to Arkansas, oversaw her confinement in the motel rooms, helped to dig her grave, helped to kill her, gave Beckley and Demetrius Hall advice on how to avoid the police, and refused to tell the police about the location of Lisa Rene's grave. And he did all of this because money had been stolen from him during a *drug transaction*. And, with regard to Hall's criminal history, after previously being imprisoned in Arkansas on drug charges and being released into the care of a family friend, Hall returned to the drug trade, directing both the mother of his child and members of his family in the business. In short, explanations for why Hall entered into the drug trade nowhere near sufficiently mitigate against his abhorrent behavior while practicing his livelihood such that there is a reasonable probability that, had this testimony been placed before the jury, Hall would have received a life sentence. *See Kunkle v. Dretke*, 352 F.3d 980, 992-93 (5th Cir. 2003) (holding that trial counsel were not ineffective for failing to present sufficient evidence of the defendant's mental problems and his troubled home life given the limited weight the jury would

58

place on this evidence when compared to the defendant's history of criminal behavior and aggressiveness towards others). The Court concludes that this claim is without merit.

10. Failing to Adequately Argue Motions for Continuance

Hall asserts that his trial counsel were ineffective for failing to adequately argue the motions for continuance that they made to this Court. Specifically, Hall contends that counsel were ineffective with respect to a motion for continuance defense counsel made on August 2, 1995, approximately two months prior to trial, and two motions for continuance made during the punishment phase of the trial. This Court denied all three motions.

As the government notes in its response, Hall must show not only that his motions for continuance would have been granted had they been supported with greater evidence and argument, but he must also establish a reasonable probability that, had the motions been granted, counsel would have obtained a sufficient amount of additional mitigating evidence to have altered the death-penalty verdict. *McFadden v. Cabana*, 851 F.2d 784, 787-88 (5th Cir. 1988). This he has not done. First, this Court almost surely would not have granted these motions for continuance had they been argued and supported as Hall suggests.[8] Second, earlier in this opinion, this Court concluded

---

[8]

Hall suggests that the first motion for continuance should have included defense attorney Michael Ware's professional schedule as support for the motion. However, Hall fails to present any evidence that Michael Ware's schedule prevented him from being ready for trial.

that Hall had failed to show a reasonable probability of a different outcome at sentencing had the additional mitigating evidence he now points to been admitted into evidence. Accordingly, Hall has failed to establish prejudice because his motions for continuance were denied, and Hall has therefore failed to establish ineffective assistance of counsel under the *Strickland* standard with regard to this claim.

## 11.  Making an Ineffective Closing Argument at Punishment

Hall further argues that his trial counsel were ineffective in their closing statements at the punishment phase of the trial. Hall contends that the two closing statements given by Michael Ware and Jeff Kearney were ineffective because an inadequate amount of time was spent arguing positive reasons why Hall's life should have been spared, such as his upbringing, his prior good behavior in prison in Arkansas, and his children. Hall further argues that the fact that the jury deliberated for over ten hours at the punishment phase is evidence that, had Hall presented more mitigating evidence at trial and argued it more forcefully in their closing statements, there is a reasonable probability that he would have received a life, rather than a death, sentence.

In considering whether a closing statement constituted ineffective assistance of counsel, an appellate court should look at the closing statements in their entirety. *Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997). And counsel is not ineffective for

making the strategic decision to acknowledge a defendant's culpability and even concede that the death penalty would be justified in order to establish credibility with the jury. *Id.*   In the case at hand, defense counsel made closing statements that lasted for one hour. In these closing statements, they expressed sympathy for the victim's family, reiterated that Hall was guilty of the offense he was convicted of, and suggested that Hall's abusive home life and the harm that a death sentence would give to his children and his mother were circumstances that mitigated against a death sentence. (R. 20A:52, 55-6.)   Defense counsel also emphasized that, if given a life sentence, Hall would not be eligible for parole and would die in federal prison (R. 20A:53, 78.)   And, defense counsel suggested that the only people who would benefit from Hall's receiving a death sentence were his co-defendants and government witness Larry Nichols, who all testified in order to lower their own prison sentences. (R. 20A:56-7.)   Finally, defense counsel made an impassioned plea that the jury not accept the partnership that the government entered into with people who were criminals and liars in order to seek the death penalty against Hall. (R. 20A:60-82.)

While Hall disagrees with the overall trial strategy of defense counsel to emphasize the equal culpability of Hall's co-defendants, this Court has determined that this was a reasonable trial strategy. Defense counsel's closing statements helped support this trial strategy, as well as emphasizing other factors that the jury should

consider in reaching its decision.  Accordingly, defense counsel's closing statements were not, taken in their entirety, ineffective closing statements.  Moreover, Hall has failed to establish prejudice. Hall points to the fact that the jury deliberated for over ten hours as evidence that, had defense counsel made more effective closing statements in which Hall's upbringing was emphasized in greater detail, there is a reasonable probability that he would not have been sentenced to death.  However, the fact that the jury deliberated for a substantial period of time militates just as forcefully toward the conclusion that defense counsel's closing statements were very effective, thereby creating  issues that necessitated extensive deliberation.  Hall's defense counsel were not ineffective in this regard.

12.  <u>Failing to Conduct an Adequate Voir Dire</u>

Finally, Hall asserts that his trial counsel rendered ineffective assistance of counsel by failing to conduct an adequate voir dire of prospective jurors.  Hall, however, only argues generally that his trial counsel were ineffective during the voir-dire process because they failed to investigate in a timely manner certain mitigating evidence.  Individual voir dire began on October 2, 1995. (R. 1.)  As noted earlier, by that date defense counsel had met with Hall and members of his family several times and had the benefit of some investigation performed by Hall's previous attorneys.  Thus, investigation into potential mitigating evidence had been conducted

prior to voir dire.  But more importantly, Hall has failed to point to any particular act or omission committed by defense counsel during the voir-dire process that rendered their representation of him ineffective. (*See* Amended Petition at 143-45.)  Without any support from the record for this claim, it is without merit.

*Summary as to Ineffective Assistance*

In summary, Hall was represented by two experienced criminal defense attorneys who had, prior to representing Hall, a total of thirty-five years of experience between them in criminal law.  Each had tried numerous criminal jury trials in both state and federal court.  Prior to Hall's trial, each had tried two other death-penalty cases to conclusion and had been involved in other capital cases where there was a mistrial or where the government did not seek the death penalty. (Government Exhibit E at 1, Exhibit F at 1-2.)  Hall's attorneys conducted reasonable investigations in all areas of the case; requested and were appointed experts to assist them; vigorously cross-examined government witnesses at both stages of the trial, thereby questioning and examining the government's case against Hall; ably argued all objections and points of law; and eloquently defended their client in their closing statements. Hall received constitutionally effective assistance of counsel at his trial, and his second claim for relief is therefore denied.

63

## C.   __Juror-Misconduct Claims__

In his third through fifth claims for relief, Hall alleges various instances of juror misconduct.  In his third claim, Hall asserts that there was extraneous evidence or information introduced into the jury's punishment-phase deliberations.  In his fourth claim for relief, Hall contends that one of the jurors had *ex parte* contact with a member of the victim's family.  And in his fifth claim for relief, Hall asserts that there is an unacceptable risk that "at least one juror" voted for the death penalty based on sympathy for the victim and her family.  Hall contends that his rights under the Fifth, Sixth, and Eighth Amendments were violated by these acts.

*Law Applicable to Juror Misconduct*

The Supreme Court has stated that, with respect to claims that there was an impermissible outside influence on the jury, due process "means a jury capable and willing to decide a case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The Supreme Court has further stated that, with such claims, the issue that must be decided is whether the intrusion affected the jury's deliberations and thereby its verdict. *United States v. Olano*, 507 U.S. 725, 739 (1993).  A defendant is entitled to a new trial when extrinsic evidence is introduced into the jury room unless these is no reasonable probability that the jury's verdict was influenced by the information. *United States v. Ruggiero*, 56 F.3d 647, 652 (5th

64

Cir. 1995); *United States v. Luffred*, 911 F.2d 1011, 1014 (5th Cir. 1990).

*Analysis*

Hall bases these claims on two incidents that allegedly occurred during the trial. First, Hall's sister, Cassandra Ross, has submitted an affidavit to this Court stating that she saw a television newscast during which one of the female jurors was interviewed. Ross claims that the juror told the reporter that, during the weekend break in punishment deliberations, she had a birthday party for her daughter and that she placed a candle on the cake in Lisa Rene's memory and she and the guests said a prayer for Lisa Rene. (Hall's Exhibit #42.) Second, Hall has submitted evidence, including copies of e-mails and letters, that one of the jurors at Hall's trial, Jacqueline Holmes, communicated with Hall by letter after his trial and told him that she had met the victim's mother in the hallway during the trial. (Hall's Exhibits #44-49.)   Hall contends that this evidence establishes that there was extrinsic information placed before the jury and there is a reasonable probability that the jury's verdict was influenced by the information.   Hall further contends that Jacqueline Holmes's statements in letters and e-mails written by her indicate that she based her decision at the penalty phase of the trial on sympathy for the victim.

This Court conducted a hearing on these issues on June 7, 2004. At this hearing, Jacqueline Holmes testified under oath.   She

65

acknowledged that she had communicated with Hall in prison by mail after the trial ended.  She also acknowledged that, in one of her letters to Hall, she stated that she met the victim's mother during the trial.  She further testified, however, that this statement was not true, that she never met the victim's mother, and that she included this statement in her letter in an attempt to encourage Hall to confide in her and respond to her inquiries.  Holmes further testified at the hearing that she did not host or attend a birthday party during the weekend break in deliberations at the penalty phase of Hall's trial, she was not aware of any other juror attending such a party, and she did not recall any discussions between the jurors about a birthday party. (*See* Record of June 7, 2004 hearing.)

With regard to Hall's allegation that a juror had *ex parte* communications with the victim's mother, the live, sworn testimony before this Court is that this communication did not occur, and this Court finds Holmes's testimony to be credible.  Accordingly, Hall has not established that any inappropriate *ex parte* contact occurred. With regard to Hall's allegation that extrinsic evidence was introduced into the jury room, Hall has made a specific allegation that a juror lit a birthday candle in honor of a murder victim and said a prayer in her memory.  Assuming that this allegation is indeed true, and a female juror other than Jacqueline Holmes attended the birthday party, it is not evidence that there was *any* outside influence on the jury.  Instead Hall offers merely *speculation* that

there may have possibly been some unknown person at the party who said something to the juror that influenced her vote. Mere speculation that some discussion between a juror and an unknown person occurred does not establish that extrinsic evidence entered the jury deliberations, especially where Jacqueline Holmes's sworn testimony is that she does not recall any juror discussing a birthday party, much less any prayer offered on behalf of the victim. Hall has also failed to establish this claim.[9]

Finally, Hall contends that an "unacceptable risk" exists that Jacqueline Holmes's decision to recommend the death penalty for Hall was based on her sympathy for the victim and her family, rather than on the evidence. Hall bases this claim on statements that Holmes made in messages posted on a web site regarding the death penalty, and Hall has submitted these messages to this Court as exhibits. In particular, Holmes stated that she was the last person on the jury in Hall's case to vote in favor of sentencing Hall to death. She admits that she ultimately voted as she did because of the horror

---

[9] Hall makes two further contentions. First, he asserts that he has been unable to locate evidence to support this claim because this Court has previously denied him discovery on this issue. As noted in its earlier order denying Hall's request for discovery, further discovery was denied on this issue because Hall had failed to assert a *prima-facie* claim of juror misconduct, because Hall's contention that someone might have communicated something to the unknown juror at the birthday party was, and remains, mere speculation. Second, Hall appears to assert a further claim that religion played an impermissible part in the jury's verdict at punishment, given the juror's prayer for the victim at the party and testimony given at trial at the punishment phase of the trial regarding attending and being active in church. (R. 32:18.) As the government notes in its response, it never advocated the death penalty for religious reasons. And, the constitution is not violated merely because testimony regarding the victim's church attendance was offered into evidence. *See United States v. Bernard*, 299 F.3d 467, 479-80 (5th Cir. 2002). These contentions are without merit.

67

the victim suffered, Hall's attempts to hide the crime, and his lack of remorse.  She discloses that she has struggled with her decision in the years since, that she will always remember the sadness of both the victim's and Hall's families, and that she stopped writing letters to Hall because she was "overwhelmed" by the emotions that the correspondence evoked. (Hall's Exhibits #44, 48.)

As support for this claim, Hall cites cases in which the trial court removed jurors from service due to their inability to serve because of mental illness, depression, or a nervous or emotional condition.  These cases are not applicable in the instant case.  In her web postings, Holmes spoke of struggling with her decision after the fact.  This is not evidence that she voted in favor of the death penalty at the time of trial based on overwhelming sympathy for the victim and her family.  Instead, she specifically stated that she ultimately voted to recommend the death penalty because of the horror Lisa Rene experienced in death and because Hall attempted to hide his crime rather than promptly expressing remorse.  Her decision was therefore based on the circumstances of the crime and Hall's response to them.  Hall has shown no constitutional violation based on Holmes's verdict.  Hall's third through fifth claims for relief are without merit, and they are denied.

### D.   **Brady Claim**

In his sixth claim for relief, Hall contends that the government violated its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), because

the government was in possession of mitigating and impeachment evidence but did not provide it to Hall.  Specifically, Hall asserts that the government knew that one of its witnesses, Larry Nichols, had additional criminal conduct and more experience as a government witness than what it revealed at trial, but that it did not inform defense counsel.  Hall further asserts that, contrary to Nichols's testimony, he had been placed in protective custody prior to the times he spoke with Hall at the Mansfield jail.  Hall contends that all of this additional information could have been used by the defense to impeachment Nichols, thereby discrediting his testimony.

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the suppression of evidence favorable to the accused and material to either guilt or punishment by the state violates a defendant's due-process rights under the federal constitutional.  And under *Brady*, the prosecution has the duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley*, 473 U.S. 667, 682, 685 (1985).  Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.  A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Bagley*, 473 U.S. at 678.

As noted earlier in this opinion, at the punishment phase of Hall's trial, Nichols testified that he and Hall were fellow inmates

69

in the Mansfield Correctional Center in the months leading up to Hall's trial.  Nichols further testified about Hall's demeanor in prison and his statements that he would kill Steven Beckley if he ever got the chance and that he had a plan to escape from custody. (R. 17:220-27.)

On direct examination, Nichols acknowledged that he had approached an FBI agent with this information when he was in court regarding his own federal cases and that, after speaking about Hall to FBI agents and an AUSA on March 6, 1995, he was placed in protective custody when he returned to Mansfield because he was a "snitch." (R. 17:236-37.)  He further acknowledged that he had been charged with the armed robbery of three banks and, in exchange for his testimony at the trial of his co-defendants, had pled guilty to two counts of using a weapon during a crime of violence. (R. 17:210-12.)  Nichols also testified that there was a provision in his plea agreement with the government whereby the government could recommend that his sentence be reduced because of his cooperation in the case against his co-defendants. (R. 17:213-14.)

On cross-examination, Nichols acknowledged his numerous prior robberies, his ownership of guns, his purchase of a car with stolen money, and his attempt to convince a co-defendant to lie in an affidavit. (R. 17:242-45, 248.)  Nichols also admitted on cross-examination that he had not yet been sentenced in his case.  He further acknowledged that the government had already filed a motion

70

with the judge presiding over his case for a downward departure from his guideline sentence due to his cooperation in that case and that he would like for the judge in his case to know about his cooperation with the government in Hall's case before he is officially sentenced. (R. 17:252, 256, 260-62, 268-69.)

Hall contends that the government withheld the full extent of Nichols's prior criminal conduct from Hall's attorneys. Hall further contends that Nichols was in protective custody before, not after, he spoke to federal agents about Hall and that this information was withheld from Hall's attorneys. And Hall asserts that the government withheld information that Nichols was a "career informant" who had cooperated with the government in cases other than those of his two co-defendant bank robbers and Hall.

Hall asserts that the government knew about Nichols's other prior criminal conduct because Nichols disclosed it during his testimony at the trial of his co-defendants. In that regard, the record from Hall's trial reflects that Hall's attorney Jeff Kearney questioned and confronted Nichols with his testimony at his co-defendants' trial on more than one occasion. (R. 17:246-47, 257.) Furthermore, in an affidavit submitted with the government's response, Kearney states that he reviewed the transcript of Nichols' previous testimony and utilized this information in cross-examining Nichols. (Government Exhibit F.) Nichols's prior criminal conduct, as related by Nichols at the prior trial, was not withheld from the defense.

Hall contends that Nichols was in protective custody before he spoke to an FBI agent on February 28, 1995, about Hall. Hall bases this on the word "protect" which is in parentheses in the report FBI Agent Arthur Grovner filed regarding his conversation with Nichols that occurred in a federal courtroom. (Hall's Exhibit #1.) Hall has no other evidence of this allegedly withheld evidence, and Hall's supposition that this parenthetical notation indicates that Nichols was already in protective custody is belied by the text of the report, which states that Nichols informed Grovner that he was a cellmate with one of the Hall brothers. This allegation is without merit.

Finally, Hall contends that the government withheld information that Nichols was a career informant. Hall does not state where he learned this information and does not specify against whom Nichols cooperated as a government witness other than his co-defendants and Hall. Regardless, even were this allegation correct and even if the government knew that Nichols had acted as an informant in the past additionally to what he admitted on the stand, Hall has not shown that this information is material impeachment evidence. On cross-examination, Nichols was impeached by defense counsel Kearney not only with his extensive criminal history, but also his willingness to testify against others, including his previous associates, in order to improve his own situation. Hall has not shown a reasonable probability that, had the jury been provided even more evidence along

72

this vein, Hall would not have received the death penalty.  Hall's sixth claim for relief is without merit and is therefore denied.

**E.    False-Testimony Claims**

In his seventh and twelfth claims for relief, Hall argues that his constitutional rights were violated when the government presented false testimony from government witnesses Larry Nichols and Steven Beckley.  Specifically, in his seventh claim, Hall contends that government witness Larry Nichols lied upon being cross-examined at the punishment phase of the trial when he testified that he never used any of the proceeds from his previous robberies to use drugs and was never told by other inmates about ways to help himself within the legal system.  In his twelfth claim for relief, citing *Johnson v. Mississippi*, 486 U.S. 578 (1988), Hall contends that his death sentence violates the Eighth Amendment because it was based on false testimony given by government witnesses Larry Nichols and Steven Beckley.

The Supreme Court has held that the presentation of false evidence violates a criminal defendant's due-process rights.  *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935).  The same result obtains when the prosecutor, although not soliciting false evidence, allows it to go uncorrected when it appears.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  And this is true whether the presentation was intentional or through negligence.  *United States v. Antone*, 603 F.2d

73

566, 569 (5th Cir. 1979), *citing Giglio v. United States*, 405 U.S. 150, 154 (1972).

In order to prevail on this claim that his constitutional rights were violated by the presentation of false testimony, Hall must establish not only that the testimony was actually false, but also that it was material and that the prosecution knew it was false. *Napue v. Illinois*, 360 U.S. at 271. As evidence that Nichols lied at trial, Hall points to Nichols's testimony at the trial of his own co-defendants. (Hall's Exhibit #31.) As noted earlier, Nichols's prior testimony was available to defense counsel and was used in cross-examining him. But even if this Court were to consider the government's failure to correct Nichols's testimony on these points at Hall's trial an error under *Napue*, it was not material. Nichols's testimony at Hall's trial and the previous trial differed with respect to collateral matters that are not material to Hall's sentence. Regardless of whether Nichols used his illegal proceeds to purchase drugs, there was ample evidence of Nichols's prior criminal behavior placed into evidence, including numerous armed robberies, as well as the illegal possession of guns. And, regardless of whether someone counseled Nichols on how to avail himself of the system to improve his chances of lowering his sentence, there was ample evidence admitted of his willingness to initiate contact with the government in order to provide information against other defendants, as well as his willingness to testify against others with the express hope

of having his sentence reduced.  Indeed, in an affidavit submitted with this Court, defense counsel Kearney explains that, while he did have access to all of Nichols's testimony from his co-defendants' trial, he decided not to confront Nichols with all of the inconsistencies in his testimony at Hall's trial and the previous trial, no matter how minor, because Nichols had substantially admitted most of the impeaching information in his testimony at Hall's trial. (Government Exhibit F.)  Hall's seventh claim for relief is denied.

With respect to Hall's twelfth claim, the Supreme Court in *Johnson v. Mississippi*, 486 U.S 578 (1988), reversed a death penalty in a case where a prior felony conviction from another state was used to prove an aggravating circumstance at the sentencing phase of the trial and that prior conviction was later reversed.  Hall asserts that under this Supreme Court precedent, his death sentence is invalid because it is based on false testimony given by Larry Nichols at the punishment phase of the trial and by false testimony given by Steven Beckley at the guilt phase of the trial.  In addition to his assertions that Nichols lied, which are set forth in his seventh claim for relief, Hall asserts that Steven Beckley lied about the nature of Hall's involvement in the kidnapping and murder of Lisa Rene and that, while this testimony was given at the guilt phase of the trial, Hall's sentence was based in part on his allegedly false testimony.

As this Court noted earlier, all of the allegedly false testimony that Nichols gave at Hall's trial was not material to the sentencing phase of the trial. With respect to Beckley's testimony, Hall asserts, without any supporting proof, that Beckley testified falsely that Hall was the leader of the group who committed the kidnapping and murder. However, while Beckley did testify that Hall was one of the primary actors in the kidnapping who also, along with Beckley and Bruce Webster, participated in her murder, his testimony was corroborated to a large extent by the testimony of Hall's brother, Demetrius Hall, by the testimony of Marvin Holloway, and by Hall's confession to the police. (*See* R. 13:107-227; R. 14:45-57; R. 16:14-64.) Hall has not shown that his death sentence was based on false testimony. Accordingly, this Court denies relief with respect to these claims.

## F.   Government-Agent Claim

In his eighth claim for relief, Hall asserts that his right to counsel under the Sixth Amendment was violated because the government used Larry Nichols as a government agent to elicit information from Hall to be used against him at trial. Specifically, Hall asserts that, either with the direction or the encouragement of FBI Agent Grovner, Nichols elicited information from Hall between February 28, 1995, the day that Nichols initially approached an FBI agent about Hall, and March 5, 1995, the date Nichols met with FBI agents and prosecutors and related his information about Hall.

76

The Supreme Court has held that, after a criminal defendant's right to counsel has attached, the government cannot initiate any questioning of the defendant without the presence of his attorney, unless he has waived his right to have counsel present. *Brewer v. Williams*, 430 U.S. 387 (1977).  This includes situations where the government uses a co-defendant who is cooperating with the government to elicit information after both have been indicted. *Maine v. Moulton*, 474 U.S. 159 (1985); *Massiah v. United States*, 377 U.S. 201 (1964).

Hall bases his contention that Larry Nichols was used as a government agent on "information and belief," but has consistently maintained that additional discovery is required to develop this claim.  However, the government has submitted an affidavit from FBI Agent Grovner in which he states that he never  encouraged or directed Nichols to elicit further information from Hall.  Rather, Grovner states in his affidavit that Nichols related to him information that Nichols had already been given by Hall regarding the escape plan, and Nichols stated that he had more information that he wanted to tell the government. (Government Exhibit B.)  And the statement made by Agent Grovner regarding his conversation with Nichols on February 28, 1995, reflects that Nichols told Grovner some, but not all, of the information he had gleaned from Hall. (Hall's Exhibit 1.)  As Agent Grovner has specifically denied Hall's contention that he ever encouraged or directed Nichols to elicit information from Hall, and Hall has presented no evidence to the contrary, Hall's claim that

77

the government violated his Sixth Amendment right to counsel by using Larry Nichols as a government agent is without merit. Hall's eighth claim for relief is denied.

## G.   **False-Statement Claim**

In his ninth claim for relief, Hall contends that his rights under the Fifth, Sixth, and Eighth Amendments were violated when, during his trial, the government gave defense counsel a false statement from FBI Agent Shannon regarding Hall's fellow inmate Alonzo Airy. Hall further asserts that the information contained in the false statement caused defense counsel to decide not to call Airy as an impeachment witness against Larry Nichols at the trial's punishment phase. Hall argues that his sentence should be reversed because, had Airy been called as a witness for the defense, he would have effectively impeached Nichols's testimony about Hall's behavior while he was at the Mansfield jail.

As noted earlier in this opinion, before the government had concluded its case-in-chief at the punishment phase of the trial, but after Larry Nichols had concluded his testimony for the government, the government requested from this Court that it be permitted to amend its witness list to add Airy to the list, who had recently been interviewed by the government. (R. 18:4.) The government wished to call Airy as a witness because he had corroborated Nichols's testimony when he spoke to government agents a couple of days earlier. (R. 18:5-6; Hall's Exhibit #39.) Defense

78

counsel objected to the government's attempt to amend its witness list (R. 18:8), and this Court denied the government's request to add Airy as a government witness. (R. 18:14.)  Defense counsel did not call Airy as a witness.

Hall offers no case law as support for his assertion that his sentence should be reversed on the basis of this claim, but has included as an exhibit an affidavit, signed by Airy on April 10, 2000, stating, in essence, that he never told Agent Shannon and AUSA Macaluso much of the information Shannon included in an FBI-302 statement dated October 30, 1995. Specifically, in his new affidavit Airy asserts that, contrary to what is stated in the FBI statement, he never told the government representatives that Hall was cold or remorseless, never told them that Hall said that the others followed him, never said that Hall told him that he wanted to kill Beckley because he was a "snitch," never said that Hall spoke of the victim in disparaging language, and never told the agents that Hall spoke to him about an escape plan in which he would kidnap and/or kill his attorney. (Hall's Exhibit #40.)

In response, the government has submitted affidavits from Macaluso and Shannon.  In his affidavit, Macaluso states that he and Shannon interviewed Airy on October 30, 1994, because the defense had listed him as a possible witness.  Macaluso further states that he recalls that Airy made very disparaging comments about Larry Nichols and viewed Nichols as someone who had taken advantage of his

own co-defendants. However, Airy confirmed the accuracy of Nichols's comments regarding Hall and what Hall had told Nichols about the kidnapping and murder of Lisa Rene. Finally, Macaluso states in his affidavit that Shannon's statement that was prepared after the interview was accurate. (Government's Exhibit C.) Likewise, in his own affidavit, Shannon states that his previous statement outlining the interview with Airy on October 30, 1994, is correct. (Government's Exhibit D.)

Hall does not allege that the government knowingly presented false testimony, as Airy did not testify for the government. Instead, Hall appears to be making a general prosecutorial misconduct claim, alleging that the prosecution committed misconduct when the prosecutors presented an FBI statement in order to convince the defense attorneys not to call Airy as a defense witness. The Fifth Circuit has stated that prosecutorial misconduct is not a ground for relief unless it casts serious doubt on the jury's verdict. *Styron v. Johnson*, 262 F.3d 438, 449 (5th Cir. 2001). And any alleged prosecutorial misconduct must be examined in the context of the trial in which it occurred. *United States v. Bermea*, 30 F.3d 1539, 1563 (5th Cir. 1994).

Hall alleges that the government's stated desire to call Airy as a witness improperly influenced defense counsel not to call Airy themselves. But to make a showing that the government infringed on his right to present a defense at the punishment phase of his trial,

80

Hall must show that the government's conduct substantially interfered with Airy's free choice to testify. *See United States v. Thompson*, 130 F.3d 676, 686 (5ᵗʰ Cir. 1997). And while the government cannot conceal exculpatory evidence from a defendant, the government is under no obligation to conduct the defendant's investigation for him. *United States v. Garza*, 165 F.3d 312, 315 (5ᵗʰ Cir. 1999); *United States v. Marrero*, 904 F.2d 251, 261 (5ᵗʰ Cir. 1990).

Hall has not shown that any government action interfered with Airy's decision or choice to testify. First, it is difficult to conceive why the government attorneys would have argued forcefully for the right to call Airy as a government witness knowing that he would give testimony substantially different than what the FBI agent recounted in his statement. Second, and more importantly, even if the FBI statement was a complete fabrication, when this Court denied the government's request to call Airy as a witness, defense counsel were free to do so and were certainly free to speak to Airy again and determine what testimony he was actually willing to give. Defense counsel, not the government, decided not to call Airy as a witness.[10] Accordingly, no prosecutorial misconduct alleged by Hall casts serious doubt upon the jury's verdict at punishment. Accordingly, this claim is without merit and it is denied.

---

[10]   As noted earlier in this opinion, the decision not to call Airy as a witness was an imminently reasonable one because, even if he contradicted everything in the FBI statement, the government was free to question him about the statement and call FBI Agent Shannon to impeach Airy's testimony. Surely, this would have undercut Hall's defense, not aided it.

**H.   <u>Interference-with-Counsel Claim</u>**

In his tenth claim for relief, Hall asserts that the government "arbitrarily interfered" with his Sixth Amendment right to counsel when the government informed his original trial counsel, Mark Daniel and Michael Heiskell, that Larry Nichols had told the government that Hall had a plan to escape by taking one of his attorneys hostage. Hall maintains that Nichols was an unreliable witness and that, had Hall's original attorneys been aware of his unreliability, they would not have withdrawn from the case. The government responds that there is no evidence that Nichols was an unreliable witness, that the government had an obligation to inform counsel about the information it had received about the escape plan, and that Hall had no constitutional right to be represented by any particular attorneys.

On October 28, 1994, Mark Daniel was appointed to represent Hall and on January 6, 1995, Michael Heiskell was appointed as co-counsel in the case. On March 8, 1995, these attorneys filed a motion to withdraw from their representation of Hall. On March 9, 1995, after conducting an *in camera* review of the issue, this Court issued an order granting the motion. Jeff Kearney and Michael Ware were subsequently appointed as new counsel for Hall. Hall's former attorneys requested to withdraw from the case when they were informed about an alleged plan by Hall to escape from custody by taking one of his attorneys hostage. (Government Exhibit E.) This information was obtained from fellow inmate Larry Nichols, who first spoke briefly

with FBI Agent Arthur Grover about the alleged plot on February 28, 1995, and then spoke in greater detail with both FBI Agents and prosecutors on March 7, 1995. (Hall's Exhibits 1, 2.)

Hall contends that the statement made by Nichols to the government, as outlined in an FBI-302 statement dated March 7, 1995, in which Nichols is quoted to have stated that Hall had a plan to escape from prison by taking one of his attorneys hostage, was an unreliable statement by an unreliable witness.  The only evidence that Hall has submitted to this Court in an attempt to establish that Nichols' statements to authorities about the escape was unreliable are sworn declarations from other fellow inmates Charles May, Javier Solis, and Alonzo Airy.  May, Solis, and Airy all assert in their statements that they were inmates with Hall at the Mansfield Detention Center for unspecified time periods and that they never heard him speak about an escape plan and did not believe that he would have said this to anyone else. (Hall's Exhibits 32, 33, 40.)  In his affidavit, Airy also states that Nichols had urged him to claim that Hall had spoken to him about an escape plan. (Hall's Exhibit 40.) All three of these affidavits were signed in 2000.

None of this evidence presented by Hall conclusively establishes that Nichols's statement to the authorities about the alleged escape plan was false, as all of the statements state only that Hall never spoke to them about any escape plan. More importantly, however, none of this evidence shows that the government had any specific reason

83

to disbelieve Nichols when he spoke to FBI agents and prosecutors on March 7, 1995.  As noted by the government in its response, Hall's previous attorneys were informed immediately about the alleged plan because it had a direct bearing on their safety.  As their motion to withdraw was filed with this Court on March 8, 1995, it is clear that Hall's prior attorneys acted immediately on the information provided to them.  Any statement or declaration made in 2000 questioning the accuracy of Nichols's statements about Hall have no bearing on whether such an escape plan was a possibility in March of 1995.

Moreover, and most importantly, Hall has shown neither any constitutional violation in the government's reasonable action of informing defense counsel about possible dangers in their representation of Hall nor in defense counsel's request to withdraw from representing Hall.  The Fifth Circuit has consistently held that a criminal defendant has no constitutional right to be represented by a particular attorney. *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also United States v. Breeland*, 53 F.3d 100, 106, n. 11 (5th Cir. 1995).  Without any proof of a constitutional violation, this claim for relief must fail.  Hall's tenth claim for relief is denied.

**I.   Selective-Prosecution Claim**

Finally, in his eleventh claim, Hall, in essence, makes a selective-prosecution claim.  Specifically, Hall contends that the

government violated his constitutional rights under the Fifth and Eighth Amendments because it has used ethnicity as a basis for seeking the death penalty against African-Americans like himself. Hall bases his claim on statistics that purport to show that the government has sought the death penalty against African-American defendants with disproportionate frequency as compared to defendants of other races.

*Applicable Law*

In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a selective-prosecution claim. In *Armstrong*, the Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. The Court then went on to state that, in order to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, a criminal defendant must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. And, in order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.* at 464-65.

*Analysis*

At trial, Hall made a pre-trial motion to dismiss the government's notice to seek the death penalty because of racial discrimination, along with a request for discovery of information

85

regarding the government's decision-making in death-penalty cases. In response, the government argued that there were an insufficient number of federal death-penalty cases to support either Hall's allegation of racial discrimination or the request for discovery. This Court denied the motion and Hall's discovery request.

In support of his contention that the federal government has used ethnicity as a factor in seeking the death penalty, Hall now on habeas review points to statistics maintained by the Federal Death Penalty Resource Center that purportedly indicate that the Department of Justice has authorized the death penalty in 199 cases, 76% of which had non-white defendants and 52% of which involved an African-American defendant.  And, of these defendants, 47.5% of white defendants obtained a plea deal for a lesser sentence, while 27.2% of African-Americans obtained such plea deals. (Second Amended Petition at 192-93.)

This statistical evidence is insufficient to establish a *prima-facie* selective-prosecution case.  In *United States v. Jones*, 287 F.3d 325, 333-35 (5th Cir.), *cert. denied*, 537 U.S. 1018 (2002), the Fifth Circuit was presented a Department of Justice Report, titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000)," as support for a selective-prosecution claim and ruled that this evidence was not sufficient to establish a *prima-facie* case.  This report reflected that, between 1995 and 2000, the Attorney General of the United States authorized

159 death-penalty prosecutions from 682 potential death-penalty cases. With respect to the race of the defendants, of those 159 cases, there were forty-four white defendants, seventy-one black defendants, thirty-two Hispanic defendants, and twelve "other" defendants. *Jones*, 287 F.3d at 333-34.

Moreover, on direct appeal in the case of Hall's co-defendant, Bruce Webster, the Fifth Circuit denied a similar claim, holding that Webster had failed to make a sufficient showing that he was selectively prosecuted, because he had not shown that other similarly situated individuals were not prosecuted for the death penalty, and he had failed to establish a discriminatory purpose on the part of the Department of Justice. The Fifth Circuit further held that Webster's statistical evidence, consisting of statistics showing that 66% of federal death penalty cases involved African-American defendants, did not rebut the presumption of good faith on the part of the prosecution. *United States v. Webster*, 162 F.3d 308, 333-35 (5th Cir. 1999).

Hall presents to this Court similar statistics to those that the Fifth Circuit has previously held to be insufficient to support a claim of selective prosecution. This Court is not at liberty to rule otherwise, so Hall's eleventh claim for relief is denied.[11]

---

[11]

Hall, conceding that his statistics are insufficient to demonstrate purposeful discrimination, further asserts that this Court should grant him the right to conduct discovery on this issue. But in both his previous motion for discovery and here, while Hall has arguably presented some statistical evidence to support his claim that there has been a disparate effect on African-Americans,

## VI

### *Request for Evidentiary Hearing*

This Court held an evidentiary hearing on Hall's third, fourth, and fifth claims for relief on June 7, 2004. Hall also requests that this Court conduct an evidentiary hearing on the remaining claims he raises in his motion. Section 2255 does not automatically require a hearing to dispose of every motion made under its authority. *Coco v. United States*, 569 F.2d 367, 369 (5ᵗʰ Cir. 1976). But § 2255 does require a hearing unless the motion, files, and record of the case conclusively show that no relief is appropriate. *United States v. Bartholomew*, 974 F.2d 39, 41 (5ᵗʰ Cir. 1992). Conclusive, rather than direct evidence, however, is required in order to deny relief without a hearing. *United States v. Drummond*, 910 F.2d 284, 285 (5ᵗʰ Cir. 1990). Bona-fide or contested fact issues must be resolved on the basis of an evidentiary hearing. *Booth v. United States*, 507 U.S. 243 (5ᵗʰ Cir. 1975); *Reagor v. United States*, 488 F.2d 515 (5ᵗʰ Cir. 1973).

The record before this Court, including the exhibits submitted by Hall with his motion, do not create any contested fact issues with

---

he has presented no evidence that there were *similarly situated* white defendants against whom the death penalty was not sought. Furthermore, Hall has failed to present any evidence, inferred or otherwise, that there has been any discriminatory intent when prosecutors have decided to ask for permission to seek the death penalty against African-American individuals or when the Department of Justice has authorized the death penalty in cases against African-American defendants. Accordingly, following the reasoning in *Armstrong*, Hall's statistical evidence is not sufficient to establish either the elements of his claim of selective prosecution or the "some evidence" standard necessary to establish good cause for discovery. *Armstrong*, 517 U.S. at 465, 468.

regard to Hall's remaining claims that must be resolved in order to decide his case. To the contrary, many of Hall's claims are based on the record from the trial. And, with regard to the claims for which Hall has submitted additional evidence, the Court has decided these claims based on information that remains uncontested, by assuming that what Hall alleges is true, or based on legal, not factual, bases. Accordingly, because the record before this Court shows conclusively that Hall is not entitled to relief, his request for an evidentiary hearing on his remaining claims for relief is denied.

It is therefore ORDERED that Petitioner's motion to vacate his conviction and sentence under 28 U.S.C. § 2255 be, and is hereby, DENIED.

It is further ORDERED that the clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

SIGNED August **24**, 2004.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/eb:be

# Exhibit 4

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 13 2004

CLERK, U.S. DISTRICT COURT
BY _____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ORLANDO CORDIA HALL, §
    Petitioner, §
VS. § CIVIL ACTION NO. 4:00-CV-422-Y
                      § (Criminal No. 4:94-CR-121-Y)
UNITED STATES OF AMERICA, §
    Respondent. §

## ORDER DENYING MOTION TO ALTER OR AMEND JUDGMENT

Pending before this Court is Hall's motion to alter or amend the judgment of this Court filed by Hall on September 7, 2004. In this motion, Hall asks this Court to reconsider its opinion and judgment denying relief, issued on August 24, 2004. Specifically, Hall asserts that this Court was incorrect in several respects in its analysis of his claim that his constitutional rights were violated because the indictment against him did not charge him with the aggravating factors that made him eligible for the death penalty. The purpose of a motion to alter or amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure is to correct errors of law or present new evidence. *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989). In his motion, while Hall disagrees with both this Court's characterization of the claim and its analysis of the claim, this Court finds that Hall has neither pointed to a legal error nor presented new evidence. Accordingly, the Court is of the opinion that Hall's motion should be DENIED.

It is so ORDERED.

SIGNED September 13, 2004.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/eb:be

1

# Exhibit 5

455 F.3d 508
United States Court of Appeals,
Fifth Circuit.

UNITED STATES of America, Plaintiff–Appellee,
v.
Orlando Cordia HALL, Defendant–Appellant.

No. 04–70050.
|
July 5, 2006.

**Synopsis**
**Background:** Following affirmance of his convictions for kidnapping resulting in death, conspiring to kidnap, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and sentence of death, 152 F.3d 381, defendant moved to vacate his conviction and sentence. The United States District Court for the Northern District of Texas, Terry R. Means, J., 2004 WL 1908242, denied the motion and defendant applied for a certificate of appealability.

**Holdings:** The Court of Appeals, King, Circuit Judge, held that:

defense counsel's investigation into defendant's family background for mitigation evidence was not deficient;

defendant was not entitled to certificate of appealability (COA) on issue of whether defense counsel was ineffective during trial;

defendant was not entitled to COA on issue of whether there was extraneous influence on the jury;

defendant was not entitled to COA on issue of whether there was prosecutorial misconduct; and

defendant failed to show a federal prosecutorial policy of discriminatory intent.

Application for certificate of appealability denied.

**Attorneys and Law Firms**

**\*510** Delonia Anita Watson, Fort Worth, TX, for U.S.

Robert Charles Owen, Owen & Rountree, Austin, TX, Marcia Adele Widder, The Capital Appeals Project, New Orleans, LA, for Hall.

Appeal from the United States District Court for the Northern District of Texas.

Before KING, SMITH and STEWART, Circuit Judges.

**Opinion**

KING, Circuit Judge:

Defendant-appellant Orlando Hall, a federal prisoner under a sentence of death, has applied for a certificate of appealability to challenge the district court's denial of his motion to vacate his conviction and sentence under 28 U.S.C. § 2255. Hall previously sought, and was denied, a certificate of appealability from the district court. For the reasons discussed below, we DENY Hall's application for a certificate of appealability.

## I. BACKGROUND

Orlando Cordia Hall ("Hall") ran a marijuana trafficking enterprise in Pine Bluff, Arkansas, along with Bruce Webster ("Webster") and Marvin Holloway ("Holloway"). Hall, Webster, and Holloway bought marijuana in the Dallas/Fort Worth area, assisted by Steven Beckley ("Beckley"), who lived in Irving, Texas. Typically, Beckley drove the marijuana back to Arkansas, and Holloway stored the marijuana in his house.

On September 21, 1994, Holloway drove Hall from Pine Bluff to Little Rock, Arkansas, and Hall then flew from Little Rock to Dallas in order to buy marijuana. Beckley and Hall's brother, Demetrius Hall ("D. Hall") picked Hall up at the Dallas airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis ("Vitalis") and Neil Rene ("N. Rene"), at a car wash and gave them $4700 to procure marijuana. Hall and Beckley returned to the car wash to pick up the marijuana, but Vitalis and N. Rene did not return. Hall then spoke with Vitalis and N. Rene by telephone, and Vitalis and N. Rene

told Hall that they had been robbed of both their car and the $4700 entrusted to them.

Hall and Beckley then gave Vitalis's and N. Rene's phone number to a friend who worked for the telephone company, and this friend told them that the number was associated with an address at the Polo Run Apartments in Arlington, Texas. Hall, D. Hall, and Beckley began surveilling this address, and they saw Vitalis and N. Rene exit an apartment and approach the same car which they claimed had been stolen along with the $4700. Based on this surveillance, Hall and Beckley concluded that Vitalis and N. Rene had lied about the robbery and had kept the $4700 for themselves.

Hall called Holloway on September 24, 1994, and instructed him to drive Webster to the airport in Little Rock. Webster then flew from Little Rock to Dallas. **\*511** That evening, Hall, D. Hall, Beckley, and Webster drove to the Polo Run Apartments in a car owned by Hall's sister Cassandra. Hall and Webster each carried handguns, D. Hall carried a souvenir baseball bat, and Beckley carried duct tape and a jug of gasoline.

When they arrived, Webster and D. Hall knocked on the front door of the apartment that Vitalis and N. Rene had left. Lisa Rene ("Rene"), N. Rene's sixteen-year-old sister, was alone in the apartment and refused them entry. When Webster and D. Hall began issuing threats, Rene called her sister and 911. Webster attempted to kick in the front door, but when that failed he and D. Hall circled around to the patio and broke into the apartment through a glass door. Webster then entered the apartment, tackled Rene, and dragged her back to Hall's sister's car. The group then drove away from the Polo Run Apartments and returned to Hall's sister's apartment, where Beckley's car was parked. There, they forced Rene into Beckley's car and then drove off in a group. During this second drive Hall raped Rene. Later, the group returned to Hall's sister's apartment, and from there Beckley, D. Hall, and Webster drove back to Pine Bluff along with Rene. Hall remained behind and flew back to Arkansas the next day.

Once Beckley, D. Hall, and Webster reached Pine Bluff, Holloway provided them with money, which they used to move into a motel room. There, they tied Rene to a chair and raped her repeatedly. On September 25, 1994, Hall and Holloway arrived at the motel room and took Rene into the bathroom for approximately twenty minutes.

When they emerged, Hall told Beckley, "She know too much," and then he left the motel with Holloway and Webster.

After leaving the motel, Hall and Webster went to Byrd Lake Park and dug a grave. That evening, Hall, Webster, and Beckley took Rene to Byrd Lake Park, but they could not find the grave site in the dark, so they returned to the motel room. Early the next morning, on September 26, 1994, Beckley and D. Hall moved Rene to another motel because they were concerned that a security guard at the first motel was becoming suspicious.

Later on the morning of the 26th, Webster, Hall, and Beckley again drove Rene to Byrd Lake Park, after covering her eyes with a mask, and they took her to the grave site, which they were able to locate in the daylight. At the grave site, Hall placed a sheet over Rene's head and then hit her once in the head with a shovel. Rene screamed and attempted to run away, but Beckley grabbed her and hit her twice in the head with the shovel. Beckley then handed the shovel to Hall, and Hall and Beckley took turns beating her. When they had finished, Webster gagged Rene, dragged her into the grave, covered her with gasoline, and covered her with dirt. In its current brief before this court, the government reminds us that the medical report supported findings that Rene was alive but unconscious when she was buried by Webster, that she died from the effects of the multiple blunt force injuries she suffered during her beating, combined with asphyxia, and that she may have regained consciousness in the grave before her death. After Rene was buried, the three men returned to the motel and picked up D. Hall.

On September 29, 1994, an arrest warrant was issued in Arlington for Hall, D. Hall, and Beckley for Rene's kidnapping, and D. Hall, Beckley, and Webster were arrested. On September 30, 1994, Hall surrendered to Pine Bluff authorities in the presence of his attorney. Based on his **\*512** attorney's advice, Hall did not give a statement at arrest, but he indicated that he would talk once he was transported to Texas. On October 5, 1994, Hall gave a written statement to FBI and Arlington County officials in which he substantially implicated himself in Rene's kidnapping and death.

The United States District Court for the Northern District of Texas issued a criminal complaint on October 26, 1994, charging Hall, D. Hall, Webster, and Beckley with

kidnapping in violation of 18 U.S.C. § 1201(a)(1). On November 4, 1994, a six-count superseding indictment was returned, charging Hall, D. Hall, Webster, Beckley, and Holloway with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c), traveling in interstate commerce with intent to promote the possession of marijuana with intent to distribute in violation of 18 U.S.C. § 1952, using a telephone to promote the unlawful activity of extortion in violation of 18 U.S.C. § 1952, traveling in interstate commerce with intent to promote extortion in violation of 18 U.S.C. § 1952, and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c).

The government filed notice of its intent to seek the death penalty against Hall on February 23, 1995. The district court severed Hall's trial from the trial of his codefendants on April 6, 1995, and his trial began on October 2, 1995. On October 31, 1995, the jury convicted Hall of kidnapping in which a death occurred, conspiracy to commit kidnapping, traveling in interstate commerce to promote possession of marijuana with intent to distribute, and using and carrying a firearm during a crime of violence. After a separate hearing, the jury recommended, by unanimous vote, that Hall receive the death penalty. [1]

Hall appealed, and his conviction and sentence were affirmed by this court on August 21, 1998. *United States v. Hall,* 152 F.3d 381, 389–90 (5th Cir.1998) [hereinafter *Hall*]. Hall filed a petition for rehearing with this court, which was denied on October 1, 1998. Hall then petitioned the Supreme Court for a writ of certiorari, which was denied on May 17, 1999. *Hall v. United States,* 526 U.S. 1117, 119 S.Ct. 1767, 143 L.Ed.2d 797 (1999).

Hall filed his initial motion to vacate his conviction and sentence, pursuant to 28 U.S.C. § 2255, in May 2000. In June 2000, the district court granted Hall's request to file a discovery motion. Hall filed an initial discovery motion in August 2000 and a supplemental discovery motion in May 2001. The district court denied both motions in April 2002. Hall then filed a second § 2255 motion to vacate in June 2002, and he filed an amended version of this motion to vacate in September 2002. In this second amended motion, Hall raised twelve claims for relief from his conviction and sentence. [2] *See Hall v.* **\*513** *United States,* No. 4:00–CV– 422–Y, slip op. at 6, 2004 WL 1908242 (N.D.Tex. Aug. 24, 2004) [hereinafter Dist. Ct. Op.].

The government filed a response to this second amended motion to vacate in January 2003, and Hall replied in March 2003. On June 7, 2004, the district court conducted an evidentiary hearing limited to the extraneous influence on the jury issues raised by Hall's third, fourth, and fifth claims for relief, which were grouped together by the district court as issue C in the list reproduced in note 2 *supra.* On August 24, 2004, the district court issued a comprehensive, careful memorandum opinion and order, denying all of the claims presented in Hall's § 2255 motion for relief.

Hall filed a notice of appeal from the district court's order denying his § 2255 motion on November 9, 2004, and he applied to the district court for a certificate of appealability ("COA") on that same date as well. The district court denied Hall's COA application on December 6**,** 2004, citing *Hernandez v. Johnson,* 213 F.3d 243, 248 (5th Cir.2000), and finding that Hall had failed to make a substantial showing of the denial of a federal constitutional right. On July 18, 2005, Hall filed the present application for a COA with this court.

## II. DISCUSSION

This court may not consider an appeal from the denial of a 28 U.S.C. § 2255 motion for relief unless either the district court or this court issues a COA. 28 U.S.C. § 2253(c)(1)(B). To obtain a COA, an applicant such as Hall "must make a substantial showing of the denial of a constitutional right." *United States v. Garza,* 165 F.3d 312, 314 (1999) (citing 28 U.S.C. § 2253(c)(2), and *United States v. Kimler,* 150 F.3d 429, 431 n. 1 (5th Cir.1998)). An applicant such as Hall "need not establish that he will win on the merits"; rather, "he need only demonstrate that the questions he raises are debatable among reasonable jurists." *Garza,* 165 F.3d at 314 (citing *United States v. Rocha,* 109 F.3d 225, 227 n. 2 (5th Cir.1997)). "In determining whether to grant a COA, our inquiry is limited to a threshold examination that 'requires an overview [of Hall's current claims] ... and a general assessment **\*514** of their merits.' " *Smith v. Dretke,* 422 F.3d 269, 273 (5th Cir.2005) (quoting *Miller–El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)). Because this matter involves a sentence of death, "any doubts as to whether a COA should be issued must be resolved" in Hall's favor. *Smith,*

422 F.3d at 273 (quoting *Hernandez,* 213 F.3d at 248) (internal alterations omitted).

Hall raises several distinct claims in his current application for a COA. First, Hall believes that a COA should issue to determine whether the district court erred in denying five of the specific substantive claims in his § 2255 motion. Second, Hall claims a COA should issue to address whether the district court erred by limiting the June 7, 2004, evidentiary hearing solely to his extraneous influence upon the jury claims. Third, Hall claims that a COA should issue to address whether the district court erred in denying all discovery. Fourth, Hall claims that a COA should issue to determine whether the district court erred in denying him reasonable additional funds to develop further evidence. Finally, Hall claims that this court should assign a new judge if it decides that a remand is necessary. The government has provided substantive and direct responses to all of the claims discussed above. [3]

The remainder of this opinion will discuss the claims in Hall's application for a COA, and the government's substantive response to these claims, in greater detail. Because both Hall and the government devote most of their attention to Hall's five general merits claims —particularly his ineffective assistance of counsel claim —these will be addressed first, together with related procedural claims.

*A. Hall's Substantive Claims*

In his current application for a COA, Hall reiterates five of the substantive claims from his § 2255 motion: his ineffective assistance of counsel claim, his extraneous influence on the jury claim, his incomplete indictment claim, his prosecutorial misconduct claim, and his selective prosecution claim. Related to these five claims is his procedural claim that the district court erred in limiting the evidentiary hearing to the extraneous influence on the jury claim. Of the five substantive claims, the ineffective assistance of counsel claim is the most important to his current application; in his brief before this court, Hall acknowledges that the "centerpiece of this case is ... [the] penalty-phase IAC [ineffective assistance of counsel] claim." Therefore, the ineffective assistance of counsel claim will be considered first, and **\*515** the sentencing component of this claim will be considered most extensively.

*1. Hall's Ineffective Assistance of Counsel Claim*

In the proceedings before the district court, Hall claimed that his trial counsel was constitutionally ineffective on twelve separate grounds, all of which are substantially reiterated in his current application for a COA. [4] After separately and extensively considering each of Hall's arguments, the district court concluded that Hall received "constitutionally effective assistance of counsel at his trial" because his attorneys "conducted reasonable investigations in all areas of the case ... vigorously cross-examined government witnesses ... ably argued all objections and points of law; and eloquently defended their client in their closing statements." The government now argues that the "record demonstrates that the [district] court conducted an exhaustive review of each of Hall's claims, and properly denied relief. No COA should issue because no court would resolve Hall's issues in a different manner." Hall believes that each of his twelve grounds was sufficient to support his ineffective assistance of counsel claim, and in his current application for a COA, he argues that reasonable jurists could debate the district court's decision on each of these twelve grounds.

To establish ineffective assistance of counsel, Hall must satisfy a two-part test and show both that his counsel's performance was deficient and that he was actually prejudiced by the deficient performance. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (stating that an ineffective assistance of counsel claim has "two components" and requiring convicted defendants to show both that "counsel's performance was deficient" and "that the deficient performance prejudiced the defense"). We determine whether counsel's performance was deficient "by examining whether the challenged representation fell below an objective standard of reasonableness." *Cotton v. Cockrell,* 343 F.3d 746, 752 (5th Cir.2003) (citing *Kitchens v. Johnson,* 190 F.3d 698, 701 (5th Cir.1999)). Crucially, "a fair assessment" of counsel's challenged **\*516** conduct requires reviewing courts to make "every effort ... to eliminate the distorting effects of hindsight ... and to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. When it has been shown that " 'counsel made an adequate investigation,' " we have held that " 'any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional

assistance.' " *Cotton,* 343 F.3d at 752 (quoting *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir.2002)). Of course, even if Hall could establish that his counsel's performance was deficient, satisfying the first step of the *Strickland* test, he would also have to establish that the " 'prejudice caused by the deficiency is such that there is a reasonable probability that the result of the proceedings would have been different[,]' " thereby rendering the trial " 'fundamentally unfair or unreliable.' " *Cotton,* 343 F.3d at 753 (quoting *Ransom v. Johnson,* 126 F.3d 716, 721 (5th Cir.1997)). But because, as will be discussed immediately below, no reasonable jurist could debate the district court's conclusion that Hall's counsel provided reasonable, vigorous, and thorough assistance at Hall's trial and sentencing, we need not address this second step of the *Strickland* test, and so we will not consider whether the errors Hall alleges could have prejudiced his defense.

### a. Hall's Mitigation Arguments

The acknowledged "centerpiece" of Hall's current application for a COA is his argument that his trial counsel failed to present various mitigation evidence and arguments at Hall's sentencing because they failed to conduct an objectively reasonable investigation into Hall's family background. We observed, when considering Hall's direct appeal, that

> [i]n support of his claim that he experienced an upbringing that militated against the imposition of the death penalty, Hall offered only the testimony of two of his family members [5] .... Additionally, this testimony indicated that Hall was not himself the object of his father's abuse and that, throughout his childhood, Hall attended school and church and was properly housed, fed, and clothed.

*Hall,* 152 F.3d at 413. Hall now argues that his upbringing was somewhat more difficult than we recognized on direct appeal. More specifically, Hall now argues that he was beaten with belts and switches by both of his parents,

but particularly his father, as a form of discipline, and he argues that this discipline constituted abuse. He also argues that his trial counsel failed to present evidence of this alleged abuse because they failed to adequately investigate his background before sentencing, and he concludes that his trial counsel's failure to present evidence of this abuse substantially prejudiced his defense at sentencing, constituting ineffective assistance of counsel. In support of this argument, Hall submitted several highly detailed declarations from family members and assorted experts along with his second amended § 2255 motion.

Although we did not consider some of the allegations presented in these declarations during Hall's direct appeal, we did consider the significant evidence, presented by Hall's trial counsel to the jury, which **\*517** demonstrated that Hall's upbringing was marked by violence. As we stated in Hall's direct appeal, his trial counsel presented uncontroverted evidence that his mother was repeatedly beaten by his father throughout his childhood. [6] *See Hall,* 152 F.3d at 413 (noting the "uncontroverted testimony that Hall's father ... beat Hall's mother throughout their marriage"). Moreover, we observe that in reviewing Hall's argument, "our principal concern ... is not whether counsel should have presented a mitigation case" of the sort Hall envisions. *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052). "Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Hall's] background *was itself reasonable.*" *Id.*

To support his current argument that his trial counsel's investigation was objectively unreasonable and therefore deficient, Hall has presented declarations from various experts purporting to show that his trial counsel fell short of then-prevailing professional norms requiring a wide-ranging and thorough inquiry into his family, medical, and social history. Hall believes that these expert declarations demonstrate that his trial counsel failed to conduct sufficiently extensive interviews with his family members about his alleged childhood abuse. At the very least, he argues that these declarations have created a fact question on this issue because they conflict with affidavits given by his trial counsel and submitted by the government defending the sufficiency of the mitigation investigation.

Even if these expert declarations are assumed to be true, no reasonable jurist could debate the district court's

conclusion that the mitigation investigation of Hall's counsel was objectively reasonable. To begin, Hall's trial counsel spoke with Hall and presented him with a lengthy questionnaire. From the questionnaire and their initial conversations, Hall's trial counsel learned that Hall felt that he had a reasonably happy and peaceful childhood, although Hall also indicated that he had been whipped when he was bad. Hall's trial counsel also made use of a private investigator to help evaluate and investigate Hall's background. Hall's trial counsel also interviewed Hall's mother and sister Cassandra, who told him that Hall's father had extremely violent tendencies. Based on these interviews, Hall's trial counsel decided to call both women to testify. Hall's trial counsel also employed the services of a mitigation specialist named Tena Francis ("Francis"), who has since submitted multiple declarations castigating Hall's trial counsel for, inter alia, failing to employ her earlier and failing to adopt all of her tactical litigation suggestions. Notwithstanding her subsequent critical declarations, Francis interviewed additional family members and a minister familiar with Hall's childhood and background while she was employed by Hall's trial counsel, and she sent summaries of these **\*518** interviews to Hall's trial counsel before sentencing. [7]

Although Hall's experts have attacked some of the strategic and tactical litigation decisions made by Hall's trial counsel, they have not raised serious fact questions about the reasonableness of the investigation upon which those litigation decisions were made. The crux of Hall's current argument is that Hall's trial counsel conducted an insufficient investigation either because counsel was unaware that Hall had been physically abused as a child or because counsel was unaware that the violent discipline inflicted upon Hall constituted abuse. [8] The government has provided affidavits from Hall's trial counsel which contradict these points, [9] but more importantly, this core of Hall's argument is also **\*519** clearly and directly contradicted by the declarations that he has presented and upon which he now relies. In both her declaration given on June 11, 2002, and her declaration given on March 11, 2003, after she reviewed one of Hall's counsel's affidavits, Francis repeatedly stated that Hall's trial counsel "was informed, by me [Francis] ... that the Hall children had been subjected to serious domestic violence in the family throughout their childhoods," and she also repeatedly acknowledged that Hall's trial counsel subsequently and

repeatedly tried to discuss this issue with Hall's mother, but that "her [Hall's mother's] answers lacked the kind of details I [Francis] had noted in my reports." Therefore, even if the declarations presented by Hall are assumed to be true, Hall's central argument lacks support. Contrary to the conclusory allegations found in Hall's application for a COA and Miller's declaration, it is clear that: Hall's trial counsel was aware that Hall had been subjected to physical discipline as a child; Hall's trial counsel was aware of expert opinions that this discipline constituted abuse; Hall's trial counsel personally conducted further investigation and also directed Francis to conduct further investigation into this issue; and finally, Hall's trial counsel attempted, albeit unsuccessfully, to elicit testimony about this issue from the family witnesses who were reasonably chosen to testify at Hall's sentencing.

In light of Hall's counsel's considerable prior experience and thorough efforts to investigate the potential mitigation case that Hall now describes, no reasonable jurist could debate the district court's conclusion that "Hall's counsel performed a reasonably substantial and independent investigation into potential mitigating circumstances and therefore did not provide ineffective assistance of counsel." Therefore, Hall is not entitled to a COA on this issue. Moreover, because this conclusion is supported not only by the subsequent affidavits submitted by the government *but also by the very declarations upon which Hall now relies,* no reasonable jurist could debate the district court's conclusion that the declarations submitted by Hall have failed to "create any contested fact issues." Accordingly, because Hall's expert declarations have failed to create a contested fact issue about the objective reasonableness of his trial counsel's mitigation investigation, no reasonable jurist could debate the district court's decision not to provide an evidentiary hearing to address this issue. As a result, Hall is not entitled to a COA based on the district court's limitation on the evidentiary hearing.

Contrary to the arguments advanced in Hall's reply brief, our recent decision in *Smith v. Dretke,* 422 F.3d at 269, does not directly control this application for a COA. In *Smith,* we granted an application for a COA based in part on our holding that "reasonable jurists could debate whether the [mitigation] investigation that supported trial counsel's strategy at sentencing was reasonable and adequate." 422 F.3d at 284. In his reply brief, Hall argues that our opinion in *Smith* illustrates

why Hall's application also merits a COA. But whatever superficial similarities Hall's application may bear to the application we considered in *Smith,* several critical distinctions prevent the direct application of *Smith*'s holding to this matter. Unlike Hall's trial counsel, the trial counsel in *Smith* could not remember specific details about their background investigation, such as "exactly who they contacted or what was learned from the individuals they contacted," and the record in *Smith* tended to "support[ ] the conclusion that trial counsel only contacted those individuals who actually testified at trial," whereas the record **\*520** in this matter indicates that Hall's trial counsel conducted a much broader investigation. *Id.* at 277. Moreover, unlike Hall's trial counsel, the trial co-counsel in *Smith* provided substantive statements about the defendant's background which were directly "contrary to the actual testimony presented at sentencing ...." *Id.* at 281. Based on these and other shortcomings without parallel in the matter at hand, we held in *Smith* that "reasonable jurists could debate whether trial counsel conducted a reasonable investigation." *Id.* But because these concerns are not raised by Hall's application for a COA, *Smith* does not control this application for a COA.

### b. Hall's Additional Ineffective Assistance of Counsel Arguments

In addition to the mitigation arguments discussed above, Hall has provided six additional specific ineffective assistance of counsel arguments which he believes merit a COA. First, Hall argues that his trial counsel failed to adequately prepare for and cross-examine Larry Nichols, a former cellmate of Hall's. Second, Hall argues that his trial counsel failed to obtain an opportunity for allocution for Hall. Third, Hall argues that his trial counsel failed to effectively argue several motions for a continuance. Fourth, Hall argues that his trial counsel failed to effectively conduct voir dire. Fifth, Hall argues that his trial counsel failed to present an effective closing argument. Sixth, Hall argues that his trial counsel failed to present adequate evidence of Hall's good conduct during his past incarceration. The district court reviewed all of these claims individually and in detail before denying Hall's ineffective assistance of counsel claim, and no reasonable jurist could debate the district court's conclusions. These arguments each "essentially come[ ] down to a matter of degrees[,]" and we have held in the past that these sorts of questions "are even

less susceptible to judicial second-guessing" than most ineffective assistance of counsel arguments. *Kitchens,* 190 F.3d at 703; *see also Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000) (citing *Kitchens* and *Strickland,* and stating the need to be "particularly wary" of arguments that second-guess the performance of trial counsel by a matter of degrees). Because Hall has offered little more than his displeasure with the outcome of his trial and sentencing hearing to support these arguments, no reasonable jurist could debate the district court's decision to deny him relief on these grounds, and no reasonable jurist could debate the district court's refusal to consider these grounds during its evidentiary hearing. Therefore, Hall is not entitled to a COA on these substantive issues, and he is not entitled to a COA based on the district court's decision to limit the evidentiary hearing.

Hall also claims that he is entitled to a COA on his ineffective assistance of counsel claim because of the cumulative effect of the various errors he alleges. Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions. *See Miller v. Johnson,* 200 F.3d 274, 286 n. 6 (5th Cir.2000) (stating that in the absence of specific demonstrated error, a defendant cannot, by definition, show that cumulative error of counsel deprived him of a fair trial); *Yohey v. Collins,* 985 F.2d 222, 229 (5th Cir.1993) (stating that because certain alleged errors did not rise to constitutionally ineffective assistance of counsel, and because certain other claims were meritless, a petitioner had "presented nothing to cumulate"). Accordingly, no reasonable jurist could debate the district court's conclusion that the cumulative effect of the **\*521** alleged errors did not constitute ineffective assistance of counsel, and Hall is not entitled to a COA on this issue.

### 2. Hall's Extraneous Influence on the Jury Claim

Hall's extraneous influence on the jury claim is based on two incidents that allegedly occurred during the trial. First, Hall alleges that juror Jacqueline Holmes ("Holmes") had contact during Hall's trial with Hall's victim's mother. This first allegation is based on letters allegedly written by Holmes to Hall in prison after the conclusion of Hall's trial. Second, Hall alleges that at least one juror—who may or may not have been Holmes—attended an event at which prayers were offered for Hall's victim.

As discussed above, the district court conducted an evidentiary hearing to resolve this claim on June 7, 2004, and at this hearing, Holmes testified under oath. With respect to Hall's first allegation, Holmes admitted that she had written letters to Hall after the trial. She also admitted that in these letters she stated that she had met Hall's victim's mother during the course of the trial. At the evidentiary hearing, however, Holmes maintained that these post-trial letters to Hall were not true: she testified that she had never met the victim's mother, and she claimed that she had lied in her letters in order to encourage Hall's correspondence with her. With respect to Hall's second allegation, Holmes testified that she had not attended any prayer ceremony of the sort described by Hall, nor was she aware of any other juror who had done so. *Id.*

With respect to Hall's first allegation, the district court found Holmes's testimony during the evidentiary hearing "to be credible," and therefore ruled that "Hall has not established that any inappropriate ex parte contact occurred." With respect to Hall's second allegation, the district court stated that even

> [a]ssuming that this allegation is indeed true, and [a juror] attended [a prayer ceremony], it is not evidence that there was *any* outside influence on the jury. Instead Hall offers merely *speculation* that there may have possibly been some unknown person at the [prayer ceremony] who said something to the juror that influenced her vote. Mere speculation that some discussion between a juror and an unknown person occurred does not establish that extrinsic evidence entered the jury deliberations, especially where Jacqueline Holmes's sworn testimony is that she does not recall any juror discussing a [prayer ceremony], much less any prayer offered on behalf of the victim [during the jury's deliberations].

*Id.* at 66–67.

In his current application, Hall argues that he is entitled to a COA on this extraneous influence on the jury claim because reasonable jurists could debate the district court's conclusion and with the limitations the district court imposed on the evidentiary hearing it held on this issue. [10] But by holding the evidentiary hearing, the court **\*522** provided Hall with sufficient opportunity to investigate his first allegation about Holmes's conduct, and it found Holmes's direct testimony credible. No reasonable jurist could find fault with either the district court's method or conclusion, particularly in light of the limitations on a juror's testimony on any individual juror's deliberations or the jury's collective deliberations. *See, e.g., United States v. Ruggiero,* 56 F.3d 647, 652 (5th Cir.1995) (reviewing the limitations on subsequent testimony about juror deliberations set forth by this court's precedent and Federal Rule of Evidence 606(b)). With respect to Hall's second allegation, no reasonable jurist could debate the district court's conclusion that Hall has merely offered speculative and conclusory allegations that "are insufficient to raise a constitutional issue." *United States v. Pineda,* 988 F.2d 22, 23 (5th Cir.1993) (quoting *United States v. Woods,* 870 F.2d 285, 288 n. 3 (5th Cir.1989)).

### *3. Hall's Incomplete Indictment Claim*

In his second amended § 2255 motion, Hall claimed that the original indictment against him violated his Fifth Amendment rights because it did not allege the aggravating circumstances and the culpable mental state that made him eligible for the death penalty. The district court denied this claim for relief, after applying our recent precedent and the recent precedent of the Supreme Court. *See* Dist. Ct. Op. at 13–16 (citing, inter alia, *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), *United States v. Robinson,* 367 F.3d 278 (5th Cir.2004), *United States v. Matthews,* 312 F.3d 652 (5th Cir.2002), and *United States v. Brown,* 305 F.3d 304 (5th Cir.2002)). In his current application for a COA, Hall acknowledges the contrary precedent of this court and the Supreme Court cited by the district court—precedent that we must follow. Because Hall concedes in a footnote that he has included this claim in his current application in order "to preserve this issue for further review[,]" we will not consider this claim any further.

### *4. Hall's Prosecutorial Misconduct Claim*

Hall's prosecutorial misconduct claim revolves around Larry Nichols ("Nichols"), one of Hall's fellow inmates who provided testimony against Hall during the sentencing phase of Hall's trial. More specifically, Hall now claims that the government concealed Nichols's full criminal history from Hall, violated Hall's Sixth Amendment rights by deliberately using Nichols to elicit information from Hall outside the presence of Hall's counsel, and encouraged or tolerated perjury by Nichols.

In denying Hall's § 2255 motion, the district court held that these claims of prosecutorial misconduct lacked factual support. The district court found, based on a review of the trial record and an affidavit from Hall's trial counsel, that the government did not withhold any information about Nichols's prior criminal conduct from Hall's trial counsel. The district court also recognized that Hall's Sixth Amendment rights were not violated for two reasons: first, because Nichols's testimony directly contradicts Hall's claims; and second, because the very text of the report Hall selectively cites undercuts his claims. Finally, the district court found that Hall failed to show that Nichols's allegedly false statements about his prior criminal behavior or his prior contact with the government were material. *See, e.g., United States v. O'Keefe,* 128 F.3d 885, 893–94 (5th Cir.1997) (stating that a conviction obtained through the use of false testimony cannot be overturned unless the allegedly false statements were material). Because no reasonable jurist could debate **\*523** the district court's conclusions, no COA should issue on Hall's claim of prosecutorial misconduct. Additionally, because Hall has failed to raise any contested fact issues about the alleged prosecutorial misconduct, no reasonable jurist could debate the district court's decision not to provide an evidentiary hearing to address this issue, and Hall is not entitled to a COA based on the district court's limitation on the evidentiary hearing.

### 5. Hall's Selective Prosecution Claim

Hall also argues that a COA should issue because reasonable jurists could conclude the district court erred in denying Hall's selective prosecution claim. In denying Hall's § 2255 motion, the district court found that Hall's statistics fell short of establishing a prima facie selective prosecution case under the standard set forth in *United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). *Armstrong* requires a defendant such as Hall to show that federal prosecutorial policy had

both a discriminatory effect *and* a discriminatory intent; in this matter, as the district court and the government both point out, Hall has not provided any direct evidence of discriminatory intent. Furthermore, the district court noted that Hall's statistical evidence is similar to evidence rejected by this court in the past. Dist. Ct. Op. at 86–87 (citing, inter alia, *United States v. Jones,* 287 F.3d 325, 333–35 (5th Cir.2002); *United States v. Webster,* 162 F.3d 308, 333–35 (5th Cir.1998)). Because no reasonable jurist could debate the district court's conclusions, no COA should issue on this claim. Additionally, because Hall has failed to raise any contested fact issues about the alleged selective prosecution, no reasonable jurist could debate the district court's decision not to provide an evidentiary hearing to address this issue, and Hall is not entitled to a COA based on the district court's limitation on the evidentiary hearing.

### B. Hall's Procedural Claims

In addition to the substantive and procedural claims considered above, Hall has raised two other procedural claims in this application for a COA. [11] First, Hall argues that a COA is appropriate because reasonable jurists could debate the district court's blanket denial of discovery. Second, Hall argues that the district court's denial of Hall's request for funds to develop evidence merits a COA. In explaining why none of Hall's substantive claims merits a COA, we have also explained why the district court's decision to limit the evidentiary hearing does not merit a COA. Similarly, because Hall has not raised any contested fact issues that might entitle him to relief, no reasonable jurist could debate the district court's decisions to deny his motions for discovery.

We now turn to Hall's final remaining claim, that a COA should issue because the district court denied him "reasonably necessary funds" to develop supporting evidence. In responding to Hall's denial of funds claim, the government observes that Hall has wholly failed to identify any specific needs for additional post-conviction funded investigation. Moreover, as the government also observes, despite this alleged lack of sufficient funding, Hall has provided several expert declarations and evaluations related to his ineffective assistance of counsel claim. In the past, "this court has held that a COA is **\*524** not necessary to appeal the denial of funds for expert assistance," reviewing such claims directly for abuse of

discretion. *Smith,* 422 F.3d at 288 (citing *Hill v. Johnson,* 210 F.3d 481, 487 n. 3 (5th Cir.2000)).

Most of our past holdings, however, relied on the text of 21 U.S.C. § 848(q)(4)(B), which was recently repealed by the USA Patriot Improvement and Authorization Act of 2005, Pub. L. No. 109–177, Title II, §§ 221(4), 222(c), 120 Stat. 192, 231–32 (2006). *See Smith,* 422 F.3d at 287–88 (relying upon the text of 21 U.S.C. § 848(q)(4)(B)); *Hill,* 210 F.3d at 487 n. 3 (stating that "[a] COA is not required for appeals under § 848(q)(4)(B)"); *cf. Jackson v. Dretke,* No. 05–70014, 2006 WL 1308063, at *10 (5th Cir. May 11, 2006) (citing *Hill* and *Smith,* without citing any statutory provision, and stating that a "COA is not required to appeal the denial of funds for expert assistance"). Moreover, the government's brief, which predates the enactment of the USA Patriot Improvement and Authorization Act of 2005, does not request direct review and the abuse of discretion standard, but instead simply claims that Hall's claim for a COA based on insufficient funding lacks all merit. In any event, because Hall has not pointed to any specific needs or limitations caused by the alleged lack of funds, his funding claim fails whether it is considered as a claim for a COA or a claim on direct review. No reasonable jurist could debate the district court's funding decisions, and therefore the district court's decision to deny Hall's overbroad funding requests could not have been an abuse of discretion.

### III. CONCLUSION

For the reasons discussed above, Hall's application for a COA is DENIED.

### All Citations

455 F.3d 508

---

Footnotes

1  Hall was sentenced to death for the kidnapping conviction, life imprisonment for the conspiracy conviction, and sixty months imprisonment for each of the remaining two convictions.

2  The district court found that the twelve claims listed in Hall's motion raised nine issues, specifically whether:

   A. Hall's rights under the Fifth Amendment were violated because the indictment against him did not allege any aggravating factors that rendered Hall eligible for the death penalty (claim one).

   B. Hall was denied his Sixth Amendment right to the effective assistance of counsel (claim two).

   C. A juror's contact with the victim's family and other extraneous information that entered into the jury's deliberations violated Hall's rights under the Fifth, Sixth, and Eighth Amendments (claims three through five).

   D. The government violated Hall's rights under the Fifth and Sixth Amendments by failing to disclose exculpatory and mitigating information concerning government witness Larry Nichols (claim six).

   E. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated because of false testimony given by government witnesses Larry Nichols and Steven Beckley (claims seven and twelve).

   F. The government violated Hall's Sixth Amendment rights by using jail inmate Larry Nichols to elicit information from Hall (claim eight).

   G. Hall's rights under the Fifth, Sixth, and Eighth Amendments were violated when the government provided a statement to the defense made by Alonso Airy that contained false information for the purpose of dissuading the defense from calling Airy to the stand (claim nine).

   H. The government interfered with Hall's Sixth Amendment right to counsel when it advised his initial defense attorneys about information that Hall intended to kidnap the attorneys in an escape attempt (claim ten).

   I. Hall's rights under the Fifth And [sic] Eighth Amendments were violated by the racially discriminatory effects of the federal capital sentence scheme (claim eleven).

   *Hall v. United States,* No. 4:00–CV–422–Y, slip op. at 6–7, 2004 WL 1908242 (N.D.Tex. Aug. 24, 2004) [hereinafter Dist. Ct. Op.]. The district court also noted that Hall moved for "an evidentiary hearing before this Court on all of his claims." *Id.* at 7.

3  In responding to Hall's second amended § 2255 motion, the government also argued that Hall was "procedurally barred from raising all but his second and part of his third through fifth claims for relief because [the barred claims] were not raised on direct appeal and he has failed to allege any cause and prejudice for the procedural default." Dist. Ct. Op. at 7–8. The district court was not persuaded by the government's procedural objections. Although it recognized that many of the claims "were not raised on direct appeal and are not based on new law or facts," the district court chose to address

the claims "in the interests of justice" because "Hall ... alleged that his appellate counsel was ineffective for not raising these claims." Dist. Ct. Op. at 8.

In responding to Hall's current application for a COA, the government briefly observes (in a single footnote) that it "is not abandoning any of those procedural bars," and it argues that "[i]n the event this Court elects to grant COA on any issue, the government will rely on those procedural bars in its [subsequent] response." Gov't Br. at 8 n.1. Because these arguments have not been sufficiently briefed at this stage, we will not consider them at any greater length.

More specifically, Hall contended that his trial counsel was constitutionally ineffective for:

1) failing to conduct a timely investigation into potential mitigating evidence, thereby emphasizing some evidence while not presenting more persuasive mitigating evidence through additional witnesses and presenting ill-prepared witnesses;

2) failing to present documentary evidence at the punishment phase of the trial to corroborate testimony;

3) failing to call available and known witnesses to testify at punishment;

4) failing to question government witnesses in order to present additional mitigating evidence;

5) failing to appropriately cross-examine government witness Larry Nichols at the punishment phase;

6) failing to re-interview a potential defense witness after he appeared to have altered his testimony;

7) failing to make a closing argument at the guilt phase of the trial;

8) failing to argue effectively that Hall should have been allowed to make a statement in allocution;

9) making uninformed and unreasonable decisions regarding their choice and use of witnesses;

10) failing to adequately argue their motions for continuance;

11) making an ineffective closing argument at the punishment phase; and

12) failing to conduct an adequate voir dire.

Dist. Ct. Op. at 16–17. Although Hall has reordered, combined, and separated these twelve grounds in his current application for a COA, they are substantially the same as the grounds considered by the district court.

The two family members who testified at Hall's trial were Hall's mother and his sister Cassandra, whose car and apartment were used in Rene's abduction. Both offered uncontroverted testimony that Hall's father beat Hall's mother throughout their marriage, until the marriage ended in divorce when Hall was fifteen. *See Hall,* 152 F.3d at 413.

More specifically, Hall's mother testified at trial that Hall's father:

was abusive towards her [Hall's mother] during most of their marriage including when she was pregnant; that she had been beaten with the butt of a gun, by a two-by-four, and with fists; that her teeth were knocked out; that she was dragged out of bed and beaten ... after getting home from work or from a store; that this was all done in front of the children; that the children tried to intervene, but would get knocked around themselves; that the police were called several times, but arrested [Hall's father] on only one occasion; that Hall would physically protect her from [Hall's father]; and that she stayed with [Hall's father] because she had small children and had no place to go ....

Dist. Ct. Op. at 27–28 (citing R. 18:113–116).

Hall's trial counsel ultimately decided against calling these additional family members as witnesses for tactical reasons. In denying Hall's § 2255 motion, the district court examined this decision and concluded that "[i]t was reasonable ... not to call as witnesses a father who was opposed to testifying, two brothers who were imprisoned criminals themselves, and a sister who at the time remained hostile to her brother, notwithstanding what they now state they would have testified to at trial." Dist. Ct. Op. at 30.

More specifically, Hall's father was opposed to testifying in large part because of his reluctance to admit to his extensive physical abuse of Hall's mother. One of the two brothers in question had been incarcerated for firing a gun into a crowd and injuring nine people; the other brother was in prison for drug possession. Finally, the sister in question was opposed to testifying because "she was very angry ... at Hall for lying to her about his involvement [in Rene's kidnapping and death] and for involving [their brother] Demetrius Hall [in Rene's kidnapping and death]." Dist. Ct. Op. at 30. No reasonable jurist could debate the district court's conclusion that Hall's counsel acted reasonably in choosing not to call these additional witnesses.

This core of Hall's argument can be found in the declaration of Jill Miller ("Miller"), a forensic social worker, whose declaration was submitted along with Hall's second amended § 2255 motion. In her declaration, Miller stated:

First, this characterization—that the Hall children were not "abused"—was incorrect. The physical discipline imposed on the children in this family, by both parents, was unduly harsh and rose to the level of abuse .... [Furthermore,] the dynamics and effects of family violence cannot be uncovered simply by asking someone if she was "abused." ... Counsel's examination of these witnesses reflects a failure to grasp this basic principle .... At the same time, the true

extent and severity of the physical beatings [visited on Hall's mother and her children] were not communicated by the testimony actually presented at [Hall's] penalty phase.

Miller Decl. (June 12, 2002) at 17.

According to one of his trial counsel's affidavits, Hall himself indicated that he had been whipped by his parents during counsel's first interview with Hall, and his subsequent, thorough investigation into Hall's background was based on his knowledge, resulting from extensive experience, "that defendants in that situation cannot necessarily be relied upon to be one-hundred percent truthful and forthcoming." Ware Aff. (Jan. 15, 2003) at 3, 5.

Hall's counsel also stated that after he directed Francis to interview Hall's additional family members and conduct further background investigation, she "later reported ... that she was sure that there must have been severe child abuse in the home, including abuse of the defendant ...." However, despite subsequent interviews, counsel was unable to elicit any further information about this alleged abuse from Hall's mother and sister, the witnesses who were reasonably chosen to testify at Hall's sentencing. Ware Aff. (Jan. 15, 2003) at 20 ("Although I spoke with them on additional occasions neither Cassandra [Hall's sister] nor [Hall's mother] nor the defendant ever said anything that supported Tena Francis's feeling that the defendant must have been physically abused as a child .... When I traveled to Arkansas and again interviewed [Hall's mother], she did not indicate anything of much additional significance on those particular topics, although, once again I asked her about them specifically after ... explaining the significance of such information.")

In particular, Hall argues that the evidentiary hearing was insufficient because Hall lacked access to videotaped interviews with the jurors. In response, the government observes that "[s]ecuring a copy of the broadcast [interviews] ... would bring Hall no closer to showing an illegal or prejudicial intrusion into the jury process" because Hall's allegations still fail to demonstrate "that any extraneous evidence was introduced into the jury's deliberations, or that any juror violated the court's instructions to forego discussion about the case outside of the deliberation process, especially given the testimony from Holmes." Gov't Br. at 31 (citing, inter alia, *United States v. Riley,* 544 F.2d 237, 242 (5th Cir.1976); *United States v. Ianniello,* 866 F.2d 540, 543 (2d Cir.1989)).

In his application for a COA, Hall also argued that this case should be reassigned if a remand was necessary in order to foreclose any claim of waiver. Because we have denied his application for a COA without remanding any issue to the district court, this claim is mooted.

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 6

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

### No. 04-70050

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ORLANDO CORDIA HALL

Defendant - Appellant

U.S. COURT OF APPEALS

**FILED**

SEP 1 2006

CHARLES R. FULBRUGE III
CLERK

---

Appeal from the United States District Court for the
Northern District of Texas, Fort Worth

---

### ON PETITION FOR REHEARING EN BANC

(Opinion 7/5/06, 5 Cir., _____, _____ F.3d _____)

Before KING, SMITH and STEWART, Circuit Judges.

PER CURIAM:

( X ) Treating the Petition for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is DENIED. No member of the panel nor judge in regular active service of the court having requested that the court be polled on Rehearing En Banc (FED. R. APP. P. and 5ᵀᴴ CIR. R. 35), the Petition for Rehearing En Banc is DENIED.

( ) Treating the Petition for Rehearing En Banc as a Petition for Panel Rehearing, the Petition for Panel Rehearing is DENIED. The court having been polled at the request of one of the members of the court and a majority of the judges who are in regular active service and not disqualified not having voted in favor (FED. R. APP. P. and 5ᵀᴴ CIR. R. 35), the Petition for Rehearing En Banc is DENIED.

ENTERED FOR THE COURT:

_Carolyn Dineen King_
United States Circuit Judge

# Exhibit 7



U.S. COURT OF APPEALS
RECEIVED
APR 2 3 2007
NEW ORLEANS, LA.

# Supreme Court of the United States
## Office of the Clerk
### Washington, DC 20543-0001

William K. Suter
Clerk of the Court
(202) 479-3011

April 16, 2007

Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130

U.S. COURT OF APPEALS
# FILED
APR 2 4 2007
CHARLES R. FULBRUGE III
CLERK

Re: Orlando Cordia Hall
v. United States
No. 06-8178
(Your No. 04-70050)

Dear Clerk:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

*William K. Suter*

William K. Suter, Clerk

# Exhibit 8

**UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| ORLANDO CORDIA HALL, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 17CV 176 |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES DANIELS, WARDEN, UNITED | ) | |
| STATES PENITENTIARY, TERRE HAUTE, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2241**

**THIS IS A CAPITAL CASE**

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................1

II.    PROCEDURAL HISTORY .................................................................................2

    A.     Mr. Hall's Conviction, Death Sentence, And Review Prior To *Johnson* .........2

    B.     *Johnson v. United States* Changes The Law .......................................................3

    C.     The Fifth Circuit Rejects Mr. Hall's Request for Authorization to File a Successive Motion Under 28 U.S.C. § 2255 .......................................................4

III.   ARGUMENT .......................................................................................................5

    A.     In Light of *Johnson*, *Welch*, *Jenkins*, and *Cardena*, Mr. Hall's § 924(c) Conviction Is Void Because the Predicate Crime Cannot Qualify as a "Crime of Violence" ...........................................................................................5

    B.     Because Mr. Hall's § 924(c) Conviction Cannot Stand, He Must Be Resentenced On All Remaining Counts ...........................................................6

    C.     Section 2241 Is the Appropriate Mechanism For Mr. Hall To Challenge The Legality Of His Death Sentence .......................................................................9

        1.     Mr. Hall's petition is cognizable under *Webster v. Daniels* .................10

            a. As interpreted by the Fifth Circuit, § 2255 denies Mr. Hall equal access to a decision on the merits of his Johnson claim……………………………………………………………… 11

            b. Section 2255 is inadequate to keep Mr. Hall from being executed based on an invalid conviction....…………………..12

        2.     Mr. Hall's petition meets the requirements set forth in *Montana v. Cross* to bring a petition under Section 2241 ......................................12

        3.     The Suspension Clause requires the Court to consider Mr. Hall's § 2241 petition..................................................................................14

IV.    CONCLUSION ...................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berry v. United States*,
   No. 16-71332 (9th Cir. June 2, 2016).................................................................................4, 11

*Brecht v. Abrahamson*,
   507 U.S. 619 (1993) ...................................................................................................................9

*In re Chapman*,
   No. 16-246 (4th Cir. May 3, 2016) ...................................................................................4, 9, 11

*Chapman v. California*,
   386 U.S. 18 (1967) ..................................................................................................................8, 9

*Collins v. Holinka*,
   510 F.3d 666 (7th Cir. 2007) .....................................................................................................9

*Dean v. United States*,
   2017 WL 1199461 (U.S. Apr. 3, 2017)......................................................................................8

*Felker v. Turpin*,
   518 U.S. 651 (1996) .................................................................................................................11

*In re Fields*,
   826 F.3d 785 (5th Cir. 2016) .....................................................................................................5

*Garza v. Lappin*,
   253 F.3d 918 (7th Cir. 2001) .....................................................................................................9

*In re Hall*,
   No. 16-10670 (5th Cir. June 20, 2016)...............................................................................5, 9, 14

*Hall v. United States*,
   No. 4:00-cv-422-Y, 2004 WL 1908242 (N.D. Tex. Aug. 24, 2004) ........................................3

*James v. United States*,
   550 U.S. 192 (2007) ..............................................................................................................3, 13

*Jerkins v. United States*,
   530 F.2d 1203 (5th Cir. 1976) ...................................................................................................8

*Johnson v. Mississippi*,
   486 U.S. 578 (1988) ............................................................................................................2, 6, 7

*Johnson v. United States*,
    135 S. Ct. 2551 (2015) ...........................................................................................*passim*

*Lockett v. Ohio*,
    438 U.S. 586 (1978) ..............................................................................................12

*Lynch v. Dimaya*,
    137 S. Ct. 31 (2016) ...............................................................................................6

*Montana v. Cross*,
    829 F.3d 775 (7th Cir. 2016) ............................................................ 2, 10, 12, 13

*In re Pinder*,
    824 F.3d 977 (11th Cir. June 1, 2016)..............................................................4, 11

*Potts v. United States*,
    210 F.3d 770 (7th Cir. 2000) ..............................................................................11

*Ruiz v. United States*,
    No. 16-1193 (7th Cir. Feb. 19, 2016)................................................................4, 11

*Schlup v. Delo*,
    513 U.S. 298 (1995) ..............................................................................................12

*Sykes v. United States*,
    131 S. Ct. 2267 (2011) .......................................................................................3, 13

*Teague v. Lane*,
    489 U.S. 288 (1989) ..........................................................................................11, 13

*Turner v. United States*,
    No. 16-1145 (1st Cir. May 4, 2016)........................................................................4

*United States v. Cardena*,
    842 F.3d 959 (7th Cir. 2016) ............................................................... 1, 5, 6, 13

*United States v. Easterling*,
    157 F.3d 1220 (10th Cir. 1998)..............................................................................8

*United States v. Hall*,
    152 F. 3d 381 (5th Cir. 1998), *cert denied*, 526 U.S. 1117 (1999).......................3

*United States v. Hall*,
    455 F.3d 508 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).......................3

*United States v. Hill*,
    832 F.3d 135 (2d Cir. 2016) ..................................................................................6

iv

*United States v. Jenkins*,
    849 F.3d 390 (7th Cir. 2017) ................................................................. 1, 5, 13

*United States v. Miller*,
    594 F.3d 172 (3rd Cir. 2010) ................................................................................7

*United States v. Prickett*,
    839 F.3d 697 (8th Cir. 2016) ................................................................................6

*United States v. Taylor*,
    814 F.3d 340 (6th Cir. 2016) ................................................................................6

*United States v. White*,
    406 F.3d 827 (7th Cir. 2005) ................................................................................8

*Webster v. Daniel*,
    784 F.3d 1123 (7th Cir. 2015) ...................................................................*passim*

*Welch v. United States*,
    136 S. Ct. 1257 (2016) ..............................................................................*passim*

*Woodson v. North Carolina*,
    428 U.S. 280 (1976) ............................................................................................14

## Statutes

18 U.S.C. § 16(b) ....................................................................................................6

18 U.S.C. § 924(c) .........................................................................................*passim*

18 U.S.C. § 924(e) ...................................................................................................4

18 U.S.C. § 1201......................................................................................................12

28 U.S.C. § 2241.............................................................................................*passim*

28 U.S.C. § 2255.............................................................................................*passim*

## Other Authorities

Eighth Amendment ......................................................................................... 6, 7, 14

U.S. Const. art. 1, § 9 .............................................................................................14

v

## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

### I.      INTRODUCTION

Petitioner Orlando Cordia Hall is a federal prisoner sentenced to death by the United States District Court for the Northern District of Texas.  Mr. Hall is incarcerated at the United States Penitentiary in Terre Haute, Indiana.  Respondent Charles Daniels is the official responsible for Mr. Hall's custody.  Mr. Hall files this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 in this Court because only this Court can provide Mr. Hall the relief from his death sentence to which current law entitles him.  Mr. Hall's right to the writ rests on three assertions.

*First*, Mr. Hall was convicted by a jury in the Northern District of Texas on four counts: kidnapping in which a death occurred (Count 1), conspiracy to commit kidnapping (Count 2), traveling in interstate commerce to promote possession of marijuana with intent to distribute (Count 3), and using and carrying a firearm during and in relation to the crime of violence alleged in Count 1, in violation of 18 U.S.C. § 924(c) (Count 6). Mr. Hall's conviction for violating § 924(c) must rest either on that statute's "residual clause" or upon its "force clause."  The residual clause of § 924(c) is materially indistinguishable from the residual clause of the Armed Career Criminal Act ("ACCA") that the Supreme Court invalidated as unconstitutionally vague in *Johnson v. United States*, 135 S. Ct. 2551 (2015), a ruling since made retroactive in *Welch v. United States*, 136 S. Ct. 1257 (2016).  Applying *Johnson*, the Seventh Circuit has declared the residual clause in § 924(c) unconstitutionally vague, and has also ruled that a conviction for kidnapping under § 1201(a) does not constitute a crime of violence under § 924(c)'s force clause. *United States v. Cardena*, 842 F.3d 959, 996 (7th Cir. 2016); *United States v. Jenkins*, 849 F.3d 390, 394 (7th Cir. 2017).   In light of *Johnson*, *Welch*, *Cardena*, and *Jenkins*, Mr. Hall's conviction under § 924(c) is invalid.

*Second*, a death sentence cannot stand when one of the counts of conviction the jury took into consideration when imposing the death sentence is invalid. *See Johnson v. Mississippi*, 486 U.S. 578 (1988). That is precisely what happened to Mr. Hall. When the jury deliberated over whether to impose the death sentence on Mr. Hall, it believed Mr. Hall had committed a crime of violence while using or carrying a firearm in violation of § 924(c).  In fact, Mr. Hall had not; indeed, he should never have been charged with that crime. The heightened need for reliability in the imposition of the death sentence requires that a jury resentences him after being properly informed of the crimes Mr. Hall committed.

*Third*, Mr. Hall has attempted to seek relief under 28 U.S.C. § 2255 from the Northern District of Texas. That avenue has been foreclosed because the Fifth Circuit refuses to acknowledge that § 924(c)'s residual clause is unconstitutionally vague. The Seventh Circuit has made clear that relief under § 2241 is available when relief by motion under § 2255 is "inadequate or ineffective to test the legality of [a prisoner's] detention." *See* 28 U.S.C. § 2255(e); *Webster v. Daniel*, 784 F.3d 1123, 1135, 1144-45 (7th Cir. 2015); *Montana v. Cross*, 829 F.3d 775, 783 (7th Cir. 2016) (petition for certiorari filed Dec. 16, 2016; distributed for conference April 5, 2017 (No. 16-775)). Like the petitioners in other cases where the Seventh Circuit has granted relief under § 2241, Mr. Hall faces a grave situation: absent review by this Court, Mr. Hall will be executed without any court having heard his claim that a new rule of constitutional law made retroactive by the Supreme Court prohibits his punishment.

## II.     PROCEDURAL HISTORY

### A.     Mr. Hall's Conviction, Death Sentence, And Review Prior To *Johnson*

On November 22, 1994, a federal grand jury in the Northern District of Texas indicted Mr. Hall on six counts: (1) kidnapping, (2) conspiracy to commit kidnapping, (3) possession of

2

marijuana with intent to distribute, (4) extortion, (5) racketeering, and (6) using or carrying a firearm in relation to the crime of violence.  The indictment specifically charged Count 6 as using and carrying "firearms, during and in relation to a crime of violence, namely kidnapping in violation of Title 18, United States Code, Section 1201(a)(1) and conspiracy to commit kidnapping, in violation [of] Title 18, United States Code, Section 1201(c)."  On October 31, 1995, a jury in the Northern District of Texas convicted Mr. Hall of Counts 1, 2, 3, and 6.  Mr. Hall was sentenced to death on Count 1, life in prison on Count 2, and 60 months in prison on each of Counts 3 and 6.[1]

Mr. Hall timely appealed.  The Fifth Circuit affirmed, and the Supreme Court denied review. *United States v. Hall*, 152 F. 3d 381 (5th Cir. 1998), *cert denied*, 526 U.S. 1117 (1999).

Following the denial of his petition for certiorari, Mr. Hall timely moved for collateral relief under 28 U.S.C. § 2255.  The United States District Court for the Northern District of Texas denied relief and refused a certificate of appealability.  *Hall v. United States*, No. 4:00-cv-422-Y, 2004 WL 1908242 (N.D. Tex. Aug. 24, 2004).  The Fifth Circuit refused leave to appeal (denying a certificate of appealability), and the Supreme Court denied review.  *United States v. Hall*, 455 F.3d 508 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

**B.**     ***Johnson v. United States* Changes The Law**

On June 26, 2015, the Supreme Court ruled that the residual clause of the ACCA is unconstitutionally vague.  *Johnson*, 135 S. Ct. at 2563.  This overruled prior Supreme Court precedent. *See*, *e.g.*, *Sykes v. United States*, 131 S. Ct. 2267 (2011); *James v. United States*, 550 U.S. 192 (2007).

---

[1] The jury charge with respect to Count 6 named only kidnapping, and not conspiracy to commit kidnapping, as a predicate offense. (*See* Ex. B, Hall Guilt-Phase Jury Charge, Oct. 31, 1995, at 16.)

The ACCA enhances the sentence of a felon who unlawfully possesses a firearm after three prior convictions "for a violent felony or a serious drug offense."  18 U.S.C. § 924(e)(1).  The ACCA defines a "violent felony" as:

> any crime punishable by imprisonment for a term exceeding one year . . . that—
>
>> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>>
>> (ii) is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another* . . . .

§ 924(e)(2)(A)-(B).  The italicized portion is the so-called "residual clause." Finding the residual clause both too indeterminate to provide fair notice to defendants and susceptible to arbitrary enforcement by judges, the Supreme Court held that due process prohibits increasing a sentence under the ACCA on that basis.  *Johnson*, 135 S. Ct. at 2563.  The Court later made clear that its ruling in *Johnson* applies retroactively to cases on collateral review. *Welch*, 136 S. Ct. at 1265.

**C.     The Fifth Circuit Rejects Mr. Hall's Request for Authorization to File a Successive Motion Under 28 U.S.C. § 2255**

In light of *Johnson* and *Welch*, Mr. Hall moved the Fifth Circuit for authorization to file a successive motion pursuant to 28 U.S.C. § 2255(h)(2).  That provision authorizes second or successive motions when a new rule made retroactive on collateral review was previously unavailable.  The Fifth Circuit denied Mr. Hall's motion for authorization, concluding – contrary to the view of this Circuit, as well as those of the Fourth, Ninth, and Eleventh Circuits[2] – that Mr.

---

[2] Four circuits – including this one – have already granted permission to file a § 2255 successor application based on the argument that *Johnson* applies to § 924(c)(3)(B). *See Berry v. United States*, No. 16-71332 (9th Cir. June 2, 2016) (per curiam) (granting permission to file a successive motion) (Ex. C); *In re Pinder*, 824 F.3d 977, 978–79 (11th Cir. June 1, 2016) (per curiam) (same); *In re Chapman*, No. 16-246 (4th Cir. May 3, 2016) (per curiam) (same) (Ex. D); *Ruiz v. United States*, No. 16-1193 (7th Cir. Feb. 19, 2016) (per curiam) (same) (Ex. E). *But see Turner v. United*

4

Hall's claim was not cognizable under § 2255(h)(2). The Fifth Circuit reasoned that *Johnson* did

not apply to § 924(c) "or any similarly worded provision" because *Johnson* did not address those

provisions. *In re Hall*, No. 16-10670, at 2 (5th Cir. June 20, 2016) (Ex. G).

## III.   ARGUMENT

### A.   In Light of *Johnson*, *Welch*, *Jenkins*, and *Cardena*, Mr. Hall's § 924(c) Conviction Is Void Because the Predicate Crime Cannot Qualify as a "Crime of Violence"

After *Johnson* and *Welch*, Mr. Hall's conviction for using or carrying a firearm during and

in relation to a "crime of violence" is void because the predicate offense of kidnapping cannot, as

a matter of law, qualify as a "crime of violence" for purposes of § 924(c).  Section 924(c) defines

"crime of violence" in two ways:

> [T]he term "crime of violence" means an offense that is a felony and –
>
> > (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> >
> > (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).  The first clause, § 924(c)(3)(A), is known as the force clause.  The second,

§ 924(c)(3)(B), is the residual clause.

The Seventh Circuit has expressly held that kidnapping under § 1201(a)(1) "is not a crime

of violence under [§ 924(c)(3)'s] Force Clause." *Jenkins*, 849 F.3d at 394.  The Seventh Circuit

has also held that, in light of *Johnson*, the residual clause in § 924(c)(3)(B) is unconstitutionally

---

*States*, No. 16-1145 (1st Cir. May 4, 2016) (per curiam) (denying permission to file a successive motion) (Ex. F); *In re Fields*, 826 F.3d 785, 786–87 (5th Cir. 2016) (same).

vague. *Cardena*, 842 F.3d at 996.[3]  Mr. Hall's conviction for kidnapping is not a crime of violence under either the force clause or the residual clause of § 924(c), and therefore his conviction under § 924(c) should be invalidated.

**B.      Because Mr. Hall's § 924(c) Conviction Cannot Stand, He Must Be Resentenced On All Remaining Counts**

The jury returned a death sentence against Mr. Hall on Count One, the kidnapping count of the indictment.  While *Johnson* does not affect Mr. Hall's conviction on Count One, his death sentence on that count nevertheless must fall as a consequence of invalidating his conviction on Count Six, the § 924(c) violation.  Given the unparalleled need for reliability in capital sentencing, the Eighth Amendment cannot tolerate the risk that Mr. Hall's invalid § 924(c) conviction contributed to his death sentence.  Accordingly, that sentence must be vacated.  *See Johnson v. Mississippi*, 486 U.S. 578 (1988).

In *Johnson v. Mississippi*, the Court struck down a death sentence that rested in part on a conviction invalidated after the death sentence was imposed, and did so even though other valid aggravating factors supported the death penalty.  *See id.*  As the Court explained, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case."  *Id.* at 584 (citations and internal quotations omitted).  Because the petitioner's prior conviction in *Johnson v. Mississippi* was invalid, and that

---

[3] The Seventh Circuit's ruling creates a circuit split, but it is still the governing law of this Court. *See United States v. Hill*, 832 F.3d 135 (2d Cir. 2016) (finding that § 924(c)'s residual clause is not unconstitutionally vague); *United States v. Prickett*, 839 F.3d 697 (8th Cir. 2016) (same) (petition for certiorari filed December 28, 2016 (No. 16-7373)); *United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016) (same) (petition for certiorari filed, Oct. 6, 2016 (No. 16-6392)).  Additionally, the United States Supreme Court recently heard argument on whether *Johnson* affects the similarly worded provision in 18 U.S.C. § 16(b). *See Lynch v. Dimaya*, 137 S. Ct. 31 (2016).

conviction had formed a part of the basis for his death sentence, the Court concluded that the "death sentence imposed on petitioner" must be reversed.  *Id.* at 586.

In reaching its conclusion, the Court emphasized the risk "that the use of that [invalid] conviction in the sentencing hearing was prejudicial."  *Id.*  As the Court explained, "[e]ven without that express argument, there would be a possibility that the jury's belief that petitioner had been convicted of a prior felony would be 'decisive' in the 'choice between a life sentence and a death sentence.'"  *Id.* (quoting *Gardner v. Florida*, 430 U.S. 349, 359 (1977)).

The same principles apply here.  There is a constitutionally-unacceptable risk in this case that the void § 924(c) conviction influenced one or more jurors to choose the death penalty over a life sentence.  Similarly, it cannot be determined with the certitude required by the Eighth Amendment that the jury's consideration of the invalid conviction did not affect its conclusion that Mr. Hall would present a continuing threat of future violent criminal conduct, as the government alleged in support of the death sentence.  There is also a constitutionally-intolerable risk that the jury's deliberation in connection with the invalid conviction influenced its consideration of statutory aggravating factors or distorted its consideration of mitigating evidence that might otherwise have been found to warrant a sentence less than death.

The reason for vacating Mr. Hall's death sentence is particularly compelling.  Mr. Hall's § 924(c) conviction was characterized as "in relation" to his kidnapping conviction. Courts have recognized that some counts of conviction are so interdependent that invalidating a conviction on one count requires resentencing on the other count(s).  That is because "interdependent offenses result in an aggregate sentence, not sentences which may be treated discretely."  *United States v. Miller*, 594 F.3d 172, 180 (3rd Cir. 2010) (describing how judges consider "sentencing packages") (citations omitted).  Courts have also concluded that § 924(c) convictions and the related crime are

"interdependent" even if "technically separate." *United States v. Easterling*, 157 F.3d 1220, 1223 (10th Cir. 1998).  For example, in *United States v. White*, this Circuit explained that when one count in a multi-count sentence is vacated, the package is unbundled, and the district judge should adjust the entire package to achieve an appropriate sentence in light of the remaining convictions. *See* 406 F.3d 827, 832 (7th Cir. 2005) (citing *United States v. Martenson*, 178 F.3d 457, 465 (7th Cir. 1999)).  *See also Dean v. United States*, 2017 WL 1199461, at \*5 (U.S. Apr. 3, 2017) (describing the sentencing package doctrine and explaining that in cases "including ones where § 924(c) convictions are invalidated – the Government routinely argues that an appellate court should vacate the entire sentence . . . . As we understand it, the Government's theory in those cases is that the district court may have relied on the now-vacated conviction when imposing sentences for the other counts").

Here, the district court, in fact, instructed jurors at the culpability phase that they should convict Mr. Hall on the § 924(c) charge only if they were "convinced that the government ha[d] proven . . . [t]hat the defendant committed the crime of interstate kidnapping as alleged in Count 1 of the indictment." (Ex. B, Hall Guilt-Phase Jury Charge, at 16.)  That is, the charge made the connection between the kidnapping conviction and the § 924(c) conviction explicit and essential. Without resentencing, there would be an unacceptable risk that the jury's consideration of Count Six affected the sentence it imposed for Count One. A court should vacate a sentence when "it can [not] be ascertained from the record, as it now stands" that a "sentence on a valid conviction was not affected by a subsequently invalidated conviction on another count of the indictment." *Jerkins v. United States*, 530 F.2d 1203, 1204 (5th Cir. 1976).  That standard is easily met here, regardless of what harmless error standard might apply. Under either *Chapman v. California*, 386 U.S. 18 (1967) (constitutional error requires reversal unless the prosecution proves it harmless beyond a

8

reasonable doubt) or *Brecht v. Abrahamson*, 507 U.S. 619 (1993) (error requires relief when the record makes plain that the error had a substantial and injurious effect on the verdict),[4] the death sentence is sufficiently tainted that it cannot be left standing given the invalidity of Mr. Hall's § 924(c) conviction.

### C.      Section 2241 Is the Appropriate Mechanism For Mr. Hall To Challenge The Legality Of His Death Sentence

In May 2016, Mr. Hall moved the Fifth Circuit for authorization to file a successive motion to vacate his conviction and death sentence under 28 U.S.C. § 2255(h). Despite the fact that four other circuits have found that the exact question presented by Mr. Hall meets the criteria for consideration set out in § 2255(h), the Fifth Circuit refused leave to file. *In re Hall*, No. 16-10670 (5th Cir. June 20, 2016) (Ex. G). Therefore, under § 2255(e), the remedy by motion under § 2255 has proved inadequate or ineffective to test the legality of Mr. Hall's detention.

Where the § 2255(h) remedy is "inadequate or ineffective to test the legality of [a prisoner's] detention," the district court in the jurisdiction in which that federal prisoner is held may hear an application for a writ of habeas corpus under § 2241. *See* 28 U.S.C. § 2255(e) (the savings clause); *Webster*, 784 F.3d at 1135, 1144-45; *Collins v. Holinka*, 510 F.3d 666, 667 (7th Cir. 2007); *Garza v. Lappin*, 253 F.3d 918, 921 (7th Cir. 2001). Pursuant to 28 U.S.C. § 2241, a writ of habeas corpus may be granted by a district court when a federal prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(a), (c)(3). The Seventh Circuit has previously agreed that this Court may properly hear a § 2241 petition

---

[4] The implication of holding *Johnson* fully retroactive is that the relevant portions of 18 U.S.C. § 924(c) have always been void for vagueness. Thus, this constitutional flaw, though not yet recognized, in fact existed at the time of Mr. Hall's direct appeal. Because Mr. Hall had no opportunity to raise the claim at that time – when it would have been reviewed under the standard of *Chapman v. California*, 386 U.S. 18 (1967) (constitutional error requires reversal unless the prosecution proves it harmless beyond a reasonable doubt) – the error should be reviewed under *Chapman* here.

9

brought by a death-sentenced prisoner whose request for leave to file a successive petition under § 2255(h) was denied by the Fifth Circuit. *See Webster*, 784 F.3d at 1145. Furthermore, Mr. Hall's petition meets the requirements for a § 2241 petition as set forth in *Montana v. Cross*, 829 F.3d 775 (7th Cir. 2016).

As applied to Mr. Hall, § 2255(h) has proven inadequate and ineffective to test the legality of his § 924(c) conviction and death sentence. Absent merits review by this Court, Mr. Hall's access to the writ of habeas corpus will be suspended, in violation of his rights under the federal constitution. Therefore, this petition under § 2241 is properly before this Court.

### 1. Mr. Hall's petition is cognizable under *Webster v. Daniels*

In Mr. Hall's case, § 2255 is "inadequate or ineffective" to test the legality of his conviction for violating § 924(c) under *Johnson* and *Welch*. When § 2255 deprives a prisoner of a "reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence," § 2241 becomes available. *Webster*, 784 F.3d at 1136. That is, when there are "structural problems" with proceeding under § 2255, a petitioner may avail himself of review under § 2241. *Id.* Here, there is no question that § 2255 deprived Mr. Hall of a "reasonable opportunity" to secure a "reliable judicial determination" of his claim in light of *Johnson*. *First*, § 2255 has prevented Mr. Hall from obtaining a merits ruling on his claim while providing such an opportunity to other, similarly-situated federal convicts. *Second*, similar to the situation that the Seventh Circuit faced in *Webster*, in Mr. Hall's case § 2255 foreclosed post-conviction review of his constitutional challenge to his § 924(c) conviction notwithstanding the heightened reliability required in the capital context.

10

### a. As interpreted by the Fifth Circuit, § 2255 denies Mr. Hall equal access to a decision on the merits of his *Johnson* claim

Mr. Hall was denied the opportunity to obtain merits review of his claim under *Johnson* while other, similarly-situated federal prisoners – who happened to be convicted in other jurisdictions – received just such an opportunity. Arbitrary and inequitable access to merits consideration renders the remedy by motion under § 2255 "inadequate or ineffective" such that review under § 2241 becomes available. *See Felker v. Turpin*, 518 U.S. 651, 667 (1996) (Souter, J., concurring) ("[t]he question [of the validity of § 2244(b)'s gatekeeping provisions] could arise if the courts of appeals adopted divergent interpretations of the gatekeeper standard."). "The essential point" of post-conviction proceedings is that a prisoner is "entitled to one unencumbered opportunity to receive a decision on the merits." *Potts v. United States*, 210 F.3d 770, 770 (7th Cir. 2000). Some persons convicted under § 924(c) have received that opportunity following *Johnson* and *Welch*. Mr. Hall has not and *cannot* obtain merits consideration of his *Johnson* claim through § 2255.

Indeed, had Mr. Hall been sentenced in a district court within this circuit, or the Fourth, Ninth or Eleventh Circuits, his successive motion under § 2255(h) would have been heard on the merits. *See Ruiz v. United States*, No 16-1193 (7th Cir. Feb. 19, 2016) (per curiam) (Ex. E); *Berry v. United States*, No. 16-71332 (9th Cir. June 2, 2016) (per curiam) (Ex. C); *In re Pinder*, 824 F.3d 977 (11th Cir. June 1, 2016) (per curiam); *In re Chapman*, No. 16-246 (4th Cir. May 3, 2016) (per curiam) (Ex. D). This arbitrary and inconsistent distribution of merits consideration is a fundamental structural problem: "the harm caused by the failure to treat similarly situated defendants alike cannot be exaggerated: such inequitable treatment hardly comports with the ideal of administration of justice with an even hand." *Teague v. Lane*, 489 U.S. 288, 315 (1989) (internal quotation marks omitted). Because § 2255 has failed to afford Mr. Hall of a reasonable opportunity

11

to obtain a reliable judicial determination on the merits of his *Johnson* claim while allowing merits review to similarly situated federal prisoners, § 2255 is an inadequate and ineffective remedy under the circumstances of this case.

### b.    Section 2255 is inadequate to keep Mr. Hall from being executed based on an invalid conviction

Capital sentences and convictions demand heightened reliability. *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978).   For this reason, even assuming *arguendo* that the structural problems identified above do not render § 2255 inadequate or ineffective in other contexts, they undoubtedly do so in this capital case.  In considering the availability of review under § 2241, courts must "take into account the fact that a core purpose of habeas corpus is to prevent a custodian from inflicting an unconstitutional sentence." *Webster*, 784 F.3d at 1139.

Mr. Hall is actually innocent of his conviction under § 924(c). The predicate offense for which Mr. Hall was convicted, kidnapping under 18 U.S.C. § 1201, fails to qualify as a crime of violence under either § 924(c)'s force clause or the residual clause. *See* Section III.A, *supra*.  Mr. Hall's conviction under § 924(c) is therefore void, and he must be resentenced on all counts. *See* Section III.B.  Under these circumstances, it would be "constitutionally intolerable" to execute Mr. Hall on the basis of a judgment that may rest in part on a void conviction.  *Schlup v. Delo*, 513 U.S. 298, 314 (1995).

### 2.    Mr. Hall's petition meets the requirements set forth in *Montana v. Cross* to bring a petition under Section 2241

In *Montana v. Cross*, the Seventh Circuit set out a three-part test for determining whether § 2255 is inadequate or ineffective such that a petitioner may avail himself of § 2241. *Montana v. Cross*, 829 F.3d at 783. Specifically, § 2241 is available where (1) the issue presented "is one of statutory interpretation"; (2) the claim relies on retroactive legal rules and was previously unavailable; and (3) the error is "'grave enough . . . to be deemed a miscarriage of justice. . . .'"

12

*Id*. at 783 (quoting *Brown v. Rios*, 696 F.3d 638, 640 (7th Cir. 2012)).  Mr. Hall's petition easily satisfies this standard.

*First*, Mr. Hall's claim that his conviction for violating § 924(c) does not survive *Johnson* involves questions of statutory interpretation – ones recently resolved by the Seventh Circuit in his favor.  The Seventh Circuit has found that kidnapping under § 1201(a) does not constitute a crime of violence under either the force clause or the residual clause of § 924(c).  *Jenkins*, 849 F.3d at 394; *Cardena*, 842 F.3d at 996.

*Second*, the legal rule set forth in *Johnson* and applicable to Mr. Hall's petition is substantive and, thus, must be retroactively applied.  *See Welch*, 136 S. Ct. at 1265 ("the rule announced in *Johnson* is substantive" and therefore "has retroactive effect under *Teague* in cases on collateral review."); *Montana*, 829 F.3d at 784 ("the requirements for criminal liability under § 924(c), is a substantive rule.").

Similarly, this rule is new; accordingly, it was unavailable to Mr. Hall prior to the *Johnson* decision.  *See Welch*, 136 S. Ct. at 1264 ("It is undisputed that *Johnson* announced a new rule."). Indeed, prior to *Johnson*, the validity of the § 924(c) residual clause was not in doubt because it and meaningfully identical provisions had been repeatedly upheld by the Supreme Court.  *See, e.g.*, *Sykes*, 564 U.S. 1, 15-16 (the ACCA residual clause and similar statutory provisions are "within congressional power to enact"); *James*, 550 U.S. at 210 n.6 ("[W]e are not persuaded by Justice Scalia's suggestion . . . that the residual provision is unconstitutionally vague.").

*Lastly*, in light of *Johnson*, Mr. Hall's case presents a miscarriage of justice.  Mr. Hall faces execution in part because the jury considered him guilty of violating § 924(c), when he is actually innocent of that offense. In large part, § 2241 exists as a safety valve designed "to prevent a custodian from inflicting an unconstitutional sentence."  *Webster*, 784 F.3d at 1139.

13

There is no greater miscarriage of justice than a wrongful execution, particularly one that rests in substantial part on an invalid conviction. *See id.* Moreover, the heightened reliability required by the Eighth Amendment in the capital context demands that Mr. Hall have the opportunity to challenge the applicability of *Johnson* to his conviction and death sentence. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (because "[d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two," the Eighth Amendment imposes "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case").

### 3. The Suspension Clause requires the Court to consider Mr. Hall's § 2241 petition

Section 2255 imposes a gate-keeping restriction on second or successive motions. Before filing such a motion, the petitioner must obtain permission to do so from the appropriate circuit court of appeals. *See* 28 U.S.C. § 2255(h). Because the the Fifth Circuit does not recognize *Johnson*'s application to § 924(c) "or any similarly worded provision," *In re Hall*, No. 16-10670 (5th Cir. June 20, 2016) (Ex. G), § 2255's gate-keeping restriction has closed the courthouse doors to Mr. Hall, unfairly preventing him from "obtain[ing] a reliable judicial determination of the fundamental legality of his conviction." *Webster*, 784 F.3d at 1136. Because § 2255 is inadequate and ineffective to test the legality of Mr. Hall's conviction for violating § 924(c), § 2241 must be available to give substance to Mr. Hall's constitutional right to petition for a writ of habeas corpus. *See* U.S. Const. art. 1, § 9; *see also Webster*, 784 F.3d at 1139 n.7 (interpreting § 2255(e)'s savings clause so as to avoid constitutional Suspension Clause problems). Absent such consideration, Mr. Hall's access to the writ of habeas corpus will be suspended in contravention of the constitution.

14

## IV.    CONCLUSION

The Fifth Circuit has held that 28 U.S.C. § 2255(h) precludes it from considering whether Mr. Hall's conviction for violating 18 U.S.C. § 924(c) is invalid under *Johnson*.  Our courts cannot sanction the execution of a prisoner whose conviction contradicts a rule of law determined by the Supreme Court and whose sentence rests in substantial part on that invalid conviction.  Section 2241 exists in part precisely to prevent such intolerable results.  Mr. Hall respectfully urges this Court to exercise appropriate jurisdiction and prevent this result from taking place.

*        *        *        *        *

For the foregoing reasons, Mr. Hall requests a writ of habeas corpus from this Court that vacates his conviction under 18 U.S.C. § 924(c) and orders that he be resentenced on all remaining counts.  Alternatively, Mr. Hall requests that this Court set a briefing schedule on this petition.

Dated:   April 18, 2017                                      SIDLEY AUSTIN LLP

                                                             By: _s/ Liv Kiser_____

                                                                 Liv Kiser
                                                                 Robert Hochman (*pro hac vice* to be filed)
                                                                 Jillian Dent (*pro hac vice* to be filed)
                                                                 One South Dearborn Street
                                                                 Chicago, Illinois 60603
                                                                 Tel.: (312) 853-7000
                                                                 Fax: (312) 853-7036
                                                                 lkiser@sidley.com
                                                                 rhochman@sidley.com
                                                                 jdent@sidley.com

15

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 18, 2017, copies of this Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 were served via first class mail and the Court's electronic filing system to:

United States Attorney's Office
10 W Market St, Suite 2100
Indianapolis, IN 46204

_____s/ Liv Kiser_____

16

# Exhibit 1

**FedEx** Express   *Package* **US Airbill**

FedEx Tracking Number   **8115 6962 8369**

Form ID No. **0215**

MUR 1

Sender's Copy

**1 From** *Please print and press hard.*

Date **4/18/2017**

Sender's FedEx Account Number: **3268-4846-8**

Sender's Name **CAROLYN WHEELER**   Phone ( **312** ) **853-7233**

Company **SIDLEY AUSTIN, LLP**

Address **1 S DEARBORN ST STE 900**   Dept/Floor/Suite/Room

City **CHICAGO**   State **IL**   ZIP **60603-2323**

**2 Your Internal Billing Reference** **34021- 90320**
First 24 characters will appear on invoice.

**3 To**

Recipient's Name **U.S. District Court**   Phone ( )

Company **Clerks Office Southern District Indiana**

Address **921 Ohio Street, Room 104**
We cannot deliver to P.O. boxes or P.O. ZIP codes.   Dept/Floor/Suite/Room

Address
Use this line for the HOLD location address or for continuation of your shipping address.

City **Terre Haute**   State **IN**   ZIP **47807**

0126577073

**Ship it. Track it. Pay for it. All online.**
Go to fedex.com.

**4 Express Package Service**   *To most locations.*
Packages up to 150 lbs.
For packages over 150 lbs., use the FedEx Express Freight US Airbill.

**Next Business Day**

☑ **FedEx First Overnight**
Earliest next business morning delivery to select locations. Friday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ **FedEx Priority Overnight**
Next business morning.* Friday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ **FedEx Standard Overnight**
Next business afternoon.*
Saturday Delivery NOT available.

**2 or 3 Business Days**

☐ **FedEx 2Day A.M.**
Second business morning.*
Saturday Delivery NOT available.

☐ **FedEx 2Day**
Second business afternoon.* Thursday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ **FedEx Express Saver**
Third business day.*
Saturday Delivery NOT available.

**5 Packaging**   *Declared value limit $500*

☑ FedEx Envelope*   ☑ FedEx Pak*   ☐ FedEx Box   ☐ FedEx Tube   ☐ Other

**6 Special Handling and Delivery Signature Options** Fees may apply. See the FedEx Service Guide.

☐ **Saturday Delivery**
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☑ **No Signature Required**
Package may be left without obtaining a signature for delivery.

☐ **Direct Signature**
Someone at recipient's address may sign for delivery.

☐ **Indirect Signature**
If no one is available at recipient's address, someone at a neighboring address may sign for delivery. For residential deliveries only.

**Does this shipment contain dangerous goods?**
One box must be checked.

☑ No   ☐ Yes As per attached Shipper's Declaration.   ☐ Yes Shipper's Declaration not required.   ☐ Dry Ice Dry Ice, 9, UN 1845 ___ x ___ kg

☐ Cargo Aircraft Only

Restrictions apply for dangerous goods — see the current FedEx Service Guide.

**7 Payment** *Bill to:*

Enter FedEx Acct. No. or Credit Card No. below.

☑ **Sender** Acct. No. in Section 1 will be billed.   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

FedEx Acct. No.
Credit Card No.   Exp. Date

Total Packages   Total Weight   Total Declared Value†

___   ___ lbs.   $ ___ .00

611

†Our liability is limited to US$100 unless you declare a higher value. See back for details. By using this airbill you agree to the service conditions on the back of this airbill and in the current FedEx Service Guide, including terms that limit our liability.

Rev. Date 5/15 • Part #163134 • ©1994–2015 FedEx • PRINTED IN U.S.A. SRM

# Exhibit A

**Exhibit Index**

**Exhibit A**: Exhibit Index

**Exhibit B**: Hall's Guilt-Phase Charge of the Court, Oct. 31, 1995

**Exhibit C**: *Berry v. United States*, No. 16-71332 (9th Cir. June 2, 2016)

**Exhibit D**: *In re Chapman*, No. 16-246 (4th Cir. May 3, 2016)

**Exhibit E**: *Ruiz v. United States*, No. 16-1193 (7th Cir. Feb. 19, 2016)

**Exhibit F**: *Turner v. United States*, No. 16-1145 (1st Cir. May 4, 2016)

**Exhibit G**: *In re Hall*, No. 16-10670 (5th Cir. June 20, 2016)

# Exhibit B

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

FILED

OCT 31 1995

NANCY DOHERTY, CLERK

By _____
                Deputy

UNITED STATES OF AMERICA     §
                             §
VS.                          §   CRIMINAL NO. 4:94-CR-121-Y
                             §
ORLANDO CORDIA HALL (2)      §

## CHARGE OF THE COURT

Members of the Jury:

In any jury trial there are, in effect, two judges.  I am one of the judges; the other is the jury.  It is my duty to preside over the trial and to decide what evidence is proper for your consideration.  It is also my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdict.

First, I will give you some general instructions which apply in every case, for example, instructions about burden of proof and how to judge the believability of witnesses.  Then I will give you some specific rules of law about this particular case, and finally I will explain to you the procedures you should follow in your deliberations.

### Duty to Follow Instructions

You, as jurors, are the judges of the facts.  But in determining what actually happened--that is, in reaching your decision as to the facts--it is your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to

CHARGE OF THE COURT - Page 1
chr - m:\user\raper\94cr121\hallorl\jury.chg

any one instruction, or to question the wisdom or correctness of any rule I may state to you.  You must not substitute or follow your own notion or opinion as to what the law is or ought to be.  It is your duty to apply the law as I explain it to you, regardless of the consequences.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy.  That was the promise you made and the oath you took before being accepted by the parties as jurors, and they have the right to expect nothing less.

### Instructions Regarding the Burden of Proof

The indictment or formal charge against a defendant is not evidence of guilt.  Indeed, the defendant is presumed by the law to be innocent.  The law does not require a defendant to prove his innocence or produce any evidence at all and no inference whatever may be drawn from the election of a defendant not to testify.  The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant.

While the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proven beyond all possible doubt.  It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt.

A "reasonable doubt" is a doubt based upon reason and common sense after careful and impartial consideration of all the evi-

dence in the case.  Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.  If you are convinced that the accused has been proven guilty beyond a reasonable doubt, say so.  If you are not convinced, say so.

### Instructions Concerning Consideration of the Evidence

As I told you earlier, it is your duty to determine the facts.  In doing so, you must consider only the evidence presented during the trial, including the sworn testimony of the witnesses and the exhibits.  Remember that any statements, objections, or arguments made by the lawyers are not evidence.  The function of the lawyers is to point out those things that are most significant or most helpful to their respective sides of the case, and in so doing to call your attention to certain facts or inferences that might otherwise escape your notice.  In the final analysis, however, it is your own recollection and interpretation of the evidence that control in the case.  What the lawyers say is not binding upon you.

Also, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case.  Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

While you should consider only the evidence, you are permitted to draw such reasonable inferences from the testimony

and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.

You should not be concerned about whether the evidence is direct or circumstantial.  "Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eye witness.  "Circumstantial evidence" is proof of a chain of facts and circumstances indicating that something is or is not a fact. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

I remind you that it is your job to decide whether the government has proven the guilt of the defendant beyond a reasonable doubt.  In doing so, you must consider all of the evidence. This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or "believability" of each witness and the weight to be given the witness's testimony.  An important part of your job will be making judgments about the testimony of the witnesses.  You should decide whether you believe what each person had to say, and how important that testimony was.  In making that decision I suggest that you ask yourself a few questions:  Did the person impress you as honest?  Did the witness have any particular reason not to tell the truth?  Did the witness have a personal interest in the outcome of the case?  Did the witness have any relationship with

CHARGE OF THE COURT - Page 4
chr - m:\user\raper\94cr121\hallorl\jury.chg

either the government or the defense? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? These are a few of the considerations that will help you determine the accuracy of what each witness said.

In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses on one side than on the other. Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point. Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say.

The testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the testimony the witness gave at this trial.

Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true. You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness.

If you believe that a witness has been discredited in this manner, it is your exclusive right to give the testimony of that

CHARGE OF THE COURT - Page 5
chr - m:\user\raper\94cr121\hallorl\jury.chg

witness whatever weight you think it deserves.

The testimony of someone who is shown to have used addictive drugs during the period of time about which the witness testified must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.  You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

You have been told that certain witnesses have been convicted of felony offenses or crimes involving dishonesty or false statements.  Such convictions are a factor you may consider in deciding whether to believe that witness, but it does not necessarily destroy the witness's credibility.  It has been brought to your attention only because you may wish to consider it when you decide whether you believe the witness's testimony.

In this case the government called as several of its witnesses alleged accomplices, some named as a co-defendants in the indictment, with whom the government has entered into a plea agreement providing for immunity, the dismissal of some charges and/or a lesser sentence than the co-defendants would otherwise be exposed to for the offense to which the co-defendants pleaded guilty.  Such plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of this court.

An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from

CHARGE OF THE COURT - Page 6
chr - m:\user\raper\94cr121\hallorl\jury.chg

testifying.  On the contrary, the testimony of such a witness may alone be of sufficient weight to sustain a verdict of guilty. You should keep in mind that such testimony is always to be received with caution and weighed with great care.  You should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt.  The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence, in and of itself, of the guilt of any other person.

In determining whether any statement, claimed to have been made by a defendant outside of court and after an alleged crime has been committed, was knowingly and voluntarily made, you should consider the evidence concerning such a statement with caution and great care, and should give such weight to the statement as you feel it deserves under all the circumstances.

You may consider in that regard such factors as the age, sex, training, education, occupation, and physical and mental condition of the defendant, his treatment while under interrogation, and all the other circumstances in evidence surrounding the making of the statement.

In any criminal case the government must prove not only the essential elements of the offense or offenses charged, as hereafter defined, but must also prove, of course, the identity of the defendant as the perpetrator of the alleged offense or offenses.

In evaluating the identification testimony of a witness you

CHARGE OF THE COURT - Page 7
chr - m:\user\raper\94cr121\hallorl\jury.chg

should consider all of the factors already mentioned concerning your assessment of the credibility of any witness in general, and should also consider, in particular, whether the witness had an adequate opportunity to observe the person in question at the time or times about which the witness testified. You may consider, in that regard, such matters as the length of time the witness had to observe the person in question, the prevailing conditions at that time in terms of visibility or distance and the like, and whether the witness had known or observed the person at earlier times.

You may also consider the circumstances surrounding the identification itself including, for example, the manner in which the defendant was presented to the witness for identification, and the length of time that elapsed between the incident in question and the next opportunity the witness had to observe the defendant.

If, after examining all of the testimony and evidence in the case, you have a reasonable doubt as to the identity of the defendant as the perpetrator of the offense charged, you must find the defendant not guilty.

During the trial you heard the testimony of witnesses who were described to us as experts.

If scientific, technical, or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

CHARGE OF THE COURT - Page 8
chr - m:\user\raper\94cr121\hallorl\jury.chg

and state an opinion concerning such matters.

Merely because an expert witness has expressed an opinion does not mean, however, that you must accept this opinion. The same as with any other witness, it is up to you to decide whether you believe this testimony and choose to rely upon it. Part of that decision will depend on your judgment about whether the witness's background or training and experience is sufficient for the witness to give the expert opinion that you heard. You must also decide whether the witness's opinions were based on sound reasons, judgment, and information.

Government's Exhibit 1B has been identified as a typewritten transcript of the oral conversations which can be heard on the tape recording received in evidence as Government's Exhibit 1A. The transcript also purports to identify the speakers engaged in such conversation.

I have admitted the transcript for the limited and secondary purpose of aiding you in following the content of the conversation as you listen to the tape recording, and also to aid you in identifying the speakers.

However, you are specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony you have heard concerning the preparation of the transcript, and from your own examination of the transcript in relation to your hearing of the tape recording itself as the primary evidence of

its own contents; and, if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

### Count One - Interstate Kidnapping Resulting in Death Charge

Count One of the Indictment charges the defendant, **ORLANDO CORDIA HALL**, and others, with violating 18 U.S.C. § 1201(a), which makes unlawful a kidnapping resulting in death.

Title 18, United States Code, Section 1201(a)(1), makes it a felony crime for anyone to kidnap another person and then transport that person in interstate commerce and the death of any person results from that kidnapping.

For you to find the defendant guilty of this crime, you must be convinced that the government has proven each of the following beyond a reasonable doubt:

First:     That the defendant, knowingly acting contrary to law, kidnapped, seized, confined, or inveigled the person described in the indictment, Lisa Rene, as charged;

Second:    That the defendant held such person for ransom, reward, or some other benefit that the defendant intended to derive from the kidnapping;

Third:     That the defendant intentionally transported such person in interstate commerce while so kidnapped, confined, or inveigled; and

Fourth:    That the death of Lisa Rene resulted.

To "kidnap" a person means to forcibly and unlawfully hold, keep, detain, and confine the person against that person's will. Involuntariness or coercion in connection with the victim's detention is an essential part of the offense.

CHARGE OF THE COURT - Page 10
chr - m:\user\raper\94cr121\hallorl\jury.chg

To "inveigle" a person means to lure, or entice, or lead the person astray by false representations or promises, or other deceitful means.

The term "ransom, reward, or some other benefit" includes motives of personal monetary gain as well as motives which do not involve financial gain, since a benefit is any legal or illegal object of the kidnapping which a perpetrator might consider of sufficient motive to induce him to undertake the kidnapping.  The government has the burden of proving whatever benefit alleged by proof beyond a reasonable doubt.

The term "interstate commerce" means commerce or travel between one state, territory or possession of the United States and another state, territory or possession of the United States, including the District of Columbia.  "Commerce" includes travel, trade, transportation and communication.

The government need not prove, however, that a kidnapper knows he is crossing state lines.  So long as the kidnapper crosses state lines while intentionally transporting the victim, the kidnapper has traveled in interstate commerce.  Moreover, a kidnapper need not personally transport a victim in interstate commerce to be guilty of the offense of kidnapping as long as the defendant kidnapped, seized, confined or inveigled the person described in the indictment prior to the willful transport of the person in interstate commerce.

### Count 2 - The Conspiracy Charge

Count Two of the Indictment alleges that the defendant,

CHARGE OF THE COURT - Page 11
chr - m:\user\raper\94cr121\hallorl\jury.chg

**ORLANDO CORDIA HALL**, and others, engaged in a conspiracy to commit the offense of kidnapping, in violation of Title 18, United States Code, Section 1201(c).

Title 18, United States Code, Section 1201(c), makes it a crime for anyone to conspire to commit the offense of kidnapping in violation of Title 18, United States Code, Section 1201(a).

A "conspiracy" is an agreement between two or more persons to join together to accomplish some unlawful purpose. It is a kind of "partnership in crime" in which each member becomes the agent of every other member.

For you to find a defendant guilty of this crime, you must be convinced that the government has proven each of the following beyond a reasonable doubt:

First:   That two or more persons made an agreement to commit at least one of the crimes as charged in the indictment;

Second:  That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

Third:   That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy.

One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators. If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that

CHARGE OF THE COURT - Page 12
chr - m:\user\raper\94cr121\hallorl\jury.chg

is sufficient to convict him for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.

The government need not prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme. Similarly, the government need not prove that all of the details of the scheme alleged in the indictment were actually agreed upon or carried out. Nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of a conspiracy, does not thereby become a conspirator.

### Count Three - Interstate Travel in Aid of a Racketeering Charge

Count Three of the Indictment charges the defendant, **ORLANDO CORDIA HALL**, with travelling in interstate commerce with intent to carry on an unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

Title 18, United States Code, Section 1952(a)(3), makes it a crime for anyone to travel between states for the purpose of carrying on certain unlawful activities.

For you to find the defendant guilty of this crime, you must be convinced that the government has proven each of the following beyond a reasonable doubt:

First:    That the defendant traveled in interstate commerce on or about the time, and between the places, charged in the indictment;

Second:   That the defendant engaged in such travel with the intent to promote, manage, establish, or carry on an "unlawful activity," as hereafter defined; and

Third:    That the defendant thereafter knowingly committed an act to promote, manage, establish, or carry on such "unlawful activity."

While the government must prove that the defendant traveled in interstate commerce with the specific intent to promote, manage, establish or carry on an "unlawful activity," it need not prove that such purpose was the only reason or motive prompting the travel.

The term "unlawful activity" includes a business enterprise involving the violations of the federal drug trafficking laws, namely, possession of a controlled substance with intent to distribute.  You are instructed that there are three elements to the offense of possession of a controlled substance with intent to distribute:

First:    That the person knowingly possesses a controlled substance;

Second:   That the substance was, in fact, the controlled substance as alleged; and

Third:     That the person who possessed the substance did so with the intent to distribute it.

To "possess with intent to distribute" simply means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

A Schedule I Controlled Substance is defined to include the substance Marihuana.

The government need not prove that the defendant actually possessed marihuana, but only that he traveled in interstate commerce with the specific intent to promote, manage, establish or carry on a business enterprise involving violations of the federal drug trafficking laws, namely, possession of marihuana with intent to distribute.

To constitute a "business enterprise" it is not necessary that the alleged illegal activity be engaged in for any particular length of time, nor must it be proven that such activity constituted the primary pursuit or occupation of the accused or that it actually returned a profit.  What must be proven beyond a reasonable doubt is that the defendant engaged in a continuous course of conduct or series of transactions for profit rather than casual, sporadic or isolated activity.

The indictment charges that the defendant traveled in interstate commerce with the intent to promote, manage, establish and carry on an unlawful activity.  If you find beyond a reasonable doubt that any one method or mode of violating the law

CHARGE OF THE COURT - Page 15
chr - m:\user\raper\94cr121\hallorl\jury.chg

occurred, that is sufficient so long as you agree unanimously upon the particular mode or method involved.

### Count Six - Using or Carrying a Firearm During and in Relation to a Crime of Violence Charge

Count Six of the Indictment charges the defendant, **ORLANDO CORDIA HALL**, and others, with violating 18 U.S.C. § 924(c)(1).

Title 18, United States Code, Section 924(c)(1) makes it a crime for anyone to use or carry a firearm during and in relation to the commission of a crime of violence.

For you to find the defendant guilty of Title 18, United States Code, Section 924(c)(1), you must be convinced that the government has proven each of the following beyond a reasonable doubt:

First:     That the defendant committed the crime of interstate kidnapping as alleged in Count One of the Indictment; and

Second:    That the defendant knowingly used or carried a firearm during and in relation to the defendant's commission of the crime of interstate kidnapping.

The government is not required to prove that the defendant actually fired the weapon or brandished it at someone in order to prove "use," as that term is used in this instruction. However, you must be convinced beyond a reasonable doubt that the firearm played a role in or facilitated the commission of a crime of violence. In other words, you must find that the firearm was an integral part of the crime of violence charged.

The term "firearm" means any weapon which will or is designed to or may readily be converted to expel a projectile by

CHARGE OF THE COURT - Page 16
chr - m:\user\raper\94cr121\hall011\jury.chg

the action of an explosive. The term "firearm" also includes the frame or receiver of any such weapon, or any firearm muffler or firearm silencer, or destructive device.

The term "crime of violence" means an offense that is a felony and - (A) has as an element the use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

### Guilt as an Aider or Abettor

The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished by that person through direction of another person as his or her agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.

So, if another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct.

Notice, however, that before any defendant may be held criminally responsible for the acts of others it is necessary

that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

## Guilt as a Co-Conspirator

A conspirator is responsible for offenses committed by another conspirator if the conspirator was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, or as a foreseeable consequence of, the conspiracy.

Therefore, if you have first found a defendant guilty of the conspiracy charged in Count Two of the Indictment and if you find beyond a reasonable doubt that during the time that defendant was a member of that conspiracy, another conspirator committed the offenses in Counts 1, 3, 4, and 6 in furtherance of or as a foreseeable consequence of that conspiracy, then you may find the defendant guilty of Counts 1, 3, 4, and 6, even though the defendant may not have participated in any of the acts which constitute the offense described in Counts 1, 3, 4, and 6.

## Instructions Regarding Deliberations

You are here to decide whether the government has proven beyond a reasonable doubt that the defendant is guilty of the

crime charged.  The defendant is not on trial for any act, conduct, or offense not alleged in the indictment.

A separate crime is charged in each count of the indictment. Each count and the evidence pertaining to it should be considered separately.  The fact that you may find the defendant guilty or not guilty as to one of the crimes charged should not control your verdict as to any other.

You should not be concerned with punishment in any way.  It should not enter your consideration or discussion.

The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

You will note that the indictment charges that the offense was committed on or about a specified date.  The government does not have to prove that the crime was committed on that exact date, so long as the government proves beyond a reasonable doubt that the defendant committed the crime on a date reasonably near the dates as stated in the indictment.

To reach a verdict, all of you must agree.  Your verdict must be unanimous on each count of the indictment.  Your deliberations will be secret.  You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so.  You must individually decide the case for yourselves, but only after an impartial consideration of the evidence with your fellow jurors.

CHARGE OF THE COURT - Page 19
chr - m:\user\raper\94cr121\hallorl\jury.chg

During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times, you are judges--judges of the facts. Your sole interest is to seek the truth from the evidence in the case, to decide whether the government has proven the defendant guilty beyond a reasonable doubt.

When you go to the jury room, the first thing that you should do is select one of your number as your presiding juror, who will help to guide your deliberations and will speak for you here in the courtroom.

A form of verdict has been prepared for your convenience.

The presiding juror will write the unanimous answer of the jury in the space provided for in each count of the indictment, either guilty or not guilty. At the conclusion of your deliberations, the presiding juror should date and sign the verdict.

If you need to communicate with me during your deliberations, the presiding juror should write the message on the forms provided in the jury room, sign and date the form, and give it to the marshal. I will either reply in writing or bring you back into the court to answer your message.

Bear in mind that you are never to reveal to any person, not even to the court, how the jury stands, numerically or otherwise,

CHARGE OF THE COURT - Page 20
chr - m:\user\raper\94cr121\hallorl\jury.chg

on any count of the indictment, until after you have reached a unanimous verdict.

SIGNED October 31, 1995.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

# Exhibit C

FILED

JUN 02 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT SHERMAN BERRY, a.k.a. Jim Preston, <br><br> Petitioner, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent. | No. 16-71332 <br><br> D.C. No. 2:96-cr-00259-WFN Eastern District of Washington, Spokane <br><br> ORDER |

Before: REINHARDT, W. FLETCHER, and OWENS, Circuit Judges.

Petitioner's application for authorization to file a second or successive 28 U.S.C. § 2255 motion makes a prima facie showing under *Johnson v. United States*, 135 S. Ct. 2551 (2015). The application is granted. *See Welch v. United States*, 136 S. Ct. 1257, 1264-68 (2016) (*Johnson* announced a new substantive rule that has retroactive effect in cases on collateral review).

The Clerk shall transfer the section 2255 motion filed on May 6, 2016, to the United States District Court for the Eastern District of Washington. The motion shall be deemed filed in the district court on May 3, 2016, the date on which it was delivered to prison authorities for forwarding to this court. *See* Fed. R. App. P. 4(c)(1); *Houston v. Lack*, 487 U.S. 266, 270 (1988). The district court may wish to

stay proceedings pending this court's decision in 14-10080, *United States v. Begay.*

The Clerk shall serve this order directly on the chambers of the Honorable Wm. Fremming Nielsen.

The Clerk shall send an electronic courtesy copy of this order to Andrea K. George, Federal Defenders of Eastern Washington and Idaho, 10 North Post, Suite 700, Spokane, WA 99201, for informational purposes.

Upon transfer of the motion, the Clerk shall close this original action in this court.

No further filings will be entertained in this case.

16-71332

# Exhibit D

FILED: May 3, 2016

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 16-246**
**(1:03-cr-00296-LMB-6)**

───────────────

In re:  SEIFULLAH CHAPMAN,

        Movant.

───────────────

O R D E R

───────────────

Seiffulah Chapman has filed a motion pursuant to 28 U.S.C. §§ 2244, 2255(h) (2012) for authorization to file a second or successive 28 U.S.C. § 2255 (2012) motion.  Chapman has made a prima facie showing that a new rule of constitutional law announced in Johnson v. United States, 135 S. Ct. 2551 (2015), and held to apply retroactively to cases on collateral review by Welch v. United States, __ S. Ct. __, No. 15-6418, 2016 WL 1551144 (U.S. Apr. 18, 2016), may apply to his case.  We grant authorization for Chapman to file a second or successive § 2255 motion, thus permitting consideration of the motion by the district court in the first instance.  The one-year limitations period of 28 U.S.C. § 2255(f)(3) (2012) for filing a § 2255 motion raising a claim

relying on the Supreme Court's decision in <u>Johnson</u> expires on June

26, 2016.

Entered at the direction of the panel: Judge Wilkinson, Judge

Shedd, and Senior Judge Davis.


For the Court

/s/ Patricia S. Connor, Clerk

2

# Exhibit E

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted February 2, 2016
Decided February 19, 2016

**Before**

DIANE P. WOOD, *Chief Judge*

RICHARD A. POSNER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

No. 16-1193

| | |
|---|---|
| JESUS RUIZ,<br>    *Applicant*,<br><br>    *v.*<br><br>UNITED STATES OF AMERICA,<br>    *Respondent*. | On Motion for an Order Authorizing the District Court to Entertain a Second or Successive Motion for Collateral Review. |

**O R D E R**

Jesus Ruiz has filed an application pursuant to 28 U.S.C. § 2244(b)(3), seeking authorization to file a successive motion to vacate under § 2255. Ruiz was convicted of three counts of using a firearm in connection with a crime of violence, 18 U.S.C. § 924(c). Ruiz wants to challenge those convictions under *Johnson v. United States*, 135 S. Ct. 2551 (2015), which held that the residual clause of the Armed Career Criminal Act is unconstitutionally vague. Because *Johnson* announced a new substantive rule of constitutional law, it has retroactive application. *Price v. United States*, 795 F.3d 731 (7th Cir. 2015).

The government concedes Ruiz's ability to make a prima facie showing that his convictions were based on the definition of a crime of violence in 18 U.S.C. § 924(c)(3)(B), which is similar to the residual clause of the Armed Career Criminal Act. The

government argues, though, that § 924(c)(3)(B) differs enough from the ACCA's residual clause that it was not invalidated by *Johnson*. But that subsection is identical to 18 U.S.C. § 16(b), which we held is unconstitutionally vague under *Johnson*. *United States v. Vivas-Ceja*, 808 F.3d 719 (7th Cir. 2015).

Accordingly, we **GRANT** Ruiz's application and **AUTHORIZE** the district court to consider his claim.

# Exhibit F

# United States Court of Appeals
## For the First Circuit

No. 16-1145

DAVID ALLEN TURNER,

Petitioner,

v.

UNITED STATES,

Respondent.

Before

Howard, Chief Judge,
Selya and Lynch, Circuit Judges.

**JUDGMENT**

Entered: May 4, 2016

Petitioner David Turner seeks certification to file in the district court a second or successive 28 U.S.C. § 2255 motion to vacate his sentence based on Johnson v. United States, 135 S. Ct. 2551 (2015), and Welch v. United States, 136 S. Ct. 1257 (2016). See 28 U.S.C. § 2255(h).

We deny the application for substantially the reasons stated in the government's oppositions to Turner's application.

Denied.[1]

By the Court:

/s/ Margaret Carter, Clerk

---

[1] This court's denial of authorization to file a second or successive motion is not appealable and may not be the subject of a petition for rehearing or a writ of certiorari. See 28 U.S.C. § 2244(b)(3)(E).

cc:    Robert Michael Goldstein
        David Turner
        Dina Michael Chaitowitz
        Michael A. Rotker
        Robert Edward Richardson

# Exhibit G

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 16-10670

———————

In re:  ORLANDO CORDIA HALL,

      Movant.

———————

Motion for an Order Authorizing
the United States District Court
for the Northern District of Texas
to Consider a Successive 28 U.S.C. § 2255 Motion

———————

Before STEWART, Chief Judge, JOLLY and SMITH, Circuit Judges.

PER CURIAM:

Orlando Hall, a federal death-row prisoner, moves for authorization to file a successive 28 U.S.C § 2255 motion.  He may do so if he makes a *prima facie* showing that, as he asserts, his claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  28 U.S.C. § 2255(h); *Reyes-Requena v. United States*, 243 F.3d 893, 897–98 (5th Cir. 2001).

Hall was convicted of one count of kidnapping in which a death occurred, conspiracy to commit kidnapping, traveling in interstate commerce to promote

No. 16-10670

possession of marihuana with intent to distribute, and using and carrying a firearm during and in relation to a crime of violence, namely kidnapping and conspiracy to commit kidnapping, in violation of 18 U.S.C. § 924(c). The relevant subpart of § 924(c)—the "residual clause"—states,

> (3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and
> . . . .
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3)(B). In *Johnson v. United States*, 135 S. Ct. 2551, 2555–57, 2563 (2015), the Court held that the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(ii), is unconstitutionally vague. Hall seeks application of *Johnson* to the differently worded "crime of violence" definition quoted above.

*Johnson* announced a new rule of constitutional law that has been made retroactive by the Supreme Court to cases on collateral review. *Welch v. United States*, 136 S. Ct. 1257, 1264–65 (2016). But *Johnson* did not address § 924(c)(3)(B) or any similarly worded provision. Noting that undeniable fact, this court has now denied a motion for authorization to file a successive § 2255 motion, holding, in a binding, published opinion involving a similarly situated federal death-row prisoner, that "the Supreme Court has not taken a position on whether *Johnson* applies to section 924(c)(3)(B)," thus denying a motion for authorization to file a successive § 2255 motion. *In re Fields*, No. 16-50521, ___ F. 3d ___, 2016 U.S. App. LEXIS 11029, at *3 (5th Cir. June 17, 2016) (per curiam). "Further, even if *Johnson* does apply to that provision, the Supreme Court has not addressed whether this arguably new rule of criminal procedure applies retroactively to cases on collateral review." *Id. See also In re Arnick*, No. 16-10328, ___ F.3d ___, 2016 U.S. App. LEXIS 11030, at *2–3 (5th Cir.

2

No. 16-10670

June 17, 2016) (per curiam) (denying a motion for leave to file a successive § 2255 motion, under *Johnson*, regarding a provision of the U.S. Sentencing Guidelines).

Based on this court's new precedent in *Fields*, Hall's motion for authorization is DENIED.

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Orlando Cordia Hall

## DEFENDANTS
Charles Daniels, Warden, United States Penitentiary, Terre Haute

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Liv Kiser, Sidley Austin LLP
One South Dearborn, Chicago, IL 60603
(312) 853-7000

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ❏ 1 U.S. Government Plaintiff | ❏ 3 Federal Question *(U.S. Government Not a Party)* |
| ☒ 2 U.S. Government Defendant | ❏ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane / ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability / ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability / Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine / ❏ 368 Asbestos Personal | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability / Injury Product Liability | | ❏ 840 Trademark | ❏ 460 Deportation |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle / **PERSONAL PROPERTY** ❏ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability / ❏ 371 Truth in Lending | ❏ 710 Fair Labor Standards Act | ❏ 861 HIA (1395ff) | ❏ 480 Consumer Credit |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury / ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Management Relations | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice / ❏ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 196 Franchise | | ❏ 751 Family and Medical Leave Act | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights / **Habeas Corpus:** | ❏ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 441 Voting / ❏ 463 Alien Detainee | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment / ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations / ❏ 530 General | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment / ☒ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other / **Other:** ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education / ❏ 550 Civil Rights | ❏ 465 Other Immigration Actions | | |
| | ❏ 555 Prison Condition | | | |
| | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ❏ 2 Removed from State Court ❏ 3 Remanded from Appellate Court ❏ 4 Reinstated or Reopened ❏ 5 Transferred from Another District *(specify)* ❏ 6 Multidistrict Litigation - Transfer ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 2441
Brief description of cause:
Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. 2241 (Capital Case)

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ❏ Yes ❏ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
04/18/2017

SIGNATURE OF ATTORNEY OF RECORD
s/ Liv Kiser

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____